# Exhibit AO

 

October 14, 2025

**Via E-Mail & Certified Mail**

U.S. Immigration and Customs Enforcement
Office of the Principal Legal Advisor
U.S. Department of Homeland Security
500 12th Street, S.W., Mail Stop 5900
Washington, D.C. 20536-5900
GILDFOIAAppeals@ice.dhs.gov

Senior Director of FOIA Operations
Privacy Office, Mail Stop 0655
U.S. Department of Homeland Security
245 Murray Lane SW
Washington, DC 20598-0655

Re:    Appeal of Expedited Processing Denial in FOIA Request 2025-ICFO-51693

Dear Appeals Officer:

The American Immigration Council (the "Council") and LatinoJustice PRLDEF (collectively, "Requesters") submitted 2025-ICFO-51693 to U.S. Immigration and Customs Enforcement ("ICE") on July 29, 2025, for certain guidance for dismissing noncitizens' immigration cases in immigration court. Ex. A. Requesters also sought expedited processing of this request, *id.* at 2-10, which ICE denied on July 30, 2025, Ex. B. This letter is Requesters' appeal of that denial.[1] Requesters seek expedited processing of this appeal for the reasons set forth in the attached expedited request.

## I.    BACKGROUND

Since the end of May 2025, ICE has arrested noncitizens in immigration court after their hearings and moved to dismiss their immigration court cases to pursue their expedited removal. This unprecedented enforcement tactic has prompted immediate and intense public outrage and debate, as many consider it a violation of due process and a scheme to forum shop and get noncitizens to abandon their immigration cases. Protesters have taken to the streets outside immigration courts in New York, Seattle, San Francisco, and elsewhere. Clergy, political leaders,

---

[1] Requesters also appealed this denial on August 26, 2025. ICE received that appeal on August 27, 2025, and designated it as 2025-ICAP-00416. Requesters filed the wrong document in that appeal and hereby withdraw that appeal.

and other members of the public have been accompanying noncitizens to their immigration court dates to document dismissals and arrests, attempt to stop the latter, and help arrestees inform their families. *Id.* at 2-8 & ns. 2-5. And several advocacy groups have sued ICE and the Executive Office of Immigration Review ("EOIR") to stop dismissals and arrests.[2]

On July 29, 2025, Requesters filed 2025-ICFO-51693 with ICE to obtain records to inform and shape the ongoing public debate about the legality and propriety of ICE moving to dismiss noncitizens' immigration court cases. They seek all guidance, instructions, policies, templates, and other similar records provided to an Office of the Principal Legal Advisor ("OPLA") Chief Counsel, OPLA Deputy Chief Counsel, or OPLA Assistant Chief Counsel since January 20, 2025, for dismissing an immigration court case. *Id.* at 1.

2025-ICFO-51693 included a request for expedited processing under 6 C.F.R. § 5.5(e)(1)(ii), (iv). *Id.* at 2-10. ICE denied this request for two reasons: (A) Requesters "failed to demonstrate a particular urgency to inform the public about the government activity involved in the request beyond the public's right to know about government activity generally"; and (B) Requesters' "letter was conclusory in nature and did not present any facts to justify a grant of expedited processing under the applicable standards." Ex. B. The denial did not elucidate these standards or explain their application to facts and analysis Requesters provided in their expedite request. Nor could Requesters locate these standards in ICE's FOIA Library.

## II.  APPEAL

FOIA obligates ICE to process requests expeditiously in two cases: (i) those where a requester "demonstrates a compelling need"—such as "urgency to inform the public concerning actual or alleged Federal Government activity" if the requester is "primarily engaged in disseminating information," 5 U.S.C. § 552(a)(6)(E)(i), (v)—and (ii) "in other cases determined by the agency," *id.* § 552(a)(6)(E)(i), which, for the Department of Homeland Security ("DHS"), include "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence," 6 C.F.R. § 5.5(e)(1)(ii), (iv). Both cases exist here, as detailed in the expedite request at issue. *See* Ex. A at 2-10. ICE's two contentions to the contrary are erroneous.

### A.  REQUESTERS DEMONSTRATED A PARTICULAR URGENCY TO INFORM THE PUBLIC ABOUT IMMIGRATION COURT DISMISSALS

The expedite request establishes a particular urgency to inform the public about immigration court dismissals, particularly the policies and guidance underlying them and the extent to which

---

[2] *See, e.g.*, Devan Cole et al., *Trump Administration Sued Over ICE Arrests at Immigration Courthouses*, CNN (July 16, 2025, 6:23 PM), https://www.cnn.com/2025/07/16/politics/ice-immigration-courthouse-arrests-lawsuit; Luis Ferré-Sadurní, *Immigrants File Class-Action Lawsuit to Stop IC Courthouse Arrests,* NY Times (July 16, 2025), https://www.nytimes.com/2025/07/16/nyregion/trump-ice-arrests-lawsuit-immigrants.html hereinafter, "Ferré-Sadurní re: Lawsuit").

ICE attorneys retain discretion to consider the individual circumstances of a particular case. Requisite urgency exists where "the request touches on 'a matter of current exigency to the American public'" and delay "compromises a significant recognized interest." *Protect Dem. Proj. v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293, 299 (D.D.C. 2017) (quoting *Al-Fayed v.* CIA, 254 F.3d 300, 310 (D.C. Cir. 2001)). The expedite request satisfies both these criteria and, contrary to ICE's contention otherwise, makes no allusions to a nonspecific right to know about government activity in general.

The expedite request shows that immigration court dismissals are exigent to the American public. Courts index exigency to "the volume of news articles and media reports." *Dem. Forward Found. v. Off. of Mgmt & Budget*, 780 F. Supp. 3d 61, 73 (D.D.C. Apr. 9, 2025) (gathering cases). Fifty articles is sufficient, *e.g.*, *Citizens for Resp. & Ethics in Wash. v. U.S. DOGE Serv.*, 769 F. Supp. 3d 8, 27 (D.D.C. 2025) ("*CREW*"), especially if they are "in multiple publications" from "disparate places," *Am. Civ. Liberties Union of No. Cal. v. U.S. Dep't of Def.*, No. C 06-01698, 2006 WL 1469418, at *6 (N.D. Cal. May 25, 2006) ("ACLU"); *see also* 6 C.F.R. § 5.5(e)(3) ("The existence of numerous articles published on a given subject can be helpful to establishing the requirement that there be an 'urgency to inform' the public on the topic."). The expedite request cites eighty-seven articles about immigration court dismissals from dozens of different national, state, and local media outlets. *See* Ex. A. at 2-10 & ns. 2-5. Therefore, it shows that these dismissals are exigent to the American public.

The expedite request also demonstrates that delayed production of responsive records would compromise a significant recognized interest: the debate about the legality and propriety of immigration court dismissals. *Id.* at 10 (citing *CREW*, 769 F. Supp. 3d at 27; *Protect Dem. Proj.*, 263 F. Supp. 3d at 299; and *ACLU*, 2006 WL 1469418, at *6-7). In *CREW* and *Protect Democracy Project* the U.S. District Court for the District of Columbia found urgency to expedite the processing of FOIA requests for records about the U.S. DOGE Service and an airstrike in Syria respectively because if production were delayed, the public and requesters would "be precluded from obtaining in a timely fashion information vital to the current and ongoing debate surrounding the legality of a high-profile government action." *CREW*, 769 F. Supp. 3d at 27 (cleaned up); *Protect Dem. Proj.*, 263 F. Supp. 3d at 299 (same). Similarly, in *ACLU*, the U.S. District Court for the Northern District of California found urgency to expedite the processing of a FOIA request about military domestic surveillance program because "[g]etting the requested information quickly might be valuable to would-be protesters and opposition groups" and "might help them decide how to express their political viewpoints." 2006 WL 1469418, at *7. Immigration court dismissals are a high-profile government action like DOGE, a airstrike in a foreign country, and domestic surveillance whose legality is subject to ongoing debate. ICE's boilerplate denial fails to distinguish, or otherwise grabble with, this point and the cited case law underlying it.

B.  REQUESTERS PRESENTED SUFFICENT FACTS IN A NON-CONCLUSORY MANNER
    TO JUSTIFY GRANTING EXPEDITED PROCESSING

The expedite request also proffers sufficient facts and evidence to merit expedite processing. As
a preliminary matter, ICE cannot deny expedition for the request not complying with "applicable
standards," Ex. B., as these standards are not available for public inspection in an electronic
format. *See* 5 U.S.C. § 552(a)(2) (barring use of statements of policy and interpretations adopted
by the agency that are not indexed and made available for such inspection). Though, the
expedite request also satisfies the criteria for expedited processing under any lawful standard.

In eight and a half pages, the expedite request details the widespread and exceptional media
interest in immigration court dismissals in which there exist possible questions about the
government's integrity affecting public confidence as well as the Council's compelling need for
responsive records. Ex. A at 2-10. It references eighty-seven articles about these dismissals
published between May 21, 2025, and July 29, 2025, and points out that many of these articles
cast doubt on the dismissals' integrity and describe them as a violation of due process and a
tactic to deport noncitizens without hearings. *Id.* at 2-7 & ns. 2-3. The expedite request also
emphasizes the public outrage that dismissals have sparked, noting the mass protests at
immigration courts around the country and that clergy, political leaders, and other members of
the public are accompanying noncitizens to their immigration court dates to document
dismissals and attempt to prevent their arrest. *Id.* at 7-8, 10. Finally, the expedite request
describes how the Council is primarily engaged in information dissemination, how delay in
producing responsive records would compromise the ongoing public debate about the propriety
of immigration court dismissals, and the questions that responsive records would address. *Id.* at
9-10 & ns.6-9.

Therefore, the expedite request offers sufficient non-conclusory facts and analysis to justify
expedited processing.

III.  EXPEDITED PROCESSING OF THE APPEAL

Requesters seek expedited processing of their appeal for the reasons set forth in a separate
expedite request in Exhibit C.

*** 

Thank you for your attention to this appeal. If you have any questions regarding this appeal,
please do not hesitate to contact us.

Very truly yours,

/s/ Chris Opila                                 /s/Rex Chen

Christopher ("Chris") Opila              Rex Chen
Staff Attorney (Transparency)         Supervising Counsel for Immigrant Rights

4

American Immigration Council                LatinoJustice PRLDEF,
PMB2026                                     475 Riverside Drive Suite 1901
2001 L Street N.W., Suite 500               New York, NY 10115
Washington, DC 20036                        212-219-3360 | rchen@latinojustice.org
202-507-7699 | copila@immcouncil.org

Exhibits
    A.   ICE FOIA Request No. 2025-ICFO-51693
    B.   Expedited Processing Denial
    C.   Expedited Processing Request

 Exhibit A 

July 29, 2025

**Via Secure Release & Certified Mail**

ICE Privacy Office
Immigration & Customs Enforcement
500 12th St., SW Stop 5004
Washington, DC 20536-5004

Senior Director of FOIA Operations
Privacy Office, Mail Stop 0655
U.S. Department of Homeland Security
245 Murray Lane SW
Washington, DC 20598-0655

Re:    Freedom of Information Act Request on Terminations of Immigration Proceedings and
ICE Arrests at Immigration Courts

Dear FOIA Officer:

The American Immigration Council (the "Council") and LatinoJustice PRLDEF (collectively,
"Requesters") submit this request to U.S. Immigration and Customs Enforcement ("ICE") under
the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

Since around the middle of May 2025, ICE has been moving to dismiss immigration proceedings
against noncitizens in immigration courts around the country to pursue their expedited removal.
Requesters seek certain records about these dismissals as well as expedited processing and a fee
waiver.

## I.    REQUEST FOR INFORMATION

Requesters seek all guidance, instructions, policies, templates, and other similar records
provided to an Office of the Principal Legal Advisor ("OPLA") Chief Counsel, OPLA Deputy Chief
Counsel, or OPLA Assistant Chief Counsel since January 20, 2025, for dismissing an immigration
court case.[1]

---

[1] *See, e.g.*, Madeleine May & Hannah Marr, *Afghan Ally Detained by ICE After Attending Immigration Court Hearing*, CBS
News (July 1, 2025, 1:48 PM), https://www.cbsnews.com/news/afghan-ally-detained-by-ice-immigration-court/
(reporting that OPLA attorneys are moving to dismiss immigration cases based on their underlying notices being
"improvidently issued"); Daniel Gonzalez & Richard Ruelas, *After Short Break, ICE Resumes Arrests at Phoenix*

## II.  FORMAT OF PRODUCTION

Requesters seek responsive electronic records in a machine-readable, native file format, with all metadata and load files. Requesters ask ICE to produce responsive materials in their entirety, including all attachments, appendices, enclosures, and/or exhibits, in a text-searchable, static-image format (PDF), in the best image quality in the agency's possession, and that the records be provided in separate, Bates-stamped files.

## III.  EXPEDITED PROCESSING

Requesters seek expedited processing of this request and certify that the statements herein are "true and correct" pursuant to 6 C.F.R. § 5.5(e)(3). FOIA obligates ICE to process requests expeditiously in two cases: (i) those where a requester "demonstrates a compelling need"—such as "urgency to inform the public concerning actual or alleged Federal Government activity" if the requester is "primarily engaged in disseminating information," 5 U.S.C. § 552(a)(6)(E)(i), (v)—and (ii) "in other cases determined by the agency," *id.* § 552(a)(6)(E)(i), which, for the Department of Homeland Security, include "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence," 6 C.F.R. § 5.5(e)(1)(ii), (iv). Both cases exist here.

### A.  A MATTER OF WIDESPREAD AND EXCEPTIONAL INTEREST RAISING GOVERNMENT INTEGRITY CONCERNS

ICE's dismissal of noncitizens' immigration court cases to facilitate their expedited removal is a matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence.

Fifty articles on an issue make it a matter of widespread and exceptional public interest. *Citizens for Resp. & Ethics in Wash. v. U.S. DOGE Serv.*, Case No. 25-cv-511 (CRC), 2025 WL 752367, at *13 (D.D.C. Mar. 10, 2025) (hereinafter "CREW") *see also Brennan Ctr. for Just. v. Dep't of Com.* 498 F. Supp. 3d 87, 97 (D.D.C. 2020). A "handful of articles" also establishes such interest where the articles are "in a variety of publications" and "repeatedly reference the ongoing national discussion." *Am. Civ. Liberties Union v. Dep't of Just.*, 321 F. Supp. 2d 24, 32 (D.D.C. 2004).

Here, state, local, and nationwide media outlets have published at least at least eighty seven articles since May 21, 2025, about ICE asking immigration judges to dismiss noncitizens'

---

*Immigration Court, Changes Keep Tactic,* AZ Central (May 29, 2025, 5:01 AM), https://www.azcentral.com/story/news/politics/immigration/2025/05/29/phoenix-immigration-court-ice-arrests-resume/83767918007/ (reporting that OPLA attorneys are moving to dismiss immigration cases because they are "no longer in the best interest of the government").

immigration cases and then arresting noncitizens once their cases are dismissed.[2] Immigration attorneys also report ICE officials serving pre-signed dismissals based on "non-opposition" to

[2] Emiliano Tahu Gómez, *'Unconstitutional Death Row': At San Antonio Immigration Court, Rep. Casar Decries Arrests, Gets Few Answers*, Austin American-Statesman (July 28, 2025, 6:19 PM), https://www.statesman.com/story/news/politics/government/2025/07/28/unconstitutional-death-row-san-antonio-immigration-court-rep-casar-decries-arrests-gets-few-answers/85415560007/ (hereinafter, "Gómez re: San Antonio"); Sanford Nowlin, *U.S. Rep. Greg Casar Calls ICE Arrests at San Antonio Immigration Court 'Disturbing, Dystopian'*, San Antonio Current (July 28, 2025, 5:03 PM), https://www.sacurrent.com/news/us-rep-greg-casar-calls-ice-arrests-at-san-antonio-immigration-court-disturbing-dystopian-38097422; Margaret Kadifa, *ICE Arrests All Adults Without Children at S.F. Immigration Court*, Mission Local (July 25, 2025, 1:05 PM), https://missionlocal.org/2025/07/hed-ice-steps-up-arrests-at-s-f-immigration-court/ (hereinafter, "Kadifa re: Adult Arrests"); Pedro Camacho, *ICE Arrests Migrant Deemed Mentally Impaired by Judge as He Exits Immigration Court: 'He's Clearly Not Understanding the Questions'*, The Latin Times (July 25, 2025, 10:36 AM), https://www.latintimes.com/ice-arrests-migrant-deemed-mentally-impaired-judge-he-exits-immigration-court-hes-clearly-not-587576; Jordan Salama, *When ICE Agents Are Waiting Outside the Courtroom*, The New Yorker (July 25, 2025), https://www.newyorker.com/news/the-lede/when-ice-agents-are-waiting-outside-the-courtroom; Maurice DuBois et al., *3 Immigration Judges Speak Out About Their Firings: "It Was Arbitrary, Unfair*, CBS News (July 24, 2025, 8:34 PM), https://www.cbsnews.com/boston/news/immigration-judges-speak-out-firings-arbitrary-unfair/?intcid=CNM-00-10abd1h; Danielle James, *ICE Arrests at Check-Ins, Court Hearings Are on the Rise. Michigan Is No Exception*, MLIVE (July 21, 2025, 7:10 AM), https://www.mlive.com/public/2025/07/ice-arrests-at-check-ins-court-hearings-are-on-the-rise-michigan-is-no-exception.html; Margaret Kadifa, *ICE Agents Keep Snatching Asylum Seekers Immediately After Their Court Hearings*, Mother Jones (July 21, 2025), https://www.motherjones.com/politics/2025/07/ice-agents-arrest-asylum-seekers-after-court-hearings-san-francisco/; Martha Bellisile et al., *Volunteers Flock to Immigration Courts to Support Migrants Arrested in the Hallways*, ABC News (July 20, 2025, 8:38 AM), https://abcnews.go.com/US/wireStory/volunteers-flock-immigration-courts-support-migrants-arrested-hallways-123902561; Mark Rivera et al., *ICE Arrests at Immigration Court in Chicago, Nationwide Labeled 'Unlawful' in New Lawsuit*, ABC 7 Chicago (July 18, 2025, 8:36 PM), https://abc7chicago.com/post/us-immigration-news-ice-arrests-courts-chicago-nationwide-labeled-unlawful-new-lawsuit-trump-administration/17186490/; Eduardo Cuevas, *'Escalation:' Federal Agents Now Detaining People with Active Immigration Cases*, USA Today (July 18, 2025, 11:26 AM), https://www.usatoday.com/story/news/nation/2025/07/18/migrants-immigration-court-trump-crackdown/84614161007/; Martha Bellisile, *Homeland Security Officials Defend Immigration Court Arrests After Being Sued*, Associated Press (July 17, 2025, 2:04 PM), https://apnews.com/article/ice-immigration-court-immigrants-a5190ada4a6019f84d76e62c11c44e30; Swasti Singhai, *Five Days, 12 Arrests: A Week Inside San Diego Immigration Court*, Times of San Diego (July 17, 2025, 7:41 AM), https://timesofsandiego.com/politics/2025/07/17/arrests-immigration-court-trump-anxiety-chaos/ (hereinafter, "Singhai re: Week at San Diego Immigration Court"); Devan Cole et al., *Trump Administration Sued Over ICE Arrests at Immigration Courthouses*, CNN (July 16, 2025, 6:23 PM), https://www.cnn.com/2025/07/16/politics/ice-immigration-courthouse-arrests-lawsuit; Luis Ferré-Sadurní, *Immigrants File Class-Action Lawsuit to Stop IC Courthouse Arrests*, NY Times (July 16, 2025), https://www.nytimes.com/2025/07/16/nyregion/trump-ice-arrests-lawsuit-immigrants.html (hereinafter, "Ferré-Sadurní re: Lawsuit"); Maxine Bernstein, *Federal Judge in Oregon: Homeland Security 'Tricked' Asylum Seeker Before Arrest at Immigration Court*, The Oregonian (July 15, 2025, 10:47 AM), https://www.oregonlive.com/pacific-northwest-news/2025/07/federal-judge-in-oregon-homeland-security-tricked-asylum-seeker-before-arrest-at-immigration-court.html; Sarah Thamer, *Advocates Denounce ICE Arrests at Fort Snelling Immigration Court*, MPR News (July 15, 2025, 4:00 AM), https://www.mprnews.org/story/2025/07/15/advocates-protest-ice-arrests-at-immigration-court; Paige Browning & John O'Brien, *Fears of Arrests Cause Tension at Seattle Immigration Court*, KUOW (July 10, 2025, 5:58 PM), https://www.kuow.org/stories/fears-of-ice-arrests-cause-tension-at-seattle-immigration-court; Margaret Kadifa, *ICE Arrests 4 People After Immigration Court Hearings in San Francisco*, Mission

Local (July 10, 2025, 12:08 PM), https://missionlocal.org/2025/07/ice-arrests-four-people-after-they-appear-in-immigration-court/ (hereinafter, "Kadifa re: 4 Arrests"); *What Goes On in America's Immigration Courts*, Economist (July 10, 2025), https://www.economist.com/united-states/2025/07/10/what-goes-on-in-americas-immigration-courts; Francesca Regalado & Soumya Karlamangla, *Tensions Escalate in San Francisco over Immigration Enforcement*, NY Times (July 9, 2025), https://www.nytimes.com/2025/07/09/us/ice-immigration-protest-san-francisco.html; Tom Li & Ko Lyn Cheang, *Video: Protestors Cling to Departing ICE Van After Arrest at S.F. Immigration Court*, San Francisco Chronicle (July 8, 2025, 5:34 PM), https://www.sfchronicle.com/sf/article/protesters-cling-ice-van-chaos-immigration-court-20761721.php; Nisa Khan, *When ICE Is Waiting at Immigration Court, What Can Advocates Do?*, KQED (July 7, 2025), https://www.kqed.org/news/12047018/how-legal-experts-advocates-are-responding-to-the-detention-of-asylum-seekers; Emma Seiwell, *ICE Opposition Grows, With Lawmakers, Attorneys Decrying Courthouse Arrests as a Violation of Due Process*, NY Daily News (July 5, 2025, 6:00 AM), https://www.nydailynews.com/2025/07/05/ice-opposition-grows-with-lawmakers-attorneys-decrying-courthouse-arrests-a-violation-of-due-process/ (hereinafter "Seiwell re: ICE Opposition Grows"); Jim Vertuno, *Honduran Family Freed From Detention After Lawsuit Against ICE Courthouse Arrests*, Associated Press (July 3, 2025, 6:14 PM), https://apnews.com/article/ice-family-children-lawsuit-release-ef8d764aebec8ba1b67bafc9080a563d; Emma Seiwell, *ICE Agents Now Snatching Migrants With Open Court Cases; NY Officials, Lawyers Say It's 'Utterly Unlawful'*, NY Daily News (July 3, 2025, 6:50 AM), https://www.nydailynews.com/2025/07/02/ice-agents-now-snatching-migrants-with-open-court-cases-ny-officials-lawyers-say-its-utterly-unlawful/ (hereinafter, "Seiwell re: ICE Snatching"); Melissa Gomez, *Faith Leaders Bear Witness as Migrants Make Their Case in Immigration Court*, Los Angeles Times (July 2, 2025, 3:00 AM), https://www.latimes.com/california/story/2025-07-02/faith-leaders-bear-witness-as-migrants-make-their-case-immigration-court (hereinafter, "Gomez re: Faith Leaders"); Shelby Bremer, *Lawsuit over San Diego Immigration Court Arrest May Give Insight Into ICE Practices*, NBC San Diego (July 1, 2025, 6:01 PM), https://www.nbcsandiego.com/news/local/san-diego-lawsuit-ice-courthouse-arrests/3861107/; May & Marr, *supra* n. 1; Margaret Kadifa, *For One S.F. Asylum Seeker, ICE Arrest Meant Move to More Conservative Judge,* Mission Local (July 1, 2025, 4:00 AM), https://missionlocal.org/2025/07/sf-asylum-seeker-immigration-judge-ice-arrest/ (hereinafter "Kadifa re: Forum Shopping"); Natali Yahr, *Wisconsin Asylum Seeker Miguel Robles Detained in Unprecedent Wave of Courthouse Arrests,* Racine County Eve (July 1, 2025), ), https://racinecountyeye.com/2025/06/30/miguel-robles-immigration-asylum/; Gwynne Hogan, *He Fled Death Threats for Being Gay, Applied for Asylum and Married a U.S. Citizen. ICE Arrested Him Anyway,* The City (June 30, 2025, 1:41 PM), https://www.thecity.nyc/2025/06/27/ice-arrested-asylum-gay/ (hereinafter "Hogan re: Mamadou Arrest"); Ko Lyn Cheang, *S.F. Drag Performer Detained by ICE After Asylum Hearing*, San Francisco Chronicle (June 28, 2025), https://www.sfchronicle.com/sf/article/drag-performer-detained-ice-20399122.php; Anna-Cat Brigida, *A Legal Trap? Why the Trump Administration is Targeting Immigration Courts for Arrests*, Al Jazeera (June 27, 2025), https://www.aljazeera.com/news/longform/2025/6/27/why-the-trump-administration-is-targeting-immigration-courts-for-arrests; Julia Marnin, *6-Year-Old Boy with Leukemia Arrested by ICE is Now Detained in Texas, Suit Says*, Fort Worth Star-Telegram (June 26, 2025, 3:23 PM), https://www.star-telegram.com/news/state/texas/article309472695.html; Dan Katz, *ICE Arrested a 6-Year-Old Boy with Leukemia at Immigration Court. His Family is Suing,* Texas Public Radio (June 25, 2025, 11:06 PM), https://www.tpr.org/border-immigration/2025-06-25/ice-arrested-a-6-year-old-boy-with-leukemia-at-immigration-court-his-family-is-suing; Nina Shapiro, *As Pushback Grows to WA Immigration Court Arrests, ICE Changes Tactics*, The Seattle Times (June 24, 2025, 6:00 AM), https://www.seattletimes.com/seattle-news/as-pushback-grows-to-wa-immigration-court-arrests-ice-changes-tactics/ (hereinafter "Shapiro re: ICE Tactic Change"); Kate Morrissey, *Here's What's Happening to the People ICE Arrests in Immigration Court*, Capital & Main (June 24, 2025), https://capitalandmain.com/heres-whats-happening-to-the-people-ice-arrests-in-immigration-court; Elizabeth L.T. Moore & Elizabeth Zavala, *Obscure San Antonion Court Becomes Flashpoint in Immigration Debate*, San Antonio Express-News (June 23, 2025), https://www.expressnews.com/news/article/obscure-san-antonio-immigration-court-spotlight-20381608.php; Luis Ferré-Sadurní, *Brad Lander Tried to Escort Immigrants facing Arrest. He's Not Alone* , NY Times (June 19, 2025), https://www.nytimes.com/2025/06/19/nyregion/ice-immigrants-volunteer-escorts-courthouse.html (hereinafter "Ferré-Sadurní re: Lander Escort"); Ryan Oehrli, *'Rigged'? ICE Agents Are Arresting People at Charlotte's Immigration*

*Court,* The Charlotte Observer (June 12, 2025, 11:31 AM),
https://www.charlotteobserver.com/news/local/crime/article308209165.html; Armando Garcia, *Immigrant Rights Group Say ICE Officers 'Ambush Noncitizens' in Courthouse Arrests, Ask Judge to Intervene,* ABC News (June 12, 2025, 10:32 AM), https://abcnews.go.com/US/immigrant-rights-groups-ice-officers-ambush-noncitizens-courthouse/story?id=122770040; Thomas Lyons, *Mood is Tense at Concord Immigration Court Following ICE Arrests,* Berkleyside (June 12, 2025, 9:55 AM), https://www.berkeleyside.org/2025/06/12/concord-immigration-court-tension-after-ice-arrests; Ximena Bustillo, *ICE's Novel Strategy Allows for More Arrests from Inside Immigration Courts,* NPR (June 12, 2025, 5:02 AM), https://www.npr.org/2025/06/12/nx-s1-5409403/trump-immigration-courts-arrests; Luis Ferré-Sadurní, *Inside a Courthouse, Chaos and Tears as Trump Accelerates Deportations,* NY Times (June 12, 2025), https://www.nytimes.com/2025/06/12/nyregion/immigration-courthouse-arrests-trump-deportation.html (hereinafter "Ferré-Sadurní re: Inside NYC Immigr. Cts."); Martha Bellisile et al., *Immigration Officers Intensify Arrests in Courthouse Hallways on a Fast Track to Deportation,* Associated Press (June 11, 2025, 4:17 PM), https://apnews.com/article/immigration-court-arrests-ice-deportation-99d822cdc93ae7dc26026c27895d5ea1; Brittany Taylor et al., *Second Day of Arrests by ICE Agents at Immigration Court in Southwest Houston,* Click 2 Houston.com (June 11, 2025, 10:25 AM), https://www.click2houston.com/news/local/2025/06/11/ice-agents-stationed-outside-immigration-court-in-houstons-greenspoint-area/; Julia Ainesly, *Trump Admin Tells Immigration Judges to Dismiss Cases in Tactic to Speed Up Arrests,* NBC News (June 11, 2025, 5:00AM), https://www.nbcnews.com/national-security/trump-admin-tells-immigration-judges-dismiss-cases-tactic-speed-arrest-rcna212138; Conrad Wilson, *ICE Arrests 2 More Asylum Seekers at Immigration Court in Portland,* OPB (June 10, 2025, 5:12 PM), https://www.opb.org/article/2025/06/10/ice-arrests-2-more-asylum-seekers-at-immigration-court-in-portland/ (hereinafter, "Wilson re: Two Arrests"); Ninfa Saavedra & Robert Arnold, *ICE Arrests Multiple People at Houston's Immigration Court,* Click2Houston.com (June 10, 2025, 2:48 PM), https://www.click2houston.com/news/local/2025/06/10/ice-arrests-reportedly-underway-at-houstons-immigration-court/; Natalie Weber, *ICE Detains Multiple Men at Houston Immigration Courthouse, Civil Rights Organization Says,* Houston Public Media (June 10, 2025, 11:58 AM), https://www.houstonpublicmedia.org/articles/news/politics/immigration/2025/06/10/523600/ice-detains-multiple-men-at-houston-immigration-courthouse/; Giulia McDonnell Nieto del Rio, *This Is What An ICE Arrest in Boston Immigration Court Looks Like,* Boston Globe (June 9, 2025, 6:31 AM), https://www.bostonglobe.com/2025/06/09/metro/ice-arrests-at-boston-immigration-court/ (hereinafter, "Nieto del Rio re: Inside Boston Immigr. Ct. Arrest"); Audrey Conklin & Bill Melugin, *Trump's ICE Launches Bold Courthouse Migrant Arrest Strategy to Fast-Track Deportations Biden Avoided,* Fox News (June 9, 2025, 4:00 AM), https://www.foxnews.com/us/trumps-ice-launches-bold-courthouse-migrant-arrest-strategy-fast-track-deportations-biden-avoided?msockid=1cd283b1756f61231883976574c46057; Conrad Wilson, *ICE Detains Another Asylum-Seeker Outside Portland Courtroom, Legal Petition Says,* OPB (June 6, 2025, 9:30 AM), https://www.opb.org/article/2025/06/06/asylum-arrest-portland-yzlh/ (hereinafter, "Wilson re: Arrest"; Amy Larson, *Newlywed Couple Separated at Immigration Courthouse by ICE,* The Hill (June 5, 2025, 1:14 PM), https://thehill.com/homenews/state-watch/5334753-immigration-courthouse-ice-trump-dhs/; Laura Romero et al., *In a New Tactic, ICE Is Arresting Migrants at Immigration Courts, Attorneys Say,* ABC News (June 4, 2025, 6:37 PM), https://abcnews.go.com/US/new-tactic-ice-arresting-migrants-immigration-courts-attorneys/story?id=122513021; Julie Carey, *Cancel, Arrest, Deport: Immigration Lawyer Warns of Emerging ICE Tactic,* 4 Washington (June 4, 2025, 3:01 PM), https://www.nbcwashington.com/news/local/cancel-arrest-deport-immigration-lawyer-warns-of-emerging-ice-tactic/3927509/; Brad Schmidt, *Immigration Arrest at Courthouse Marks First for Portland,* The Oregonian (June 3, 2025, 3:22 PM), https://www.oregonlive.com/politics/2025/06/immigration-arrest-at-courthouse-marks-first-for-portland.html; Stephen Franklin & Katema Hosseini, *ICE Target Noncitizens As Cases Dismissed in Immigration Court in Chicago,* Borderless (June 3, 2025), https://borderlessmag.org/2025/06/03/ice-arrests-chicago-immigration-court-trump-detention-immigration-custom-enforcement/; Conrad Wilson, *ICE Detains Asylum Seeker Outside Portland Immigration Court, Lawyers Say,* OPB (June 2, 2025, 11:01 PM), https://www.opb.org/article/2025/06/02/ice-immigration-enforcement-detains-asylum-seeker-portland-court/; Angélica Franganillo Díaz & Priscilla Alvarez, *ICE Targets Migrants for Arrest at Courthouses as Trump Administration*

*Intensifies Deportation Push*, CNN (June 2, 2025, 5:00 AM), https://www.cnn.com/2025/06/02/politics/ice-arrests-migrants-courthouse; Shelly Bradbury, *Feds Detain Immigrant Family at Denver Courthouse Amid New Trump Strategy*, Denver Post (May 30, 2025, 3:32 PM), https://www.denverpost.com/2025/05/30/denver-immigration-arrest-courthouse-ice-trump/; Giulia McDonnell Nieto del Rio, *ICE Arrests at Massachusetts Immigration Courts Target Immigrants Seeking Permission to Stay in US*, Boston Globe (May 30, 2025, 1:39PM), https://www.bostonglobe.com/2025/05/27/metro/immigration-courts-ice-arrests-massachusetts (hereinafter, "Nieto del Rio re: Boston Immigr. Ct. Arrests"); Suzanne Gamboa, *Immigration Arrests in Courthouses Have Become the New Deportation Tool, Stripping Migrants of a Legal Process*, NBC News (May 30, 2025, 5:00 AM), https://www.nbcnews.com/news/latino/immigrations-arrests-ice-deportations-courthouse-legal-process-ice-rcna209671; Hamed Aleaziz et al., *How ICE is Seeking to Ramp Up Deportations Through Courthouse Arrests*, NY Times (May 30, 2025), https://www.nytimes.com/2025/05/30/us/politics/ice-courthouse-arrests.html; Allison Sherry, *Signaling a Policy Shift, ICE Detains a Family Who Showed Up at Denver Immigration Court for a Check-In*, CPR News (May 29, 2025, 1:35 PM), https://www.cpr.org/2025/05/29/ice-detains-family-denver-immigration-court/; Gonzalez & Ruelas, *supra* n. 1; David Noriega, *Immigration Courts Are Dismissing Cases of Those Sent to El Salvador, Potentially Cutting Off Their Return*, NBC News (May 28, 2025, 5:10 PM), https://www.nbcnews.com/news/latino/immigration-courts-alien-enemies-deportation-andry-hernandez-romero-rcna209402; Gwynne Hogan, *Migrants, Protestors, and a Pastor Arrested Inside and Outside Manhattan Immigration Courthouses,* The City (May 28, 2025, 3:16 PM), https://www.thecity.nyc/2025/05/28/ice-arrests-migrants-26-federal-plaza-pastor/ (hereinafter, "Hogan re: NYC Immigr. Ct. Arrests"); Tomoki Chien, *Undercover ICE Agents Begin Making Arrests at SF Immigration Court*, The San Franciso Standard (May 27, 2025, 5:32 PM), https://sfstandard.com/2025/05/27/undercover-ice-agents-make-arrests-san-francisco-court/; Michael Elsen-Rooney, *A Bronx High Schooler Showed Up for a Routine Immigration Court Date. ICE Was Waiting*, Chalkbeat New York (May 26, 2025, 8:35 pm), https://www.chalkbeat.org/newyork/2025/05/27/bronx-high-school-student-detained-by-immigration-ice-agents/?ref=hellgatenyc.com (hereinafter, "Elsen-Rooney re: Dylan Arrest"); Milena Malaver et al., *ICE Agents in Miami Find New Spot to Carry Out Arrests: Immigration Court*, Miami Herald (May 26, 2025, 1:27 PM), https://www.miamiherald.com/news/local/immigration/article306900486.html; Melissa Gomez, *Father Ripped from Family as Agents Target Immigration Courts, Arresting People After Cases Dismissed*, LA Times (May 24, 2025, 10:00AM), https://www.latimes.com/california/story/2025-05-24/ice-agents-swarm-immigration-courts-arresting-people-after-cases-dismissed (hereinafter, "Gomez re: Immigr. Ct. Arrests"); Tyche Hendricks, *'Unprecedented': ICE Officers Operating Inside Bay Area Immigration Courts, Lawyers Say*, KQED (May 24, 2025), https://www.kqed.org/news/12041473/unprecedented-ice-officers-operating-inside-bay-area-immigration-courts-lawyers-say; Camilo Montoya-Galvez & Nidia Cavazos, *ICE Ending Migrants' Court Cases In Order to Arrest and Move to Deport Them*, CBS News (May 23, 2025, 9:53 AM), https://www.cbsnews.com/news/ice-ending-migrants-court-cases-arrest-move-to-deport-them/; Arelis R. Hernández & Maria Sacchetti, *Immigrant Arrests at Courthouses Signal New Tactic in Trump's Deportation Push*, Washington Post (May 23, 2025), https://www.washingtonpost.com/immigration/2025/05/23/immigration-court-arrests-ice-trump/; Trevor Hughes, *ICE Agents Deploy New Tactic: Arresting People As They Leave Mandatory Court Hearings*, USA Today (May 22, 2025, 1:13 PM), https://www.usatoday.com/story/news/nation/2025/05/22/ice-arrests-immigration-court-deportation-tactics/83792357007/; Joshua Goodman et al., *They Came to Hearing at Chicago's Immigration Court, Then Got Arrested*, Chicago Sun-Times (May 22, 2025, 3:59PM), https://chicago.suntimes.com/immigration/2025/05/22/ice-agents-hallways-immigration-court-trump-mass-arrest; Anders Hagstrom & Bill Melugin, *ICE Beings New, Nationwide Effort to Arrest Illegal Aliens at Immigration Hearings* (May 22, 2025, 1:07 PM), https://www.foxnews.com/politics/ice-begins-new-nationwide-effort-arrest-illegal-aliens-immigration-hearings; Joshua Goodman & Gisela Salomon, *ICE Agents Wait in Hallways of Immigration Court as Trump Seeks to Deliver on Mass Arrest* Pledge, Associated Press (May 22, 2025, 1:30 AM), https://apnews.com/article/immigration-courts-arrests-trump-ice-deportations-fa96435d4ec021cc8ff636b23d80d848; J. Dale Shoemaker, ICE Raids Immigration Court in Buffalo, Investigative Post (May 22, 2025), https://www.investigativepost.org/2025/05/22/ice-raids-immigration-court-in-buffalo/; Raphael Romero Ruiz et al., *For 2nd Day, People Attending Phoenix Immigration Hearings Arrested by ICE*, USA Today (May 21, 2025, 11:42 PM), https://www.usatoday.com/story/news/politics/immigration/2025/05/21/ice-arrests-phoenix-

noncitizen respondents at immigration courts without respondents not having notice of ICE's motion to dismiss their immigration case and an opportunity to oppose it. Much of the coverage on these dismissals casts doubt on their integrity, describing them as a violation of due process and a tactic to deport noncitizens without hearings.[3]

ICE dismissals and arrests at immigration courts have outraged Americans around the country. Opposition to these actions and doubts about their legality have prompted mass protests at immigration courts in New York, Seattle, San Francisco, and elsewhere.[4] It has also prompted

---

immigration-court/83772323007/?gnt-cfr=1&gca-cat=p; Gustavo Sagrero Álvarez, *ICE Agents at Seattle Courthouse Arrest People Whose Deportation Hearings are Dismissed*, KUOW (May 21, 5:45 PM), https://www.kuow.org/stories/ice-agents-at-seattle-courthouse-arrest-people-whose-deportation-hearings-are-dismissed; Akela Lacy et al. *ICE Agents Are Camped Outside Immigration Courts to Make Arrests*, The Intercept (May 21, 2025, 3:27 PM), https://theintercept.com/2025/05/21/ice-agents-courts-arrests-immigrants-deport/; Paul Ingram, *'Mayhem' As ICE Officials Arrest Multiple People at Immigration Court in Phoenix*, AZ Mirror (May 21, 2025, 11:12 AM), https://azmirror.com/2025/05/21/mayhem-as-ice-officials-arrest-multiple-people-at-immigration-court-in-phoenix/; Nina Shapiro, *ICE Arrests at WA Immigration Court Spark Fear of Fast-Track Removal*, Seattle Times (May 21, 2025, 6:00 AM), https://www.seattletimes.com/seattle-news/law-justice/ice-arrests-at-wa-immigration-court-spark-fear-of-fast-track-removal/ (hereinafter, "Shapiro re: ICE Arrests").

[3] Gómez re: San Antonio, *supra* n. 2; Nowlin, *supra* n. 2; Kadifa re: Adult  Arrests, *supra* n. 2; Camacho, *supra* n. 2; Salama, *supra* n. 2; James, *supra* n. 2; Cole et al., *supra* n. 2; Ferré-Sadurní re: Lawsuit, *supra* n. 2; Cuevas, *supra* n. 2; Bernstein, *supra* n. 2; Browning & O'Brien, *supra* n. 2; Kadifa re: 4 Arrests, *supra* n. 2; Li & Cheang, *supra* n. 2; Khan, *supra* n. 2; Kadifa re: Forum Shopping, *supra* n. 2; Yahr, *supra* n. 2; Hogan re: Mamadou Arrest, *supra* n.2; Cheang, *supra* n. 2; Brigida, *supra* n. 2; Moore & Zavala, *supra* n. 2; Lyons, *supra* n. 2; Oehrli, *supra* n. 2; Garcia, *supra* n. 2; Bustillo, *supra* n. 2; Ferré-Sadurní re: Inside NYC Immigr. Cts., *supra* n. 2; Bellisile et al. re: Immigration Officers Intensify Arrests, *supra* n. 2; Wilson re: Two Arrests, *supra* n. 2; Saavedra & Arnold, *supra* n. 2; Nieto del Rio re: Inside Boston Immigr. Ct. Arrest, *supra* n. 2; Conklin & Melugin, *supra* n. 2; Wilson re: Arrest, *supra* n. 2; Romero et al., *supra* n. 2; Carey, *supra* n. 2; Franklin & Hosseini, *supra* n. 2; Bradbury, *supra* n. 2; Nieto del Rio re: Boston Immigr. Ct. Arrests, *supra* n. 2; Gamboa, *supra* n. 2; Aleaziz et al., *supra* n. 2; Chien, *supra* n. 2; Elsen-Rooney re: Dylan Arrest, *supra* n. 2; Malaver et al., *supra* n. 2; Gomez re: Immigr. Ct. Arrests, *supra* n. 2; Hernández & Sacchetti, *supra* n. 2; Hughes, *supra* n. 2; Ruiz *et al*, *supra* n. 2; Lacy et al, *supra* n. 2; Shapiro re: ICE Arrests, *supra* n. 2; Seiwell re: ICE Snatching, *supra* n. 2; Hendricks, *supra* n. 2; Seiwell re: ICE Opposition Grows, *supra* n. 2.

[4] Thamer, *supra* n. 2; Browning & O'Brien, *supra* n. 2; Alicia Victoria Lozano, *Violent Clashes at San Francisco Immigration Court Won't Deter Protestors, Organizers Say*, NBC News (July 10, 2025, 4:43 PM), https://www.nbcnews.com/news/us-news/violent-clashes-san-francisco-immigration-court-wont-deter-protesters-rcna218059; Sarah Rumpf-Whitten, *Watch: ICE Agents Fight Off Masked Mob Outside Blue City Immigration Court*, FOX News (July 10, 2025, 1:12 PM), https://www.foxnews.com/us/watch-ice-agents-fight-off-masked-mob-outside-blue-city-immigration-court; Shay Arthur, *Crowd Gathers for Immigration Rally at Memphis Court*, WREG Memphis (July 8, 2025, 12:07 PM), https://wreg.com/news/local/crowd-gathers-for-immigration-rally-at-memphis-court/; Regalado & Karlamangla, *supra* n. 2; Li & Cheang, *supra* n. 2; Khan, *supra* n. 2; Stephania Jimenez, *PSL San Antonio Organizes Event to Educate Community on Immigration Laws Amid Rising IDE Deportations*, KSAT (July 1, 2025, 10:42 PM), https://www.ksat.com/news/local/2025/07/02/psl-san-antonio-organizes-event-to-educate-community-on-immigration-laws-amid-rising-ice-deportations/; May & Marr, *supra* n. 1; Nina Shapiro, *As Pushback Grows to WA Immigration Court Arrests, ICE Changes Tactics*, The Seattle Times (June 24, 2025, 6:00 AM), https://www.seattletimes.com/seattle-news/as-pushback-grows-to-wa-immigration-court-arrests-ice-changes-tactics/; Luis Ferré-Sadurní, *Brad Lander is Arrested by ICE Agents at Immigration Courthouse*, NY Times (June 17, 2025), https://www.nytimes.com/2025/06/17/nyregion/brad-lander-immigration-ice.html; Moore & Zavala, *supra* n. 2; Stephen Hobbs, *In Sacramento's Immigration Court, ICE Detention Threats Leave Residents in Limbo,* The

clergy, political leaders, and other members of the public to accompany noncitizens to their immigration court dates to document dismissals and arrests, attempt to stop the latter, and help arrestees inform their families.[5]

Responsive records will address critical integrity questions left open by existing media coverage. Such records will show the exact policies underlying dismissals and the extent to which ICE OPLA attorneys retain discretion to consider the individual circumstances of a particular case.

B.   URGENCY TO INFORM THE PUBLIC ABOUT FEDERAL GOVERNMENT ACTIVITY BY A REQUESTER

Additionally, and alternatively, the Council has a compelling need for the records sought. It is primarily engaged in disseminating information. And urgency also exists to inform the public

---

Sacramento Bee (June 14, 2025, 10:05 AM), https://www.sacbee.com/news/politics-government/capitol-alert/article308346910.html; Greg Micek et al., *Sacramento Immigration Court on Lockdown, Draws Protest After Suspected ICE Operation*, Capradio (June 12, 2025), https://www.capradio.org/articles/2025/06/12/sacramento-immigration-court-on-lockdown-draws-protest-after-suspected-ice-operation/; Lyons, *supra* n. 2; Ferré-Sadurní re: Inside NYC Immigr. Cts., *supra* n. 2; Bellisile et al. re: Immigration Officers Intensify Arrests, *supra* n. 2; Priscilla Alvarez, *ICE Protest Nationwide Comes As Agency Scrambles to Meet Trump's Immigration Arrest Quotas*, CNN (June 10, 2025, 10:16 PM), https://www.cnn.com/2025/06/10/politics/ice-scrambles-immigration-arrest-quotas; George Kelly & Max Harrison-Caldwell, Protesters Shut Down Immigration Court After ICE Arrests, The San Francisco Standard (June 10, 2025, 1:00 PM), https://sfstandard.com/2025/06/10/protesters-surround-immigration-court-after-ice-arrests/; Weber, *supra* n. 2; Joe Rivano Barros et al., *S.F. Police Arrest Dozens in 2nd Night of Protests Against ICE*, Mission Local (June 9, 2025, 8:16 PM), https://missionlocal.org/2025/06/sf-mission-march-mobilized-thousands-against-ice/; Aleaziz et al., *supra* n. 2; Hogan re: NYC Immigr. Ct. Arrests, *supra* n. 2; Ruiz *et al*, *supra* n. 2.

[5] Gómez re: San Antonio, *supra* n. 2; Salama, *supra* n. 2; Bellisile et al. re: Volunteers Flock to Immigration Courts, *supra* n. 2; Ferré-Sadurní re: Lawsuit, *supra* n. 2; Thamer, *supra* n. 2; Brian Strassburger, S.J. & William Critchley-Menor, S.J., *What We Saw During An ICE Arrest & Immigration Court Hearing: The Breakdown of Justice in America*, America: The Jesuit Review (July 11, 2025), https://www.americamagazine.org/politics-society/2025/07/11/ice-immigration-court-deportation-injustice-251119; Ciara Encinas, *Volunteers Describe How They Document ICE Arrests in Immigration Courts*, Fox 5 (July 11, 2025, 4 :55 PM), https://fox5sandiego.com/news/local-news/san-diego/san-diego-court-ice-arrests/; Moore & Zavala, *supra* n. 2; Joey Safchik, *ICE Handcuffs 71-Year-Old Grandmother, a US Citizen, at San Diego Immigration Court*, 7 San Diego (July 9, 2025, 7 :06 PM), https://www.nbcsandiego.com/news/local/ice-arrests-71-year-old-grandmother-a-us-citizen-at-san-diego-immigration-court/3865098/; Khan, *supra* n. 2; Swasti Singhai, *San Diego Volunteers Bear Witness Daily as ICE Continues Courtroom Arrests*, Times of San Diego (July 3, 2025, 3:41 PM), https://timesofsandiego.com/life/2025/07/03/san-diego-community-bears-witness-as-ice-continues-courtroom-arrests/; Gomez re : Faith Leaders, *supra* n. 2; Shapiro re: ICE Tactic Change, *supra* n. 2; Ray Sanchez & Allsha Ebrahimji, *Masked Ice Officers: The New Calling Card of The Trump Administration's Crackdown*, CNN (June 21, 2025), https://www.cnn.com/us/ice-immigration-officers-face-masks; Ferré-Sadurní re: Lander Escort, *supra* n. 2; Micek et al, *supra* n. 2. Ken Stone, *ICE Agents Scatter As SD Bishop Pham, Other Clergy Visit Immigration Court,* Times of San Diego (June 20, 2025, 3:04 PM), https://timesofsandiego.com/life/2025/06/20/ice-agents-scatter-as-sd-bishop-pham-other-clergy-visit-immigration-court/; Stephen Hobbs, *In Sacramento's Immigration Court, ICE Detention Threats Leave Residents in Limbo,* The Sacramento Bee (June 14, 2025, 10:05 AM), https://www.sacbee.com/news/politics-government/capitol-alert/article308346910.html; Carolina Estrada, *Two Men Detained by ICE After Sacramento Immigration Court* Hearings, KCRA3 (June 11, 2025, 11:13 PM), https://www.kcra.com/article/two-men-detained-by-ice-sacramento-immigration-hearings/65041264.

about the policies and guidance underlying ICE OPLA attorneys moving to dismiss noncitizens' immigration court cases to facilitate expedited removal.

     1.   *The Council Primarily Engages in Information Dissemination*

The Council primarily engages in disseminating information and analysis on immigration and other issues. Organizations primarily engaged in information dissemination include not only "media organizations and newspapers," *Heritage Found. v. Entl. Prot. Agency*, Civil Action No. 23-748, 2023 WL 2954418, \*3 (D.D.C. 2023), but also "non-partisan law and public policy group[s]" like Requesters that "regularly write[], publish[], and disseminat[e], information online," *Brennan Ctr. for Just.*, 498 F. Supp. 3d at 98 (Brennan Center); *see also Ctr. for Pub. Integrity v. U.S. Dep't of Def.*, 411 F. Supp. 3d 5 (D.D.C. 2019) (Center for Public Integrity); *Protect Dem. Proj. v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293, 298 (D.D.C. 2017) (Protect Democracy Project); *Am. Civil Liberties Union*, 321 F. Supp. 2d at 29 n.5 (Electronic Privacy Information Center ("EPIC")).

Like Brennan Center, Protect Democracy Project, EPIC, and Center for Public Integrity, the Council authors factsheets and special reports on proposed and actual immigration policies, some of which shape media coverage in outlets across the nation.[6] It also analyzes immigration data and other government records—including those obtained through FOIA requests like this one—in interactive web reports.[7] And it circulates its reports and factsheets through its website,[8] blog, email newsletters, and an X (formerly known as Twitter) account with 64.9 thousand followers.[9]

     2.   *Urgency Exists to Inform the Public*

Urgency also exists to inform the public about the policies and guidance underlying the dismissal of noncitizens' immigration court cases to facilitate expedited removal.

---

[6] *See, e.g., Trump-Backed Mass Deportations Would Cost Billions*, Report Says, CBS News (Oct. 3, 2024), https://www.cbsnews.com/video/trump-backed-mass-deportations-would-cost-billions-report/ (discussing Am. Immig. Council, Mass Deportation: Devasting Costs to America, Its Budget and Economy (Oct. 2, 2024), https://www.americanimmigrationcouncil.org/report/mass-deportation/); Emma Goldberg, *What if Trump Deported Millions of Immigrants*, The New York Times (Oct. 22, 2024), https://www.nytimes.com/interactive/2024/10/22/us/elections/trump-deportation.html?unlocked_article_code=1.Uk4.Pjao.99QiYFTTpEl6 (same); *What Trump's Mass Deportation Plan Might Look Like If He Wins the Election*, 60 Minutes (Oct. 27, 2024), https://www.youtube.com/watch?v=WjCHjwlSMFI (same); *Mass Deportations*, Last Week Tonight (Oct. 27, 2024), https://www.youtube.com/watch?v=0UEhMDAlX1Y (same); *The Costs of Mass Deportation? Expert Breaks Down Trump's Immigration Plan*, Amanpour & Company, (Oct. 28, 2024), https://www.youtube.com/watch?v=Dmfo3atidKE (same).

[7] *See* Am. Immig. Council, Torrance County Detention Facility: Troubling Role in Detaining Haitian Migrants During the 2021 Del Rio Incident (2024), https://www.americanimmigrationcouncil.org/foia/torrance-detention-facility; Am. Immig. Council, Ohio, We Have a Problem: Border Patrol & Local Law Enforcement's Patterns & Tactics of Abuse in Ohio's Immigration Enforcement (2024), https://www.americanimmigrationcouncil.org/foia/ohio-border-patrol-abuse; Am. Immig. Council, Refugee Resettlement in U.S. Cities (2019), https://data.americanimmigrationcouncil.org/en/refugee-resettlement-us/#exploratory_tool

[8] The Council's website received 4,506,460 views from 2,952,034 different users in 2024.

[9] *See* https://x.com/immcouncil.

Requisite urgency exists where "the request touches on 'a matter of current exigency to the American public'" and delay "compromises a significant recognized interest." *Protect Dem. Proj.*, 263 F. Supp. 3d 293 at 299 (quoting *Al-Fayed v.* CIA, 254 F.3d 300, 310 (D.C. Cir. 2001)). Dismissal of immigration court cases to facilitate expedited removal is exigent to the American public, as demonstrated by the eighty plus articles cited in this request and protests inside and outside of immigration courts around the country. *See CREW*, 2025 WL 752367, at *13 (finding urgency to inform the public based on at least fifty articles on the issue); *Am. Civil Liberties Union of No. Cal. v. U.S. Dep't of Def.*, No. C 06-01698, 2006 WL 1469418, at *6 (N.D. Cal. May 25, 2006) (same); 6 C.F.R. § 5.5(e)(3) ("The existence of numerous articles published on a given subject can be helpful to establishing the requirement that there be an 'urgency to inform' the public on the topic.").

Delayed production of the policies and guidance for dismissing noncitizens' immigration court cases to facilitate expedited removal would compromise the ongoing public debate about the propriety of such dismissals. *Cf. CREW*, 2025 WL 752367, at *13 (expediting a request for records about the U.S. DOGE Service); *Protect Dem. Proj.*, 263 F. Supp. 3d 293 at 299 (expediting a request for records about a possible unlawful airstrike on Syria); *Am. Civil Liberties Union of N. Cal. v. U.S. Dep't of Def.*, No. C 06-01698, 2006 WL 1469418, at *6-7 (N.D. Cal. May 25, 2006) (expediting a request for records about possible unlawful military surveillance of protestors); *Freedom Coalition of Doctors for Choice v. Ctrs. For Disease Control & Prevention*, 2:23-cv-102, 2024 WL 69084, at *14 (N.D. Tex. Jan. 5, 2024) (expediting a request disputing the effectiveness of COVID-19 vaccines).

## IV.  FEE WAIVER REQUEST

Requestors seek a fee waiver since "disclosure of the requested records is in the public interest." 5 U.S.C. § 552(a)(4)(A)(iii). ICE must construe "the FOIA fee waiver provision … liberally … in favor of waivers for noncommercial requesters" like Requesters. *Schoenman v. FBI*, 604 F. Supp. 2d 174, 188 (D.D.C. 2009). Disclosure is in the public interest where it (A) "is likely to contribute significantly to public understanding of the operations or activities of the government" and (B) "is not primarily in the commercial interest of the [R]equesters." 5 U.S.C. § 552(a)(4)(A)(iii); *see also* 6 C.F.R. § 5.11(k)(1). Requesters satisfy both requirements.

### A.  DISCLOSURE OF THE INFORMATION IS IN THE PUBLIC INTEREST

Disclosing the requested records is likely to contribute significantly to the public's understanding of ICE dismissing immigration court cases and the extent to which dismissal remains a matter of discretion for OPLA attorneys to consider on a case-by-case basis.

ICE must consider two factors when assessing a disclosure's contribution to public understanding of a government activity or operation, *see* 6 C.F.R. § 5.11(k)(2): (i) whether the request has a "direct and clear" rather than "remote or attenuated" connection to "identifiable operations or activities of the federal government"; and (ii) whether disclosure "would be likely to

contribute significantly to public understanding of those operations or activities." *Id.* § 5.11(k)(2)(i)-(ii). Each factor supports a fee waiver here.

> 1. *Request Has a Direct and Clear Connection to Government Operations or Activities*

First, this request has a direct and clear relation to the following governmental operations and activities: ICE's dismissal or termination of immigration court proceedings so it can seek noncitizens' expedited removal.

> 2. *Records Sought Will Contribute Significantly to Public Understanding of the Above*

Second, disclosing the records sought will "contribute significantly to public understanding of" the above activities. *Id.* § 5.11(k)(2)(ii). Such contribution exists where "[d]isclosure of the requested information [is] meaningfully informative about [these] activities" and "contribute[s] to the understanding of a reasonably broad audience of persons interested in the subject, as opposed to the individual understanding of the requester." *Id.* 5.11(k)(2)(ii)(A)-(B). Both criteria are satisfied here.

> i. DISCLOSURE OF RECORDS IS MEANINGFULLY INFORMATIVE

Disclosing requested records will be meaningfully informative about ICE's dismissal or termination of immigration court proceedings so it can seek expedited removal of respondent noncitizens. Disclosure is meaningfully informative where disclosed information is not "in the public domain, in either the same or a substantially identical form." *Id.* § 5.11(k)(2)(ii)(A).

Here, as demonstrated by the media coverage cited above, the public only knows that ICE is arresting noncitizens at or near immigration courts after moving to dismiss their immigration cases and that immigration judges are granting many dismissals, thereby allowing ICE to pursue expedited removal.[10] Public knowledge does not extend to the exact guidance that ICE OPLA attorneys are receiving from their superiors about dismissals or the extent to which dismissal remains a matter of discretion for attorneys to consider on a case-by-case basis. Requested records are therefore "meaningfully informative" about each of these activities.

> ii. DISCLOSURE OF RECORDS CONTRIBUTES TO UNDERSTANDING OF A REASONABLY BROAD AUDIENCE

Disclosing requested records will contribute to the understanding of a reasonably broad audience of persons interested in ICE's dismissal or termination of immigration court proceedings so it can seek respondent noncitizens' expedited removal.

Requesters presumably satisfy this consideration as representatives of the news media. *Id.* § 5.11(k)(2)(ii)(B). They both "gather[] information of potential interest to a segment of the public,

---

[10] *See generally* Media articles cited in footnotes 2-5.

use[] [their] editorial skills to turn the raw materials into a distinct work, and distribute[] that work to an audience." *Id.* § 5.11(b)(6); *see also Serv. Women's Action Network v. Dep't of Def.*, 888 F. Supp. 2d 282, 287-88 (D. Conn. 2012) (finding that ACLU is a news media representative); *cf. Elec. Privacy Info. Ctr. v. Dep't of Def.*, 241 F. Supp. 2d 5, 10-15 (D.D.C. 2003) (finding that an organization similar to the Council is a news media representative).

Additionally, and alternatively, the ongoing and extensive media coverage in nationwide, state, and local outlets about ICE dismissals of immigration proceedings demonstrates interest in this subject by a reasonably broad audience. Requesters intend and are well-equipped to inform this audience about the information contained in responsive records, as they are experts in educating the public about immigration issues.

As detailed further in the expedited processing section, the Council analyzes government records—including those obtained through FOIA requests like this one—in interactive web reports and other publications available for free on its website.[11] And it circulates these publications for free through its website,[12] blog, email newsletters, and an X account with 64.9 thousand followers. It intends to publish content about records obtained from this request on its website and otherwise disseminate that content to its readers and the larger public.

Similarly, LatinoJustice PRLDEF produces newsletters, blogs, reports, opinion, editorials, and video interviews about the constitutional rights and equal protection of Latinos, immigrants, and other marginalized communities.[13] And it circulates these publications through its social media accounts. All of its materials are free and available to the public on its website.

In sum, Requesters intend to analyze the records they receive from this request and educate a broad audience of the interested public about them. And, Requesters have a demonstrated ability to do so.

    B.   REQUESTERS' LACK OF COMMERCIAL INTEREST

Turning to commercial interest, disclosure is not primarily in Requesters' commercial interest. As nonprofits, Requesters have no commercial interest in the records requested. *See Am. Ctr. for L. & Just. v. U.S. Dep't of Homeland Sec.*, 573 F. Supp. 3d 78, 84 (D.D.C. 2021) ("[N]onprofit organizations by definition have no commercial interests."); *Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 82 F. Supp. 3d 396, 406 (D.D.C. 2015) (finding that the Council has no such interest in its record requests). Rather, the request furthers Requesters' work to increase public

---

[11] *See, e.g.*, Torrance County Detention Facility: Troubling Role in Detaining Haitian Migrants During the 2021 Del Rio Incident, *supra* n. 7; Ohio, We Have a Problem: Border Patrol & Local Law Enforcement's Patterns & Tactics of Abuse in Ohio's Immigration Enforcement, *supra* n. 7; Refugee Resettlement in U.S. Cities, *supra* n. 7.

[12] The Council's website received 4,506,460 views from 2,952,034 different users in 2024.

[13] *See, e.g.*, LatinoJustice PRLDEF, 100 Days Later: The Harm So Far to Latinx Communities (April 2025), https://www.latinojustice.org/en/pressreport/100-days-later-harm-so-far-latinx-communities; LatinoJustice PRLDEF, A Promise to Harm: What's at Stake for the Latino Community in Project 2025 (Oct. 2024), https://www.latinojustice.org/en/pressreport/promise-harm-whats-stake-latino-community-project-2025;

understanding of immigration processes, including the dismissal of immigration court proceedings so that ICE may channel respondent noncitizens into expedited removal.

Alternatively, and additionally, the public interest in obtaining a better understanding of ICE's actions discussed above exceeds any commercial interest that ICE may ascribe to Requesters in records responsive to this request.

***

Thank you for your attention to this request. If you have any questions regarding this request, please do not hesitate to contact us.

Very truly yours,

/s/ Chris Opila _____                     _/s/Rex Chen_____

Christopher ("Chris") Opila                  Rex Chen
Staff Attorney (Transparency)                Supervising Counsel for Immigrant Rights
American Immigration Council                 LatinoJustice PRLDEF,
PMB2026                                      475 Riverside Drive Suite 1901
2001 L Street N.W., Suite 500                New York, NY 10115
Washington, DC 20036                         212-219-3360 | rchen@latinojustice.org
202-507-7699 | copila@immcouncil.org

Exhibit B

**From:**      ice-foia@ice.dhs.gov
**To:**        Chris Opila
**Subject:**   ICE FOIA 2025-ICFO-51693
**Date:**      Wednesday, July 30, 2025 10:39:46 AM

---

**External sender** <noreply@securerelease.us>

Make sure you trust this sender before taking any actions.

07/30/2025

Chris Opila
2001 L Street N.W.
Washington, District of Columbia 20036

RE:    ICE FOIA Case Number 2025-ICFO-51693

Dear Requester:

This acknowledges receipt of your Freedom of Information Act (FOIA) request to U.S. Immigration and Customs Enforcement (ICE), dated 7/29/2025, your request for a waiver of all assessable FOIA fees, and your request for expedited treatment. Your request was received in this office on 7/29/2025. Specifically, you have requested all guidance, instructions, policies, templates, and other similar records provided to an Office of the Principal Legal Advisor ("OPLA") Chief Counsel, OPLA Deputy Chief Counsel, or OPLA Assistant Chief Counsel since January 20, 2025, for dismissing an immigration court.

Due to the increasing number of FOIA requests received by this office, we may encounter some delay in processing your request. Per Section 5.5(a) of the DHS FOIA regulations, 6 C.F.R. Part 5, ICE processes FOIA requests according to their order of receipt. Although ICE's goal is to respond within 20 business days of receipt of your request, the FOIA does permit a 10-day extension of this time period. As your request seeks numerous documents that will necessitate a thorough and wide-ranging search, ICE will invoke a 10-day extension for your request, as allowed by Title 5 U.S.C. § 552(a)(6)(B). If you're able to narrow the scope of your request please contact our office. Narrowing the scope may speed up the search process. We will make every effort to comply with your request

in a timely manner.

In addition, ICE acknowledges that your FOIA request includes a request for fee waiver. We will adjudicate this request only if the agency is allowed to assess fees under the FOIA. See 6 C.F.R. § 5.11(c)-(d). If this is the case, you will be notified of our decision in a separate communication. If there are no assessable fees, your request for a fee waiver will be moot and you will not receive further communications from ICE regarding fees related to this FOIA request.

Your request for expedited treatment is hereby denied.

Under the DHS FOIA regulations, expedited processing of a FOIA request is warranted if the request involves "circumstances in which the lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual," 6 C.F.R. § 5.5(e)(1)(i), or "an urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information," 6 C.F.R. § 5.5(e)(l)(ii). Requesters seeking expedited processing must submit a statement explaining in detail the basis for the request, and that statement must be certified by the requester to be true and correct. 6 C.F.R. § 5.5(e)(3).

Your request for expedited processing is denied because you do not qualify for either category under 6 C.F.R. § 5.5(e)(1). You failed to demonstrate a particular urgency to inform the public about the government activity involved in the request beyond the public's right to know about government activity generally. Your letter was conclusory in nature and did not present any facts to justify a grant of expedited processing under the applicable standards.

If you deem the decision to deny expedited treatment of your request an adverse determination, you have the right to appeal. Should you wish to do so, you must send your appeal and a copy of this letter, within 90 days of the date of this letter following the procedures outlined in the DHS FOIA regulations at 6 C.F.R. Part 5 § 5.5(e)(2). You may submit your appeal electronically at GILDFOIAAppeals@ice.dhs.gov or via regular mail to:

> U.S. Immigration and Customs Enforcement
> Office of the Principal Legal Advisor
> U.S. Department of Homeland Security
> 500 12th Street,, S.W., Mail Stop 5900
> Washington, D.C. 20536-5900

Your envelope and letter should be marked "FOIA Appeal." Copies of the FOIA and DHS regulations are available at www.dhs.gov/foia.

ICE has queried the appropriate program offices within ICE for responsive records. If any responsive records are located, they will be reviewed for determination of releasability. Please be assured that one of the processors in our office will respond to your request as expeditiously as possible. We appreciate your patience as we proceed with your request.

If you have any questions, please contact FOIA Public Liaison Daniel Edgington, at (866) 633-1182 or

500 12th St, SW Stop 5009 Washington, DC 20536-5009. Additionally, you have a right to seek dispute resolution services from the Office of Government Information Services (OGIS) which mediates disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation.  If you are requesting access to your own records (which is considered a Privacy Act request), you should know that OGIS does not have the authority to handle requests made under the Privacy Act of 1974.  You may contact OGIS as follows:  Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448.

Your request has been assigned reference number 2025-ICFO-51693. Please use this number in future correspondence.

Sincerely,

ICE FOIA Office
Immigration and Customs Enforcement
Freedom of Information Act Office
500 12th Street, S.W., Stop 5009
Washington, D.C. 20536-5009

 Exhibit C 

October 14, 2025

**Via Email & Certified Mail**

U.S. Immigration and Customs Enforcement
Office of the Principal Legal Advisor
U.S. Department of Homeland Security
500 12th Street, S.W., Mail Stop 5900
Washington, D.C. 20536-5900
GILDFOIAAppeals@ice.dhs.gov

Senior Director of FOIA Operations
Privacy Office, Mail Stop 0655
U.S. Department of Homeland Security
245 Murray Lane SW
Washington, DC 20598-0655

Re:    Expedited Processing of Appeal of Expedited Processing Denial in FOIA Request No. 2025-ICFO-51693

Dear FOIA Officer:

The American Immigration Council (the "Council") and LatinoJustice PRLDEF (collectively, "Requesters") submitted FOIA Requests No. 2025-ICFO-51693 to U.S. Immigration & Customs Enforcement ("ICE") on July 29, 2025, for guidance issued to Office of the Principal Legal Advisor ("OPLA") Assistant Chief Counsel, Deputy Chief Counsel, or Chief Counsel since January 20, 2025, for dismissing cases. *See* Ex. A.

Requesters sought expedited processing of the Request under 5 U.S.C. § 552(a)(6)(E)(i) and 6 C.F.R. § 5.5(e)(1)(ii), (iv), which ICE denied on July 30, 2025. Requesters are appealing their denial and seek expedited processing of their appeal under 5 C.F.R. § 16.5(e)(1)(ii), (iv) and 5 U.S.C. § 552(a)(6)(E)(i).

Statement of Facts

Requesters certify that the statements herein are "true and correct" under 6 C.F.R. § 5.5(e)(3).



## I. Immigration Court Arrests & Dismissals Timeline

### A. Pre-Trump Administration 2.0 Policies

1. For decades, ICE officers largely refrained from civil immigration enforcement actions—including civil immigration arrests—in immigration courts, lest such arrests deter noncitizens from attending removal proceedings, impede the proper functioning of courts, and undermine the fair administration of justice.

2. ICE formalized this longstanding practice in an April 2021 memo that prohibited "civil immigration enforcement action … in or near a courthouse" (including immigration courts) absent a national security threat; imminent risk of death, violence, physical harm to any person, or destruction of evidence material to a criminal case; or hot pursuit of an individual posing a threat to public safety. U.S. Dep't of Homeland Sec., Memorandum re: Civil Immigration Enforcement Actions in or near Courthouses (Apr. 27, 2021).

3. Approximately two and half years later, the EOIR prohibited the DHS from making civil immigration arrests and taking other civil immigration enforcement actions "in or near an immigration court" except in the limited circumstances described above or where "a safe alternative location for the enforcement action d[id] not exist." U.S. Dep't of Just., Exec. Off. for Immigr. Rev., Off. of the Chief Immigr. Judge, PM 23-01, Operating Policies & Procedures Memorandum 23-01: Enforcement Actions in or Near OCIJ Space (Dec. 11, 2023).

### B. Trump Administration's Growing Frustration with Existing Processes Preventing It from Hitting Immigration Arrest and Deportation Targets

1. Before returning to office, Tom Homan and Stephen Miller, surrogates of then-candidate Trump who now serve as Border Czar and White House Deputy Chief of Staff respectively in the Trump Administration, promised to "take the handcuffs off ICE" and "launch a 'light speed' mass deportation campaign."[1]

2. Upon taking office, the Administration ordered ICE to arrest at least 1,200 to 1,500 noncitizens daily and threatened to hold agency officials accountable for missing these targets.[2]

---

[1] *See* Fox News, *Tom Homan: 'We're Going to Take the Handcuffs off ICE'*, YouTube (Jan. 19, 2025), https://www.youtube.com/watch?v=cimNzNpNhuk; Nick Miroff et al., *Deportation at 'Light Speed': How Trump's Crackdown Could Unfold*, The Washington Post (Jan. 16, 2025), https://www.washingtonpost.com/immigration/interactive/2025/trump-immigrants-mass-deportations/.

[2] Nick Miroff & Maria Sacchetti, *Trump Officials Issue Quotas to ICE Officers to Ramp Up Arrests*, The Washington Post (Jan. 26, 2025), https://www.washingtonpost.com/immigration/2025/01/26/ice-arrests-raids-trump-quota/.



3. Through February 2025, ICE struggled to meet these arrest targets, prompting the Trump Administration to remove the agency's acting director and other top officials.[3]

4. By March 2025, the Trump Administration had grown increasingly frustrated with ICE's failure to meet these targets with Tom Homan, telling President Trump that ICE "need[s] to increase the arrests," as their numbers were "not high enough."[4]

5. In May 2025, Stephen Miller, the White House's Deputy Chief of Staff and leading architect of President Trump's immigration policy, "laid into top immigration officials" for not hitting their arrest and deportation targets.[5]

6. Trump Administration then announced an increase of ICE's arrest target to 3,000 arrests for per day and replaced the acting ERO director.[6]

C. Immigration Court Arrests, Dismissals, & Policy Changes

1. Meanwhile, the Administration authorized ICE to conduct civil immigration arrests in and around immigration courts to help it meet its daily arrest quota.

2. On January 21, 2025, ICE rescinded the April 27, 2021, memo. On an interim basis, it also authorized agency officers or agents to "conduct civil immigration actions in or near courthouses when they have credible information that leads them to believe the targeted [noncitizen(s)] is or will be present at a specific location, and where such action is not precluded by the jurisdiction in which the enforcement action will take place." U.S. Immig. & Customs Enf't, Policy No. 11072.3, Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses (Jan. 21, 2025).

3. Seven days later, the EOIR "rescinded and cancelled" its prohibition of "civil immigration actions by the Department of Homeland Security (DHS) in or near EOIR space." U.S. Dep't of Just., PM 25-06, Cancellation of Operating Policies & Procedures Memorandum 23-01 (Jan. 28, 2025).

---

[3] Marianne LeVine & Nick Miroff, *Acting ICE Director Removed Amid White House Pressure to Boost Arrests*, The Washington Post (Feb. 21, 2025), https://www.washingtonpost.com/immigration/2025/02/21/ice-director-removed-caleb-vitello/ Nick Miroff & Marianne LeVine, *ICE Struggles to Boost Arrest Numbers Despite Infusion of Resources*, The Washington Post (Feb. 15, 2025), https://www.washingtonpost.com/immigration/2025/02/15/ice-arrests-immigration-deportations/; Nick Miroff, *Top ICE Officials Reassigned Amid Strain to Meet Trump Deportation Goals*, The Washington Post (Feb. 11, 2025), https://www.washingtonpost.com/immigration/2025/02/11/ice-enforcement-officials-reassigned/.

[4] Hamed Aleaziz & Zolan Kanno-Youngs, *Frustration Grows Inside the White House Over Pace of Deportations*, The New York Times (Mar. 5, 2025), https://www.nytimes.com/2025/03/05/us/politics/trump-immigration-deportations-arrests.html?searchResultPosition=1.

[5] Brittany Gibson & Stef. W. Kight, *Scoop: Stephen Miller, Noem Tell ICE to Supercharge Immigrant Arrests*, Axios (May 28, 2025), https://www.axios.com/2025/05/28/immigration-ice-deportations-stephen-miller.

[6] Fox News, *Stephen Miller Reveals Trump Admin's 'Daily Goal' for Illegal Migrant Arrests*, YouTube (May 29, 2025), https://www.youtube.com/watch?v=MJNXsOqFSZs; Marianne LeVine & Maria Sacchetti, *Trump Administration Shakes Up ICE Leadership As It Struggles to Ramp Up Deportations*, The Washington Post (May 29, 2025), https://www.washingtonpost.com/immigration/2025/05/29/trump-ice-deportations-leadership-dhs/.

 

4. Around May 20, 2025, as the number of arrests and deportations remained below target, ICE began to arrest noncitizens in immigration courts—where they are easy to locate—and seek their removal through expedited removal —a faster process with fewer due process protections and no pathway to permanent residence.

5. ICE also instructed prosecutors in its Office of the Principal Legal Advisor ("OPLA") to identify any noncitizen with an upcoming immigration court hearing who would be susceptible to expedited removal if their immigration court case were dismissed and move to dismiss this case. It further directed OPLA prosecutors to inform ERO officers of such a noncitizen at least 48 hours in advance of the upcoming hearing and provide "the exact location of the courtroom at which the … hearing is being held and an estimate of the time frame for the hearing." It also ordered OPLA prosecutors to give the immigration court "a 24-hour warning" of the planned enforcement operation.[7]

6. On May 27, 2025, ICE published its final guidance for courthouse arrests, wherein it authorized agency officers and agents to "conduct civil immigration enforcement actions in or near courthouses when they have credible information that leads them to believe the targeted [noncitizen(s)] is or will be present at a specific location," even in jurisdictions whose laws preclude courthouse arrests. U.S. Immigr. & Customs Enf't, Policy No. 11072.4, Civil Immigration Enforcement Actions in or near Courthouses (May 27, 2025).

7. On May 30, 2025, the EOIR emailed Assistant Chief Immigration Judges (ACIJs) new guidance for ICE motions to dismiss and courthouse arrests. Notwithstanding agency regulations and policy requiring parties to make pre-trial motions "in writing and … state, with particularly the grounds therefor," 8 C.F.R. 1003.23(a), the guidance allows "DHS Motions to Dismiss [to] be made orally and decided from the bench" without "additional documentation or briefing." Ex. B.

8. The guidance also advises that "[t]he motion to dismiss is regulatory" based upon Immigration and Nationality Act (INA) 239.2(a)(6) (Notice to Appear "improvidently issued") or INA 239.2(a)(7) ("[C]ircumstances have changed to such an extent that continuation is no longer in the best interest of the government"), *id.*, misstating the standard for dismissal for changed circumstances, *cf.* 8 C.F.R. 239.2(a)(7), (c) ("Circumstances *of the case* have changed after the notice to appear was issued to such an extent that continuation is no longer in the best interest of the government" (emphasis added)). Ex. B.

9. The guidance further provides that "[g]enerally, if DHS has met the regulatory burden, the oral motion to dismiss may be granted" without "[a] 10-day response period," *id.*,

---

[7] Hamed Aleaziz et al., *How ICE is Seeking to Ramp Up Deportations Through Courthouse Arrests*, NY Times (May 30, 2025), https://www.nytimes.com/2025/05/30/us/politics/ice-courthouse-arrests.html.



despite agency policy giving noncitizens ten days to respond to such motions, Immigration Court Practice Manual 3.1(b)(1)(A).

10. Finally, the guidance directs ACIJs to ensure the immigration judges and administrative staff under their supervision "are familiar with Policy Memo 25-06"—which rescinded past guidance barring ICE arrests at immigration courts—and to reach out to the Regional Deputy Chief Immigration Judge supervising them if they "encounter any unusual circumstances with an enforcement action." Ex. B.

11. Pursuant to this guidance, ACIJs have directed and pressured immigration judges they supervise to grant ICE motions to dismiss unless they are defective. Ex. C.

12. ICE has arrested thousands of noncitizens in immigration courts around the country since May 20, 2025.

13. ICE also filed 6,221 motions to dismiss noncitizens' removal proceedings between May 20, 2025, and July 28, 2025, 81 percent of which were oral.[8]

14. Immigration judges adjudicated 78 percent of these motions on the day filed, granted 73 percent of them, and dismissed 4,558 noncitizens' removal proceedings, allowing ICE to put them into expedited removal.[9]

15. ICE is continuing to arrest noncitizens in immigration courts around the country and move to dismiss their removal proceedings.

## II.    Media Coverage of Immigration Court Dismissals

Immigration court dismissals have received ongoing, widespread, and exceptional media coverage since ICE launched this new enforcement tactic at the end of May 2025. This coverage has repeatedly expressed public doubts about this tactic's integrity and legality.

Requesters' initial expedite request points the agencies to eighty-seven articles about immigration court dismissals between May 20, 2025, and the Requests' filing date. Ex. A at 2-7 & n.2. Since then, national, state, and local media outlets have published another thirty-two[10] on this matter, bringing the total coverage to one hundred and nineteen articles.

---

[8] Laila Khan & Chris Opila, *ICE Attorneys Increasingly Request Case Dismissals at Immigration Court Hearings—and Immigration Judges Grant Them on the Spot*, Am. Immigr. Council (Oct. 7, 2025), https://www.americanimmigrationcouncil.org/blog/ice-attorneys-case-dismissals-immigration-court-hearings-judges-grant/.

[9] *Id.*

[10] Julia Ingram, *ICE Agents Target New York City Immigration Courts More Often Than Others, New Analysis Suggests*, CBS News (Oct. 8, 2025, 12:49 PM), https://www.cbsnews.com/news/ice-agents-new-york-city-immigration-courts-analysis/; Sage Ríos Mace, *ICE Slams Man Against Wall in Mistaken Arrest at S.F. Immigration Court*, Mission Local (Sept. 26, 2025, 8:09 PM), https://missionlocal.org/2025/09/ice-mistakenly-arrests-man-at-s-f-immigration-court/ (hereinafter "Mace re: ICE Mistaken Arrest"); Sage Ríos Mace, *Supervisor Fielder Visits S.F. Immigration Court, Concerned Over Conditions* (Sept. 26, 2025, 12:23 PM), https://missionlocal.org/2025/09/supervisor-fielder-visits-s-f-



immigration-court-concerned-over-conditions/ (hereinafter, "Mace re: Supervisor Fielder Visit"); Sage Ríos Mace, *Man With 10 by 10 Inch Tumor Escapes ICE Detention in S.F.—For Now*, Mission Local (Sept. 19, 2025, 3:57 PM), https://missionlocal.org/2025/09/man-with-10-by-12-in-tumor-escapes-ice-detention-in-s-f-for-now/ (hereinafter, "Mace re: ICE Escape"); Mariana Garcia, *ICE Arrests Another 7 at S.F. Immigration Court, 2 Without Lawyers*, Mission Local (Sept. 18, 2025, 3:50 PM), https://missionlocal.org/2025/09/ice-arrests-another-7-at-s-f-immigration-court-2-without-lawyers/ (hereinafter, "Garcia re: ICE 7 Arrests"); Shelby Bremer, *ICE Making Fewer Arrests at San Diego Immigration Court, Sources Say*, 7 San Diego (Sept. 10, 2025, 6:29 PM), https://www.nbcsandiego.com/news/local/ice-making-fewer-arrests-at-san-diego-immigration-court-sources-say/3899247/; Mariana Garcia, *ICE Makes Largest Single-Court Arrest in S.F., Detaining 8*, Mission Local (Sept. 12, 2025, 1:52 PM), https://missionlocal.org/2025/09/ice-arrests-8-asylum-seekers-at-s-f-immigration-court-most-ever-in-single-morning/ (hereinafter, "Garcia re: Largest ICE Arrest in S.F."); Gustavo Solis, *San Diego Class-Action Suit Says ICE Courthouse Arrests Are Illegal*, KPBS 65 (Sept. 9, 2025, 4:52 PM), https://www.kpbs.org/news/border-immigration/2025/09/09/san-diego-class-action-suit-says-ice-courthouse-arrests-are-illegal (hereinafter, "Solis re: San Diego Class Action"); Mark Liederman, *Asylum Seeker in Chicago 'Whisked Away' By ICE to Louisiana After Routine Court Hearing: Lawsuit*, Block Club Chicago (Sept. 10, 2025), https://blockclubchicago.org/2025/09/10/asylum-seeker-in-chicago-whisked-away-by-ice-to-louisiana-after-routine-court-hearing-lawsuit/; Dean Moses, *A Day at Lower Manhattan Immigration Court: ICE Agents Accost Citizen, Immigrant Left in Tears, Another Family Separated*, AMNY (Sept. 9, 2025), https://www.amny.com/news/lower-manhattan-immigration-court-ice-09092025/ (hereinafter, "Moses re: A Day in Manhattan Immigr. Ct."); Cassandra Stephenson, *Memphis Legal Nonprofit, Clergy Look to Create Immigration Court Watch Program*, Tennessee Lookout (Sept. 8, 2025, 5:00AM), https://tennesseelookout.com/2025/09/08/memphis-legal-nonprofit-clergy-look-to-create-immigration-court-watch-program/; Neil G. Ballard, *Illustrating A Day Inside San Francisco's Immigration Court*, Mission Local (Sept. 7, 2025, 12:30pm), https://missionlocal.org/2025/09/illustrating-a-day-inside-san-franciscos-immigration-court/; Mark Dow, *'There is No Law': Scenes from a Houston Immigration Court in Trump's America*, Common Dreams (Sept. 6, 2025), https://www.commondreams.org/opinion/houston-immigration-court-trump; Mariana Garcia, *ICE Arrests Three at S.F. Immigration Court, Including Man Trying to Self-Deport*, Mission Local (Sept. 5, 2025, 2:11 PM), https://missionlocal.org/2025/09/ice-arrests-three-at-immigration-court/ (hereinafter, "Garcia re: ICE Arrests 3"); Margaret Kadifa, *ICE Arrests Five Asylum-Seekers in S.F., Despite Judge Blocking Trump Deportation Policy*, Mission Local (Sept. 4, 2025, 6:02 PM), https://missionlocal.org/2025/09/ice-arrest-federal-ruling/ (hereinafter, "Kadifa re: ICE Arrests 5"); Dean Moses, *The Intimidation Game: NYC Immigration Lawyers Say Their Clients Can't Get a Fair Hearing With ICE Agents Stalking the Courthouses*, AMNY (Sept. 3, 2025), https://www.amny.com/news/nyc-immigraiton-lawyers-ice-agents-arrests-courts/ (hereinafter, "Moses re: Unfair Hearings"); Margaret Kadifa, *S.F. Immigration Judge Ordered a Woman Into Court. Then ICE Took Her*, Mission Local (Aug. 28, 2025, 5:53 PM), https://missionlocal.org/2025/08/six-arrested-immigration-court/ ("hereinafter, "Kadifa re: S.F. Judge Orders Woman to Appear Then ICE Took Her"); Michael Bott, *At Least 13 Migrants Detained by ICE in San Francisco as Arrests Soar*, NBC Bay Area (Aug. 28, 2025, 6:32 PM), https://www.nbcbayarea.com/news/local/migrants-detained-ice-san-francisco/3940300/; Eric Feldman, *Fired Immigration Judge: 'I Fear Due Process Is Being Violated'*, NY1 (Aug. 27, 2025, 8:20 AM), https://ny1.com/nyc/all-boroughs/politics/2025/08/27/fired-immigration-judge-warns-courts-are-being-set-up-to-fail-; Mariana Garcia, *ICE Arrests Colombian Asylum Seeker at S.F. Court Hearing*, Mission Local (Aug. 22, 2025, 1:11 PM), https://missionlocal.org/2025/08/sf-ice-colombian-asylum-seeker-arrest/ (hereinafter, "Garcia: ICE Arrests Colombian Asylum Seeker"); Sara Holthouse, *Local Groups Call Attention to Buffalo ICE Incident Involving City Woman*, The Post-Journal (Aug. 16, 2025), https://www.post-journal.com/news/top-stories/2025/08/local-groups-call-attention-to-buffalo-ice-incident-involving-city-woman/; Margaret Kadifa, *ICE Makes Unusual Arrests of Indigenous Woman in S.F. Immigration Court*, Mission Local (Aug. 15, 2025, 4:42 PM), https://missionlocal.org/2025/08/sf-ice-indigenous-arrest-immigration-court/ (hereinafter, "Kadifa re: ICE Arrests Indigenous Woman"); Aleja Hertzler-McCain, *'There Really Is No Escape': Faith Leaders Help Immigrants Face Court as*



Much of the media coverage of immigration court dismissals "casts doubt on their integrity, describing them as a violation of due process and a tactic to deport noncitizens without hearings." Ex. A at 6 & n.3 (gathering articles).

The ongoing media coverage of immigration dismissals continues to prominently feature the public controversy, doubt, and questions about their integrity, propriety, and legality. Specifically,

1. On August 1, 2025, the Austin Chronicle published an article about immigration court arrests and dismissals. Therein it covered Congressman Greg Casar's alarm that immigration judges "are dismissing the cases of people applying for asylum without even hearing them" and"[a]fter the dismissals, ICE officers use a formerly obscure process … to quickly deport the immigrants, sometimes in less than a day." It noted that "these people were faithfully following the rules applying to asylum" so "now, lawyers may start advising people not to go to court, if court is no longer safe." And it discussed Congressman Casar's belief that these summary dismissals are "a violation of the Constitution, particularly the 14th Amendment's due process clause."[11]

2. On August 4, 2025, PBS published its interview with Father Brian Strassberger—a Jesuit Priest who services migrants on both sides of the U.S.-Mexican border—about the immigration court arrests and dismissals he observed at the Harlingen Immigration Court. Fr. Strassberger described what he observed as "a breakdown of justice in America," a "sham," and "tactics … used by the government to increase

---

*ICE Arrests Rise*, RNS (Aug. 15, 2025), https://religionnews.com/2025/08/15/faith-leaders-accompany-immigrants-to-court-appointments/; Jose Pagliery, *Ex-Immigration Judge Reveals Tactics Used to Arrest Migrants Who Show Up for Court*, NOTUS (Aug. 14, 2025, 5:18 AM), https://www.notus.org/courts/former-immigration-judge-court-hearings-ice-arrest; Haidee Chu & Gwynne Hogan, *NYC Is the Nation's Capital of Immigration Courthouse Arrests, New Data Analysis Shows* (Aug. 11, 2025, 5:00 AM), https://www.thecity.nyc/2025/08/11/26-federal-plaza-immigration-court-trump-arrests-data-analysis/; Deepa Bharath, *Faith Leaders Rally to Support Immigrants Facing Deportation in Southern California*, Associated Press (Aug. 8, 2025, 7:01 AM), https://apnews.com/article/faith-leaders-california-trump-immigration-crackdown-c08b988309584aa3fdd4f86d8b1ee272; Stephen Hobbs, *At Sacramento's Immigration Court, These Volunteers Have Their Eyes on ICE*, The Sacramento Bee (Aug. 7, 2025, 1:47 PM), https://www.sacbee.com/news/politics-government/capitol-alert/article311482768.html; Tim Henderson, *ICE Has a New Courthouse Tactic: Get Immigrants' Cases Tossed, Then Arrest Them Outside*, Stateline (August 6, 2025, 5:00 AM), https://stateline.org/2025/08/06/ice-has-a-new-courthouse-tactic-get-immigrants-cases-tossed-then-arrest-them-outside/; William Brangham et al., *Jesuit Priest Describes Seeing ICE Agents Target Migrants at Immigration Court*, PBS News (Aug. 4, 2025, 6:30 PM), https://www.pbs.org/newshour/show/jesuit-priest-describes-seeing-ice-agents-target-migrants-at-immigration-court; Margaret Kadifa, *Four Out of Five Asylum Seekers Arrested Friday in S.F. Immigration Court*, Mission Local (Aug. 1, 2025, 5:04 PM), https://missionlocal.org/2025/08/four-arrested-friday-immigrationcourt/ (hereinafter, "Kadifa re: Friday Arrests"); Brant Bingamon, *Judges Are Ignoring the Rule of Law in Immigration Court, Greg Casar Says*, The Austin Chronicle (Aug. 1, 2025), https://www.austinchronicle.com/news/2025-08-01/judges-are-ignoring-the-rule-of-law-in-immigration-court-greg-casar-says/; Matt Shuham, *Five Days in Immigration Court*, HuffPost (July 25, 2025), https://www.huffpost.com/entry/five-days-in-new-york-city-immigration-court-federal-agents_n_68640763e4b0aa65edbb4642.
[11] Bingham, *supra* n.10.




detention and deportation, especially fast-track deportation without allowing someone to go through the regular procedures of the law that have been part of U.S. immigration policy for decades." Fr. Strassberger shared that noncitizens "are terrified to go to court" as a result.[12]

3.  On August 6, 2025, Stateline published an article about immigration court arrests and dismissals. Therein, it discussed advocates' beliefs that "courthouse arrests and dismissals for placement in expedited removal" are "illegal" and "contrary to the traditional way people are treated when released at the border for court dates." It discussed how "the new practice of arresting people after they show up for court hearings" is "uproot[ing] lives," "may cross a new line legally," and "could make immigrants hesitant to show up for court dates, which in turn could make them subject to immediate deportation."[13]

4.  On August 12, 2025, AMNY published an article about immigration court arrests and dismissals. Therein it noted that "immigrants due to appear in court at Federal Plaza [Immigration Court] have also tried to skip their hearing to avoid possible arrest" and that ICE targeting courthouses "silences victims, scares witnesses, and keeps [the New York City] community from seeking justice or vital services."[14]

5.  On August 14, 2025, the New Republic and Law and Crime each published an article about immigration court arrests and dismissals. Therein, they covered the Honorable Judge Dale E. Ho's "scathing opinion" finding that ICE "arrests in immigration court had turned the procedure into 'detention roulette'" and violate the Fifth Amendment.[15]

6.  On August 15, 2025, Religion News published an article about immigration court arrests and dismissals. Therein, it described clergy and other religious figures as "accompanying immigrants to court appointments to provide comfort and information and, in case where their worst fears are realized, pick up the pieces of a shattered American dream." It also quoted Rev. Noel Andersen, national field director at Church World Service, as describing ICE arrests as "abducti[ons]" and Rev. Chloe Beyer, an Episcopal priest and director of the Interfaith Center of New York" as

---

[12] Brangham et al. *supra* n.10.

[13] Henderson, *supra* n.10.

[14] Dean Moses, *ICE in Courts: More Immigrants Cuffed in Lower Manhattan as Legal Groups Look to Preserve and Expand New York's Immigration Protections*, AMNY (Aug. 12, 2025), https://www.amny.com/news/ice-in-courts-immigrant-protections-new-york/ (hereinafter, "Moses re: ICE in Courts").

[15] Elie Quinlan Houghtaling, *Judge Torches Trump for Letting ICE Arrest People at Immigration Court*, New Republic (Aug. 14, 2025, 10:48 AM), https://newrepublic.com/post/199098/judge-donald-trump-ice-immigration-court-due-process; Colin Kalmbacher, *'Erroneous Deprivation of Liberty': Angry Judge Swipes at Trump Admin Over 'Game of Detention Roulette' and "Masked" ICE Agents at Immigration Hearings in Habeas Case*, Law & Crime (Aug. 14, 2025, 12:39 PM), https://lawandcrime.com/high-profile/erroneous-deprivation-of-liberty-angry-judge-swipes-at-trump-admin-over-game-of-detention-roulette-and-masked-ice-agents-at-immigration-hearings-in-habeas-case/.



describing ICE arrests as "a kind of public display of lawlessness" in which "there seemed to be no 'rhyme or reason' behind which immigrants were detained and which were able to leave."[16]

7.  On August 18, 2025, AMNY published an article about a sketch artist documenting immigration court arrests and dismissals at a New York City Immigration Court. Therein, it reported the artist describing this tactic as "like a canary in the coal mine situation" and that many call the arrests "abductions."[17]

8.  On August 19, 2025, AMNY published an article about New York City and the State of New York filing amicus briefs in a lawsuit challenging immigration court arrests and dismissals. Therein, it reported that these jurisdictions' belief that this "practice deters people from attending hearings and undermines public safety" and various officials' statements criticizing this tactic for "chipping away at the bedrock principles of fairness and due process that support our entire system of justice."[18]

9.  On August 19, 2025, CBS News published an article about New York City filing an amicus brief in a lawsuit challenging immigration court arrests and dismissals. Therein, it quoted city officials criticizing this tactic as "wrong" and for "deter[ring] people from accessing the court system on which local governance depends." It noted concerns that "immigrants heading to court have been 'caught in a trap laid by immigration authorities' which presents them 'with an impossible choice: risk detention by attending future court proceedings or run the same risk by not attending.'"[19]

10. On August 25, 2025, NPR published an article about immigration court arrests and dismissals in a New York City Immigration Court. Therein, it reported that this tactic "has thrown immigration courts into chaos" and volunteer observers' beliefs that ICE's "strategies and … tactics have become more and more aggressive and assertive." It also quoted an immigration attorney as stating that "we've seen an institution die in real time … To see this institution that we've been arguing cases in, that we've been representing people in for years and years, essentially just be eviscerated by the Department of Homeland Security—and in a matter of months—has been absolutely surreal." "People are being put into an absolutely impossible situation," he said.

[16] Hertzler-McCain, *supra* n.10.

[17] Dean Moses, *The Art of Bearing Witness: How One Sketch Artists Is Capturing the ICE Arrests in NYC Immigration Court,* AMNY (Aug. 18, 2025), https://www.amny.com/new-york/sketch-artist-ice-arrests-nyc-courts/.

[18] Adam Daly, *NY Leaders Join Lawsuits to Halt ICE Courthouse Arrests & Improve Detention Conditions*, AMNY (Aug. 19, 2025), https://www.amny.com/immigration/ny-leaders-lawsuit-ice-courthouse-arrests/.

[19] Marcia Karmer, *Mayor Adams, NYC Ask Court to Stop ICE Arrests at Immigration Court Hearings*, CBS News (Aug. 19, 2025, 6:38 PM), https://www.cbsnews.com/newyork/news/ice-arrests-at-immigration-court-hearings/.




"They're being forced to gamble their own liberty versus potentially continuing with their case, continuing with their claim."[20]

11. On August 27, 2025, Spectrum News published an interview with a recently terminated immigration judge. Therein, she expressed "fears that the [immigration] court system is being set up to fail" and that "due process is being violated and that justice is being kicked to the curb." She described "a pressure campaign from the Trump administration on specific cases" to get immigration judges "to comply with any directive or email that [they] have received because [they] want to keep [their] job."[21]

12. On August 28, 2025, NBC Bay Area published an article about immigration court arrests and dismissals in the San Francisco Immigration Court. Therein, it reported an immigration lawyer's opinion that "courthouse arrests seem to align with [ICE's] practice over the last two months of trying to get cases dismissed so they can take away people's rights to apply for asylum and put them in expedited proceedings."[22]

13. On August 29, 2025, a PBS affiliate published an article about immigration court arrests in the San Diego Immigration Court. Therein, it reported an immigration attorney's belief that courthouse arrests "remove[] a lot of credibility from the process."[23]

14. On September 3, 2025, AMNY published an article about immigration court arrests and dismissals in a New York City Immigration Court. Therein, it reported immigration attorneys' belief that this tactic is "making it harder for [their clients] to get a fair shake before a judge" because "judges are scared of being retaliated against or losing their jobs, because you've seen in recent cases where there are immigration judges that have high approval ratings have gotten fired, and I think a lot of judges are scared to either get fired or have retaliation, so a lot of them are just agreeing with DHS." One attorney noted that "[t]here's been so many cases where the judges are not even listening to attorneys' arguments. No matter how valid the arguments are, they're just automatically siding with DHS."[24]

15. On September 3, 2025, AMNY published an article about immigration court arrests and dismissals in a New York City Immigration Court. Therein, it reported NY Attorney General Letitia James's criticism of this tactic, which she derided as an "attempt[] to

---

[20] Ximena Bustillo, *Confusion, Explosive Anger and Waiting: NPR Spent a Day in New York Immigration Court*, NPR (Aug. 25, 2025, 5:00 AM), https://www.npr.org/2025/08/25/nx-s1-5503595/immigration-court-new-york (hereinafter "Bustillo re: NY Immigration Court").

[21] Feldman, *supra* n.10.

[22] Bott, *supra* n.10.

[23] Gustavo Solis, *One Man's Journey Through the Trump Era Asylum System*, KPBS (Aug. 29, 2025, 6:00 AM), https://www.kpbs.org/news/border-immigration/2025/08/28/one-mans-journey-through-the-trump-era-asylum-system (hereinafter "Solis re: One Man's Journey").

[24] Moses re: Unfair Hearings, *supra* n.10



rewrite immigration law, erase due process protections, and deny people their most basic constitutional rights."[25]

16. On September 4, 2025, Mission Local (a San Francisco news site) published an article about immigration court arrests and dismissals in the San Francisco Immigration Court. Therein, it reported that immigration judges face "pressure from the Executive Office for Immigration Judge" "to grant" ICE motions to dismiss and that even where an immigration judge denies the motion, arrested individuals "are transferred to longer-term detention facilities , where their cases are heard by more-conservative judges who are more willing to grant the motion to dismiss, allowing DHS to put the asylum-seeker in expedited removal." It also reported that "[s]ome asylum-seekers, frightened by the arrest and possibility of detention, give up their rights to asylum and ask to leave the country before a judge can even rule on the motion to dismiss," while "[o]thers, particularly in recent weeks, get released from detention on habeas corpus petitions, which argue that DHS violated their due process rights by arresting and detaining them."[26]

17. On September 6, 2025, Common Dreams published an article about immigration court arrests and dismissals. Therein, it reported that the ICE "prosecutor can literally dismiss [noncitizens'] cases, send a text message or a Teams message … to the ICE agents, who are in the hallways, and then they know exactly who's coming out." It also reported that ICE "wants more people detained and has always opposed due process and interfered with legal help."[27]

18. On September 9, 2025, AMNY published an article about immigration court arrests and dismissals in a New York Immigration Court. Therein, it reported the opinion of an immigration attorney that "many judges have been dismissing cases out of fear for their jobs": "'[A] lot of judges are scared of being retaliated against or losing their jobs, because you've seen in recent cases where there are immigration judges that have high approval ratings have gotten fired, and I think a lot of judges are scared to either get fired or have retaliation, so a lot of them are just agreeing with DHS,' [the attorney] said. 'There's been so many cases where the judges are not even listening to attorneys' arguments. No matter how valid the arguments are, they're just automatically siding with DHS.'"[28]

19. On September 18, 2025, Mission Local published an article about immigration court arrests and dismissals in the San Francisco Immigration Court. Therein, it noted that "[i]t is difficult for [individuals arrested] to continue pleading their cases while in

[25] Dean Moses, *ICE Arrests Ramp Up in NYC Immigration Court as AG Letitia James Fights to Stop Indefinite Detentions*, AMNY (Sept. 3, 2025), https://www.amny.com/news/ice-arrests-increase-nyc-immigration-court-09042025/.
[26] Kadifa re: ICE Arrests 5, *supra* n.10.
[27] Dow, *supra* n.10.
[28] Moses re: A Day in Manhattan Immigr. Ct, *supra* n.10.

 

detention" and that no observers were present when ICE moved to dismiss several noncitizens' asylum cases because "[t]hey were overwhelmed with assisting five other people who were arrested earlier that morning."[29]

20. On September 18, 2025, Mission Local published an article about a lawsuit filed against immigration court arrests and dismissals in San Francisco. It reported that this "practice puts asylum seekers in a Catch-22: Either attend your court hearing in person and risk arrest, or skip court and be declared deportable." It also reported that this tactic allegedly violates "the First and Fifth Amendments, particularly the Fifth Amendment's due-process protections."[30]

21. On September 19, 2025, KQED (an NPR and PBS affiliate) published an article about a lawsuit filed by "Bay Area immigrant rights advocates" against immigration court arrests and dismissals in San Francisco. Therein it reported allegations that "[t]hese arrests are often traumatic and needlessly violent" and that "[t]he unprecedented tactic has triggered heated protests, with some activists attempting to block arrests and getting into clashes with ICE officers." It quotes advocates decrying this tactic for "turn[ing] our immigration courts into a trap" wherein "[i]f [noncitizens] miss court, they automatically receive an *in absentia* order ordering their deportation" while "[o]n the other hand, folks who do come to court are not at risk of being arrested."[31]

22. On September 26, 2025, USA Today published an article about immigration court arrests in a New York City Immigration Court. Therein, it reported that the Court "has been the scene of previous controversial arrests, as agents detained people entering or exiting immigration court."[32]

23. On September 28, 2025, the San Francisco Examiner published an article about immigration court arrests and dismissals in the San Francisco Immigration Court. Therein it explained that "confusion is the new normal as once-predictable procedures have been upended under President Donald Trump's administration, which has employed novel strategies in an effort to carry out its mass-deportation pledge." It also reproted that the Court which "used to be, allegedly, where somebody

---

[29] Garcia re: ICE 7 Arrests, *supra* n.10.

[30] Joe Rivano Barros, *ACLU Sues ICE in S.F. to Stop Courthouse Arrests, 'Inhumane' Detention*, Mission Local (Sept. 18, 2025, 7:44 PM), https://missionlocal.org/2025/09/sf-aclu-lawsuit-ice-sansome/.

[31] Tyche Hendricks, *Bay Area Immigrant Advocates Sue the Trump Administration to End Courthouse Arrests*, KQED (Sept. 19, 2025, 11:42 AM), https://www.kqed.org/news/12056762/bay-area-immigrant-advocates-sue-the-trump-administration-to-end-courthouse-arrests.

[32] Eduardo Cuevas, *ICE Agent 'Relieved' of Duties After Video Captures Him Throwing Immigrant to the Floor*, USA Today (Sept. 26, 2025, 6:11 PM), https://www.usatoday.com/story/news/nation/2025/09/26/ice-agent-video-shoving-woman-dhs-new-york/86373206007/.



could go to present their case and at least have a judge adjudicate their case now is a trap."[33]

24. On October 8, 2025, CBS published an article about immigration arrests and dismissals. Therein, it reported the fears of an immigration attorney that "everything is going to fall apart and explode" at a New York City Immigration Court due to tensions about arrests "reaching a boiling point." It also decried the lack of transparency about courthouse arrests such that a mathematician had to do "drawn-out analysis to know ... basic facts" like how many immigrants ICE has arrested at immigration court. It reiterated that "Immigrants face 'an impossible catch 22,' ...: show up to court and risk arrest, or stay home and receive a deportation order" and that arrests are "going to do lasting and irreparable harm to noncitizens' trust in government systems."[34]

25. On October 10, 2025, Slate published an article about immigration court arrests and dismissals at a New York City Immigration Court. Therein, it described the court as "a flash point in Donald Trump's brutal transformation of the United States' immigration system, as armed and masked agents have abruptly arrested immigrants at various stages of the legal process." It also reported the following:

    i.    "The everyday reality of the White House's war on immigrants can be seen most in the quiet hallways of buildings like 26 Fed: paperwork filled out under the watchful eye of a secret police force that is allowed to act with impunity, breaking the social contract of laws and procedure in personal, invasive ways that dehumanize everyone it comes in contact with."

    ii.    "Inside 26 Fed, ICE does whatever it wants. Everyone else—the staff, the judges, the private security, the lawyers, the press, and especially those caught in this system—can do nothing but watch it happen."

    iii.    "It used to be that if you followed the system, you had a reasonable shot of a good outcome: the right paperwork going through, an asylum claim being granted. At the very least, you would be treated with a general sense of professionalism and courtesy, in exchange for attempting to navigate the system as it was designed. But paperwork and filings can no longer keep immigrants from being thrown in a cell, and an administration promising to scoop up the 'worst of the worst' is instead penalizing those who have done their best to follow the rules."

    iv.    "'What the Trump administration is doing is tricking people to go to court and then detain and deport them,' said ... the president of the New York Immigration Coalition, a nonprofit group that works on immigration issues

---

[33] Adam Shanks, *Inside the Contentious ICE Arrests at SF Immigration Courts*, San Francisco Examiner (Sept. 28, 2025), https://www.sfexaminer.com/news/the-city/sf-responds-to-trump-administration-immigration-policies/article_28a2fe03-8cd5-42f9-b8cb-e2c08444908f.html.

[34] Ingram, *supra* n.10.

 

in the city. 'Court used to be a refuge for the rule of law, not a trapdoor. What's happening [there] isn't justice. It's state-sponsored intimidation. It's always been about cruelty, which is the point. It's never been about the safety and security of this country.'"

v.   "The pressure of this situation eats away at everyone, but none more so than the people waiting for their time in front of the bench. You can see it in their faces, their bodies, the way that they speak….The fear is primal. The masked agents are hunters, looking to strike whenever someone vulnerable leaves the group."

vi.  "Initially, many of the deportation arrests happened after a judge 'dismissed' an asylum case. Many petitioners did not understand that dismissal meant that their case had not been approved; when they left, ICE agents were waiting to pounce and immediately eject them from the country. But now, observers said, the arrests are arbitrary and frequently mistaken." [35]

## III.   Condemnations in Op-Eds and By Editorial Boards and Professional Organizations

Several media outlets and other organizations have published editorials, op-eds, and statements critical of immigration court dismissals.

A.   On June 26, 2025, the Riverdale Press's editorial board criticized ICE for arresting a New York City high schooler in immigration court and moving to dismiss his case. The board decried the tactic as "a set up."[36]

B.   On July 7, 2025, the New York City Bar's Rule of Law Task Force and Immigration and Nationality Law Committee issued a statement condemning immigration court arrests and dismissals for violating noncitizens' due process rights. *See* Ex. D.

C.   On July 11, 2025, America published an op-ed by two Jesuit priests who had attended immigration proceedings at the Harlingen Immigration Court. Therein, they decried these proceedings as "a farce" and "shameful." The priests also described observing "[a]n undercover ICE official … present in [an immigration] courtroom … text[] another undercover ICE agent who was in the lobby to alert them that [a noncitizen] was leaving the courtroom and that he, as of a few minutes ago, had no legal status in the United States" so that the agent in the lobby could arrest the individual. They also called for the public to engage in "[d]irect observation and accompaniment" in immigration court and

---

[35] Jack Crosbie, *Dystopian, Mundane, Terrifying: How ICE Turned Court Into Immigrants' Hell*, Slate (Oct. 10, 2025, 5:40 AM), https://slate.com/news-and-politics/2025/10/ice-deportations-immigration-trump-new-york-city.html.
[36] *Masked ICE Arrests Raise Urgent Questions About U.S. Immigration Practices*, The Riverdale Press (June 26, 2025), https://www.riverdalepress.com/stories/masked-ice-arrests-raise-urgent-questions-about-us-immigration-practices,187060.




call their "elected officials" to let them "know that you are aware of what is taking place and do not support it."[37]

D. On July 18, 2025, a former OPLA prosecutor wrote an op-ed in the Hill. Therein, she criticized immigration court arrests and dismissals as "seriously disturbing" and an attempt "restructure the immigration system by force and without debate or legislation" that will lead to "the collapse of immigration courts as we know them."[38]

## IV. Condemnations of Immigration Court Dismissals by U.S. Senators, Members of Congress, and State and Local Officials

Numerous political leaders have issued statements and sent letters criticizing immigration court dismissals. Several of the letters call on ICE and to release guidance documents and other materials.

A. On May 21, 2025, Senator Ruben Gallego denounced immigration court arrests and dismissals as "chaos that doesn't bring any more security" but rather "discourages people from showing up to court, making our immigration system less efficient—not more." @SenRubeGallego, X (May 21, 2025, 3:16 PM), https://x.com/SenRubenGallego/status/1925269435801068021.

B. On May 28, 2025, four members of Arizona's Congressional delegation sent a letter to the DHS Secretary and the Acting Director of ICE to "express concern regarding recent actions by [ICE] at the Phoenix immigration court on May 20th and 21st, 2025, in light of reports that ICE abruptly detained multiple individuals who were attending their scheduled immigration court hearings—a pattern reported in other cities across the country." Ex. E at 1 (footnotes omitted). They noted that "ICE's unprecedented enforcement actions created a confusing and frightening environment in what should have been a routine court appearance" and decried these tactics for "mak[ing] the immigration system less efficient and fair and discourag[ing] individuals from appearing for future hearings." Id. at 2. They also asked the agencies to provide "the relevant memorandum, guidance, or other written directive associated with this ICE action" as well as other records. Id.

C. That day, Congressman Ritchie Torres also wrote the DHS Secretary and Acting Director of ICE to express his "deep concern regarding the recent detention of … a 20-year-old high school student, legal entrant to the United States, and a constituent of [his] in New York's 15th Congressional District in the Bronx" whom ICE had "detained … on May 21, 2025,

[37] Brian Strassburger, S.J. & William Critchley-Menor, S.J., What We Saw During An ICE Arrest & Immigration Court Hearing: The Breakdown of Justice in America, America: The Jesuit Review (July 11, 2025), https://www.americamagazine.org/politics-society/2025/07/11/ice-immigration-court-deportation-injustice-251119.
[38] Veronica Cardenas, I Was Once an ICE Prosecutor. What I See Now in Immigration Courts Is Disturbing, The Hill (July 17, 2025, 8:00AM), https://thehill.com/opinion/immigration/5404863-i-was-once-an-ice-prosecutor-what-i-see-now-in-immigration-courts-is-disturbing/.

 

following the dismissal of his immigration case in court." Ex. F. He noted that "[t]his incident will cause a deeply chilling effect on immigrant communities in [his] district, throughout New York City, and across the nation. Families will be too afraid to show up to court — even if they are fully adhering to the law … ICE's actions have undermined trust in the very institutions meant to offer structure and protection to those seeking to lawfully build new lives in America."

D. On May 29, 2025, Congresswoman Alexandra Ocasio Cortez criticized ICE for arresting the NYC school student in immigration court and dismissing his case. She decried this tactic as "an ambush" and for "undermining due process." @RepAOC, X (May 29, 2025, 5:25 PM), https://x.com/RepAOC/status/1928201139075301866.

E. On June 5, 2025, eighty-six members of the U.S. House of Representatives sent a letter to the Secretary of Homeland Security to "express grave concern over the disturbing pattern of [ICE] operations taking place at immigration court across the country— including recent incidents in New York City where masked, plainclothes ICE officers detained non-violent, non-criminal immigrants immediately following the dismissal of their existing deportation cases by DHS attorneys." Ex. G at 1. The representatives asked for any "[g]uidance … DHS [has] issued regarding the dismissal of ongoing court cases, followed by immediate ICE detention and expedited removal." *Id* at 3.

F. On July 1, 2025, the City of New York filed an amicus brief in support of a NYC city resident seeking release from ICE detention after ICE had arrested him in a Manhattan Immigration Court subsequent to a hearing in his immigration case. Ex. H. Therein, the City condemned immigration court arrests for "undermin[ing] the public interest" and "present[ing] many City residents with an impossible choice: risk detention by attending court proceedings or run the same risk by failing to attend." *Id*. at 5. It further decried the arrests for "[c]reating a culture of fear around court appearances" that "deters people from participating in judicial proceedings—and not just immigration proceedings, but all manner of court proceedings that depend on cooperation from members of the public, whatever their legal status may be." *Id*.

G. On July 7, 2025, the City of New York filed another amicus brief in support of another city resident seeking release from ICE detention after ICE had arrested him in a Manhattan Immigration Court subsequent to a hearing in his immigration case. Ex. I. Therein, the City again condemned immigration court arrests for "undermin[ing] the public interest" and "present[ing] many City residents with an impossible choice: risk detention by attending court proceedings or run the same risk by failing to attend." *Id*. at 5. It further decried the arrests for "[c]reating a culture of fear around court appearances" that "deters people from participating in judicial proceedings—and not just immigration proceedings, but all manner of court proceedings that depend on cooperation from members of the public, whatever their legal status may be." *Id*.

16

 

H. On July 11, 2025, twenty-four U.S. Senators sent a letter to the DHS Secretary, the Attorney General, and the Acting Director of ICE where they expressed numerous concerns about "reports of a recent initiative to arrest and detain noncitizens at their immigration court hearings, and in many cases, dismiss their immigration cases without advance notice and while hiding the government's intent to arrest them." Ex. J at 1. The Senators further decried this initiative for violating due process, not following immigration court procedures, and depriving noncitizens of the opportunity to obtain lawful status in the United States. *Id.* at 1-3. The Senators also asked the DHS and the DOJ/EOIR to provide guidance for dismissals and "enforcement actions in and around immigration courtrooms" and other records about this initiative. *Id.* at 4-6.

I. On July 28, 2025, Congressman Greg Casar criticized immigration court arrests and dismissals at a press conference outside the San Antonio Immigration Court after attending immigration proceedings therein. He decried the dismissals and other proceedings he witnessed as "the most disturbing, dystopian government proceeding [he] ha[d] ever seen or could ever imagine," "a show trial," and "a kangaroo court."[39] He also expressed a fear that immigration court arrests and dismissals "will result in the complete collapse of the immigration court system and the destruction of our judicial system in this country."[40]

J. On August 19, 2025, the City of New York filed a third amicus brief criticizing immigration court arrests and dismissals at New York City Immigration Courts. Therein, the City again decried this enforcement tactic for "present[ing] many other City residents with an impossible choice: risk detention by attending future court proceedings or run the same risk by not attending." Ex. K at 9. The City also reiterated its concern that this tactic is "[c]reating a culture of fear around court appearances" that "deters people from participating in judicial proceedings—not just immigration proceedings, but all manner of court proceedings that depend on cooperation from members of the public, whatever their status may be." *Id.* at 10.

K. On August 25, 2025, the State of New York filed an amicus brief criticizing immigration court arrests and dismissals at immigration courts in New York. Ex. L. Therein, the State decried this enforcement tactic for "chill[ing] [noncitizens'] participation in state and local proceedings" and "depriv[ing] the State, communities, and families of these noncitizens' important contributions," economic and otherwise." *Id.* at 11.

---

[39] Sanford Nowlin, U.S. Rep. Greg Casar Calls ICE Arrests at San Antonio Immigration Court 'Disturbing, Dystopian', San Antonio Current (July 28, 2025, 5:03 PM), https://www.sacurrent.com/news/us-rep-greg-casar-calls-ice-arrests-at-san-antonio-immigration-court-disturbing-dystopian-38097422.

[40] Meredith Haas, *ICE Arrests Outside SA Immigration Court Draw Criticism from Lawmakers, Advocates*, KENS5 (July 28, 2025, 6:06 PM), https://www.kens5.com/article/news/local/san-antonio-texas-immigration-court-ice-arrests-deportation-congressman-greg-casar-advocates-lawmakers/273-dd5bcb13-bcb5-4ea2-b6bb-9827e056376c.

 

V.    **Protests**: As noted in Requesters' initial expedite request, *see* Ex. A at 7 & n.4, opposition to immigration court arrests and dismissals and doubts about their legality is prompting sustained protests at immigration courts in Houston, New York, San Francisco, and elsewhere.[41]

VI.    **Accompaniment**: As noted in Requesters' initial expedite request, *see* Ex. A at 7-8 & n.5, opposition to immigration court arrests and dismissals and doubts about their legality is also prompting clergy, military veterans, political leaders, and ordinary public citizens to accompany noncitizens to immigration courts in Dallas, Denver, Los Angeles, Memphis, New York City, Orange County, Phoenix, San Antonio, Sacramento, San Francisco, San Diego, and elsewhere to try to stop, and otherwise document, courthouse arrests.[42]

VII.    **Lawsuits**: The legality of immigration court arrests and dismissals is at issue in numerous court challenges. Dozens of federal courts have deemed individual arrests unlawful and ordered

---

[41] Julius Consantine Motal, *Civil Disobedience & Mass Arrests Outside Immigration Court in New York – In Pictures*, Guardian (Sept. 19, 2025, 11:36 AM), https://www.theguardian.com/us-news/gallery/2025/sep/19/arrests-immigration-court-new-york-in-pictures; Barros, *supra* n.42; Dow, *supra* n.10; Bustillo re: NY Immigration Court, *supra* n.29; Joe Kukura, *US Citizen & SF Native Arrested by ICE After Protest*, SFIST (Aug. 22, 2025), https://sfist.com/2025/08/22/us-citizen-and-sf-native-arrested-by-ice-after-protest/; Margaret Kadifa & Joe Rivan Barros, *ICE Pepper Sprays Protestors & Press at S.F. Immigration Court*, Mission Local (Aug. 20, 2025, 12:53 PM), https://missionlocal.org/2025/08/ice-agents-pepper-spray-protesters-arrest-one-in-downtown-s-f/; Moses re: ICE in Courts, *supra* n.16; Dean Moses, *'Give Me Liberty or Give Me Death': Anti-ICE Protestors Dressed as Lady Justice, Statute of Liberty Arrested Outside of Manhattan Immigration Court*, AMNY (Aug. 11, 2025), https://www.amny.com/news/anti-ice-protesters-dressed-lady-justice-immigration-court/; Arya Sundaram, *NYPD Arrests 15 in Lower Manhattan Protest Against Immigrant Enforcement Tactics*, Gothamist (Aug. 8, 2025), https://gothamist.com/news/nypd-arrests-15-in-lower-manhattan-protest-against-immigration-enforcement-tactics.

[42] Crosbie, *supra* n.10; Priscilla Rice, *Volunteer Observers Are 'Staying Vigilant' as Dallas Immigration Court Arrests Continue*, KERA (Sept. 17, 2025, 5:21 AM), https://www.keranews.org/immigration/2025-09-17/volunteer-observers-dallas-immigration-court-arrests; Stephenson, *supra* n.10; Dow, *supra* n.10; Solis re: One Man's Journey, *supra* n.32; Bustillo re: NY Immigration Court, *supra* n.29; Michelle Boorstein, *He Was a Child Refugee. Now He's a Bishop Navigating Trump's Deportation Push.*, The Washington Post (Aug. 24, 2025, 6:00 AM), https://www.washingtonpost.com/nation/2025/08/24/pope-leo-bishop-san-diego-michael-pham/; Emma Ruby, *Fear & Heartbreak in Dallas' Federal Immigration Court*, Dallas Observer (Aug. 22, 2025), https://www.dallasobserver.com/news/ice-arrests-at-dallas-immigration-court-documented-by-community-23068425; Moses: ICE Arrests Slow, *supra* n.25; Holthouse, *supra* n.10; Hertzler-McCain, *supra* n.10; Haidee Chu & Gwynne Hogan, *NYC Is the Nation's Capital of Immigration Courthouse Arrests, New Data Analysis Shows* (Aug. 11, 2025, 5:00 AM), https://www.thecity.nyc/2025/08/11/26-federal-plaza-immigration-court-trump-arrests-data-analysis/; Bharath, *supra* n.10; Hobbs, *supra* n.10; Margaret Kadifa, *An Old Legal Procedure is Getting Asylum Seekers Out of ICE Detention* (Aug. 6, 2025, 2:30 PM), https://missionlocal.org/2025/08/habeas-corpus-petitions/; Crystal Cranmore, *Westchester High School Grad Detained by ICE After Routine Visa Hearing, Family Says*, ABC 7 (Aug. 4, 2025, 6:27 AM), https://abc7ny.com/post/westchester-high-school-grad-detained-ice-routine-visa-hearing/17407805/; Kadifa re: Friday Arrests, *supra* n.10; Bingamon, *supra* n.10; Shuham, *supra* n.10.

 

ICE to release the arrested individuals and the U.S. District Court for the Southern District of New York has stayed the EOIR's May 30 dismissal guidance in Manhattan and Bronx due to its likely illegality. The American public has a significant interest in learning more about immigration court arrests and dismissals before all the litigation challenging them resolves.

A. Federal courts across the country from Oregon to New York have deemed dozens of specific arrests in immigration courts unlawful, ordered ICE and the DHS to release the arrested individuals, and decried these arrests and dismissals for violating due process. *E.g.*, *Lopez Benitez v. Francis*, 25 Civ. 5937, 2025 WL 2371588, at *15 (S.D.N.Y. Aug. 13, 2025) ("'[T]reating attendance in immigration court as a game of detention roulette is not consistent with the constitutional guarantee of due process."); *Valesquez v. Kurzdorfer*, 25-cv-493, 2025 WL 1953796, at *13 (W.D.N.Y. July 16, 2025) (chastising the DHS for "pull[ing] the rug out from under [petitioner]"); Maxine Bernstein, *Federal Judge in Oregon: Homeland Security 'Tricked' Asylum Seeker Before Arrest at Immigration Court*, The Oregonian (July 15, 2025, 10:47 AM), https://tinyurl.com/mw3w9xdj (reporting that a federal judge blasted the DHS for its "series of procedural errors" and "oscillating legal positions").[43]

---

[43] *See also Lopez-Arevelo v. Ripa,* Cause No. EP-25-cv-337, 2025 WL 2691828, at *1, *12 (W.D. Tex. Sept. 22, 2025); *Bautista Pico v. Albarran*, Case No. 25-cv-8002 JST (JSC), 2025 WL 2689860, at *1-4 (N.D. Cal. Sept. 19, 2025); *Pablo Sequen v. Kaiser*, Case No. 25-cv-06487, 2025 WL 2691143, at *1-4 (N.D. Cal. Sept. 19, 2025); *Cardenas Castellanos v. Kasier*, 25-cv-07962, 2025 WL 2689853, at *1-2, *4 (N.D. Cal. Sept. 18, 2025); *Munoz Materano v. Arteta*, 25 Civ. 6137, 2025 WL 2630826, at *1-2, *11-12, *20 (S.D.N.Y. Sept. 12, 2025); *Acosta Roa v. Off. Fulfilling the Duties of Field Off. Dir.*, Case No. 25-cv-07802, 2025 WL 2637565, at *1-4 (N.D. Cal. Sept. 12, 2025); *Hinestroza v. Kaiser*, 25-cv-07559, 2025 WL 2606983, at *1-2 (N.D. Cal. Sept. 9, 2025); *Valencia Zapata v. Kaiser*, Case No. 25-cv-07492, 2025 WL 2578207, at *2, *5 (N.D. Cal. Sept. 5, 2025); *Espinoza v. Kaiser*, Case No. 1:25-cv-01101, 2025 WL 2581185, at *1-3, *14 (E.D. Cal. Sept. 5, 2025); *Nieves v. Kaiser*, Case No. 25-cv-06921, 2025 WL 2533110, at *1-2 (N.D. Cal. Sept. 3, 2025); *Cordero Pelico v. Kaiser*, Case No. 25-cv-07286, 2025 WL 2494426, at *1-3 (N.D. Cal. Aug. 29, 2025); *Salazar v. Kaiser*, Case No. 1:25-CV-01017, 2025 WL 2456232, at *1-2, *13 (E.D. Cal. Aug. 26, 2025); *Oliveros v. Kaiser*, Case No. 25-cv-07117, 2025 WL 2430495, at *1, *4 (N.D. Cal. Aug. 22, 2025); *Hernandez v. Wofford*, No. 1:25-cv-00986, 2025 WL 2420390, at *1-2, *8 (E.D. Cal. Aug. 21, 2025); *Garcia v. Andrews*, Case No. 1:25-cv-01006, 2025 WL 2420068, at *1-2, *13 (E.D. Cal. Aug. 21, 2025); *Samb v. Joyce*, 25 Civ. 6373, 2025 WL 2398831, at *1-4 (S.D.N.Y. Aug. 19, 2025); *Orellana v. Francis*, 25-CV-04212, 2025 WL 2402780, at *2, *7 (E.D.N.Y. Aug. 19, 2025); *Garcia v. Kaiser*, Case No. 25-cv-06916, 2025 WL 2453970, at *1, *3 (N.D. Cal. Aug. 17, 2025); *Pineda Campos v. Kaiser*, Case No. 25-cv-06920, 2025 WL 2454050, at *1-3 (N.D. Cal. Aug. 16, 2025); *Aceros v. Kaiser*, Case No. 25-cv-06924, 2025 WL 2453968, at *1-3 (N.D. Cal. Aug. 16, 2025); *Castellon v. Kaiser*, Case No. 1:25-cv-00968, 2025 WL 2373425, at *1-2, *12 (E.D. Cal. Aug. 14, 2025); *Calderon v. Kaiser*, Case No. 25-cv-06695, 2025 WL 2294914, at *1, *3 (N.D. Cal. Aug. 8, 2025); *Otero ex rel Ruiz v. Kaiser*, Case No. 25-cv-06536, 2025 WL 2453969, at *1, *3-4 (Aug. 3, 2025); *Pablo Sequen v. Kaiser*, Case No. 25-cv-06487, 2025 WL 2203419, at *1, *4 (N.D. Cal. Aug. 1, 2025); *Ramirez Clavijo v. Kaiser*, Case No. 25-cv-06248, 2025 WL 2419263, at *1, *4 (N.D. Cal. July 25, 2025); *Chipantiza-Sisalema v. Francis*, 25 Civ. 5528, 2025 WL 1927931, at *1, *4 (S.D.N.Y. July 13, 2025); *Singh v. Andrews*, No. 1:25-cv-00801, 2025 WL 1918679, at *1, *10 (E.D. Cal. July 11, 2025); *Y-Z-L-H v. Bostock*, Case No. 3:25-cv-965, 2025 WL 1898025, at *1-2, *14 (D. Or. July 9, 2025); *Pinchi v. Noem*, Case No. 5:25-cv-05632, 2025 WL 1853763, at *1, *4 (N. D. Cal. July 4, 2025); *Valdez v. Joyce*, 25 Civ. 4627, 2025 WL 1707737, at *1-2, *5 (S.D.N.Y. June 18, 2025); *Martinez v. Hyde*, Civil Action No. 25-11613, 2025 WL 1859273, at *1, *2 (D. Mass. June 17, 2025).

 

B. Advocacy groups are all challenging the policies underlying immigration court arrests and dismissals in at least four cases filed across the country. *See, e.g.*, Compl., *Immigr. Advocates Response Collaborative v. U.S. Dep't of Just.*, 25-cv-2279 (D.D.C. July 16, 2025), ECF No. 1; Compl., *African Cmtys. Together v. Lyons*, 25-cv-6366 (S.D.N.Y. Aug. 1, 2025), ECF No. 1; Compl., *A.M. v. U.S. Dep't of Homeland Sec.*, 25-cv-2308 (S.D. Cal. Sept. 4, 2025), ECF No. 1; Am. Compl., *Pablo Sequen v. Albarran*, No. 25-cv-6487 (N.D. Cal. Sept. 18, 2025), ECF No. 32.

1. In *Immigration Advocates Response Collaborative v. U.S. Department of Justice*, Plaintiffs' motion for expedited production of the administrative record is fully briefed as of August 14, 2025. The U.S. District Court for the District of Columbia may rule at any time.

2. In *African Communities Together v. Lyons*, the U.S. District Court for the Southern District of New York has ruled that the EOIR's May 30 guidance directing immigration judges to grant ICE motions to dismiss is likely unlawful and has stayed that guidance in Manhattan and the Bronx for the pendency of litigation. Op. & Order, *African Communities Together v. Lyons*, 25-cv-6366 (S.D.N.Y. Sept. 12, 2025), ECF No. 51.

3. In *Pablo Sequen v. Kaiser*, Plaintiffs have moved to certify a class of all persons who have a court hearing in a proceeding on the EOIR's non-detained docket in the Concord, San Francisco, and Sacramento Immigration Courts. Mot. to Certify Class, *Pablo Sequen v. Albarran*, No. 25-cv-6487 (N.D. Cal. Sept. 18, 2025), ECF No. 33. The U.S. District Court for the Northern District of California has set a hearing on this motion for October 30, 2025, after which it may rule at any time. Clerk's Notice, *Pablo Sequen v. Albarran*, No. 25-cv-6487 (N.D. Cal. Sept. 29, 2025), ECF No. 47.

4. In *A.M. v. U.S. Department of Homeland Security*, Plaintiffs represent a purported class of individuals seeking asylum in removal proceedings who were/are permitted to remain out of custody during these proceedings and were/are required to personally appear in the San Diego Immigration Court on or after January 1, 2025. Compl. ¶ 73, *A.M. v. U.S. Dep't of Homeland Sec.*, 25-cv-2308 (S.D. Cal. Sept. 4, 2025), ECF No. 1. Motions for class certification and class-wide relief are likely forthcoming.

VIII.    The American Immigration Council's Engagement Information Dissemination

The Council is primarily engaged in information dissemination. It envisions a nation where immigrants are embraced, communities are enriched, and justice prevails for all. It strives to create a society that values immigrants as vital contributors to our nation and where everyone is afforded an equal opportunity to thrive socially, economically, and culturally.[44]

---

[44] *About Us*, Am. Immigr. Council, https://www.americanimmigrationcouncil.org/our-impact/mission-vision/ (last visited Oct. 6, 2025).

 

Communications, research, and other information dissemination are a primary tool for the Council to advance its mission, build "positive public attitudes and create a more welcome America—one that provides a fair process for immigrants and adopts immigration laws and policies that account for the needs of the U.S. economy."[45] "The Council is a national leader in challenging the myths and misinformation that too often dominate the political and public debate around immigration" through its analysis, publications, and research.[46]

The Council disseminates information to the American public about immigration issues through its website, blog, newsletters, and social media accounts. Between January 1, 2025, and September 25, 2025, 4.6 million different Internet users visited the Council's website, an average of 17,228 users per day.

A. **Blog**: The Council has a blog where it publishes analysis, research, and opinions about immigration issues, with a focus on recent immigration events and hot topics. The Council posted 96 articles on its blog between January 1, 2025, and September 29, 2025 (an average of two or three articles per week). Examples of these articles include:

1. President Trump's New Travel Ban: What You Need to Know, which approximately 114,400 Internet users have visited since its publication on June 9, 2025.[47]
2. How the Supreme Court's Latest Decision Clears the Way for Racial Profiling During Immigration Raids, which approximately 85,500 Internet users have visited since its publication on September 9, 2025.[48]
3. Trump Administration Abruptly Stopped Processing Green Gard Applications Filed by Asylees, Refugees. A FOIA Request Seeks Answers, which approximately 77,900 Internet users have visited since its publication on April 23, 2025.[49]
4. In Birthright Citizenship Decision, the Supreme Court Expanded Trump's Power, which approximately 75,100 Internet users have visited since its publication on July 1, 2025.[50]

---

[45] *Id.*
[46] *Id.*
[47] Aaron Reichlin-Melnick, *President Trump's New Travel Ban: What You Need to Know*, American Immigration Council (June 9, 2025), https://www.americanimmigrationcouncil.org/blog/president-trumps-new-travel-ban-what-you-need-to-know/.
[48] Aaron Reichlin-Melnick, *How the Supreme Court's Latest Decision Clears the Way for Racial Profiling During Immigration Raids*, American Immigration Council (Sept. 9, 2025), https://www.americanimmigrationcouncil.org/blog/supreme-courts-decision-racial-profiling-immigration-raids/.
[49] Raul Pinto & Jennifer Coberly, *Trump Administration Abruptly Stopped Processing Green Card Applications Filed by Asylees, Refugees. A FOIA Request Seeks Answers*, American Immigration Council (April 23, 2025), https://www.americanimmigrationcouncil.org/blog/trump-stopped-processing-green-cards-asylees-refugees-foia/.
[50] Michelle Lapointe, *In Birthright Citizenship Decision, the Supreme Court Expanded Trump's Power*, American Immigration Council (July 1, 2025), https://www.americanimmigrationcouncil.org/blog/in-birthright-citizenship-decision-the-supreme-court-expanded-trumps-power/.




5. What Does the Supreme Court Ruling on Birthright Citizenship Mean?, which approximately 62,300 Internet users have visited since its publication on June 27, 2025.[51]

B. **Factsheets & Special Reports:** The Council regularly publishes and updates factsheets and special reports on immigration issues to help the public understand the state of immigration law and policy, its history, and its effects on immigrants in the United States and the American economy.

1. On September 22, 2025, the Council updated a factsheet on the H-1B visa program, the process for obtaining this visa, and visa holders' benefits to the American economy.[52] Media outlets have featured this factsheet in their coverage of the Trump Administration's changes to the application fee for this visa.[53]

2. On August 20, 2025, the Council published its annual New American Fortune 500 Report wherein it quantified, and reported on, immigrant entrepreneurs' contributions to the U.S. economy.[54]

3. On August 6, 2025, the Council published a report about the Trump Administration's 2025 Travel Ban wherein it informed the public about the countries the ban targets, the stated justifications for the ban, the issuance of visas to affected countries, the impact of the previous travel ban, and the possible impacts of the new travel ban.[55]

4. On July 23, 2025, the Council published a special report about immigration policy six months into the second Trump Administration. Therein, it explained to the public who the Administration was allowing to enter the United States and whom it was excluding, how the Administration was treating immigrants already here, and whom

---

[51] Melissa Cruz, *What Does the Supreme Court Ruling on Birthright Citizenship Mean?*, American Immigration Council (June 27, 2025), https://www.americanimmigrationcouncil.org/blog/what-does-the-supreme-court-ruling-on-birthright-citizenship-mean/.

[52] Am. Immigr. Council, The H-1B Visa Program & Its Impact on the U.S. Economy (Sept. 22, 2025), https://www.americanimmigrationcouncil.org/fact-sheet/h1b-visa-program-fact-sheet/.

[53] *See, e.g.*, Eduardo Cuevas, *What is An H-1B Visa? Look to Silicon Valley as Trump Seeks $100,000 Fee*, USA Today (Sept. 20, 2025, 4:31 PM), https://www.usatoday.com/story/news/nation/2025/09/20/trump-h1b-visa-india-china-executive-order/86267816007/.

[54] Am. Immigr. Council, Nearly Half of Fortune 500 Companies in 2025 Were Founded by Immigrants or Their Children (Aug. 20, 2025), https://www.americanimmigrationcouncil.org/report/fortune-500-companies-founded-by-immigrants-2025/.

[55] Am. Immigr. Council, Trump's 2025 Travel Ban: Who Is Affected and What It Could Cost the U.S. Economy (Aug. 6, 2025), https://www.americanimmigrationcouncil.org/report/trump-2025-travel-ban/.




the Administration was expelling, and how it was doing so.[56] Numerous media outlets covered this report.[57]

5. On July 14, 2025, the Council published a fentanyl smuggling factsheet, which analyzed two different Customs & Border Protection ("CBP") datasets about fentanyl seizures and informed the public that most seizures occur at ports of entry and most smugglers are U.S. citizens, not immigrants.[58] Media outlets have featured this factsheet in their coverage of efforts to combat fentanyl and other opioids at the U.S.-Mexican border.[59]

6. On July 14, 2025, the Council updated its factsheet about the immigration and border-related provisions in H.R. 1, the so-called "One Big Beautiful Bill" after the bill's passage. It detailed increases to application fees and funding for detention, border wall construction, and new ICE enforcement and removal officers.[60] Several media outlets referenced this factsheet in their coverage of the bill.[61]

7. On June 6, 2025, the Council published a factsheet about the travel ban issued by the Trump Administration. The fact sheet informed the public about who is subject to the new ban, the stated justifications for the ban, the processes for removing countries from the ban, and the ban's ramifications.[62]

8. On July 1, 2025, the Council published a factsheet about differences in the two reconciliation bills passed by the U.S. Senate and the U.S. House of Representatives and decisions by the Senate Parliamentarian that certain immigration fee increases

---

[56] Am. Immigr. Council, Mass Deportation: Analyzing the Trump Administration's Attacks on Immigrants, Democracy, and America (July 23, 2025), https://www.americanimmigrationcouncil.org/report/mass-deportation-trump-democracy/.

[57] See, e.g., Steve S. Rao, Trump Is Targeting Nonviolent & Legal Immigrants. Americans Are Starting to Notice, Fox News (Aug. 15, 2025, 5:00 AM), https://www.foxnews.com/opinion/trump-targeting-nonviolent-legal-immigrants-americans-starting-notice;

[58] Am. Immigr. Council, Facts About Fentanyl Smuggling: Most Seizures Occur at Ports of Entry Where U.S. Citizens are the Primary Smugglers (July 14, 2025), https://www.americanimmigrationcouncil.org/fact-sheet/fentanyl-smuggling/.

[59] See, e.g., Emma Withrow, Fact Check Team: Exploring Fentanyl's Impact on America, The National News Desk (Sept. 9, 2025, 6:05 PM), https://thenationaldesk.com/news/fact-check-team/fact-check-team-exploring-fentanyls-impact-on-america-disease-overdoese-immigration-border-synthetic-opioids-cartel-chinese-chemical.

[60] Am. Immigr. Council, What's in the Big Beautiful Bill? Immigration & Border Security Unpacked (July 14, 2025), https://www.americanimmigrationcouncil.org/fact-sheet/big-beautiful-bill-immigration-border-security/.

[61] See, e.g., Solcyré Burga, 'Lone Start Lockup' ICE Mega Detention Facility Opens Doors, Time (Aug. 19, 2025, 12:50 PM), https://time.com/7310657/ice-immigration-detention-texas-lone-star-lockup/?amp=true;

[62] Am. Immigr. Council, Analysis of Trump's New Travel Ban (June 6, 2025), https://live-americanimmigrationcouncilorg.pantheonsite.io/fact-sheet/analysis-trump-travel-ban/.



violate the reconciliation rules.[63] Media coverage of these bills featured the Council's analysis.[64]

9. On April 17, 2025, the Council published its analysis of Asian and Pacific Islander residents' contributions to the Texas economy and tax base based on data from the 2013 and 2023 American Community Survey and the U.S. Congressional Budget Office.[65]

10. On April 1, 2025, the Council published its analysis of immigrants' contributions to the Michigan economy and tax base based on data from the 2017, 2021, and 2022 American Community Survey and the U.S. Congressional Budget Office.[66]

11. On March 14, 2025, the Council re-released its factsheet on Birthright Citizenship in the United States, the constitutional and statutory underpinnings of such citizenship, and the illegality of the Trump Administration's executive order on the subject.[67] Approximately 480,000 different Internet users have accessed this factsheet.

12. On February 28, 2025, the Council published a factsheet on immigrants' contributions to the healthcare sector of New Mexico's economy based on its analysis of data from the 2022 American Community Survey.[68]

13. On February 26, 2025, the Council published a factsheet about an interim final rule issued by U.S. Citizenship and Immigration Services (USCIS) that requires all noncitizens in the United States to apply for registration. Therein, it analyzed the history of the federal immigration registration scheme, the Trump Administration's efforts to enforce these laws, who the new rule affects, and the fear and uncertainty arising from the new rule.[69]

---

[63] Am. Immigr. Council, What's in the 2025 Reconciliation Bill so Far (July 1, 2025), https://live-americanimmigrationcouncilorg.pantheonsite.io/fact-sheet/house-reconciliation-bill-immigration-border-security/
[64] *See, e.g.*, Ted Hesson, Factbox-How the Republican Spending Bill Super-Charges Immigration Enforcement, U.S. News (July 2, 2025), https://www.usnews.com/news/politics/articles/2025-07-02/factbox-how-the-republican-spending-bill-super-charges-immigration-enforcement.
[65] Am. Immigr. Council, Power of the Purse: Contributions of Asian and Pacific Islander Residents in Texas (April 17, 2025), https://live-americanimmigrationcouncilorg.pantheonsite.io/report/power-purse-contributions-asian-and-pacific-islander-residents-texas/.
[66] Am. Immigr. Council, Contributions of New Americans in Mid-Michigan (Apr. 1, 2025), https://live-americanimmigrationcouncilorg.pantheonsite.io/report/contributions-new-americans-mid-michigan/.
[67] Am. Immigr. Council, Birthright Citizenship in the United States (Mar. 14, 2025), https://live-americanimmigrationcouncilorg.pantheonsite.io/fact-sheet/birthright-citizenship-united-states/
[68] Am. Immigr. Council, The Growing Demand for Healthcare Workers in New Mexico (Feb. 28, 2025), https://live-americanimmigrationcouncilorg.pantheonsite.io/fact-sheet/the-growing-demand-for-healthcare-workers-in-new-mexico/.
[69] Am. Immigr. Council, The Trump Administration's Registration Requirement for Immigrants (Feb. 26, 2025), https://live-americanimmigrationcouncilorg.pantheonsite.io/fact-sheet/the-trump-administrations-registration-requirement-for-immigrants/.




14. On February 21, 2025, the Council published a factsheet about sanctuary city policies. Therein, it provided examples of these policies' many forms and debunked myths about these policies' illegality and connection with crime.[70]

15. On February 20, 2025, the Council published a factsheet on expedited removal. Therein, it analyzed the current and historical use of this process for summary removal and the concerns that expanded use of this process raises.[71]

16. On January 27, 2025, the Council published a factsheet on the Trump Administration declaring the first ever "mass influx" of immigrants at the U.S.-Mexico border, the statutory authority for doing so, the powers that such a declaration unlocks, and practical considerations and concerns arising from the declaration.[72]

17. On January 22, 2025, the Council published a factsheet about the Trump Administration's Day One Executive Actions. Therein, it analyzed the ten executive orders and proclamations that the Administration issued about immigration on its first day in office.[73] Approximately 167,000 different Internet users have accessed this factsheet since publication.

18. On November 18, 2024, the Council published a factsheet about Documented Dreamers. Therein, it discussed the lack of a clear path toward permanent legal status for minors who immigrated to the United States as derivates of their parents' temporary work visas and age out of such derivative status once they turn 21 years old. It also analyzed different immigration bills and the extent to which each bill would extend status to this population of children.[74]

19. On October 29, 2024, the Council analyzed Department of Labor data in a special report on the rising demand for H-2B visa holders in hospitality, tourism, landscaping, construction, forestry, and seafood processing industries, as the U.S. population ages out of these industries' workforce and younger Americans lack interest in these fields.[75]

---

[70] Am. Immigr. Council, Sanctuary Policies: An Overview (Feb. 21, 2025), https://live-americanimmigrationcouncilorg.pantheonsite.io/fact-sheet/sanctuary-policies-overview/.

[71] Am. Immigr. Council, Expedited Removal Explainer (Feb. 20, 2025), https://live-americanimmigrationcouncilorg.pantheonsite.io/fact-sheet/expedited-removal/.

[72] Am. Immigr. Council, The "Mass Influx" Declaration (Jan. 27, 2025), https://live-americanimmigrationcouncilorg.pantheonsite.io/fact-sheet/mass-influx-declaration/.

[73] Am. Immigr. Council, After Day One: A High-Level Analysis of Trump's First Executive Actions (Jan. 22, 2025), https://live-americanimmigrationcouncilorg.pantheonsite.io/fact-sheet/after-day-one-high-level-analysis-trumps-first-executive-actions/.

[74] Am. Immigr. Council, Documented Dreamers: An Overview (Nov. 18, 2024), https://live-americanimmigrationcouncilorg.pantheonsite.io/fact-sheet/documented-dreamers-overview/.

[75] Am. Immigr. Council, The Expanding Role of H-2B Workers in the United States (Oct. 29, 2024), https://live-americanimmigrationcouncilorg.pantheonsite.io/report/h-2b-workers-united-states/.



20. On October 17, 2024, the Council published a factsheet about immigration and crime. Therein, it analyzed FBI crime reporting data and U.S. Census Bureau demographic data and identified a correlation between a decline in a location's crime rate and an increase in the immigrant share of that location's population.[76]

21. On October 2, 2024, the Council published a special report on then-Presidential-Candidate Donald Trump's mass deportation plan. Therein, it analyzed American Community Survey data to project the devastating effect that deporting 11 million people would have on the American economy and society.[77] Approximately 214,000 different Internet users have accessed this report.

C. **Use of FOIA:** The Council regularly analyzes data, information, and records it obtains from government agencies through FOIA and distributes that analysis to the public on its website and monthly transparency newsletter. It intends to do the same for records responsive to the request at issue here.

1. On October 7, 2025, the Council published a blog about immigration judges' adjudication of ICE motions to dismiss from May 1, 2025, through July 28, 2025, after analyzing data obtained from the EOIR through FOIA. The blog discussed trends in these adjudications, their violation of immigration court procedures, and the public response.[78]

2. On June 26, 2025, the Council published an interactive tool about the demographics of refugees resettled in U.S. cities and states from October 1, 2017, through December 31, 2024, using data received through FOIA from the U.S. Department of State. The tool reports on the nationality, age, gender, education, native language, English proficiency, and resettlement location of each refugee resettled to the United States during this time.[79]

3. On October 24, 2024, the Council published a web report about the detention and treatment of Haitian nationals in the Torrance County Detention Facility, an ICE detention center in rural New Mexico, using records received from ICE through FOIA. The report noted that ICE fails to document systemically the race of detained immigrants, that African immigrants had the longest lengths of detention in Torrance, and that ICE continued to fill Torrance with detained immigrants despite the facility

---

[76] Am. Immigr. Council, Debunking the Myth of Immigrants & Crime (Oct. 17, 2024), https://live-americanimmigrationcouncilorg.pantheonsite.io/fact-sheet/debunking-myth-immigrants-and-crime/.

[77] Am. Immigr. Council, Mass Deportation (Oct. 2, 2024), https://www.americanimmigrationcouncil.org/report/mass-deportation/.

[78] Khan & Opila, *supra* n. 8.

[79] Am. Immigr. Council, The Council Received Data on City-Level Refugee Resettlement from the Department of State (June 26, 2025), https://www.americanimmigrationcouncil.org/foia-request/refugee-resettlement-data/.




failing numerous inspections and government oversight entities recommending that the agency shut the facility down.[80]

4. On March 19, 2024, the Council published a web report about U.S. Border Patrol ("USBP") collaboration with the Ohio State Highway Patrol based on records obtained through FOIA from U.S. Customs and Border Protection ("CBP"). It noted the use of racial profiling and pretextual stops to facilitate USBP immigration checks and that 23.2 percent of USBP apprehensions from this program were U.S. citizens.[81]

5. On September 20, 2023, the Council published a web report about CBP policing racial justice protests during the summer of 2020 based on records obtain from CBP through FOIA. It reported that CBP's action exceeded its mandate to protect federal property and without invitation from local officials. It noted agency officers' lack of training in protestors' First Amendment rights and conflict de-escalation techniques and use of military surveillance drones.[82]

6. On June 27, 2023, the Council published a web report about ICE's failure to adhere to the Biden Administration's enforcement priorities while this guidance was in effect based on records obtain through FOIA.

7. On March 16, 2023, the Council published a web report about USCIS misprocessing thousands of applications for humanitarian parole made by Afghans in 2021 after the fall of Kabul based on records obtain from the agency through FOIA. The report discussed delays due to an unannounced prolonged adjudications pause, the agency's miniscule approval rate, and the agency scrambling to deal with the volume of applications it received.[83]

8. On February 28, 2023, the Council published a report about CBP One—a CBP cell phone application used during the Biden Administration by migrants without entry documents to schedule appointments at ports of entry and submit biometric information to CBP as part of the parole process for certain nationalities—based on records obtained from CBP through FOIA. The report discussed the application's origins, expansion, and flaws—particularly its capacity to capture photographs of

---

[80] Am. Immigr. Council, Torrance County Detention Facility's Troubling Role in Detaining Haitian Migrants During the 2021 Del Rio Incident (Oct. 24, 2024), https://www.americanimmigrationcouncil.org/report/torrance-detention-facility/.

[81] Am. Immigr. Council, Ohio We Have a Problem (Mar. 19, 2024), https://www.americanimmigrationcouncil.org/report/ohio-we-have-a-problem/.

[82] Am. Immigr. Council et al., Beyond the Border: U.S. Customs & Border Protection (CBP) Presence at Racial Justice Protests in Summer of 2020 (Sept. 20, 2023), https://www.americanimmigrationcouncil.org/report/cbp-presence-racial-justice-protests-summer-2020/.

[83] Amm. Immigr. Council, Agency Failures Make Obtaining Humanitarian Parole Almost Impossible for Afghans (March 16, 2023), https://www.americanimmigrationcouncil.org/report/agency-failures-make-obtaining-humanitarian-parole-almost-impossible-for-afghans/.



immigrants with darker skin colors and CBP frequently using the application for tasks it had not been designed to accomplish.[84]

D. **Map the Impact:** The Council analyzes data from the American Community Survey, the U.S. Census Bureau, Fortune Magazine, the Congressional Budget Office, the Institute on Taxation and Economic Policy, and other sources to model the economic benefits that immigrants offer to the United States, each state, and counties, metro areas, and Congressional districts within each state.[85] Media outlets frequently cite to this model when discussing the economic impact of immigrants.[86]

Eligibility for Expedited Processing

FOIA obligates ICE and the DHS to process a FOIA appeal expeditiously in two cases: (i) those where a requester "demonstrates a compelling need"—such as "urgency to inform the public concerning actual or alleged Federal Government activity" if the requester is "primarily engaged in disseminating information," 5 U.S.C. § 552(a)(6)(E)(i), (v)—and (ii) "in other cases determined by the agency," *id.* § 552(a)(6)(E)(i), which, for the DHS, include "[a] matter of widespread and

---

[84] Am. Immigr. Council, Government Documents Reveal Information About the Development of the CBP One App (Feb. 28, 2023), https://www.americanimmigrationcouncil.org/report/government-documents-reveal-information-about-development-cbp-one-app/.

[85] Am. Immigr. Council, Map the Impact (2025), https://data.americanimmigrationcouncil.org/map-the-impact/.

[86] *See, e.g.*, Gisela Salomon, *Florida Was a Top Destination for Immigrants Who Came to the U.S. Under Biden*, Associated Press (Oct. 1, 2025, 10:37 AM), https://apnews.com/article/immigration-florida-biden-trump-6cf46ff0a8f17a29e85dc08ac570a05b; Natalie Robbins, *As Residents Leave, Immigrant Labor Remains Central to New Mexico's Workforce, Experts Say*, Albuquerque Journal (Sept. 28, 2025, 10:03 AM), https://www.yahoo.com/news/articles/residents-leave-immigrant-labor-remains-140300648.html; Simon Kaufman, *Immigrant Population in the US Has Started to Decline for the First Time in Years*, MSN (Aug. 22, 2025), https://www.msn.com/en-us/news/us/immigrant-population-in-the-us-has-started-to-decline-for-the-first-time-in-years/ar-AA1L33jd; David Goodman, *Fear of ICE Jolts a Maine Beach Town*, NY Times (July 28, 2025), https://www.nytimes.com/2025/07/28/travel/maine-wells-ice-immigration-tourism.html; Editorial Board, *When Deportations Leave Immigrant Children Parentless*, Boston Globe (July 24, 2025, 4:00 AM), https://archive.is/VapWn; Anita Wadhwani, *'Economically Reckless' Small Businesses Slam Bill to Bar Immigrant Kids from School*, Tennessee Lookout (Apr. 7, 2025, 5:48 AM), https://tennesseelookout.com/2025/04/07/economically-reckless-small-businesses-slam-bill-to-bar-immigrant-kids-from-school/; Lizbeth Gutierrez, *American Immigration Council Release Report on Immigrant Economic Impact*, Spectrum News 9 (Apr. 1, 2025,4:23 PM), https://baynews9.com/fl/tampa/news/2025/04/01/immigrant-workforce-impact; Marissa Luck, *ICE Crackdown Rattles Houston's Construction Industry as Contractors Warn of Labor Shortage*, MSN (June 27, 2025), https://www.msn.com/en-us/news/other/ice-crackdown-rattles-houston-s-construction-industry-as-contractors-warn-of-labor-shortage/ar-AA1HxIHH?ocid=BingNewsSerp; Sheila Cherfilus-McCormick, *This Is Personal: Why South Florida Must Stand with Immigrant Families*, Yahoo News (June 20, 2025, 5:01 AM), https://www.yahoo.com/news/personal-why-south-florida-must-090153316.html; Jasmine Laws, *Map Shows How Much Immigrants Pay in Taxes In Every State*, Newsweek (Aug. 19, 2024, 5:58 PM), https://www.newsweek.com/map-shows-how-much-immigrants-pay-taxes-every-state-1939268;




exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence," 6 C.F.R. § 5.5(e)(1)(ii), (iv). Both cases exist here.

## I. A MATTER OF WIDESPREAD AND EXCEPTIONAL INTEREST RAISING GOVERNMENT INTEGRITY CONCERNS

ICE's dismissal of noncitizens' immigration court cases to facilitate their expedited removal is a matter of widespread and exceptional media interest in which there exist possible questions about government integrity which affect public confidence.

### A. Immigration Court Dismissals Are a Matter of Widespread & Exceptional Media Interest

There is widespread and exceptional media interest in immigration court dismissals. Fifty articles on an issue is more than sufficient to make this showing. *Citizens for Resp. & Ethics in Wash. v. U.S. DOGE Serv.*, 769 F. Supp. 3d 8, 27 (D.D.C. 2025) ("CREW"); *see also Brennan Ctr. for Just. v. Dep't of Com.* 498 F. Supp. 3d 87, 97 (D.D.C. 2020). A "handful of articles" also establishes widespread and exceptional interest where the articles are "in a variety of publications" and "repeatedly reference the ongoing national discussion." *Am. Civ. Liberties Union v. Dep't of Just.*, 321 F. Supp. 2d 24, 32 (D.D.C. 2004).

Here, one hundred and nineteen articles in state, local, and nationwide media outlets have discussed ICE asking immigration judges to dismiss noncitizens' immigration cases so it can pursue their expedited removal. Statement of Facts § II. Such coverage dwarfs the fifty-article threshold for widespread and exceptional media interest. *See, e.g.*, *CREW*, 769 F. Supp. 3d at 27.

### B. Immigration Court Dismissals Also Raises Issues of Government Integrity That Affect Public Confidence

Immigration court dismissals are also a matter "in which there exist possible questions about the government's integrity that affect public confidence." 6 C.F.R. § 5.5(e)(1)(iv). Much of the coverage expresses doubts about this tactic's integrity, describing it as a due process violation and/or a tactic to increase deportations by removing noncitizens without hearings. *See* Statement of Facts § II & notes.

Beyond the press, editorials and political leaders are condemning the dismissals as a "set up" and for disregarding due process. *Id.* §§ III, IV & notes. Protestors are also gathering outside immigration courts in New York, San Francisco, and elsewhere to chant their opposition to this tactic and doubts about its legality. *Id.* § V. Similarly, clergy, political leaders, and other members of the public are accompanying noncitizens to their immigration court dates to document

29




dismissals and arrests, attempt to stop the latter, and help arrested individuals inform their families. *Id.* § VI.

Finally, opposition to immigration court arrests and dismissals and doubts about their legality have also led to a litany of litigation: at least four groups of advocates are suing ICE and the EOIR to stop the arrests, *see id.* § VII.B. And New York City and the State of New York have filed amicus briefs to support such relief. *Id.* § IV.G-H, L-M.

## II. URGENCY TO INFORM THE PUBLIC ABOUT FEDERAL GOVERNMENT ACTIVITY BY A REQUESTER

Additionally, and alternatively, the Council has a compelling need for the records sought. It is primarily engaged in disseminating information. And urgency also exists to inform the public about immigration court dismissals before debate on this high-profile government action dissipates or courts adjudicate its legality.

### A. The Council Primarily Engages in Information Dissemination

The Council primarily engages in disseminating information on immigration and other issues.

As a news media requester, the Council need not "detail" or otherwise "establish that [its] primary professional activity or occupation is information dissemination," 6 C.F.R. § 5.5(e)(3); *see also Heritage Found. v. Entl. Prot. Agency*, Civil Action No. 23-748, 2023 WL 2954418, *3 (D.D.C. April 14, 2023) ("Court have … routinely held that media organizations and newspapers qualify" as requesters "primarily engaged in information dissemination"). "[A]ny … entity that actively gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience" is a news media requester. 6 C.F.R. § 5.11(b)(6). The Council gathers information about immigration through FOIA and other channels; uses its editorial and analytical skills to turn these materials into blog posts, fact sheets, and other publications; and distributes this work to tens, if hundreds, of thousands of readers interested in immigration issues. *See* Statement of Facts § VIII.

Additionally, and alternatively, the Council is primarily engaged in disseminating information and analysis on immigration since it "regularly writes, publishes, and disseminates information" on its website. *Brennan Ctr. for Just.*, 498 F. Supp. 3d at 98 (Brennan Center); *see also Ctr. for Pub. Integrity v. U.S. Dep't of Def.*, 411 F. Supp. 3d 5 (D.D.C. 2019) (Center for Public Integrity); *Protect Dem. Proj.*, 263 F. Supp. 3d 293, 298 (D.D.C. 2017) (Protect Democracy Project); *Am. Civil Liberties Union*, 321 F. Supp. 2d 24, 29 n.5 (D.D.C. 2004) (Electronic Privacy Information Center ("EPIC")).




Like Brennan Center, Protect Democracy Project, EPIC, and Center for Public Integrity, the Council authors factsheets, special reports, and blog posts on proposed and actual immigration policies, some of which shape media coverage in outlets across the nation. *See* Statement of Facts §§ VIII.A-B. It also analyzes immigration data and other government records—including those obtained through FOIA requests like this one—in blog posts and interactive web reports. *Id.* § VIII.C-D And it circulates its reports and factsheets through its website, blog, email newsletters, and an X (formerly known as Twitter) account with 64.9 thousand followers.[87] Hundreds of thousands of readers have also read the Council's publications since the start of 2025. *Id.* § VIII.A.1-5, B.11, 17, 21.

## B.  Urgency Exists to Inform the Public

Urgency also exists to inform the public about immigration court dismissals. Requisite urgency exists where "the request touches on 'a matter of current exigency to the American public'" and delay "compromises a significant recognized interest." *Protect Dem. Proj.*, 263 F. Supp. 3d 293 at 299 (quoting *Al-Fayed v. CIA*, 254 F.3d 300, 310 (D.C. Cir. 2001)). Dismissals to facilitate expedited removal are exigent to the American public, as demonstrated by the one hundred plus articles in the record on this matter. *See CREW*, 769 F. Supp. 3d at 27 (finding urgency to inform the public based on at least fifty articles on the issue); *Am. Civil Liberties Union of No. Cal. v. U.S. Dep't of Def.*, No. C 06-01698, 2006 WL 1469418, at *6 (N.D. Cal. May 25, 2006) (same); 6 C.F.R. § 5.5(e)(3) ("The existence of numerous articles published on a given subject can be helpful in establishing the requirement that there be an 'urgency to inform' the public on the topic."). The number of articles alone proves the exigency – as does the range of outlets printing articles, the extended time period for the articles, and how the articles are being written across the country. Moreover, the widespread and diverse condemnation by news outlets and professional organizations, condemnation by politicians, protests, and lawsuits independently prove the exigency too.

Delayed production of responsive records is compromising the ongoing public debate about the propriety of dismissing immigration cases to facilitate expedited removal, a high-profile government action. *Cf. CREW*, 769 F. Supp. 3d at 27 (expediting a request for records about the U.S. DOGE Service); *Protect Dem. Proj.*, 263 F. Supp. 3d 293 at 299 (expediting a request for records about a possible unlawful airstrike on Syria); *ACLU*, 2006 WL 1469418, at *6-7 (expediting a request for records about possible unlawful military surveillance of protestors); *Freedom Coalition of Doctors for Choice v. Ctrs. For Disease Control & Prevention*, 2:23-cv-102, 2024 WL 69084, at *14 (N.D. Tex. Jan. 5, 2024) (expediting a request disputing the effectiveness of COVID-19 vaccines).

---

[87] *See* https://x.com/immcouncil.




In *CREW* and *Protect Democracy Project* the U.S. District Court for the District of Columbia found urgency to expedite the processing of FOIA requests for records about the U.S. DOGE Service and an airstrike in Syria respectively because if production were delayed, the public and requesters would "be precluded from obtaining in a timely fashion information vital to the current and ongoing debate surrounding the legality of a high-profile government action." *CREW*, 769 F. Supp. 3d at 27 (cleaned up); *Protect Dem. Proj.*, 263 F. Supp. 3d at 299 (same). Similarly, in *ACLU*, the U.S. District Court for the Northern District of California found urgency to expedite the processing of a FOIA request about military domestic surveillance program because "[g]etting the requested information quickly might be valuable to would-be protesters and opposition groups" and "might help them decide how to express their political viewpoints." 2006 WL 1469418, at *7. As demonstrated by the extensive media coverage on the issue, condemnation by news outlets and politicians, protests outside immigration courts, accompaniment to immigration court, and lawsuits filed, immigration court dismissals are a high-profile government action akin to DOGE, bombing a foreign country, and domestic surveillance such that delayed production of responsive records is compromising the ongoing debate about this tactic's legality.

Additionally, delayed processing of responsive records is also compromising the significant public interest in informing the public debate about the legality of immigration court dismissals before courts rule on this issue in pending litigation. *See Heritage Found.*, 2023 WL 29554418, at *4 (recognizing a public interest in obtaining records to inform public debate about government action before the conclusion of a court case challenging that action).

At least four court cases are challenging the legality of these dismissals, one of which has ruled that they are likely unlawful. Statement of Facts § VII.B. Several of these cases have outstanding motions that a court may address at any time. *See id.* § VII.B.1, 3 (motions to dismiss, for class certification, and to expedite the production of the administrative record).

Production of responsive records is needed prior to the adjudication of these preliminary motions to inform the public debate about the courts' forthcoming rulings. Should production not occur before then, it is also needed prior to the adjudication of any appeal or forthcoming motion for summary judgment to inform the public debate over that decision.

*** 

Thank you for your expedition of Requesters' appeal of the decision to deny the expedited processing in FOIA Request No. 2025-ICFO-51693. If you have any questions, please do not hesitate to contact us.

Very truly yours,

/s/ Chris Opila_____                    _/s/Rex Chen_____

   

Christopher ("Chris") Opila
Staff Attorney (Transparency)
American Immigration Council
PMB2026
2001 L Street N.W., Suite 500
Washington, DC 20036
202-507-7699 | copila@immcouncil.org

Rex Chen
Supervising Counsel for Immigrant Rights
LatinoJustice PRLDEF,
475 Riverside Drive Suite 1901
New York, NY 10115
212-219-3360 | rchen@latinojustice.org

Exhibits
    A.  FOIA Request No. ICFO-51693
    B.  EOIR Dismissal Guidance
    C.  Pappas Declaration
    D.  New York Bar Statement
    E.  Arizona Congressional Delegation Letter
    F.  Congressman Torres Letter
    G.  U.S. House of Representatives Letter
    H.  City of New York Amicus Brief No. 1
    I.   City of New York Amicus Brief No. 2
    J.  U.S. Senators Letter
    K.  City of New York Amicus Brief No. 3
    L.  State of New York Amicus Brief



Exhibit C.A.



July 29, 2025

**Via Secure Release & Certified Mail**

ICE Privacy Office
Immigration & Customs Enforcement
500 12th St., SW Stop 5004
Washington, DC 20536-5004

Senior Director of FOIA Operations
Privacy Office, Mail Stop 0655
U.S. Department of Homeland Security
245 Murray Lane SW
Washington, DC 20598-0655

Re:    Freedom of Information Act Request on Terminations of Immigration Proceedings and ICE Arrests at Immigration Courts

Dear FOIA Officer:

The American Immigration Council (the "Council") and LatinoJustice PRLDEF (collectively, "Requesters") submit this request to U.S. Immigration and Customs Enforcement ("ICE") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

Since around the middle of May 2025, ICE has been moving to dismiss immigration proceedings against noncitizens in immigration courts around the country to pursue their expedited removal. Requesters seek certain records about these dismissals as well as expedited processing and a fee waiver.

I.    REQUEST FOR INFORMATION

Requesters seek all guidance, instructions, policies, templates, and other similar records provided to an Office of the Principal Legal Advisor ("OPLA") Chief Counsel, OPLA Deputy Chief Counsel, or OPLA Assistant Chief Counsel since January 20, 2025, for dismissing an immigration court case.[1]

---

[1] *See, e.g.,* Madeleine May & Hannah Marr, *Afghan Ally Detained by ICE After Attending Immigration Court Hearing*, CBS News (July 1, 2025, 1:48 PM), https://www.cbsnews.com/news/afghan-ally-detained-by-ice-immigration-court/ (reporting that OPLA attorneys are moving to dismiss immigration cases based on their underlying notices being "improvidently issued"); Daniel Gonzalez & Richard Ruelas, *After Short Break, ICE Resumes Arrests at Phoenix*

## II.  FORMAT OF PRODUCTION

Requesters seek responsive electronic records in a machine-readable, native file format, with all metadata and load files. Requesters ask ICE to produce responsive materials in their entirety, including all attachments, appendices, enclosures, and/or exhibits, in a text-searchable, static-image format (PDF), in the best image quality in the agency's possession, and that the records be provided in separate, Bates-stamped files.

## III.  EXPEDITED PROCESSING

Requesters seek expedited processing of this request and certify that the statements herein are "true and correct" pursuant to 6 C.F.R. § 5.5(e)(3). FOIA obligates ICE to process requests expeditiously in two cases: (i) those where a requester "demonstrates a compelling need"—such as "urgency to inform the public concerning actual or alleged Federal Government activity" if the requester is "primarily engaged in disseminating information," 5 U.S.C. § 552(a)(6)(E)(i), (v)—and (ii) "in other cases determined by the agency," *id.* § 552(a)(6)(E)(i), which, for the Department of Homeland Security, include "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence," 6 C.F.R. § 5.5(e)(1)(ii), (iv). Both cases exist here.

### A.  A MATTER OF WIDESPREAD AND EXCEPTIONAL INTEREST RAISING GOVERNMENT INTEGRITY CONCERNS

ICE's dismissal of noncitizens' immigration court cases to facilitate their expedited removal is a matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence.

Fifty articles on an issue make it a matter of widespread and exceptional public interest. *Citizens for Resp. & Ethics in Wash. v. U.S. DOGE Serv.*, Case No. 25-cv-511 (CRC), 2025 WL 752367, at *13 (D.D.C. Mar. 10, 2025) (hereinafter "CREW") *see also Brennan Ctr. for Just. v. Dep't of Com.* 498 F. Supp. 3d 87, 97 (D.D.C. 2020). A "handful of articles" also establishes such interest where the articles are "in a variety of publications" and "repeatedly reference the ongoing national discussion." *Am. Civ. Liberties Union v. Dep't of Just.*, 321 F. Supp. 2d 24, 32 (D.D.C. 2004).

Here, state, local, and nationwide media outlets have published at least at least eighty seven articles since May 21, 2025, about ICE asking immigration judges to dismiss noncitizens'

---

*Immigration Court, Changes Keep Tactic,* AZ Central (May 29, 2025, 5:01 AM), https://www.azcentral.com/story/news/politics/immigration/2025/05/29/phoenix-immigration-court-ice-arrests-resume/83767918007/ (reporting that OPLA attorneys are moving to dismiss immigration cases because they are "no longer in the best interest of the government").

immigration cases and then arresting noncitizens once their cases are dismissed.[2] Immigration attorneys also report ICE officials serving pre-signed dismissals based on "non-opposition" to

[2] Emiliano Tahu Gómez, *'Unconstitutional Death Row': At San Antonio Immigration Court, Rep. Casar Decries Arrests, Gets Few Answers*, Austin American-Statesman (July 28, 2025, 6:19 PM), https://www.statesman.com/story/news/politics/government/2025/07/28/unconstitutional-death-row-san-antonio-immigration-court-rep-casar-decries-arrests-gets-few-answers/85415560007/ (hereinafter, "Gómez re: San Antonio"); Sanford Nowlin, *U.S. Rep. Greg Casar Calls ICE Arrests at San Antonio Immigration Court 'Disturbing, Dystopian'*, San Antonio Current (July 28, 2025, 5:03 PM), https://www.sacurrent.com/news/us-rep-greg-casar-calls-ice-arrests-at-san-antonio-immigration-court-disturbing-dystopian-38097422; Margaret Kadifa, *ICE Arrests All Adults Without Children at S.F. Immigration Court*, Mission Local (July 25, 2025, 1:05 PM), https://missionlocal.org/2025/07/hed-ice-steps-up-arrests-at-s-f-immigration-court/ (hereinafter, "Kadifa re: Adult Arrests"); Pedro Camacho, *ICE Arrests Migrant Deemed Mentally Impaired by Judge as He Exits Immigration Court: 'He's Clearly Not Understanding the Questions'*, The Latin Times (July 25, 2025, 10:36 AM), https://www.latintimes.com/ice-arrests-migrant-deemed-mentally-impaired-judge-he-exits-immigration-court-hes-clearly-not-587576; Jordan Salama, *When ICE Agents Are Waiting Outside the Courtroom*, The New Yorker (July 25, 2025), https://www.newyorker.com/news/the-lede/when-ice-agents-are-waiting-outside-the-courtroom; Maurice DuBois et al., *3 Immigration Judges Speak Out About Their Firings: "It Was Arbitrary, Unfair*, CBS News (July 24, 2025, 8:34 PM), https://www.cbsnews.com/boston/news/immigration-judges-speak-out-firings-arbitrary-unfair/?intcid=CNM-00-10abd1h; Danielle James, *ICE Arrests at Check-Ins, Court Hearings Are on the Rise. Michigan Is No Exception*, MLIVE (July 21, 2025, 7:10 AM), https://www.mlive.com/public/2025/07/ice-arrests-at-check-ins-court-hearings-are-on-the-rise-michigan-is-no-exception.html; Margaret Kadifa, *ICE Agents Keep Snatching Asylum Seekers Immediately After Their Court Hearings*, Mother Jones (July 21, 2025), https://www.motherjones.com/politics/2025/07/ice-agents-arrest-asylum-seekers-after-court-hearings-san-francisco/; Martha Bellisile et al., *Volunteers Flock to Immigration Courts to Support Migrants Arrested in the Hallways*, ABC News (July 20, 2025, 8:38 AM), https://abcnews.go.com/US/wireStory/volunteers-flock-immigration-courts-support-migrants-arrested-hallways-123902561; Mark Rivera et al., *ICE Arrests at Immigration Court in Chicago, Nationwide Labeled 'Unlawful' in New Lawsuit*, ABC 7 Chicago (July 18, 2025, 8:36 PM), https://abc7chicago.com/post/us-immigration-news-ice-arrests-courts-chicago-nationwide-labeled-unlawful-new-lawsuit-trump-administration/17186490/; Eduardo Cuevas, *'Escalation:' Federal Agents Now Detaining People with Active Immigration Cases*, USA Today (July 18, 2025, 11:26 AM), https://www.usatoday.com/story/news/nation/2025/07/18/migrants-immigration-court-trump-crackdown/84614161007/; Martha Bellisile, *Homeland Security Officials Defend Immigration Court Arrests After Being Sued*, Associated Press (July 17, 2025, 2:04 PM), https://apnews.com/article/ice-immigration-court-immigrants-a5190ada4a6019f84d76e62c11c44e30; Swasti Singhai, *Five Days, 12 Arrests: A Week Inside San Diego Immigration Court*, Times of San Diego (July 17, 2025, 7:41 AM), https://timesofsandiego.com/politics/2025/07/17/arrests-immigration-court-trump-anxiety-chaos/ (hereinafter, "Singhai re: Week at San Diego Immigration Court"); Devan Cole et al., *Trump Administration Sued Over ICE Arrests at Immigration Courthouses*, CNN (July 16, 2025, 6:23 PM), https://www.cnn.com/2025/07/16/politics/ice-immigration-courthouse-arrests-lawsuit; Luis Ferré-Sadurní, *Immigrants File Class-Action Lawsuit to Stop IC Courthouse Arrests*, NY Times (July 16, 2025), https://www.nytimes.com/2025/07/16/nyregion/trump-ice-arrests-lawsuit-immigrants.html (hereinafter, "Ferré-Sadurní re: Lawsuit"); Maxine Bernstein, *Federal Judge in Oregon: Homeland Security 'Tricked' Asylum Seeker Before Arrest at Immigration Court*, The Oregonian (July 15, 2025, 10:47 AM), https://www.oregonlive.com/pacific-northwest-news/2025/07/federal-judge-in-oregon-homeland-security-tricked-asylum-seeker-before-arrest-at-immigration-court.html; Sarah Thamer, *Advocates Denounce ICE Arrests at Fort Snelling Immigration Court*, MPR News (July 15, 2025, 4:00 AM), https://www.mprnews.org/story/2025/07/15/advocates-protest-ice-arrests-at-immigration-court; Paige Browning & John O'Brien, *Fears of Arrests Cause Tension at Seattle Immigration Court*, KUOW (July 10, 2025, 5:58 PM), https://www.kuow.org/stories/fears-of-ice-arrests-cause-tension-at-seattle-immigration-court; Margaret Kadifa, *ICE Arrests 4 People After Immigration Court Hearings in San Francisco*, Mission

Local (July 10, 2025, 12:08 PM), https://missionlocal.org/2025/07/ice-arrests-four-people-after-they-appear-in-immigration-court/ (hereinafter, "Kadifa re: 4 Arrests"); *What Goes On in America's Immigration Courts*, Economist (July 10, 2025), https://www.economist.com/united-states/2025/07/10/what-goes-on-in-americas-immigration-courts; Francesca Regalado & Soumya Karlamangla, *Tensions Escalate in San Francisco over Immigration* Enforcement, NY Times (July 9, 2025), https://www.nytimes.com/2025/07/09/us/ice-immigration-protest-san-francisco.html; Tom Li & Ko Lyn Cheang, *Video: Protestors Cling to Departing ICE Van After Arrest at S.F. Immigration Court*, San Francisco Chronicle (July 8, 2025, 5:34 PM), https://www.sfchronicle.com/sf/article/protesters-cling-ice-van-chaos-immigration-court-20761721.php; Nisa Khan, *When ICE Is Waiting at Immigration Court, What Can Advocates Do?*, KQED (July 7, 2025), https://www.kqed.org/news/12047018/how-legal-experts-advocates-are-responding-to-the-detention-of-asylum-seekers; Emma Seiwell, *ICE Opposition Grows, With Lawmakers, Attorneys Decrying Courthouse Arrests as a Violation of Due Process*, NY Daily News (July 5, 2025, 6:00 AM), https://www.nydailynews.com/2025/07/05/ice-opposition-grows-with-lawmakers-attorneys-decrying-courthouse-arrests-a-violation-of-due-process/ (hereinafter "Seiwell re: ICE Opposition Grows"); Jim Vertuno, *Honduran Family Freed From Detention After Lawsuit Against ICE Courthouse Arrests*, Associated Press (July 3, 2025, 6:14 PM), https://apnews.com/article/ice-family-children-lawsuit-release-ef8d764aebec8ba1b67bafc9080a563d; Emma Seiwell, *ICE Agents Now Snatching Migrants With Open Court Cases; NY Officials, Lawyers Say It's 'Utterly Unlawful'*, NY Daily News (July 3, 2025, 6:50 AM), https://www.nydailynews.com/2025/07/02/ice-agents-now-snatching-migrants-with-open-cases-nyc-officials-lawyers-say-its-utterly-unlawful/ (hereinafter, "Seiwell re: ICE Snatching"); Melissa Gomez, *Faith Leaders Bear Witness as Migrants Make Their Case in Immigration Court,* Los Angeles Times (July 2, 2025, 3:00 AM), https://www.latimes.com/california/story/2025-07-02/faith-leaders-bear-witness-as-migrants-make-their-case-immigration-court (hereinafter, "Gomez re: Faith Leaders"); Shelby Bremer, *Lawsuit over San Diego Immigration Court Arrest May Give Insight Into ICE Practices*, NBC San Diego (July 1, 2025, 6:01 PM), https://www.nbcsandiego.com/news/local/san-diego-lawsuit-ice-courthouse-arrests/3861107/; May & Marr, *supra* n. 1; Margaret Kadifa, *For One S.F. Asylum Seeker, ICE Arrest Meant Move to More Conservative Judge,* Mission Local (July 1, 2025, 4:00 AM), https://missionlocal.org/2025/07/sf-asylum-seeker-immigration-judge-ice-arrest/ (hereinafter "Kadifa re: Forum Shopping"); Natali Yahr, *Wisconsin Asylum Seeker Miguel Robles Detained in Unprecedent Wave of Courthouse Arrests,* Racine County Eve (July 1, 2025), ), https://racinecountyeye.com/2025/06/30/miguel-robles-immigration-asylum/; Gwynne Hogan, *He Fled Death Threats for Being Gay, Applied for Asylum and Married a U.S. Citizen. ICE Arrested Him Anyway,* The City (June 30, 2025, 1:41 PM), https://www.thecity.nyc/2025/06/27/ice-arrested-asylum-gay/ (hereinafter "Hogan re: Mamadou Arrest"); Ko Lyn Cheang, *S.F. Drag Performer Detained by ICE After Asylum Hearing,* San Francisco Chronicle (June 28, 2025), https://www.sfchronicle.com/sf/article/drag-performer-detained-ice-20399122.php; Anna-Cat Brigida, *A Legal Trap? Why the Trump Administration is Targeting Immigration Courts for Arrests*, Al Jazeera (June 27, 2025), https://www.aljazeera.com/news/longform/2025/6/27/why-the-trump-administration-is-targeting-immigration-courts-for-arrests; Julia Marnin, *6-Year-Old Boy with Leukemia Arrested by ICE is Now Detained in Texas, Suit Says*, Fort Worth Star-Telegram (June 26, 2025, 3:23 PM), https://www.star-telegram.com/news/state/texas/article309472695.html; Dan Katz, *ICE Arrested a 6-Year-Old Boy with Leukemia at Immigration Court. His Family is Suing,* Texas Public Radio (June 25, 2025, 11:06 PM), https://www.tpr.org/border-immigration/2025-06-25/ice-arrested-a-6-year-old-boy-with-leukemia-at-immigration-court-his-family-is-suing; Nina Shapiro, *As Pushback Grows to WA Immigration Court Arrests, ICE Changes Tactics*, The Seattle Times (June 24, 2025, 6:00 AM), https://www.seattletimes.com/seattle-news/as-pushback-grows-to-wa-immigration-court-arrests-ice-changes-tactics/ (hereinafter "Shapiro re: ICE Tactic Change"); Kate Morrissey, *Here's What's Happening to the People ICE Arrests in Immigration Court*, Capital & Main (June 24, 2025), https://capitalandmain.com/heres-whats-happening-to-the-people-ice-arrests-in-immigration-court; Elizabeth L.T. Moore & Elizabeth Zavala, *Obscure San Antonion Court Becomes Flashpoint in Immigration Debate*, San Antonio Express-News (June 23, 2025), https://www.expressnews.com/news/article/obscure-san-antonio-immigration-court-spotlight-20381608.php; Luis Ferré-Sadurní, *Brad Lander Tried to Escort Immigrants facing Arrest. He's Not Alone* , NY Times (June 19, 2025), https://www.nytimes.com/2025/06/19/nyregion/ice-immigrants-volunteer-escorts-courthouse.html (hereinafter "Ferré-Sadurní re: Lander Escort"); Ryan Oehrli, *'Rigged'? ICE Agents Are Arresting People at Charlotte's Immigration*

*Court,* The Charlotte Observer (June 12, 2025, 11:31 AM), https://www.charlotteobserver.com/news/local/crime/article308209165.html; Armando Garcia, *Immigrant Rights Group Say ICE Officers 'Ambush Noncitizens' in Courthouse Arrests, Ask Judge to Intervene,* ABC News (June 12, 2025, 10:32 AM), https://abcnews.go.com/US/immigrant-rights-groups-ice-officers-ambush-noncitizens-courthouse/story?id=122770040; Thomas Lyons, *Mood is Tense at Concord Immigration Court Following ICE Arrests,* Berkleyside (June 12, 2025, 9:55 AM), https://www.berkeleyside.org/2025/06/12/concord-immigration-court-tension-after-ice-arrests; Ximena Bustillo, *ICE's Novel Strategy Allows for More Arrests from Inside Immigration Courts,* NPR (June 12, 2025, 5:02 AM), https://www.npr.org/2025/06/12/nx-s1-5409403/trump-immigration-courts-arrests; Luis Ferré-Sadurní, *Inside a Courthouse, Chaos and Tears as Trump Accelerates Deportations,* NY Times (June 12, 2025), https://www.nytimes.com/2025/06/12/nyregion/immigration-courthouse-arrests-trump-deportation.html (hereinafter "Ferré-Sadurní re: Inside NYC Immigr. Cts."); Martha Bellisile et al., *Immigration Officers Intensify Arrests in Courthouse Hallways on a Fast Track to Deportation,* Associated Press (June 11, 2025, 4:17 PM), https://apnews.com/article/immigration-court-arrests-ice-deportation-99d822cdc93ae7dc26026c27895d5ea1; Brittany Taylor et al., *Second Day of Arrests by ICE Agents at Immigration Court in Southwest Houston,* Click 2 Houston.com (June 11, 2025, 10:25 AM), https://www.click2houston.com/news/local/2025/06/11/ice-agents-stationed-outside-immigration-court-in-houstons-greenspoint-area/; Julia Ainsley, *Trump Admin Tells Immigration Judges to Dismiss Cases in Tactic to Speed Up Arrests,* NBC News (June 11, 2025, 5:00AM), https://www.nbcnews.com/national-security/trump-admin-tells-immigration-judges-dismiss-cases-tactic-speed-arrest-rcna212138; Conrad Wilson, *ICE Arrests 2 More Asylum Seekers at Immigration Court in Portland,* OPB (June 10, 2025, 5:12 PM), https://www.opb.org/article/2025/06/10/ice-arrests-2-more-asylum-seekers-at-immigration-court-in-portland/ (hereinafter, "Wilson re: Two Arrests"); Ninfa Saavedra & Robert Arnold, *ICE Arrests Multiple People at Houston's Immigration Court,* Click2Houston.com (June 10, 2025, 2:48 PM), https://www.click2houston.com/news/local/2025/06/10/ice-arrests-reportedly-underway-at-houstons-immigration-court/; Natalie Weber, *ICE Detains Multiple Men at Houston Immigration Courthouse, Civil Rights Organization Says,* Houston Public Media (June 10, 2025, 11:58 AM), https://www.houstonpublicmedia.org/articles/news/politics/immigration/2025/06/10/523600/ice-detains-multiple-men-at-houston-immigration-courthouse/; Giulia McDonnell Nieto del Rio, *This Is What An ICE Arrest in Boston Immigration Court Looks Like,* Boston Globe (June 9, 2025, 6:31 AM), https://www.bostonglobe.com/2025/06/09/metro/ice-arrests-at-boston-immigration-court/ (hereinafter, "Nieto del Rio re: Inside Boston Immigr. Ct. Arrest"); Audrey Conklin & Bill Melugin, *Trump's ICE Launches Bold Courthouse Migrant Arrest Strategy to Fast-Track Deportations Biden Avoided,* Fox News (June 9, 2025, 4:00 AM), https://www.foxnews.com/us/trumps-ice-launches-bold-courthouse-migrant-arrest-strategy-fast-track-deportations-biden-avoided?msockid=1cd283b1756f61231883976574c46057; Conrad Wilson, *ICE Detains Another Asylum-Seeker Outside Portland Courtroom, Legal Petition Says,* OPB (June 6, 2025, 9:30 AM), https://www.opb.org/article/2025/06/06/asylum-arrest-portland-yzlh/ (hereinafter, "Wilson re: Arrest"); Amy Larson, *Newlywed Couple Separated at Immigration Courthouse by ICE,* The Hill (June 5, 2025, 1:14 PM), https://thehill.com/homenews/state-watch/5334753-immigration-courthouse-ice-trump-dhs/; Laura Romero et al., *In a New Tactic, ICE Is Arresting Migrants at Immigration Courts, Attorneys Say,* ABC News (June 4, 2025, 6:37 PM), https://abcnews.go.com/US/new-tactic-ice-arresting-migrants-immigration-courts-attorneys/story?id=122513021; Julie Carey, *Cancel, Arrest, Deport: Immigration Lawyer Warns of Emerging ICE Tactic,* 4 Washington (June 4, 2025, 3:01 PM), https://www.nbcwashington.com/news/local/cancel-arrest-deport-immigration-lawyer-warns-of-emerging-ice-tactic/3927509/; Brad Schmidt, *Immigration Arrest at Courthouse Marks First for Portland,* The Oregonian (June 3, 2025, 3:22 PM), https://www.oregonlive.com/politics/2025/06/immigration-arrest-at-courthouse-marks-first-for-portland.html; Stephen Franklin & Katema Hosseini, *ICE Target Noncitizens As Cases Dismissed in Immigration Court in Chicago,* Borderless (June 3, 2025), https://borderlessmag.org/2025/06/03/ice-arrests-chicago-immigration-court-trump-detention-immigration-custom-enforcement/; Conrad Wilson, *ICE Detains Asylum Seeker Outside Portland Immigration Court, Lawyers Say,* OPB (June 2, 2025, 11:01 PM), https://www.opb.org/article/2025/06/02/ice-immigration-enforcement-detains-asylum-seeker-portland-court/; Angélica Franganillo Díaz & Priscilla Alvarez, *ICE Targets Migrants for Arrest at Courthouses as Trump Administration*

*Intensifies Deportation Push*, CNN (June 2, 2025, 5:00 AM), https://www.cnn.com/2025/06/02/politics/ice-arrests-migrants-courthouse; Shelly Bradbury, *Feds Detain Immigrant Family at Denver Courthouse Amid New Trump Strategy*, Denver Post (May 30, 2025, 3:32 PM), https://www.denverpost.com/2025/05/30/denver-immigration-arrest-courthouse-ice-trump/; Giulia McDonnell Nieto del Rio, *ICE Arrests at Massachusetts Immigration Courts Target Immigrants Seeking Permission to Stay in US*, Boston Globe (May 30, 2025, 1:39PM), https://www.bostonglobe.com/2025/05/27/metro/immigration-courts-ice-arrests-massachusetts (hereinafter, "Nieto del Rio re: Boston Immigr. Ct. Arrests"); Suzanne Gamboa, *Immigration Arrests in Courthouses Have Become the New Deportation Tool, Stripping Migrants of a Legal Process*, NBC News (May 30, 2025, 5:00 AM), https://www.nbcnews.com/news/latino/immigrations-arrests-ice-deportations-courthouse-legal-process-ice-rcna209671; Hamed Aleaziz et al., *How ICE is Seeking to Ramp Up Deportations Through Courthouse Arrests*, NY Times (May 30, 2025), https://www.nytimes.com/2025/05/30/us/politics/ice-courthouse-arrests.html; Allison Sherry, *Signaling a Policy Shift, ICE Detains a Family Who Showed Up at Denver Immigration Court for a Check-In*, CPR News (May 29, 2025, 1:35 PM), https://www.cpr.org/2025/05/29/ice-detains-family-denver-immigration-court/; Gonzalez & Ruelas, *supra* n. 1; David Noriega, *Immigration Courts Are Dismissing Cases of Those Sent to El Salvador, Potentially Cutting Off Their Return*, NBC News (May 28, 2025, 5:10 PM), https://www.nbcnews.com/news/latino/immigration-courts-alien-enemies-deportation-andry-hernandez-romero-rcna209402; Gwynne Hogan, *Migrants, Protestors, and a Pastor Arrested Inside and Outside Manhattan Immigration Courthouses*, The City (May 28, 2025, 3:16 PM), https://www.thecity.nyc/2025/05/28/ice-arrests-migrants-26-federal-plaza-pastor/ (hereinafter, "Hogan re: NYC Immigr. Ct. Arrests"); Tomoki Chien, *Undercover ICE Agents Begin Making Arrests at SF Immigration Court*, The San Franciso Standard (May 27, 2025, 5:32 PM), https://sfstandard.com/2025/05/27/undercover-ice-agents-make-arrests-san-francisco-court/; Michael Elsen-Rooney, *A Bronx High Schooler Showed Up for a Routine Immigration Court Date. ICE Was Waiting*, Chalkbeat New York (May 26, 2025, 8:35 pm), https://www.chalkbeat.org/newyork/2025/05/27/bronx-high-school-student-detained-by-immigration-ice-agents/?ref=hellgatenyc.com (hereinafter, "Elsen-Rooney re: Dylan Arrest"); Milena Malaver et al., *ICE Agents in Miami Find New Spot to Carry Out Arrests: Immigration Court*, Miami Herald (May 26, 2025, 1:27 PM), https://www.miamiherald.com/news/local/immigration/article306900486.html; Melissa Gomez, *Father Ripped from Family as Agents Target Immigration Courts, Arresting People After Cases Dismissed*, LA Times (May 24, 2025, 10:00AM), https://www.latimes.com/california/story/2025-05-24/ice-agents-swarm-immigration-courts-arresting-people-after-cases-dismissed (hereinafter, "Gomez re: Immigr. Ct. Arrests"); Tyche Hendricks, *'Unprecedented': ICE Officers Operating Inside Bay Area Immigration Courts, Lawyers Say*, KQED (May 24, 2025), https://www.kqed.org/news/12041473/unprecedented-ice-officers-operating-inside-bay-area-immigration-courts-lawyers-say; Camilo Montoya-Galvez & Nidia Cavazos, *ICE Ending Migrants' Court Cases In Order to Arrest and Move to Deport Them*, CBS News (May 23, 2025, 9:53 AM), https://www.cbsnews.com/news/ice-ending-migrants-court-cases-arrest-move-to-deport-them/; Arelis R. Hernández & Maria Sacchetti, *Immigrant Arrests at Courthouses Signal New Tactic in Trump's Deportation Push*, Washington Post (May 23, 2025), https://www.washingtonpost.com/immigration/2025/05/23/immigration-court-arrests-ice-trump/; Trevor Hughes, *ICE Agents Deploy New Tactic: Arresting People As They Leave Mandatory Court Hearings*, USA Today (May 22, 2025, 1:13 PM), https://www.usatoday.com/story/news/nation/2025/05/22/ice-arrests-immigration-court-deportation-tactics/83792357007/; Joshua Goodman et al., *They Came to Hearing at Chicago's Immigration Court, Then Got Arrested*, Chicago Sun-Times (May 22, 2025, 3:59PM), https://chicago.suntimes.com/immigration/2025/05/22/ice-agents-hallways-immigration-court-trump-mass-arrest; Anders Hagstrom & Bill Melugin, *ICE Beings New, Nationwide Effort to Arrest Illegal Aliens at Immigration Hearings* (May 22, 2025, 1:07 PM), https://www.foxnews.com/politics/ice-begins-new-nationwide-effort-arrest-illegal-aliens-immigration-hearings; Joshua Goodman & Gisela Salomon, *ICE Agents Wait in Hallways of Immigration Court as Trump Seeks to Deliver on Mass Arrest* Pledge, Associated Press (May 22, 2025, 1:30 AM), https://apnews.com/article/immigration-courts-arrests-trump-ice-deportations-fa96435d4ec021cc8ff636b23d80d848; J. Dale Shoemaker, ICE Raids Immigration Court in Buffalo, Investigative Post (May 22, 2025), https://www.investigativepost.org/2025/05/22/ice-raids-immigration-court-in-buffalo/; Raphael Romero Ruiz *et al.*, *For 2ⁿᵈ Day, People Attending Phoenix Immigration Hearings Arrested by ICE*, USA Today (May 21, 2025, 11:42 PM), https://www.usatoday.com/story/news/politics/immigration/2025/05/21/ice-arrests-phoenix-

noncitizen respondents at immigration courts without respondents not having notice of ICE's motion to dismiss their immigration case and an opportunity to oppose it. Much of the coverage on these dismissals casts doubt on their integrity, describing them as a violation of due process and a tactic to deport noncitizens without hearings.[3]

ICE dismissals and arrests at immigration courts have outraged Americans around the country. Opposition to these actions and doubts about their legality have prompted mass protests at immigration courts in New York, Seattle, San Francisco, and elsewhere.[4] It has also prompted

---

immigration-court/83772323007/?gnt-cfr=1&gca-cat=p; Gustavo Sagrero Álvarez, *ICE Agents at Seattle Courthouse Arrest People Whose Deportation Hearings are Dismissed*, KUOW (May 21, 5:45 PM), https://www.kuow.org/stories/ice-agents-at-seattle-courthouse-arrest-people-whose-deportation-hearings-are-dismissed; Akela Lacy et al. *ICE Agents Are Camped Outside Immigration Courts to Make Arrests*, The Intercept (May 21, 2025, 3:27 PM), https://theintercept.com/2025/05/21/ice-agents-courts-arrests-immigrants-deport/; Paul Ingram, *'Mayhem' As ICE Officials Arrest Multiple People at Immigration Court in Phoenix*, AZ Mirror (May 21, 2025, 11:12 AM), https://azmirror.com/2025/05/21/mayhem-as-ice-officials-arrest-multiple-people-at-immigration-court-in-phoenix/; Nina Shapiro, *ICE Arrests at WA Immigration Court Spark Fear of Fast-Track Removal*, Seattle Times (May 21, 2025, 6:00 AM), https://www.seattletimes.com/seattle-news/law-justice/ice-arrests-at-wa-immigration-court-spark-fear-of-fast-track-removal/ (hereinafter, "Shapiro re: ICE Arrests").

[3] Gómez re: San Antonio, *supra* n. 2; Nowlin, *supra* n. 2; Kadifa re: Adult  Arrests, *supra* n. 2; Camacho, *supra* n. 2; Salama, *supra* n. 2; James, *supra* n. 2; Cole et al., *supra* n. 2; Ferré-Sadurní re: Lawsuit, *supra* n. 2; Cuevas, *supra* n. 2; Bernstein, *supra* n. 2; Browning & O'Brien, *supra* n. 2; Kadifa re: 4 Arrests, *supra* n. 2; Li & Cheang, *supra* n. 2; Khan, *supra* n. 2; Kadifa re: Forum Shopping, *supra* n. 2; Yahr, *supra* n. 2; Hogan re: Mamadou Arrest, *supra* n.2; Cheang, *supra* n. 2; Brigida, *supra* n. 2; Moore & Zavala, *supra* n. 2; Lyons, *supra* n. 2; Oehrli, *supra* n. 2; Garcia, *supra* n. 2; Bustillo, *supra* n. 2; Ferré-Sadurní re: Inside NYC Immigr. Cts., *supra* n. 2; Bellisile et al. re: Immigration Officers Intensify Arrests, *supra* n. 2; Wilson re: Two Arrests, *supra* n. 2; Saavedra & Arnold, *supra* n. 2; Nieto del Rio re: Inside Boston Immigr. Ct. Arrest, *supra* n. 2; Conklin & Melugin, *supra* n. 2; Wilson re: Arrest, *supra* n. 2; Romero et al., *supra* n. 2; Carey, *supra* n. 2; Franklin & Hosseini, *supra* n. 2; Bradbury, *supra* n. 2; Nieto del Rio re: Boston Immigr. Ct. Arrests, *supra* n. 2; Gamboa, *supra* n. 2; Aleaziz et al., *supra* n. 2; Chien, *supra* n. 2; Elsen-Rooney re: Dylan Arrest, *supra* n. 2; Malaver et al., *supra* n. 2; Gomez re: Immigr. Ct. Arrests, *supra* n. 2; Hernández & Sacchetti, *supra* n. 2; Hughes, *supra* n. 2; Ruiz *et al*, *supra* n. 2; Lacy et al, *supra* n. 2; Shapiro re: ICE Arrests, *supra* n. 2; Seiwell re: ICE Snatching, *supra* n. 2; Hendricks, *supra* n. 2; Seiwell re: ICE Opposition Grows, *supra* n. 2.

[4] Thamer, *supra* n. 2; Browning & O'Brien, *supra* n. 2; Alicia Victoria Lozano, *Violent Clashes at San Francisco Immigration Court Won't Deter Protestors, Organizers Say*, NBC News (July 10, 2025, 4:43 PM), https://www.nbcnews.com/news/us-news/violent-clashes-san-francisco-immigration-court-wont-deter-protesters-rcna218059; Sarah Rumpf-Whitten, *Watch: ICE Agents Fight Off Masked Mob Outside Blue City Immigration Court*, FOX News (July 10, 2025, 1:12 PM), https://www.foxnews.com/us/watch-ice-agents-fight-off-masked-mob-outside-blue-city-immigration-court; Shay Arthur, *Crowd Gathers for Immigration Rally at Memphis Court*, WREG Memphis (July 8, 2025, 12:07 PM), https://wreg.com/news/local/crowd-gathers-for-immigration-rally-at-memphis-court/; Regalado & Karlamangla, *supra* n. 2; Li & Cheang, *supra* n. 2; Khan, *supra* n. 2; Stephania Jimenez, *PSL San Antonio Organizes Event to Educate Community on Immigration Laws Amid Rising IDE Deportations*, KSAT (July 1, 2025, 10:42 PM), https://www.ksat.com/news/local/2025/07/02/psl-san-antonio-organizes-event-to-educate-community-on-immigration-laws-amid-rising-ice-deportations/; May & Marr, *supra* n. 1; Nina Shapiro, *As Pushback Grows to WA Immigration Court Arrests, ICE Changes Tactics*, The Seattle Times (June 24, 2025, 6:00 AM), https://www.seattletimes.com/seattle-news/as-pushback-grows-to-wa-immigration-court-arrests-ice-changes-tactics/; Luis Ferré-Sadurní, *Brad Lander is Arrested by ICE Agents at Immigration Courthouse*, NY Times (June 17, 2025), https://www.nytimes.com/2025/06/17/nyregion/brad-lander-immigration-ice.html; Moore & Zavala, *supra* n. 2; Stephen Hobbs, *In Sacramento's Immigration Court, ICE Detention Threats Leave Residents in Limbo*, The

clergy, political leaders, and other members of the public to accompany noncitizens to their immigration court dates to document dismissals and arrests, attempt to stop the latter, and help arrestees inform their families.[5]

Responsive records will address critical integrity questions left open by existing media coverage. Such records will show the exact policies underlying dismissals and the extent to which ICE OPLA attorneys retain discretion to consider the individual circumstances of a particular case.

B.   URGENCY TO INFORM THE PUBLIC ABOUT FEDERAL GOVERNMENT ACTIVITY BY A REQUESTER

Additionally, and alternatively, the Council has a compelling need for the records sought. It is primarily engaged in disseminating information. And urgency also exists to inform the public

---

Sacramento Bee (June 14, 2025, 10:05 AM), https://www.sacbee.com/news/politics-government/capitol-alert/article308346910.html; Greg Micek et al., *Sacramento Immigration Court on Lockdown, Draws Protest After Suspected ICE Operation*, Capradio (June 12, 2025), https://www.capradio.org/articles/2025/06/12/sacramento-immigration-court-on-lockdown-draws-protest-after-suspected-ice-operation/; Lyons, *supra* n. 2; Ferré-Sadurní re: Inside NYC Immigr. Cts., *supra* n. 2; Bellisile et al. re: Immigration Officers Intensify Arrests, *supra* n. 2; Priscilla Alvarez, *ICE Protest Nationwide Comes As Agency Scrambles to Meet Trump's Immigration Arrest Quotas*, CNN (June 10, 2025, 10:16 PM), https://www.cnn.com/2025/06/10/politics/ice-scrambles-immigration-arrest-quotas; George Kelly & Max Harrison-Caldwell, Protesters Shut Down Immigration Court After ICE Arrests, The San Francisco Standard (June 10, 2025, 1:00 PM), https://sfstandard.com/2025/06/10/protesters-surround-immigration-court-after-ice-arrests/; Weber, *supra* n. 2; Joe Rivano Barros et al., *S.F. Police Arrest Dozens in 2nd Night of Protests Against ICE*, Mission Local (June 9, 2025, 8:16 PM), https://missionlocal.org/2025/06/sf-mission-march-mobilized-thousands-against-ice/; Aleaziz et al., *supra* n. 2; Hogan re: NYC Immigr. Ct. Arrests, *supra* n. 2; Ruiz *et al*, *supra* n. 2.
[5] Gómez re: San Antonio, *supra* n. 2; Salama, *supra* n. 2; Bellisile et al. re: Volunteers Flock to Immigration Courts, *supra* n. 2; Ferré-Sadurní re: Lawsuit, *supra* n. 2; Thamer, *supra* n. 2; Brian Strassburger, S.J. & William Critchley-Menor, S.J., *What We Saw During An ICE Arrest & Immigration Court Hearing: The Breakdown of Justice in America*, America: The Jesuit Review (July 11, 2025), https://www.americamagazine.org/politics-society/2025/07/11/ice-immigration-court-deportation-injustice-251119; Ciara Encinas, *Volunteers Describe How They Document ICE Arrests in Immigration Courts*, Fox 5 (July 11, 2025, 4 :55 PM), https://fox5sandiego.com/news/local-news/san-diego/san-diego-court-ice-arrests/; Moore & Zavala, *supra* n. 2; Joey Safchik, *ICE Handcuffs 71-Year-Old Grandmother, a US Citizen, at San Diego Immigration Court*, 7 San Diego (July 9, 2025, 7 :06 PM), https://www.nbcsandiego.com/news/local/ice-arrests-71-year-old-grandmother-a-us-citizen-at-san-diego-immigration-court/3865098/; Khan, *supra* n. 2; Swasti Singhai, *San Diego Volunteers Bear Witness Daily as ICE Continues Courtroom Arrests*, Times of San Diego (July 3, 2025, 3:41 PM), https://timesofsandiego.com/life/2025/07/03/san-diego-community-bears-witness-as-ice-continues-courtroom-arrests/; Gomez re : Faith Leaders, *supra* n. 2; Shapiro re: ICE Tactic Change, *supra* n. 2; Ray Sanchez & Allsha Ebrahimji, *Masked Ice Officers: The New Calling Card of The Trump Administration's Crackdown*, CNN (June 21, 2025), https://www.cnn.com/us/ice-immigration-officers-face-masks; Ferré-Sadurní re: Lander Escort, *supra* n. 2; Micek et al, *supra* n. 2. Ken Stone, *ICE Agents Scatter As SD Bishop Pham, Other Clergy Visit Immigration Court,* Times of San Diego (June 20, 2025, 3:04 PM), https://timesofsandiego.com/life/2025/06/20/ice-agents-scatter-as-sd-bishop-pham-other-clergy-visit-immigration-court/; Stephen Hobbs, *In Sacramento's Immigration Court, ICE Detention Threats Leave Residents in Limbo,* The Sacramento Bee (June 14, 2025, 10:05 AM), https://www.sacbee.com/news/politics-government/capitol-alert/article308346910.html; Carolina Estrada, *Two Men Detained by ICE After Sacramento Immigration Court* Hearings, KCRA3 (June 11, 2025, 11:13 PM), https://www.kcra.com/article/two-men-detained-by-ice-sacramento-immigration-hearings/65041264.

about the policies and guidance underlying ICE OPLA attorneys moving to dismiss noncitizens' immigration court cases to facilitate expedited removal.

        1.   *The Council Primarily Engages in Information Dissemination*

The Council primarily engages in disseminating information and analysis on immigration and other issues. Organizations primarily engaged in information dissemination include not only "media organizations and newspapers," *Heritage Found. v. Entl. Prot. Agency*, Civil Action No. 23-748, 2023 WL 2954418, *3 (D.D.C. 2023), but also "non-partisan law and public policy group[s]" like Requesters that "regularly write[], publish[], and disseminat[e], information online," *Brennan Ctr. for Just.*, 498 F. Supp. 3d at 98 (Brennan Center); *see also Ctr. for Pub. Integrity v. U.S. Dep't of Def.*, 411 F. Supp. 3d 5 (D.D.C. 2019) (Center for Public Integrity); *Protect Dem. Proj. v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293, 298 (D.D.C. 2017) (Protect Democracy Project); *Am. Civil Liberties Union*, 321 F. Supp. 2d at 29 n.5 (Electronic Privacy Information Center ("EPIC")).

Like Brennan Center, Protect Democracy Project, EPIC, and Center for Public Integrity, the Council authors factsheets and special reports on proposed and actual immigration policies, some of which shape media coverage in outlets across the nation.[6] It also analyzes immigration data and other government records—including those obtained through FOIA requests like this one—in interactive web reports.[7] And it circulates its reports and factsheets through its website,[8] blog, email newsletters, and an X (formerly known as Twitter) account with 64.9 thousand followers.[9]

        2.   *Urgency Exists to Inform the Public*

Urgency also exists to inform the public about the policies and guidance underlying the dismissal of noncitizens' immigration court cases to facilitate expedited removal.

---

[6] *See, e.g.*, *Trump-Backed Mass Deportations Would Cost Billions*, Report Says, CBS News (Oct. 3, 2024), https://www.cbsnews.com/video/trump-backed-mass-deportations-would-cost-billions-report/ (discussing Am. Immig. Council, Mass Deportation: Devasting Costs to America, Its Budget and Economy (Oct. 2, 2024), https://www.americanimmigrationcouncil.org/report/mass-deportation/); Emma Goldberg, *What if Trump Deported Millions of Immigrants*, The New York Times (Oct. 22, 2024), https://www.nytimes.com/interactive/2024/10/22/us/elections/trump-deportation.html?unlocked_article_code=1.Uk4.Pjao.99OiYFTTpEl6 (same); *What Trump's Mass Deportation Plan Might Look Like If He Wins the Election*, 60 Minutes (Oct. 27, 2024), https://www.youtube.com/watch?v=WjCHjwlSMFI (same); *Mass Deportations*, Last Week Tonight (Oct. 27, 2024), https://www.youtube.com/watch?v=0UEhMDAlX1Y (same); *The Costs of Mass Deportation? Expert Breaks Down Trump's Immigration Plan*, Amanpour & Company, (Oct. 28, 2024), https://www.youtube.com/watch?v=Dmfo3atidKE (same).

[7] *See* Am. Immig. Council, Torrance County Detention Facility: Troubling Role in Detaining Haitian Migrants During the 2021 Del Rio Incident (2024), https://www.americanimmigrationcouncil.org/foia/torrance-detention-facility; Am. Immig. Council, Ohio, We Have a Problem: Border Patrol & Local Law Enforcement's Patterns & Tactics of Abuse in Ohio's Immigration Enforcement (2024), https://www.americanimmigrationcouncil.org/foia/ohio-border-patrol-abuse; Am. Immig. Council, Refugee Resettlement in U.S. Cities (2019), https://data.americanimmigrationcouncil.org/en/refugee-resettlement-us/#exploratory_tool

[8] The Council's website received 4,506,460 views from 2,952,034 different users in 2024.

[9] *See* https://x.com/immcouncil.

Requisite urgency exists where "the request touches on 'a matter of current exigency to the American public'" and delay "compromises a significant recognized interest." *Protect Dem. Proj.*, 263 F. Supp. 3d 293 at 299 (quoting *Al-Fayed v.* CIA, 254 F.3d 300, 310 (D.C. Cir. 2001)). Dismissal of immigration court cases to facilitate expedited removal is exigent to the American public, as demonstrated by the eighty plus articles cited in this request and protests inside and outside of immigration courts around the country. *See CREW*, 2025 WL 752367, at *13 (finding urgency to inform the public based on at least fifty articles on the issue); *Am. Civil Liberties Union of No. Cal. v. U.S. Dep't of Def.*, No. C 06-01698, 2006 WL 1469418, at *6 (N.D. Cal. May 25, 2006) (same); 6 C.F.R. § 5.5(e)(3) ("The existence of numerous articles published on a given subject can be helpful to establishing the requirement that there be an 'urgency to inform' the public on the topic.").

Delayed production of the policies and guidance for dismissing noncitizens' immigration court cases to facilitate expedited removal would compromise the ongoing public debate about the propriety of such dismissals. *Cf. CREW*, 2025 WL 752367, at *13 (expediting a request for records about the U.S. DOGE Service); *Protect Dem. Proj.*, 263 F. Supp. 3d 293 at 299 (expediting a request for records about a possible unlawful airstrike on Syria); *Am. Civil Liberties Union of N. Cal. v. U.S. Dep't of Def.*, No. C. 06-01698, 2006 WL 1469418, at *6-7 (N.D. Cal. May 25, 2006) (expediting a request for records about possible unlawful military surveillance of protestors); *Freedom Coalition of Doctors for Choice v. Ctrs. For Disease Control & Prevention*, 2:23-cv-102, 2024 WL 69084, at *14 (N.D. Tex. Jan. 5, 2024) (expediting a request disputing the effectiveness of COVID-19 vaccines).

## IV. FEE WAIVER REQUEST

Requestors seek a fee waiver since "disclosure of the requested records is in the public interest." 5 U.S.C. § 552(a)(4)(A)(iii). ICE must construe "the FOIA fee waiver provision … liberally … in favor of waivers for noncommercial requesters" like Requesters. *Schoenman v. FBI*, 604 F. Supp. 2d 174, 188 (D.D.C. 2009). Disclosure is in the public interest where it (A) "is likely to contribute significantly to public understanding of the operations or activities of the government" and (B) "is not primarily in the commercial interest of the [R]equesters." 5 U.S.C. § 552(a)(4)(A)(iii); *see also* 6 C.F.R. § 5.11(k)(1). Requesters satisfy both requirements.

### A. DISCLOSURE OF THE INFORMATION IS IN THE PUBLIC INTEREST

Disclosing the requested records is likely to contribute significantly to the public's understanding of ICE dismissing immigration court cases and the extent to which dismissal remains a matter of discretion for OPLA attorneys to consider on a case-by-case basis.

ICE must consider two factors when assessing a disclosure's contribution to public understanding of a government activity or operation, *see* 6 C.F.R. § 5.11(k)(2): (i) whether the request has a "direct and clear" rather than "remote or attenuated" connection to "identifiable operations or activities of the federal government"; and (ii) whether disclosure "would be likely to

10

contribute significantly to public understanding of those operations or activities." *Id.* §
5.11(k)(2)(i)-(ii). Each factor supports a fee waiver here.

      1.   *Request Has a Direct and Clear Connection to Government Operations or Activities*

First, this request has a direct and clear relation to the following governmental operations and
activities: ICE's dismissal or termination of immigration court proceedings so it can seek
noncitizens' expedited removal.

      2.   *Records Sought Will Contribute Significantly to Public Understanding of the Above*

Second, disclosing the records sought will "contribute significantly to public understanding of"
the above activities. *Id.* § 5.11(k)(2)(ii). Such contribution exists where "[d]isclosure of the
requested information [is] meaningfully informative about [these] activities" and "contribute[s]
to the understanding of a reasonably broad audience of persons interested in the subject, as
opposed to the individual understanding of the requester." *Id.* 5.11(k)(2)(ii)(A)-(B). Both criteria
are satisfied here.

         i.   DISCLOSURE OF RECORDS IS MEANINGFULLY INFORMATIVE

Disclosing requested records will be meaningfully informative about ICE's dismissal or
termination of immigration court proceedings so it can seek expedited removal of respondent
noncitizens. Disclosure is meaningfully informative where disclosed information is not "in the
public domain, in either the same or a substantially identical form." *Id.* § 5.11(k)(2)(ii)(A).

Here, as demonstrated by the media coverage cited above, the public only knows that ICE is
arresting noncitizens at or near immigration courts after moving to dismiss their immigration
cases and that immigration judges are granting many dismissals, thereby allowing ICE to pursue
expedited removal.[10] Public knowledge does not extend to the exact guidance that ICE OPLA
attorneys are receiving from their superiors about dismissals or the extent to which dismissal
remains a matter of discretion for attorneys to consider on a case-by-case basis. Requested
records are therefore "meaningfully informative" about each of these activities.

        ii.   DISCLOSURE OF RECORDS CONTRIBUTES TO UNDERSTANDING OF A REASONABLY BROAD
              AUDIENCE

Disclosing requested records will contribute to the understanding of a reasonably broad
audience of persons interested in ICE's dismissal or termination of immigration court
proceedings so it can seek respondent noncitizens' expedited removal.

Requesters presumably satisfy this consideration as representatives of the news media. *Id.* §
5.11(k)(2)(ii)(B). They both "gather[] information of potential interest to a segment of the public,

---

[10] *See generally* Media articles cited in footnotes 2-5.

use[] [their] editorial skills to turn the raw materials into a distinct work, and distribute[] that work to an audience." *Id.* § 5.11(b)(6); *see also Serv. Women's Action Network v. Dep't of Def.*, 888 F. Supp. 2d 282, 287-88 (D. Conn. 2012) (finding that ACLU is a news media representative); *cf. Elec. Privacy Info. Ctr. v. Dep't of Def.*, 241 F. Supp. 2d 5, 10-15 (D.D.C. 2003) (finding that an organization similar to the Council is a news media representative).

Additionally, and alternatively, the ongoing and extensive media coverage in nationwide, state, and local outlets about ICE dismissals of immigration proceedings demonstrates interest in this subject by a reasonably broad audience. Requesters intend and are well-equipped to inform this audience about the information contained in responsive records, as they are experts in educating the public about immigration issues.

As detailed further in the expedited processing section, the Council analyzes government records—including those obtained through FOIA requests like this one—in interactive web reports and other publications available for free on its website.[11] And it circulates these publications for free through its website,[12] blog, email newsletters, and an X account with 64.9 thousand followers. It intends to publish content about records obtained from this request on its website and otherwise disseminate that content to its readers and the larger public.

Similarly, LatinoJustice PRLDEF produces newsletters, blogs, reports, opinion, editorials, and video interviews about the constitutional rights and equal protection of Latinos, immigrants, and other marginalized communities.[13] And it circulates these publications through its social media accounts. All of its materials are free and available to the public on its website.

In sum, Requesters intend to analyze the records they receive from this request and educate a broad audience of the interested public about them. And, Requesters have a demonstrated ability to do so.

B.   REQUESTERS' LACK OF COMMERCIAL INTEREST

Turning to commercial interest, disclosure is not primarily in Requesters' commercial interest. As nonprofits, Requesters have no commercial interest in the records requested. *See Am. Ctr. for L. & Just. v. U.S. Dep't of Homeland Sec.*, 573 F. Supp. 3d 78, 84 (D.D.C. 2021) ("[N]onprofit organizations by definition have no commercial interests."); *Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 82 F. Supp. 3d 396, 406 (D.D.C. 2015) (finding that the Council has no such interest in its record requests). Rather, the request furthers Requesters' work to increase public

---

[11] *See, e.g.*, Torrance County Detention Facility: Troubling Role in Detaining Haitian Migrants During the 2021 Del Rio Incident, *supra* n. 7; Ohio, We Have a Problem: Border Patrol & Local Law Enforcement's Patterns & Tactics of Abuse in Ohio's Immigration Enforcement, *supra* n. 7; Refugee Resettlement in U.S. Cities, *supra* n. 7.
[12] The Council's website received 4,506,460 views from 2,952,034 different users in 2024.
[13] *See, e.g.*, LatinoJustice PRLDEF, 100 Days Later: The Harm So Far to Latinx Communities (April 2025), https://www.latinojustice.org/en/pressreport/100-days-later-harm-so-far-latinx-communities; LatinoJustice PRLDEF, A Promise to Harm: What's at Stake for the Latino Community in Project 2025 (Oct. 2024), https://www.latinojustice.org/en/pressreport/promise-harm-whats-stake-latino-community-project-2025;

understanding of immigration processes, including the dismissal of immigration court proceedings so that ICE may channel respondent noncitizens into expedited removal.

Alternatively, and additionally, the public interest in obtaining a better understanding of ICE's actions discussed above exceeds any commercial interest that ICE may ascribe to Requesters in records responsive to this request.

***

Thank you for your attention to this request. If you have any questions regarding this request, please do not hesitate to contact us.

Very truly yours,

/s/ Chris Opila                                    /s/Rex Chen

Christopher ("Chris") Opila                  Rex Chen
Staff Attorney (Transparency)               Supervising Counsel for Immigrant Rights
American Immigration Council                LatinoJustice PRLDEF,
PMB2026                                          475 Riverside Drive Suite 1901
2001 L Street N.W., Suite 500               New York, NY 10115
Washington, DC 20036                         212-219-3360 | rchen@latinojustice.org
202-507-7699 | copila@immcouncil.org

PRACTICE RESOURCES

# Practice Alert: EOIR Guidance to Immigration Judges on Dismissals and Other Adjudications

6/12/25  |  AILA Doc. No. 25061204.  |  Expedited Removal, Removal & Relief

It has been reported in the news that EOIR leadership sent an email giving guidance to Assistant Chief Immigration Judges (ACIJs) on adjudications. The email was sent on Friday, May 30, 2025. Printed below is the full text of the EOIR email sent to ACIJs:

"Subject: Guidance on Case Adjudication

ACIJs –

During the past few months, EOIR has experienced significant changes in its caseload. EOIR's detained caseload has greatly increased in the past few months, and to meet the demands of the increasing workload on the detained dockets, we have re-emphasized goals for detained dockets and reallocated judges from non-detained dockets to detained dockets. There have been several developments with non-detained cases in the past few months. DHS is carrying out enforcement actions in or near EOIR space. Further, DHS attorneys have moved to dismiss cases that are currently pending in court. Given the recent developments the following guidance is provided to ensure the expeditious adjudication of cases:

1. Cases should not be reset for Oral Decision. Oral Decisions must be completed within the same hearing slot on the day testimony and arguments are concluded. If a case is continued after testimony and arguments are concluded without issuance of an oral decision, then a written decision must be issued.

2. DHS Motions to Dismiss may be made orally and decided from the bench. No additional documentation or briefing is required.

   The following information regarding DHS Motions to Dismiss may be generally helpful.

   The Motions to Dismiss is regulatory based upon INA 239.2(a)(6)[*NTA improvidently issued*] or INA 239.2(a)(7) [*circumstances have changed to such an extent that continuation is no longer in the best interest of the government*]. Generally, if DHS has met the regulatory burden, the oral motion to dismiss may be granted. A 10-day response period is not required.

   Respondents who were not continuously present for 2 years before inadmissibility was determined by an immigration officer under 212(a)(6) or 212(a)(7) of the INA may be placed in Expedited Removal (ER) Proceedings under INA 235.3 at the discretion of the AG. Expedited Removal Orders (ERO) carry a 5y bar to re-entry to the US.

   Respondents in the expedited removal proceedings are subject to mandatory detention. Fear claims are reviewed by USCIS via credible fear interviews. Negative credible fear findings are subject to Credible Fear Review before the court. If the negative credible fear determinations are affirmed by the court, Respondents are subject to the expedited removal order of the immigration officer. If negative credible fear determinations are vacated by the court, Respondents are placed in 240 Proceedings. Reasonable Fear Determinations, Reasonable Fear Review and Withholding Only Proceedings involve aliens subject to expedited removal under section 238(b) (*aggravated felons*) and aliens subject to reinstatement of prior order of removal under 241 (a)(5) who have a reasonable fear of persecution and torture.

3. DHS Enforcement actions at or near EOIR facilities: Please ensure that you, the Judges under your supervision, and your administrative staff are familiar with Policy Memo 25-06, which is found here. If you encounter any unusual circumstances with an enforcement action, please reach out to your RDCIJ to discuss. Please ensure your judges are aware of the above guidance. If you have any questions, please contact your supervisor to discuss."

**The following additional authorities may be helpful in the event, ICE OPLA makes a motion to dismiss in your case:**

The federal regulation governing "pre-decision" motions, 8 CFR 1003.23 specifies how motions should be made. The email instruction sent by EOIR conflicts with the regulation which states:

Pre-decision motions. Unless otherwise permitted by the immigration judge, motions submitted prior to the final order of an immigration judge **shall be in writing and shall state, with particularity the grounds therefor, the relief sought, and the jurisdiction** [emphasis added]. The immigration judge may set and extend time limits for the making and replying to of motions and replies thereto. A motion shall be deemed unopposed unless timely response is made.

The email instruction sent by EOIR inaccurately quotes the regulation governing cancellation of notices to appear, 8 CFR 239.2, as requiring that "*circumstances have changed to such an extent that continuation is no longer in the best interest of the government.*" The regulation actually states that an officer may cancel a notice to appear provided that "circumstances of the case" have changed, not merely that "circumstances have changed". Here is the text of the regulation:

> **Circumstances of the case** have changed after the notice to appear was issued to such an extent that continuation is no longer in the best interest of the government.

Finally, the immigration court practice manual, Chapter 3.1, indicates that responses to a filing for master calendar hearings "must be submitted within ten (10) days after the original filing with the immigration court". This has been interpreted by courts as providing respondents with a 10-day period to respond. The email instruction sent by EOIR explicitly instructs immigration judges to the contrary: "A 10-day response period is not required."

A recent EOIR Policy Memorandum emphasized the importance of impartiality and decisional independence of adjudicators, lamented that such values had been eroded in recent years, and indicated that such values would be of utmost importance going forward. EOIR PM 25-02, EOIR's Core Policy Values, Jan. 27, 2025. The same memorandum had a section dedicated to the barring of secret operational policies, defined to include "any operational policies related to case adjudications that were not disseminated publicly on EOIR's website or on social media." Per the memorandum, EOIR believed that the secretive nature of such policies "may have violated basic principles of administrative law."

In sum, the clandestine EOIR directive appears to violate the regulations, the immigration practice manual, and EOIR public guidance produced under this administration. Practitioners should make such arguments as appropriate and should consider trying to introduce news articles describing he secret guidance (or the guidance itself should it be released) into the record of proceedings.

*Special thanks to AILA members and the EOIR committee members for helping with this practice alert.

Exhibit C.C.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

VITOR LOPES RAMIRO,              )
                                 )
            Petitioner,          )
                                 )
v.                               )          C.A. No. 25-11851-BEM
                                 )
ANTONE MONIZ, Superintendent, Plymouth  )
County Correctional Facility, et al.,   )
                                 )
            Respondents.         )
_____)

I, George Pappas, declare the following under penalty of perjury:

1. My name is George Pappas. I was an Immigration Judge under the Department of Justice from July 23, 2023, to July 22, 2025.

2. As an Immigration Judge at the Chelmsford Immigration Court in Massachusetts, I was instructed by the Assistant Chief Immigration Judge ("ACIJ") to grant motions to dismiss when moved by the Department of Homeland Security Office of Chief Counsel' attorneys.

3. This instruction was within context of when ICE officers began to appear in the courthouse around June 2025.

4. I responded and said, "are you telling me to rubberstamp stamp these motions"? And the ACIJ responded "unless it is defective - grant them".

5. The pressure and the instruction were clear that I was to grant the motions to dismiss.

Executed July 30th 2025.

_____

George Pappas, Esq.

Sarah L. Candela
NOTARY PUBLIC
Commonwealth of
Massachusetts
My Commission Expires
July 28, 2028



Commonwealth of Massachusetts                                County of Suffolk

On this 30 of July, 2025, before me, the undersigned notary public, George Pappas, Esq., personally appeared, proved to me through satisfactory evidence of identification, which was personal knowledge of identity, to be the person whose name is signed on the attached document, and acknowledged to me that he signed it voluntarily for its stated purpose.

Sarah L. Candela, Esq., Notary Public
My commission expires: 07/28/2028

Exhibit C.D

**NEW YORK CITY BAR**

## STATEMENT BY THE IMMIGRATION AND NATIONALITY LAW COMMITTEE AND THE RULE OF LAW TASK FORCE

## THE GOVERNMENT'S USE OF CASE DISMISSALS IN IMMIGRATION COURT TO FACILITATE ICE ARRESTS VIOLATES DUE PROCESS AND UNDERMINES ACCESS TO HUMANITARIAN PROTECTIONS

Recent reports from immigration legal service providers and advocates reveal a deeply concerning pattern in immigration courts across New York State, at 26 Federal Plaza, 290 Broadway, and 201 Varick Street, in New York City, and Buffalo, NY. According to these reports, attorneys from the U.S. Immigration and Customs Enforcement's Office of the Principal Legal Adviser (ICE OPLA)—the "prosecutors" in administrative removal proceedings—have moved to dismiss cases with the apparent intent to strip noncitizens of the legal protections available in full-blown removal proceedings. Dismissal of the removal proceedings renders the noncitizen vulnerable to placement into expedited removal proceedings—where noncitizens' due process rights are considerably circumscribed and incentivizes immediate detention by ICE's Enforcement and Removal Operations (ICE ERO). Equally alarming is recent reporting that immigration judges are acquiescing in ICE's strategy, in violation of the fundamental due process rights owed to all.[1]

Most concerning is that Immigration Judges have entered dismissals even when individuals have pending applications for relief. Moreover, ICE ERO has reportedly stationed officers (some in plainclothes, some in black uniforms or vests, some armed, mostly masked[2]) inside the courtrooms and within the court buildings to detain such individuals—including those with pending applications for immigration relief like asylum—sending some to detention facilities as far away as Louisiana before legal advocates could intervene. For those persons who were detained at 26 Federal Plaza in reportedly inhumane conditions, ICE ERO refused access to several members of the New York Congressional delegation after they demanded access, thereby denying U.S. representatives their basic civil and constitutional rights.[3]

---

[1] NBC News, Trump admin tells immigration judges to dismiss cases in tactic to speed up arrests, June 11, 2025, https://www.nbcnews.com/news/amp/rcna212138 (All websites last accessed on June 3, 2025).

[2] *See* City Bar's Statement on the Use of Masks by ICE ERO, June 20, 2025, https://www.nycbar.org/press-releases/statement-on-wearing-of-masks-by-ice-agents/?back=1.

[3] CBS News, NYC lawmakers say they were denied access to ICE facility at Federal Plaza, June 9, 2025, https://www.cbsnews.com/newyork/news/ice-arrests-federal-plaza-new-york-city-adrian-espaillat-nydia-velazquez/ (denying Representatives Espaillat and Velazquez); and The City, ICE Bars Reps. Goldman and Nadler From Immigrant Detention Area 'Approaching Capacity', June 18, 2025, https://www.thecity.nyc/2025/06/18/ice-nadler-goldman-federal-detention-manhattan/.

**About the Association**
*The mission of the New York City Bar Association, which was founded in 1870 and has more than 20,000 members, is to equip and mobilize a diverse legal profession to practice with excellence, promote reform of the law, and uphold the rule of law and access to justice in support of a fair society and the public interest in our community, our nation, and throughout the world.*

This unfolding crisis is difficult to comprehend even for seasoned legal practitioners, and nearly impossible for unrepresented noncitizens to navigate. To better understand what is happening, it is important to explain the procedural dilemma now faced by individuals in removal proceedings. In a typical case, noncitizens are placed into immigration court proceedings where they may be eligible to seek legal relief such as asylum, cancellation of removal, or other humanitarian protections. These forms of relief are available only in removal proceedings and can take years to resolve.

What has emerged now is a kind of bureaucratic trap. ICE OPLA requests to dismiss the case—seemingly a positive development—yet this very dismissal eliminates the forum in which the noncitizen was eligible to apply for relief. Once dismissed, individuals are no longer in removal proceedings and thus have no pending protection application in court. However, they remain vulnerable to ICE enforcement and are subject to arrest and fast-tracked deportation without the protections of a hearing, especially if they are placed into expedited removal. This creates a perverse legal Catch-22: to seek protection, one must be in court—but going to court can now result in the case being dismissed and the person being immediately arrested and removed. Legal presence and legal vulnerability are now paradoxically linked, with no clear pathway for individuals to secure safety without risking detention or deportation.

This newly emerging practice appears to be the product of a quiet but dramatic shift in enforcement policy. In effect, it has created a seamless and deeply troubling pipeline: dismissal, detention, deportation. This three-step sequence—initiated without public announcement or formal policy change—relies on the sudden dismissal of immigration court cases, often while individuals have pending applications for relief; immediate arrest by ICE ERO officers stationed in or near courtrooms; and rapid transfer of those arrested to detention centers, sometimes across the country, often before legal counsel can intervene. Once detained, individuals are frequently removed from the jurisdiction of their attorneys and family, making it significantly more difficult to reassert their rights or challenge deportation.

The swiftness and coordination of this process signals a strategic shift by ICE and EOIR to circumvent the ordinary protections of due process. Rather than following the traditional and legally required adjudication pathway, this approach seeks to eliminate the courtroom altogether, using procedural dismissals not as a means of case resolution but as a tactical mechanism to expose individuals to unreviewable enforcement and removal.

Those actions are particularly disturbing in light of reports that ICE OPLA has, in some cases, verbally reassured advocates and *pro se* respondents that they were not seeking enforcement action. Nonetheless, individuals were detained by ICE ERO in the court hallway immediately after their appearance. This contradictory messaging creates a dangerous bait-and-switch dynamic: while ICE OPLA provides assurances and noncitizens inform their actions based on those assurances, ICE ERO operates in the same courtroom and building with the clear aim of doing exactly the opposite.

More importantly, the procedure presents noncitizens in removal proceedings with an appalling Hobson's choice:  either to attend one's removal hearing and risk dismissal of one's case (and immediate arrest and detention) on one hand, or to skip the hearing and be ordered removed

2

from the United States *in absentia*. Indeed, colloquial reports indicate that the level of attendance at 26 Federal Plaza hearings has dropped precipitously in recent weeks, with a concomitant rise in the number of noncitizens ordered removed *in absentia* for missing their hearings.

Such sharp practices by government officers not only erode the integrity of the process and undermine trust between government actors and those whom they are charged to serve, but also raise serious constitutional and legal concerns, particularly with respect to due process under the Fifth Amendment. The Supreme Court has long held that noncitizens are entitled to due process protections in immigration proceedings.[4] The government's actions in dismissing cases without notice or adequate justification—thereby extinguishing any legal protections—undermine these foundational rights.[5]

Moreover, the use of dismissals in this context contradicts the principle that immigration court proceedings must be fair, transparent, and consistent with humanitarian obligations under both domestic and international law.[6] In fact, for many years, the Executive Office of Immigration Review (EOIR) explicitly prohibited such enforcement action within or near its courthouses.[7] Previous EOIR guidance dating back to as early as 1996 warned of the "chilling effect" that courthouses arrests would have in immigration courts.[8] The rescission of this policy by EOIR's Acting Director Sirce E. Owens pursuant to EOIR Policy Memorandum 25-06 raises serious legal issues under the Administrative Procedure Act as to whether such rescission adequately accounts for the strong public policy and legal rationales for prohibiting immigration arrests within or near

---

[4] Landon v Plasencia, 459 U.S. 21 (1982); Knauff v. Shaughnessy, 338 U.S. 537 (1950); Yamataya v. Fisher, 189 U.S. 86 (1903); Kwong Hai Chew v. Colding, 344 U.S. 590 (1953). See also Mathews v. Eldridge, 424 U.S. 319 (1976) (as persuasive authority holding that procedural due process must be evaluated through a balancing test that considers the individual's interest, the government's interest in avoiding procedural burdens, and the risk of erroneous deprivation under the current procedures).

[5] "[T]he right of access to the courts is grounded not in the Sixth Amendment but in various other constitutional provisions," including the First and Fifth Amendments" Doe v. U.S. Immigr. & Customs Enf't, 490 F. Supp. 3d 672, 695 (S.D.N.Y. 2020).

[6] *See* Universal Declaration of Human Rights, G.A. Res 217A(III), U.N. Doc A/RES/217 (III), arts, 10,14 (Dec. 10, 1948 (establishing the right to a fair and public hearing and the right to seek asylum to free oneself from persecution); Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85, art. 3 (entered into force June 26, 1987; ratified by the United States Oct.. 21, 1994) (prohibiting the return of persons to a country where they are at risk of torture and implicitly requiring procedural safeguards to ensure proper assessment if such risk); Immigration and Nationality Act sections 208 (asylum) and 241(b)(3) (withholding of removal). *See also* International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171, arts. 13-14 (entered into force Mar. 23, 1976; ratified by the United States June 8, 1992, with reservations) (protecting non-citizens from arbitrary expulsion and requiring that any expulsion be decided according to the law affording noncitizens an opportunity to be heard in a fair and public hearing).

[7] "[P]ermitting enforcement actions in or near OCIJ space would disincentivize noncitizens from appearing for their hearings, which in turn would create inefficiencies for all parties involved and hinder the ability of OCIJ to carry out the mission of the agency." EOIR OPPM 23-01 https://www.aila.org/library/eoir-issues-policy-memo-on-enforcement-actions-in-or-near-ocij-space.

[8] See, EOIR, Office of the Chief Immigration Judge, Operating Policies and Procedures Memorandum (OPPM) No. 96-6 (Sept. 30, 1996) "Arrest by INS Officers In or Near Immigration Court Facilities" (located at https://www.justice.gov/sites/default/files/eoir/legacy/2002/12/13/96-6.pdf).

3

immigration courts.[9] EOIR's stated reasons for rescinding its prohibition of immigration arrests within immigration courts falls far short of the legal standard for such an abrupt change in policy.[10]

Critical public safety enforcement functions rely on the community. Integral to this trust is the right of access to courthouses free from the threat of civil arrests. The current immigration court arrest policy chills cooperation of noncitizen parties in all judicial proceedings and impairs functioning and trust in not only immigration proceedings, but also in state and federal courts as well.[11] Indeed, civil enforcement action in courts has previously shown to severely hamper the functioning of the justice system at large, and decrease trust in the legal system, including even deterring domestic violence victims from reporting crime.[12]

It is contrary to fundamental principles of due process to use court appearances—mandated under the threat of removal—as opportunities to entrap individuals into legal vulnerability. It is a form of procedural ambush to compel appearances under official order, only to dismiss the case mid-hearing stripping the individual of their right to pursue their protections under the law. This practice disproportionately harms the majority of noncitizens who often lack English proficiency and access to legal representation and are thus even more vulnerable in a procedure that is already stacked against them. The image of plainclothes ICE ERO agents stationed in hallways waiting to "sweep up" respondents—many of whom were statutorily shielded from removal by pending claims for relief—offends both legal ethics and basic principles of human dignity. It is a misuse of the judicial process in service of prosecution.

**Recommendations and Call to Action:**

In light of these developments, the New York City Bar joins other members of the legal community in expressing grave concern and urges the following immediate actions:

1. **For Immigration Judges:**

   o   Refrain from ruling on dismissal motions on the spot but, rather, give noncitizens facing such motions the full ten days afforded by EOIR's Practice Manual (or more,

---

[9] See, <u>Dep't of Homeland Sec. v. Regents of the Univ. of California</u>, 140 S. Ct. 1891, 1896, 207 L. Ed. 2d 353 (2020) (noting that the failure of the agency to weigh the reliance interests rendered the purported rescission of the Deferred Action for Childhood Arrivals policy arbitrary and capricious).

[10] See, <u>Motor Vehicle Mfrs Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.</u>, 463 U.S. 29 (1983) ("It is axiomatic that an agency must provide a reasoned explanation for a departure from its prior policy"); <u>Biden v. Texas</u>, 597 U.S. 785 (2022) (remanding to the district court to analyze whether the government's rescission of the Migrant Protection Protocol program sufficiently accounted for the change in policy).

[11] Jennifer M. Chacon, *State Courthouses in the ICE Age, State Court Report* (May 22, 2025), <u>https://statecourtreport.org/our-work/analysis-opinion/state-courthouses-ice-age</u>.

[12] "Evidence proffered by the plaintiffs indicates that substantial numbers of non-citizen litigants, even those who were not themselves subject to these actions, now feared *any kind of participation* in the legal system, including reporting domestic violence." <u>New York v. U.S. Immigr. & Customs Enf't</u>, 466 F. Supp. 3d 439, 443 (S.D.N.Y. 2020), <u>vacated and remanded sub nom. on other grounds</u> <u>New York v. United States Immigr. & Customs Enf't</u>, No. 20-2622, 2023 WL 2333979 (2d Cir. Feb. 28, 2023).

4

in light of many noncitizens' *pro se* status) to respond to the ICE OPLA's motion, thereby avoiding the possibility that the noncitizen might be immediately placed into expedited proceedings.

o   When possible and appropriate, conduct hearings—specifically master calendar hearings—remotely to mitigate the risk of ICE ERO surveillance and detention within court premises.

o   Carefully scrutinize motions to dismiss filed by ICE OPLA and request clarity as to the government's intent in respondent's particular case and the implications for pending relief if such relief has already been filed or if the respondent intends to file for relief shortly thereafter.

o   Where appropriate, exercise discretion to deny dismissal requests that would leave applicants without recourse or expose them to removal, particularly where relief applications are pending.

o   Insist that all present in the courtroom follow the rules of the court, and prohibit ICE OPLA from using their cell phones.

**2.   For Immigration Attorneys:**

o   Be vigilant and strategic when ICE OPLA seeks dismissal of a case. Do not stipulate to the dismissal sought without first assessing the full immigration consequences for the client, including the risk of being placed in expedited removal and immediate detention and deportation.

o   Consider opposing any motion to dismiss where it would violate respondent's due process, under the framework of *Mathews v. Eldridge*, and make the argument on the record.

o   Submit written opposition and request oral argument if needed. Where appropriate, argue that dismissing the case without affording respondent an opportunity to be heard on any pending relief violates fundamental fairness.

3.   **For Legal Service Providers and Community Advocates:**

o   Monitor and document ICE ERO presence in and around immigration courts and inform legal teams immediately when enforcement actions are observed.

o   Support respondents in requesting remote appearances and provide know-your-rights information about the consequences of dismissal, including disseminating *pro se* materials.[13]

---

[13] The National Immigration Project has prepared helpful *pro se* materials that can be found here: https://nipnlg.org/work/resources/template-opposition-dhs-motion-dismiss-pursue-expedited-removal;

5

      o   Urge bar associations, courts, and policymakers to investigate these practices and protect the integrity of the immigration adjudication process.

4. **For Members of Congress:**

      o   Conduct investigations through hearings, public inquiry, or formal requests for data and accountability from ICE leadership.

We call upon EOIR and ICE OPLA leadership to clarify that case dismissals must not be used as a tool for circumventing due process or fast-tracking removal without a hearing. We further urge ICE to cease enforcement operations in courts that threaten the safety, dignity, and legal rights of noncitizens seeking protection under our laws.

Immigration & Nationality Law Committee
Dorian E. Rojas, Co-Chair
Ludivine Van Der Heyden, Co-Chair

Rule of Law Task Force
Susan Kohlmann, Chair (2025-2028)
Hon. Marcy Louise Kahn (Ret.), Chair (2022-2025)

July 2025

**Contact**
Elizabeth Kocienda, Director of Advocacy | 212.382.4788 | ekocienda@nycbar.org
Raabia Qasim, Associate Policy Counsel | 212.382.6655 | rqasim@nycbar.org

---

https://nipnlg.org/sites/default/files/2025-06/pro-se-template.pdf; https://nipnlg.org/work/resources/oral-opposition-dismissal-template-pro-se-respondents.

# Congress of the United States

## Washington, DC 20515

Exhibit C.E.

May 28, 2025

The Honorable Kristi Noem
Secretary of Homeland
U.S. Department of Homeland Security
Washington, D.C. 20528

Mr. Todd M. Lyons
Acting Director
U.S. Immigration and Customs Enforcement
Washington, D.C. 20024

Dear Secretary Noem and Acting Director Lyons:

We write to express great concern regarding recent actions by U.S. Immigration and Customs Enforcement (ICE) at the Phoenix immigration court on May 20th and 21st, 2025, in light of reports that ICE abruptly detained multiple individuals who were attending their scheduled immigration court hearings[1]—a pattern reported in other cities across the country.[2] As lawmakers representing a border state, we know firsthand the impact that decades of federal inaction have had on Arizona and our border communities, and we have been relieved to see illegal border crossings continue to decrease since mid-2024.[3] However, targeting immigrants without a criminal record who are following the law by showing up for their scheduled immigration hearing  has only created chaos and does not make our communities safer. These actions raise serious concerns about transparency, due process, and the integrity of this administration's immigration enforcement priorities.

Reporting on May 20, 2025, suggests that ICE attorneys either moved to terminate proceedings or withdrew the "Notice to Appear" that initiated the immigration court proceedings in order to detain immigrants and place them in a fast-track deportation process to circumvent the court.[4] There has been no indication in any of the reports that these individuals have a criminal record. Also troubling, video footage shows ICE officers in plainclothes and masks detaining several

---

[1] "'Mayhem' as ICE officials arrest multiple people at immigration court in Phoenix," AZ Mirror (May 21, 2025), https://azmirror.com/2025/05/21/mayhem-as-ice-officials-arrest-multiple-people-at-immigration-court-in-phoenix/
[2] "ICE agents at Seattle courthouse arrest people whose deportation hearings are dismissed," KUOW (May 21, 2025), https://www.kuow.org/stories/ice-agents-at-seattle-courthouse-arrest-people-whose-deportation-hearings-are-dismissed; "ICE agents in Miami find new spot to carry out arrest: Immigration court," Miami Herald (May 22, 2025), https://www.miamiherald.com/news/local/immigration/article306900486.html; "ICE agents wait in hallways of immigration court as Trump seeks to deliver on mass arrest pledge," AP News (May 22, 2025), https://apnews.com/article/immigration-courts-arrests-trump-ice-deportations-fa96435d4ec021cc8ff636b23d80d848
[3] U.S. Customs and Border Protection, Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.
[4] "For 2nd day, people attend Phoenix immigration hearings arrested by ICE," AZ Central (May 21, 2025), https://www.azcentral.com/story/news/politics/immigration/2025/05/21/ice-arrests-phoenix-immigration-court/83772323007/?tbref=hp

women in front of their children, who approached an unmarked ICE vehicle crying and upset. For those individuals detained and witnesses at the courthouse, ICE's unprecedented enforcement actions created a confusing and frightening environment in what should have been a routine court appearance. This action targeted those who followed the rules and showed up to their hearing to present their case to an immigration judge as part of the process for claiming asylum or other legal status, where they would be granted or denied status.

These tactics make our immigration system less efficient and fair and discourage individuals from appearing for future hearings. In Phoenix, we have seen individuals denied the right to make their case and placed in a fast-track deportation process. This has the effect of denying protection and due process to those who need it most while preventing the court from discovering frivolous asylum claims. In addition, many of these individuals reportedly did not have sufficient time to find legal representation or translation services for their hearings, impairing their ability to understand the proceedings, meaningfully participate in their defense and claim for immigration status, or make sense of their detention by ICE—further dragging out the time it takes to move through the immigration system.

Not only do these tactics make the immigration system less fair and efficient, but they also directly contradict the administration's claims that it is targeting the worst criminals and genuine public safety threats. In fact, only about one-third of the immigrants detained by ICE this fiscal year have criminal convictions.[5] The administration's use of limited resources and reassignment of law enforcement away from drug trafficking and human trafficking cases to target noncriminal immigrants means that serious criminals may be allowed to continue roaming the streets at large—making Arizonans less safe. Instead, finite ICE resources should be focused on removing individuals who pose genuine threats to public safety, such as gang members and violent offenders, not people complying with the law.

It is unacceptable that congressional oversight inquiries seeking answers have not been adequately answered to date. We now urge that you promptly and substantively respond to the following questions and produce information no later than by June 3, 2025:

1. How many individuals has ICE arrested and detained at an immigration court during the week of May 19, 2025, to date? Provide the total number of individuals arrested and detained, and also disaggregate by country of origin, age, and gender.
    a. How many of the individuals were in removal proceedings after initially being granted parole at a port of entry of the United States?
    b. How many individuals detained by ICE at the immigration court have been placed in expedited removal (INA Sec. 235)?
2. Provide a copy of the relevant memorandum, guidance, or other written directive associated with this ICE action.
3. How is ICE complying with statutory requirements for screening individuals for fear of persecution?

---

[5] U.S. Customs and Immigration Enforcement, *ICE Initial Book-Ins by Criminality and MSC: FY2025 YTD* (May 17, 2025).

Furthermore, we request that you brief our offices on this matter, including operational information on how these actions are being carried out, the applicable policies and rules, and how DHS and ICE are complying with statutory obligations. Please schedule the briefing as soon as possible, but no later than by June 3, 2025.

Sincerely,

Mark Kelly
United States Senator

Ruben Gallego
United States Senator

Greg Stanton
Member of Congress

Yassamin Ansari
Member of Congress

Exhibit C.F.

**Help the House Litigation and Response Committee protect hardworking Americans from federal disinvestment.**     <u>SHARE YOUR STORY HERE</u>

 **RITCHIE TORRES**                                    **CONTACT ME**

      About ⌄           Issues           Press

Resources / In the News                        Share on       

# Rep. Ritchie Torres Demands Answers from DHS + ICE on Detention of High-School Student and NY-15 Constituent

May 28, 2025      ⚡ In the News      🏛 Public Safety

Today, Congressman **Ritchie Torres** (NY-15) wrote to Secretary of Homeland Security **Kristi Noem** and Acting Director Immigration and Customs Enforcement **Todd Lyons.** The full letter reads (PDF attached):

"I am writing with deep concern regarding the <u>recent detention of Dylan</u>, a 20-year-old high school student, legal entrant to the United States, and a constituent of mine in New York's 15th Congressional District in the Bronx. Dylan was detained by ICE agents on May 21, 2025, following the dismissal of his immigration case in court; a decision that has left his school, his community, and even me — his elected Congressional representative — shocked and searching for answers.

"Dylan arrived to the United States in April 2024 legally through the Biden Administration's humanitarian parole program. Since then, he has demonstrated extraordinary resilience

Exhibit C.G

# Congress of the United States

## Washington, DC 20515

June 5, 2025

The Honorable Kristi Noem
Secretary
Department of Homeland Security
Washington, D.C. 20528

Mr. Todd M. Lyons
Acting Director
U.S. Immigration and Customs Enforcement
Washington, D.C. 20024

Dear Secretary Noem and Acting Director Lyons:

We write to express grave concern over the disturbing pattern of Immigration and Customs Enforcement (ICE) operations taking place at immigration courts across the country — including recent incidents in New York City where masked, plainclothes ICE officers detained non-violent, non-criminal immigrants immediately following the dismissal of their existing deportation cases by DHS attorneys.[1]

Over the past week, we have witnessed federal agents lying in wait outside courtrooms, detaining individuals as they leave their hearings upon the expectation that their immigration proceedings — often including asylum applications — have been dismissed upon the government's request.[2] These mass arrests are part of what Trump administration officials have confirmed is a nationwide effort to terminate ongoing removal cases and reroute people into fast-tracked "expedited" removal proceedings, usually without counsel, due process, or any specific case-by-case analysis.[3]

By terminating ongoing removal proceedings, any pending asylum claim is rendered void, thereby creating a potentially short window to quickly deport immigrants who have previously applied for asylum, which, as you well know, is a *legal pathway* to enter the United States. It also bears emphasizing that asylum is not available to individuals convicted of serious crimes or deemed a danger to the security of the United States, meaning that those asserting asylum claims in immigration court are unlikely to have criminal backgrounds and are instead seeking protection under U.S. law.[4]

Recent reports indicate that the Trump administration is pressuring federal agencies to triple the number of daily immigration arrests as part of a sweeping push to achieve the arbitrary number

---

[1] Tracey Tully and Zolan Kanno-Youngs, "ICE Courthouse Arrests Face New Scrutiny Amid Legal Challenges," *New York Times*, May 30, 2025, https://www.nytimes.com/2025/05/30/us/politics/ice-courthouse-arrests.html
[2] *Id.*
[3] Camilio Montoya-Galvez and Nidia Cavazos, "ICE Ending Migrants' Court Cases in Order to Arrest and Move to Deport Them," *CBS News*, May 23, 2025 https://www.cbsnews.com/news/ice-ending-migrants-court-cases-arrest-move-to-deport-them/
[4] Priscilla Alvarez, Evan Perez, Sean Lyngaas and Holmes Lybrand, "White House Pushes for Increased Immigration Arrests by Lae Enforcement Agencies," *CNN*, May 29, 2025, https://www.cnn.com/2025/05/29/politics/white-house-immigration-arrests-law-enforcement-agencies

of 1 million deportations a year. This effort has led to the reassignment of FBI agents, U.S. Marshals, DEA, and CBP officers to immigration enforcement duties — ultimately straining national security resources, diverting attention away from investigating serious crimes, and raising real concerns about the public safety priorities of this administration.[5]

During Secretary Noem's confirmation hearing, you stated that DHS "would work every day to make sure people are safe and that those with criminal convictions are immediately removed." [6] However, it is clear that ICE is now targeting immigrants with no criminal history, many of whom are asylum seekers, parolees admitted through lawful processes, and students like Dylan — a 20-year-old Bronx high schooler who was detained after attending his court hearing alone and without a lawyer. He has since been transferred across four states, denied medical treatment, and cut off from legal representation.[7] Dylan entered the United States lawfully in 2024, enrolled in public school, had employment authorization, and had no criminal record at the time of his detainment.

This new policy, designed to meet an arbitrary quota of deportations, is not targeting criminals — the "worst of the worst" as administration officials have repeatedly claimed [8] — but instead is surreptitiously and deceptively aimed at those who are following the rules, voluntarily appearing in court, and doing it the right way. This policy neither targets criminals nor makes the public safer.

Instead, this policy creates perverse incentives for immigrants who are pursuing lawful pathways into our country and will encourage immigrants to go further underground and avoid following the lawful and official immigration process. This will not only result in the loss of tax and social security revenue — contributed by asylum-seekers eligible for work authorization — but will lead to greater disorder and public safety concerns. When combined with diverting significant law enforcement resources to arrests of non-violent immigrants instead of violent felons, the impact of this new policy makes our communities less safe.

The United States is a nation founded by immigrants that has benefited immensely from immigration. As a democracy grounded in the principles of due process and equal protection under the law, the use of courthouse ambush tactics not only undermines those principles but directly contradicts the Department's stated mission to uphold the law with integrity.

---

[5] "Kristi Nome Testifies at Senate Confirmation Hearing," *Rev.com*, accessed May 30, 2025, https://www.rev.com/transcripteditor/shared/QmAMnvocJpXkMLCFO3o9JK49iQCUHBKmns9lemjxa_R5kEmQtFXQyzzPBVweJEQI6YbRX6hnbF-YxQfnrAYC5ow2dQs?loadFrom=PastedDeeplink&ts=6383.88

[6] Marcia Kramer, "New York City Public School Student Detained by ICE at Asylum Hearing," *CBS News New York*, May 27, 2025, https://www.cbsnews.com/newyork/news/nyc-high-school-student-immigrant-detained-ice/

[7] See, e.g., Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025) (noting focus of immigration enforcement on those "who threaten the safety or security of the American people"); REUTERS, Trump to appoint former ICE director Tom Homan as US 'border czar' (Nov. 11, 2024), https://www.reuters.com/world/us/trump-appointformer-ice-director-tom-homan-countrys-border-czar-2024-11-11/  ("Tom Homan ... said on Monday he would prioritize deporting immigrants in the United States illegally who pose threats to public safety and national security"); The Department of Homeland Security's Budget Request for Fiscal Year 2026: Hearing Before the Senate Comm. on Homeland Security and Governmental Affairs (May 20, 2025) (Statement of Sec. Kristi Noem) ("once again, the United States is enforcing immigration laws to arrest, identify, detain and remove dangerous illegal alien criminals. We're prioritizing those that are a public safety threat to people, especially those who are affiliated with the terrorist organizations MS-13 and Tren de Aragua.").

[8] 8 U.S.C. § 1158

Page 3

Accordingly, as part of Congress's constitutional obligation to conduct oversight of the Department, we demand written responses to the following questions no later than June 19, 2025:

1. What specific guidance has DHS issued regarding the dismissal of ongoing court cases, followed by immediate ICE detention and expedited removal? Please provide all email communications, memoranda, legal justification, and written notes of relevant meetings. This includes any relevant material that mentions how the Department of Justice (DOJ) and the Executive Office for Immigration Review (EOIR) will coordinate and cooperate with enforcement operations.
2. What criteria is DHS using to determine which individuals should be targeted by this new policy?
3. How many individuals have been detained nationwide following court case dismissals since May 1, 2025? Please provide a breakdown by state and court locations.
   - Of those who have been detained and placed in expedited removal, how many (if any) had an affirmative asylum application pending or had informed the court of their intention to pursue other legal relief with United States Citizenship and Immigration Services (USCIS)?
   - Of those who have been detained and placed in expedited removal, how many (if any) have criminal convictions in the United States? Please provide relevant information about those cases and individuals.
4. Are immigration judges being tracked for how they handle these cases? If so, for what specific purpose?
5. For every detainee who had previously filed an asylum claim or other juvenile or family-based relief, please provide any and all information about whether and to what extent they received a credible fear screening under the expedited removal process.
6. What specific guidance (if any) has DHS issued, including any guidance involving the Department of Justice, about restricting observers in courtrooms or on the court premises?
7. What written guidance (if any) has DHS issued about agents wearing masks during enforcement operations?

We urge DHS to immediately suspend enforcement actions targeting noncriminal immigrants and individuals who are actively complying with our immigration laws.

We look forward to your prompt and forthright response.

Sincerely,

Dan Goldman
Member of Congress

Bennie G. Thompson
Member of Congress
Ranking Member, Committee
on Homeland Security

J. Luis Correa
Member of Congress

Seth Magaziner
Member of Congress

Eric Swalwell
Member of Congress

Delia C. Ramirez
Member of Congress

LaMonica McIver
Member of Congress

Robert Garcia
Member of Congress

Shri Thanedar
Member of Congress

Troy A. Carter, Sr.
Member of Congress

Julie Johnson
Member of Congress

Timothy M. Kennedy
Member of Congress

Pablo José Hernández
Member of Congress

Jamie Raskin
Member of Congress

Pramila Jayapal
Member of Congress

Jerrold Nadler
Member of Congress

Henry C. "Hank" Johnson, Jr.
Member of Congress

Mary Gay Scanlon
Member of Congress

Zoe Lofgren
Member of Congress

Jasmine Crockett
Member of Congress

Ted W. Lieu
Member of Congress

Sydney Kamlager-Dove
Member of Congress

Deborah K. Ross
Member of Congress

Becca Balint
Member of Congress

Joaquin Castro
Member of Congress

Greg Casar
Member of Congress

Alexandria Ocasio-Cortez
Member of Congress

Veronica Escobar
Member of Congress

Madeleine Dean
Member of Congress

Cleo Fields
Member of Congress

Eleanor Holmes Norton
Member of Congress

Val Hoyle
Member of Congress

MARK TAKANO
Member of Congress

Kevin Mullin
Member of Congress

Suzanne Bonamici
Member of Congress

André Carson
Member of Congress

Nydia M. Velázquez
Member of Congress

Sylvia R. Garcia
Member of Congress

Jan Schakowsky
Member of Congress

Yvette D. Clarke
Member of Congress

Danny K. Davis
Member of Congress

Mark Pocan
Member of Congress

Nanette Diaz Barragán
Member of Congress

Grace Meng
Member of Congress

Adriano Espaillat
Member of Congress

Derek T. Tran
Member of Congress

Nikema Williams
Member of Congress

Shontel M. Brown
Member of Congress

Joe Courtney
Member of Congress

Diana DeGette
Member of Congress

Debbie Wasserman Schultz
Member of Congress

Robert J. Menendez
Member of Congress

Glenn Ivey
Member of Congress

Betty McCollum
Member of Congress

April McClain Delaney
Member of Congress

Paul D. Tonko
Member of Congress

Maxine Dexter
Member of Congress

Sara Jacobs
Member of Congress

Gregory W. Meeks
Member of Congress

Lauren Underwood
Member of Congress

George Latimer
Member of Congress

Gilbert Ray Cisneros, Jr.
Member of Congress

Bonnie Watson Coleman
Member of Congress

Adam Smith
Member of Congress

Frank Pallone, Jr.
Member of Congress

Dina Titus
Member of Congress

Seth Moulton
Member of Congress

Jesús G. "Chuy" García
Member of Congress

Sam T. Liccardo
Member of Congress

Jahana Hayes
Member of Congress

Linda T. Sánchez
Member of Congress

Andrea Salinas
Member of Congress

Luz M. Rivas
Member of Congress

Dave Min
Member of Congress

Ritchie Torres
Member of Congress

Jimmy Gomez
Member of Congress

Suzan K. DelBene
Member of Congress

James P. McGovern
Member of Congress

Stephen F. Lynch
Member of Congress

Jimmy Panetta
Member of Congress

Mike Quigley
Member of Congress

Mike Levin
Member of Congress

Julia Brownley
Member of Congress

John Garamendi
Member of Congress

Juan Vargas
Member of Congress

David Scott
Member of Congress

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Exhibit C.H

JOSE LUIS ROJAS FIGUERA,

*Petitioner*,

-against-

ANTHONY J. LAROCCO, in his official capacity as Sheriff of Nassau County; WILLIAM JOYCE, in his official capacity as District Director of New York, Immigration and Customs Enforcement; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; PAM BONDI, in her official capacity as Attorney General.

*Respondents.*

Case No.
2:25-cv-03095

**BRIEF FOR AMICUS CURIAE THE CITY OF NEW YORK IN SUPPORT OF PETITIONER JOSE LUIS ROJAS FIGUERA**

MURIEL GOODE-TRUFANT
*Corporation Counsel*
*of the City of New York*
100 Church Street
New York, New York 10007
212-356-1000

JULIA PILCER LICHTENSTEIN
*of Counsel*

July 1, 2025

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES……………………………………………………..……ii

INTEREST OF AMICUS CURIAE AND SUMMARY OF ARGUMENT .........................1

ARGUMENT: THE EQUITIES AND PUBLIC INTEREST
STRONGLY FAVOR INJUNCTIVE RELIEF ....................................................................2

CONCLUSION .........................................................................................................................7

# TABLE OF AUTHORITIES

**Cases**

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ...............................................2

**Other Authorities**

Austen C. Jefferson and Steve Kastenbaum, *Can NY stop ICE from arresting immigrants at federal courthouses?*, CITY & STATE, NEW YORK (May 30, 2025), available at https://perma.cc/9QSA-HTXE (created June 12, 2025). ...................................................3

Dan Clark, *Immigrants are being arrested at NY courthouses, top judge says*, TIMES UNION (Feb. 13, 2025), https://www.timesunion.com/capitol/article/ice-arresting-immigrants-new-york-courthouses-20165859.php (last visited May 31, 2025). ................................5

Gwynne Hogan, *ICE Agents Arrest at Least Seven Immigrants as Courthouse Blitz Continues*, THE CITY (May 29, 2025),  (last visited May 31, 2025), available at https://perma.cc/3RMZ-SWMM (created June 12, 2025) ...................................................3

Hamed Aleaziz et al., *How ICE Is Seeking to Ramp Up Deportations Through Courthouse Arrests*, N.Y. TIMES (May 30, 2025), https://www.nytimes.com/2025/05/30/us/politics/ice-courthouse-arrests.html (last visited May 31, 2025) ..........................................................................................................4

Luis Ferré-Sadurni, *Inside a Courthouse, Chaos and Tears as Trump Accelerates Deportations*, N.Y. TIMES (June 12, 2025), https://www.nytimes.com/2025/06/12/nyregion/immigration-courthouse-arrests-trump-deportation.html (last visited June 12, 2025). ...................................................................4

Marisa Gerber, *Low wages, lousy shifts, little room for advancement: Immigrant workers describe on-the-job discrimination*, L.A. TIMES (Oct. 19, 2023), https://www.latimes.com/world-nation/story/2023-10-19/immigrant-workers-report-high-leves-of-discrimination-on-the-job#:~:text=Of%20the%20working%20immigrants%20surveyed,workplace%20because%20they%20were%20immigrants (last visited May 31, 2025), available at https://perma.cc/LDC2-ZTHC (created June 12, 2025)......................................................6

Mayor's Office of Immigrant Affairs, *2023 Annual Report on New York City's Immigrant Population and Initiatives of the Office* ("MOIA 2023 Report") at 10, available at https://perma.cc/G94T-ZQLD (created June 12, 2025). ...................................................2

Mayor's Office of Immigrant Affairs, *2024 Annual Report on New York City's Immigrant Population and Initiatives of the Office* ("MOIA 2024 Report") at 8, available at https://perma.cc/2V9U-5EP6 (created June 12, 2025)................................................2, 5

Mayor's Office of Immigrant Affairs, *State of our Immigrant City: Mayor's Office of Immigrant Affairs Annual Report for Calendar Year 2020* at 32, available at https://perma.cc/3826-M9T7 (created June 12, 2025). .....................................................3

N.Y. City Department of Social Services, *Universal Access to Legal Services: A Report on Year Six of Implementation in New York City* at 11 (Winter 2023), https://www.nyc.gov/assets/hra/downloads/pdf/services/civiljustice/OCJ_UA_Annual_Report_2023.pdf (last visited May 31, 2025), available at https://perma.cc/QK74-GKEC (created June 12, 2025) ...................................................................................................5

N.Y. State Unified Court System, *Family Court Caseload Activity*, https://ww2.nycourts.gov/family-courtdata-35076 (last visited May 31, 2025)................5

Rachel Leya Davidson et al., *False Hopes: Over 100,000 Youth Trapped in the SIJS Backlog* at 28 (2023), https://static1.squarespace.com/static/5fe8d735a897d33f7e7054cd/t/656a48a3f0259744 1a4cbf95/1701464285675/2023-false-hopes-report.pdf (last visited May 31, 2025 ........7

## INTEREST OF AMICUS CURIAE
## AND PRELIMINARY STATEMENT

The City of New York (the "City") submits this amicus brief in support of petitioner Jose Luis Rojas Figuera, a City resident and former high school student who was caught in a trap laid by immigration authorities in a courthouse in Manhattan, where federal, state, and local courthouses cluster within a few blocks.

The City has a strong interest in this case. While the City neither sets immigration policy nor decides who enters the country, it cannot effectively and responsibly govern while turning a blind eye to the many undocumented immigrants and asylum seekers who call New York City home. The City also has an interest here because, since Jose arrived in the City in October 2023, he has interacted with multiple City agencies, including visiting one of the City's asylum help centers and attending the Pan American High School in Queens, New York. First Amend. Pet. for Writ of Habeas Corpus ¶ 9, ECF No. 9; Figuera Decl. ¶ 5, ECF No. 9-2.

Tactics like those used to detain Jose present many City residents with an impossible choice: risk detention by attending court proceedings or run the same risk by failing to attend. Such tactics undermine the public interest. Creating a culture of fear around court appearances deters people from participating in judicial proceedings—and not just immigration proceedings, but all manner of court proceedings that depend on cooperation from members of the public, whatever their legal status may be. Free access to courts is a pillar of the rule of law. Our judicial system cannot work as it should, as it must, if courthouses are treated as convenient places to spring traps.

## ARGUMENT

## THE EQUITIES AND PUBLIC INTEREST STRONGLY
## FAVOR INJUNCTIVE RELIEF

In determining whether to grant injunctive relief, this Court must consider the balance of the equities and whether an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The City submits this brief in support of Jose's petition to highlight how the equities and public interest heavily favor the relief he seeks—to protect not only his individual rights but also the interests of the broader community in which he resides.

New York City is home to more than three million immigrants, nearly 40% of the City's total population.[1] Among them are those who remain undocumented[2] and who are pursuing legal status. The City is also a beacon for those fleeing violence and insecurity in their home countries, with more than 100,000 recently entering the City while seeking asylum.[3]

However these people entered the country, the reality is that they are here, and they participate in our communities, as students, workers, employers, and more.[4] The City cannot pretend that these residents do not exist. To govern, the City must extend public health, safety, and other public resources to all its residents, allowing them to access required public schooling and continue contributing as members of our communities while here.

---

[1] Mayor's Office of Immigrant Affairs, *2024 Annual Report on New York City's Immigrant Population and Initiatives of the Office* ("MOIA 2024 Report") at 8, available at https://perma.cc/2V9U-5EP6 (created June 12, 2025).

[2] Mayor's Office of Immigrant Affairs, *2023 Annual Report on New York City's Immigrant Population and Initiatives of the Office* ("MOIA 2023 Report") at 10, available at https://perma.cc/G94T-ZQLD (created June 12, 2025).

[3] *See* MOIA 2023 Report at 24.

[4] *See* MOIA 2024 Report at 6, 10; Mayor's Office of Immigrant Affairs, *State of our Immigrant City: Mayor's Office of Immigrant Affairs Annual Report for Calendar Year 2020* at 32, available at https://perma.cc/3826-M9T7 (created June 12, 2025).

For many, continued community participation begins with a willingness to follow the legal pathways to legal status available under federal law. And doing so requires applicants to consistently appear for proceedings at immigration courts in the City, without fear of being lulled into a false sense of security as a pretext for detention and swift removal. On June 2, 2025, Jose was detained following what he expected to be a routine immigration hearing at which he was unrepresented by counsel. First Amend. Pet. for Writ of Habeas Corpus ¶ 13, ECF No. 9; Figuera Decl. ¶ 11, ECF No. 9-2. At the immigration hearing, the judge denied a motion to dismiss Jose's removal proceedings and set his case for a new hearing. First Amend. Pet. for Writ of Habeas Corpus ¶ 13. Despite this, Jose was detained. *Id.* ¶ 14. He is reportedly one of many people who have been led to believe that their immigration cases were being favorably resolved and then arrested either in or outside an immigration courthouse in Manhattan,[5] a stone's throw away from a federal district court, state criminal and civil courts, local criminal, housing, and family courts, and other courthouses.

These tactics risk driving underground those otherwise inclined to follow the country's immigration laws, undermining the very system that those laws are designed to serve. Indeed, since the federal government began arresting immigrants who show up for proceedings in immigration court, reporting shows that these tactics are already beginning to dissuade many from appearing: according to one report, of the approximately two dozen immigrants who were required to appear

---

[5] *See* Gwynne Hogan, *ICE Agents Arrest at Least Seven Immigrants as Courthouse Blitz Continues*, THE CITY (May 29, 2025), (last visited May 31, 2025), available at https://perma.cc/3RMZ-SWMM (created June 12, 2025); Austen C. Jefferson and Steve Kastenbaum, *Can NY stop ICE from arresting immigrants at federal courthouses?*, CITY & STATE, NEW YORK (May 30, 2025), available at https://perma.cc/9QSA-HTXE (created June 12, 2025).

for immigration proceedings at a courthouse in Manhattan on a single day in June this year, 17 did not make an appearance.[6]

Nor is the problem limited to immigration proceedings. When authorities stoke a culture of fear around routine immigration appearances, deterrence will not stop at a single courthouse's doors. Targeted populations do not draw such fine lines when their liberty is at stake. So now that immigration authorities are deploying tactics like those used against Jose across the country,[7] it threatens to deter cooperation with judicial proceedings of all kinds, in federal, state, and local courthouses. And that would be true even if immigration authorities were not already engaging in enforcement action in or near state and local courthouses, despite the protections contemplated by laws like New York State's Protect Our Courts Act.[8]

The implications run deep and wide. Many matters critical to the safety and wellbeing of City residents flow through the court system. Protecting rights to fair housing often entails proceedings in housing court.[9] Avoiding abuse or neglect and recovering child support frequently

---

[6] Luis Ferré-Sadurní, *Inside a Courthouse, Chaos and Tears as Trump Accelerates Deportations*, N.Y. TIMES (June 12, 2025), https://www.nytimes.com/2025/06/12/nyregion/immigration-courthouse-arrests-trump-deportation.html (last visited June 12, 2025).

[7] *See* Hamed Aleaziz et al., *How ICE Is Seeking to Ramp Up Deportations Through Courthouse Arrests*, N.Y. TIMES (May 30, 2025), https://www.nytimes.com/2025/05/30/us/politics/ice-courthouse-arrests.html (last visited May 31, 2025) (discussing operations around the country applying tactics similar to those used against Jose).

[8] *See* Dan Clark, *Immigrants are being arrested at NY courthouses, top judge says*, TIMES UNION (Feb. 13, 2025), https://www.timesunion.com/capitol/article/ice-arresting-immigrants-new-york-courthouses-20165859.php (last visited May 31, 2025).

[9] *See, e.g.*, N.Y. City Department of Social Services, *Universal Access to Legal Services: A Report on Year Six of Implementation in New York City* at 11 (Winter 2023), https://www.nyc.gov/assets/hra/downloads/pdf/services/civiljustice/OCJ_UA_Annual_Report_2023.pdf (last visited May 31, 2025), available at https://perma.cc/QK74-GKEC (created June 12, 2025) (reporting that more than 125,000 eviction petitions were filed in New York City housing courts between 2022 and 2023).

requires appearances in family court.[10] Attempts to enforce wage protections and antidiscrimination laws often lead workers into the courts as well. And asylum seekers and immigrants, no less than citizens or permanent residents, face the types of deprivations our court system protects against.[11] If these residents fear that simply appearing in court to protect their rights or the rights of others could expose them to detention and removal, our judicial system will suffer, and the City with it.

This case illustrates the broader hardships at stake. Jose is a 20-year-old immigrant from Venezuela who, since arriving in New York City in October 2023, has demonstrated a commitment to building a future in the United States. First Amend. Pet. for Writ of Habeas Corpus ¶ 9, ECF No. 9; *see also* Figuera Decl., ECF No. 9-2; Exhs. A, B to Figuera Decl., ECF No. 9-2. During his first year in the United States, Jose visited one of the City's asylum help centers and attended the Pan American High School in Queens, New York. First Amend. Pet. for Writ of Habeas Corpus ¶ 9, ECF No. 9; Figuera Decl. ¶ 5, ECF No. 9-2. In Fall 2024, he left school to work and support his mother as her primary support and caretaker.

---

[10]   *See* N.Y. State Unified Court System, *Family Court Caseload Activity*, https://ww2.nycourts.gov/family-court-data-35076 (last visited June 30, 2025) (showing that more than 500,000 cases were filed in family court in New York City during 2024 alone).

[11]   *See, e.g.*, MOIA 2024 Report at 6; Marisa Gerber, *Low wages, lousy shifts, little room for advancement: Immigrant workers describe on-the-job discrimination*, L.A. TIMES (Oct. 19, 2023), https://www.latimes.com/world-nation/story/2023-10-19/immigrant-workers-report-high-leves-of-discrimination-on-the-job#:~:text=Of%20the%20working%20immigrants%20surveyed,workplace%20because%20the y%20were%20immigrants (last visited May 31, 2025), available at https://perma.cc/LDC2-ZTHC (created June 12, 2025) (reporting results of survey finding that 47% of the working immigrants surveyed reported that employers did not pay them for all hours they worked or they faced discrimination and harassment because they were immigrants, among other forms of mistreatment).

Immigrants in New York City may be eligible for Special Immigrant Juvenile Status (SIJS), a pathway to lawful permanent residency status that may be available to children under 21-years old who obtain a state-court order finding that they were abused, neglected, or abandoned.[12] Jose has a pending application for SIJS relief in Family Court in Bronx County, in which the judge granted a Special Findings Order. His recent detention has upended his SIJS proceedings. Whatever the outcome of these proceedings may be, it sends a message to the thousands of other SIJS applicants in New York City alone[13] that their appearance in court—be it for an SIJS proceeding or otherwise—may cut them out of the legal residency process they were otherwise willing to follow.

At bottom, the City is obligated to govern all residents living in its jurisdiction, and local governance will only suffer if a substantial segment of our population becomes too fearful to attend the judicial and administrative proceedings that are central to protecting public health, safety, and welfare in our community.

---

[12] U.S. Citizenship and Immigration Services, *Special Immigrant Juveniles*, https://www.uscis.gov/working-in-US/eb4/SIJ#:~:text=If%20you%20have%20been%20granted,status%20or%20adjustment%20of%20status (last visited June 12, 2025), available at https://perma.cc/9E6T-W488 (created June 12, 2025).

[13] *See* Rachel Leya Davidson et al., *False Hopes: Over 100,000 Youth Trapped in the SIJS Backlog* at 28 (2023), https://static1.squarespace.com/static/5fe8d735a897d33f7e7054cd/t/656a48a3f02597441a4cbf95/1701464285675/2023-false-hopes-report.pdf (last visited May 31, 2025), available at https://perma.cc/63ZS-F4XN (created June 12, 2025) (explaining that as of 2023, more than 6,000 New York City residents had received a state-court order qualifying them for SIJS but were awaiting approval of their applications from the federal government).

**CONCLUSION**

For the reasons set forth in this brief, as well as those set forth by petitioner, this Court should grant petitioner's writ of habeas corpus.

Dated: July 1, 2025                          Respectfully submitted,

                                             MURIEL GOODE-TRUFANT
                                             *Corporation Counsel*
                                             *of the City of New York*
                                             100 Church Street
                                             New York, New York 10007


                              By:    /s/ Julia Pilcer Lichtenstein
                                     JULIA PILCER LICHTENSTEIN
                                     *Senior Counsel*
                                     jlichten@law.nyc.gov
                                     (212) 356-2471

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Exhibit C.I

Derlis Snaider CHUSIN TOAQUIZA,

*Petitioner,*

-against-

William P. JOYCE, in his official capacity as
Acting Field Office Director of New York,
Immigration and Customs Enforcement; Caleb
VITELLO, Acting Director, U.S. Immigration and
Customs Enforcement; Kristi NOEM, in her
official capacity as Secretary of the United States
Department of Homeland Security; and Pamela
BONDI, Attorney General, U.S. Department of
Justice,

Case No.
1:25-cv-4791

*Respondents.*

**BRIEF FOR AMICUS CURIAE THE CITY OF NEW YORK IN SUPPORT OF
PETITIONER DERLIS SNAIDER CHUSIN TOAQUIZA**

MURIEL GOODE-TRUFANT
*Corporation Counsel
of the City of New York*
100 Church Street
New York, New York 10007
212-356-1000

JULIA PILCER LICHTENSTEIN
*of Counsel*

July 7, 2025

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES......................................................................ii

INTEREST OF AMICUS CURIAE AND PRELIMINARY STATEMENT .........1

ARGUMENT.....................................................................................2

CONCLUSION ...............................................................................7

# TABLE OF AUTHORITIES

Austen C. Jefferson and Steve Kastenbaum, *Can NY stop ICE from arresting immigrants at federal courthouses?*, CITY & STATE, NEW YORK (May 30, 2025),  available at https://perma.cc/9QSA-HTXE (created June 12, 2025)....4

Dan Clark, *Immigrants are being arrested at NY courthouses, top judge says*, TIMES UNION (Feb. 13, 2025), https://www.timesunion.com/capitol/article/ice-arresting-immigrants-new-york-courthouses-20165859.php (last visited May 31, 2025). ...........................................................................................5

Gwynne Hogan, *ICE Agents Arrest at Least Seven Immigrants as Courthouse Blitz Continues*, THE CITY (May 29, 2025),  (last visited May 31, 2025), available at https://perma.cc/3RMZ-SWMM (created June 12, 2025) ............4

Hamed Aleaziz et al., *How ICE Is Seeking to Ramp Up Deportations Through Courthouse Arrests*, N.Y. TIMES (May 30, 2025), https://www.nytimes.com/2025/05/30/us/politics/ice-courthouse-arrests.html (last visited May 31, 2025) ...............................................................5

Luis Ferré-Sadurni, *Inside a Courthouse, Chaos and Tears as Trump Accelerates Deportations*, N.Y. TIMES (June 12, 2025), https://www.nytimes.com/2025/06/12/nyregion/immigration-courthouse-arrests-trump-deportation.html (last visited June 12, 2025). ........................4

Marisa Gerber, *Low wages, lousy shifts, little room for advancement: Immigrant workers describe on-the-job discrimination*, L.A. TIMES (Oct. 19, 2023), https://www.latimes.com/world-nation/story/2023-10-19/immigrant-workers-report-high-leves-of-discrimination-on-the-job#:~:text=Of%20the%20working%20immigrants%20surveyed,workplace%20because%20they%20were%20immigrants (last visited May 31, 2025), available at https://perma.cc/LDC2-ZTHC (created June 12, 2025)...............6

Mayor's Office of Immigrant Affairs, *2023 Annual Report on New York City's Immigrant Population and Initiatives of the Office* ("MOIA 2023 Report") at 10, available at https://perma.cc/G94T-ZQLD (created June 12, 2025)...........2

Mayor's Office of Immigrant Affairs, *2024 Annual Report on New York City's Immigrant Population and Initiatives of the Office* ("MOIA 2024 Report") at 8, available at https://perma.cc/2V9U-5EP6 (created June 12, 2025). ....2, 3, 6

Mayor's Office of Immigrant Affairs, *State of our Immigrant City: Mayor's Office of Immigrant Affairs Annual Report for Calendar Year 2020* at 32, available at https://perma.cc/3826-M9T7 (created June 12, 2025). .................3

N.Y. City Department of Social Services, *Universal Access to Legal Services: A Report on Year Six of Implementation in New York City* at 11 (Winter 2023), https://www.nyc.gov/assets/hra/downloads/pdf/services/civiljustice/OCJ_UA_Annual_Report_2023.pdf (last visited May 31, 2025), available at https://perma.cc/QK74-GKEC (created June 12, 2025) ...................................5

N.Y. State Unified Court System, *Family Court Caseload Activity*, https://ww2.nycourts.gov/family-court-data-35076 (last visited July 2, 2025) ...............................................................................................................5

## INTEREST OF AMICUS CURIAE
## AND PRELIMINARY STATEMENT

The City of New York (the "City") submits this amicus brief in support of petitioner Derlis Snaider Chusin Toaquiza, a City resident and high school student who was caught in a trap laid by immigration authorities in a courthouse in Manhattan, where federal, state, and local courthouses cluster within a few blocks.

The City has a strong interest in this case. While the City neither sets immigration policy nor decides who enters the country, it cannot effectively and responsibly govern while turning a blind eye to the many undocumented immigrants and asylum seekers who call New York City home. The City also has an interest in this case because Derlis attended Grover Cleveland High School, a public school in Queens, New York, until he was detained just before the end of the school year. Amended Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 ("Amend. Pet."), ECF No. 19, at ¶ 15.

Tactics like those used to detain Derlis present many City residents with an impossible choice: risk detention by attending court proceedings or run the same risk by failing to attend. Such tactics undermine the public interest. Creating a culture of fear around court appearances deters people from participating in judicial proceedings—and not just immigration proceedings, but all manner of court proceedings that depend on cooperation from members of the public, whatever their legal status may be. Free access to courts is a pillar of the rule

of law. Our judicial system cannot work as it should, as it must, if courthouses are treated as convenient places to spring traps.

## ARGUMENT

The City submits this brief in support of Derlis' petition to highlight how the public interest heavily favors the relief he seeks—to protect not only his individual rights but also the interests of the broader community in which he resides.

New York City is home to more than three million immigrants, nearly 40% of the City's total population.[1] Among them are those who remain undocumented[2] and who are pursuing legal status. The City is also a beacon for those fleeing violence and insecurity in their home countries, with more than 100,000 recently entering the City while seeking asylum.[3]

However these people entered the country, the reality is that they are here, and they participate in our communities, as students, workers, employers, and more.[4] The City cannot pretend that these residents do not exist. To govern,

---

[1] Mayor's Office of Immigrant Affairs, *2024 Annual Report on New York City's Immigrant Population and Initiatives of the Office* ("MOIA 2024 Report") at 8, available at https://perma.cc/2V9U-5EP6 (created June 12, 2025).

[2] Mayor's Office of Immigrant Affairs, *2023 Annual Report on New York City's Immigrant Population and Initiatives of the Office* ("MOIA 2023 Report") at 10, available at https://perma.cc/G94T-ZQLD (created June 12, 2025).

[3] *See* MOIA 2023 Report at 24.

[4] *See* MOIA 2024 Report at 6, 10; Mayor's Office of Immigrant Affairs, *State of our Immigrant City: Mayor's Office of Immigrant Affairs Annual Report for*

the City must extend public health, safety, and other public resources to all its residents, allowing them to access required public schooling and continue contributing as members of our communities while here.

For many, continued community participation begins with a willingness to follow the legal pathways to legal status available under federal law. And doing so requires applicants to consistently appear for proceedings at immigration courts in the City without fear of being lulled into a false sense of security as a pretext for detention and swift removal. On June 4, 2025, Derlis was detained following what he expected to be a routine immigration hearing. Amend. Pet. ¶¶ 21-23. At the hearing, the judge denied a motion by the Department of Homeland Security to dismiss the case and set the next hearing for October 2026. *Id.* ¶ 22. Despite this, Derlis was detained immediately after the hearing. *Id.* ¶ 23. He is reportedly one of many people who have been led to believe that their immigration cases were being favorably resolved and then arrested either in or outside an immigration courthouse in Manhattan,[5] a stone's throw away from a federal district court, state criminal and civil courts, local criminal, housing, and family courts, and other courthouses.

---

*Calendar Year 2020* at 32, available at https://perma.cc/3826-M9T7 (created June 12, 2025).

[5] *See* Gwynne Hogan, *ICE Agents Arrest at Least Seven Immigrants as Courthouse Blitz Continues*, THE CITY (May 29, 2025), (last visited May 31, 2025), available at https://perma.cc/3RMZ-SWMM (created June 12, 2025); Austen C. Jefferson and Steve Kastenbaum, *Can NY stop ICE from arresting immigrants at federal courthouses?*, CITY & STATE, NEW YORK (May 30, 2025), available at https://perma.cc/9QSA-HTXE (created June 12, 2025).

These tactics risk driving underground those otherwise inclined to follow the country's immigration laws, undermining the very system that those laws are designed to serve. Indeed, since the federal government began arresting immigrants who show up for proceedings in immigration court, reporting shows that these tactics are already beginning to dissuade many from appearing: according to one report, of the approximately two dozen immigrants who were required to appear for immigration proceedings at a courthouse in Manhattan on a single day in June this year, 17 did not make an appearance.[6]

Nor is the problem limited to immigration proceedings. When authorities stoke a culture of fear around routine immigration appearances, deterrence will not stop at a single courthouse's doors. Targeted populations do not draw such fine lines when their liberty is at stake. Now that immigration authorities are deploying tactics like those used against Derlis across the country,[7] it threatens to deter cooperation with judicial proceedings of all kinds, in federal, state, and local courthouses. And that would be true even if immigration authorities were not already engaging in enforcement action in or near state and local

---

[6] Luis Ferré-Sadurni, *Inside a Courthouse, Chaos and Tears as Trump Accelerates Deportations*, N.Y. TIMES (June 12, 2025), https://www.nytimes.com/2025/06/12/nyregion/immigration-courthouse-arrests-trump-deportation.html (last visited June 12, 2025).

[7] *See* Hamed Aleaziz et al., *How ICE Is Seeking to Ramp Up Deportations Through Courthouse Arrests*, N.Y. TIMES (May 30, 2025), https://www.nytimes.com/2025/05/30/us/politics/ice-courthouse-arrests.html (last visited May 31, 2025) (discussing operations around the country applying tactics similar to those used against Derlis).

courthouses, despite the protections contemplated by laws like New York State's Protect Our Courts Act.[8]

The implications run deep and wide. Many matters critical to the safety and wellbeing of City residents flow through the court system. Protecting rights to fair housing often entails proceedings in housing court.[9] Avoiding abuse or neglect and recovering child support frequently requires appearances in family court.[10] Attempts to enforce wage protections and antidiscrimination laws often lead workers into the courts as well. And asylum seekers and immigrants, no less than citizens or permanent residents, face the types of deprivations our court system protects against.[11] If these residents fear that simply appearing in

---

[8] *See* Dan Clark, *Immigrants are being arrested at NY courthouses, top judge says*, TIMES UNION (Feb. 13, 2025), https://www.timesunion.com/capitol/article/ice-arresting-immigrants-new-york-courthouses-20165859.php (last visited May 31, 2025).

[9] *See, e.g.*, N.Y. City Department of Social Services, *Universal Access to Legal Services: A Report on Year Six of Implementation in New York City* at 11 (Winter 2023), https://www.nyc.gov/assets/hra/downloads/pdf/services/civiljustice/OCJ_UA_Annual_Report_2023.pdf (last visited May 31, 2025), available at https://perma.cc/QK74-GKEC (created June 12, 2025) (reporting that more than 125,000 eviction petitions were filed in New York City housing courts between 2022 and 2023).

[10] *See* N.Y. State Unified Court System, *Family Court Caseload Activity*, https://ww2.nycourts.gov/family-court-data-35076 (last visited July 3, 2025) (showing that more than 500,000 cases were filed in family court in New York City during 2024 alone).

[11] *See, e.g.*, MOIA 2024 Report at 6; Marisa Gerber, *Low wages, lousy shifts, little room for advancement: Immigrant workers describe on-the-job discrimination*, L.A. TIMES (Oct. 19, 2023), https://www.latimes.com/world-nation/story/2023-10-19/immigrant-workers-report-high-leves-of-discrimination-on-the-job#:~:text=Of%20the%20working%20immigrants%20surveyed,workplace%20

court to protect their rights or the rights of others could expose them to detention and removal, our judicial system will suffer, and the City with it.

This case illustrates the broader hardships at stake. Derlis is a 19-year-old immigrant from Ecuador who attended Grover Cleveland High School in Queens, New York where he made it onto his school's soccer team and was awarded "Most Improved" by his high school teachers. Amend. Pet. ¶¶ 15-17. Since arriving in New York City, Derlis has demonstrated a commitment to building a future in the United States and has endeavored to be a positive member of his community. *Id.* at ¶¶ 12-19.

At bottom, the City is obligated to govern all residents living in its jurisdiction, and local governance will only suffer if a substantial segment of our population becomes too fearful to attend the judicial and administrative proceedings that are central to protecting public health, safety, and welfare in our community.

---

because%20they%20were%20immigrants (last visited May 31, 2025), available at https://perma.cc/LDC2-ZTHC (created June 12, 2025) (reporting results of survey finding that 47% of the working immigrants surveyed reported that employers did not pay them for all hours they worked or they faced discrimination and harassment because they were immigrants, among other forms of mistreatment).

## CONCLUSION

For the reasons set forth in this brief, as well as those set forth by petitioner, the Court should grant petitioner's writ of habeas corpus.


Dated: July 7, 2025                  Respectfully submitted,

MURIEL GOODE-TRUFANT
*Corporation Counsel*
*of the City of New York*
100 Church Street
New York, New York 10007


By:    /s/ Julia Pilcer Lichtenstein
JULIA PILCER LICHTENSTEIN
*Senior Counsel*
jlichten@law.nyc.gov
(212) 356-2471

7

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief complies with the Court's formatting rules and that the portions of the brief that must be included in a word count contain 1,522 words. I relied on the word count of the Microsoft Word program used to prepare this brief.

Dated: July 7, 2025                By:      /s/ Julia Pilcer Lichtenstein   
                                             Julia Pilcer Lichtenstein

# United States Senate

## WASHINGTON, DC 20510

Exhibit C.J

July 11, 2025

The Honorable Kristi Noem
Secretary of Homeland Security
U.S. Department of Homeland Security
245 Murray Lane, SW
Washington, DC 20528

The Honorable Pam Bondi
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Mr. Todd Lyons
Acting Director
U.S. Immigration and Customs Enforcement
500 12th St., SW
Washington, DC 20536

Dear Secretary Noem, Attorney General Bondi, and Acting Director Lyons:

We are extremely concerned by reports of a recent initiative to arrest and detain noncitizens at their immigration court hearings, and in many cases, dismiss their immigration cases without advance notice and while hiding the government's intent to arrest them.[1] Some reports indicated that plain-clothed Immigration and Customs Enforcement (ICE) personnel stationed outside of immigration courtrooms had lists of cases marked for dismissal and even photos of the individuals they intended to arrest.[2] Upon the granting of this request by an immigration judge, ICE officers have reportedly arrested individuals or families outside the courtrooms and placed them in a fast-track removal process known as expedited removal (ER).[3] These actions prevent noncitizens from having their fair day in court and raise serious legal and due process concerns. They also make clear that this Administration is not targeting the worst criminals and threats to public safety, instead redirecting staff and resources away from drug trafficking and human trafficking and towards these operations targeting noncriminal immigrants who are following the law and showing up for their day in court.

ER historically has applied only to a noncitizen who "is arriving in the United States" and certain other noncitizens apprehended close to the border less than 14 days after arrival in the United States.[4] Individuals subject to ER are mandatorily detained[5] and can be summarily deported

---

[1] See e.g. Malaver Milena, Grethel Aguila, Jacqueline Charles and Syra Ortiz Blanes, *ICE Agents in Miami Find New Spot to Carry out Arrests: Immigration Court*, Miami Herald, (originally published May 21, 2025, updated May 26, 2025), https://www.miamiherald.com/news/local/immigration/article306900486.html; Ingram, Paul, "*Mayhem" as ICE Officials Arrest Multiple People at Immigration Court in Phoenix*, AZ Mirror, May 21, 2025, https://azmirror.com/2025/05/21/mayhem-as-ice-officials-arrest-multiple-people-at-immigration-court-in-phoenix/; Aleaziz, Hamed, Luis Ferre-Sadurni and Miriam Jordan, *How ICE is seeking to ramp up deportations through courthouse arrests*, NY Times (May 30, 2025, updated June 1, 2025), https://www.nytimes.com/2025/05/30/us/politics/ice-courthouse-arrests.html.
[2] See e.g. Rahman, Billal, *DHS Responds to Reports of Children Zip-Tied by ICE Agents*, Newsweek (June 2, 2025), https://www.newsweek.com/dhs-children-zip-tied-ice-agents-2079893.
[3] Supra note 1.

without a hearing before a judge, administrative appeal or federal court review,[6] unlike regular removal proceedings. The ER process offers very limited administrative review[7] and no meaningful opportunity for a noncitizen to challenge whether they can legally be placed in ER. There is no real opportunity to provide documentation, for example, that would demonstrate they have continuously resided in the United States for more than two years, or that they were, in fact, admitted or paroled into the United States and therefore not subject to ER.[8]  ICE is now expanding the application of ER to noncitizens in the interior of the United States[9] who have developed significant ties to the United States, including by lawfully working and attending school.[10]  Arresting law-abiding individuals and placing them in ER deprives them of the opportunity to have their fair day in court with the due process protections in immigration court proceedings.

Nevertheless, we understand that ICE attorneys have been instructed to look for immigration court cases that can be dismissed[11] and then orally request, without prior notice, that removal proceedings be dismissed or the Notice to Appear be withdrawn.[12] ICE often did not inform immigration judges or the noncitizens that the purpose of their request was not relief from removal, but instead that ICE intended to arrest and place the individual in fast-track removal without a hearing.[13] It has been a longstanding practice to dismiss cases that are not a priority for enforcement or that ICE chooses not to prosecute, allowing noncitizens to instead pursue immigration applications affirmatively through U.S. Citizenship and Immigration Services (USCIS).[14] Here, however, many noncitizens were not notified that their cases were being

---

[4] American Immigration Council, *Expedited Removal Explainer*, (Feb. 20, 2025), https://www.americanimmigrationcouncil.org/research/expedited-removal.

[5] INA sec. 235(b)(1)(B)(iii)(IV).

[6] INA sec. 235 (b)(1) (A).

[7] There is no administrative review of an ER order, except for very limited review of a noncitizen's claim that they in fact have lawful permanent resident, refugee, or asylum status. INA sec. 235(b)(1)(C).

[8] See INA sec. 235(b)(1). ER also only applies to noncitizens charged under specific grounds of inadmissibility, having engaged in fraud or misrepresentation to procure admission or other immigration benefit, or that they lack the requisite documents for admission and does not apply to noncitizens who are removable for other reasons.  INA sec. 235 (b)(1)(A)(i).

[9] 90 F.R. 8139 (Jan. 24, 2025).  This expansion of ER is being challenged in court.  *Make the Road New York v. Noem*, 25-cv-00190 (D.D.C.), challenges the Secretary's designation of expanded expedited removal throughout the country to certain noncitizens present for less than 2 years. New ICE guidance instructs officers also to expand ER for arriving aliens to encompass all noncitizens paroled at a port of entry at any time and to consider them for placement into ER. See Hessen, Ted and Kristina Cooke,  Reuters, *Trump weighs revoking legal status of Ukrainians as US steps up deportations*, (March 6, 2025), https://www.reuters.com/world/us/trump-plans-revoke-legal-status-ukrainians-who-fled-us-sources-say-2025-03-06/, including a link to the ICE guidance at https://fingfx.thomsonreuters.com/gfx/legaldocs/gkpljxxoqpb/ICE_email_Reuters.pdf.  This further expansion of ER to encompass noncitizens lawfully paroled at a port of entry at any time, even after two years in the United States, is being challenged in *CHIRLA v. Noem*.

[10] See e.g. Kramer, Marcia, CBS News, *New York City Public High School Student Detained by ICE at Asylum Hearing*, (May 27, 2025), https://www.cbsnews.com/newyork/news/nyc-high-school-student-immigrant-detained-ice/.

[11] Supra note 1 (NY Times).

[12] Supra note 1 (Miami Herald). See also Aleaziz, Hamed, Luis Ferre-Sadurni and Miriam Jordan, *How ICE is seeking to ramp up deportations through courthouse arrests*, NY Times (May 30, 2025, updated June 1, 2025), https://www.nytimes.com/2025/05/30/us/politics/ice-courthouse-arrests.html.

[13] Supra note 1.

[14] American Bar Association, Children's Immigration Law Academy, Termination v. Dismissal in Removal Proceedings (Apr. 2, 2024), https://cilacademy.org/2024/04/02/termination-v-dismissal-in-removal-proceedings/.

dismissed for a different purpose—to place them in ER—and effectively deny them access to a decision from an immigration judge as well as affirmative applications through USCIS.[15] Because noncitizens did not understand the purpose of their dismissal, they did not, through counsel or otherwise, have an opportunity to take steps to oppose the ICE attorneys' motions to terminate or withdraw.[16]

Immigration judges—who are not part of an independent judiciary but housed under the Executive Office of Immigration Review within the Department of Justice—have also received guidance encouraging immigration judges to grant the ICE attorneys' motion to dismiss "with no additional documentation or briefing" or opportunity for a noncitizen to respond.[17] In some cases, immigration judges were not made aware of the purpose of the dismissal. As a result, immigration judges could not take into account in their dismissal determination that the noncitizen will immediately be placed in ER.[18] In some cases, the immigration judge did not give noncitizens adequate time to respond to ICE motions to dismiss, or ensure those appearing *pro se* were informed of the consequences of their cases being dismissed.[19] And in some cases, the immigration judge dismissed the case over the strong objections from the noncitizen who wished for their immigration case to continue with the court.[20]

Noncitizens whose removal proceedings are abruptly dismissed in this manner lose the ability to request relief in immigration court for which they are otherwise eligible, such as asylum or adjustment of status to lawful permanent resident, or to request that an immigration judge hold their case while they pursue an immigration status with USCIS, such as classification as a Special Immigrant Juvenile.  Many of these noncitizens who had their cases dismissed had reportedly already submitted an asylum application or other forms of relief to the immigration court, raising serious concerns that their applications were wrongfully denied any consideration. For example, a Mexican transgender woman with no criminal history who came to the United States in 2023 after being subject to abduction and rape by members of the Knights Templar drug cartel in Mexico, had applied for asylum; upon her appearance for her court hearing in Portland, Oregon, ICE moved to dismiss her case, the court granted the request, and she was subsequently

---

[15] See e.g., Bustillo, Ximena, NPR, *ICE's novel strategy allows for more arrests from inside immigration courts*, (June 12, 2025), https://www.npr.org/2025/06/12/nx-s1-5409403/trump-immigration-courts-arrests.

[16] Id. See also supra note 1.

[17] Based on Department of Justice Guidance Reviewed by Staff of Ranking Member Durbin of the Senate Judiciary Committee.  See also Bustillo, Ximena, NPR, *ICE's novel strategy allows for more arrests from inside immigration courts*, (June 12, 2025), https://www.npr.org/2025/06/12/nx-s1-5409403/trump-immigration-courts-arrests. This new guidance also conflicts with the relevant regulations, namely 8 CFR sec. 1003.23 and 8 CFR sec. 239.2, governing pre-decision motions and cancellation of notices to appear, respectively, as well as with Chapter 3.1 of the Immigration court practice manual.  See American Immigration Lawyers Association, *Practice Alert: EOIR Guidance to Immigration Judges on Dismissals and Other Adjudications*, (June 12, 2025), AILA Doc. No. 25061204.

[18] See e.g. Malaver Milena, Grethel Aguila, Jacqueline Charles and Syra Ortiz Blanes, *ICE Agents in Miami Find New Spot to Carry out Arrests: Immigration Court*, Miami Herald, (originally published May 21, 2025, updated May 26, 2025), https://www.miamiherald.com/news/local/immigration/article306900486.html.

[19] American Immigration Lawyers Association, *Policy Brief: ICE Arrests at Immigration Courts*, (May 30, 2025), https://www.aila.org/library/policy-brief-ice-arrests-at-immigration-courts . In some cases, even when the immigration judge did not immediately grant the motion to dismiss and did give the respondent additional time to respond, ICE detained the noncitizen anyway. Aleaziz, Hamed, Luis Ferre-Sadurni and Miriam Jordan, *How ICE is seeking to ramp up deportations through courthouse arrests*, NY Times (May 30, 2025, updated June 1, 2025), https://www.nytimes.com/2025/05/30/us/politics/ice-courthouse-arrests.html.

[20]  Arizona case reported to Sen. Kelly office.

arrested by ICE agents in the lobby.[21]  In another case, ICE requested the dismissal of a case of a Cuban man who entered the United States in 2021 and had an asylum application pending; an immigration judge in the Miami Immigration Court told the asylum seeker he could seek asylum affirmatively from USCIS after the dismissal; instead, ICE arrested and detained him.[22]

The U.S. Supreme Court recently stated, "[w]e have long held that no person shall be removed from the United States without opportunity, at some time, to be heard. Due process requires notice that is reasonably calculated, under all the circumstances, to apprise interested parties and that affords[s] a reasonable time …to make an appearance."[23] Here, it appears that the ICE attorneys are being told to dismiss immigration cases and place noncitizens in expedited removal.  At the same time, immigration judges are being told that they may dismiss such cases without any briefing or opportunity to respond.  In addition, often noncitizens have not been notified of the purpose of their dismissal, in order to respond or contest the dismissal of their immigration cases, or the placement of their case into expedited removal.  Taken together, these actions raise serious due process concerns.

These actions also place noncitizens in an impossible position. If noncitizens who fear arrest do not attend their immigration court hearing, they may receive an *in absentia* removal order that will newly subject them to swift detention and removal. If they do attend, they risk arrest, detention, and a swift deportation, possibly to South Sudan, Libya, or El Salvador—countries they may have no connection to.[24] This manipulation of existing laws to enact this Administration's mass deportation agenda is creating chaos in our immigration system while doing nothing to make our communities safer.

We request responses to the following questions by July 25, 2025:

1. What specific guidance has DHS or DOJ/EOIR issued regarding the dismissal of standard 240 removal proceedings and the facilitation of enforcement actions in and around immigration courtrooms? Please provide a copy of the relevant guidance, email, memorandum, or other directives associated with this policy.

2. How many individuals have been detained and placed in ER following dismissal of their cases from January 20th to May 19th, 2025? How many have been detained and placed in ER following dismissal since May 20, 2025?  Provide the total number of individuals arrested and detained by week, and disaggregate by country of origin, gender, and age.

[21] Mesh, Aaron, *Lawyers say ICE Arrested Woman Seeking Asylum After her Portland Court Hearing*, Willamette Week, (June 2, 2025), https://www.wweek.com/news/courts/2025/06/02/attorneys-say-ice-arrested-woman-seeking-asylum-after-her-portland-court-hearing/.
[22] Supra note 1 (Miami Herald).
[23] *A. A. R. P. v Trump*, 145 S. Ct. 1364, 1367 (2025)(internal citations and quotations omitted).
[24] Gabbatt, Adam, The Guardian, *Group stranded with ICE in Djibouti shipping container after removal from U.S.*, (June 6, 2025), https://www.theguardian.com/us-news/2025/jun/06/migrants-djibouti-ice#:~:text=A%20group%20of%20men%20removed,stopped%20by%20an%20American%20court

a. What number of the total individuals detained and placed in ER following the dismissal of their removal proceedings have been referred for a credible fear interview (CFI)? How many have passed that interview with the asylum officer and how many did not? Of the total negative CFIs by an asylum officer, how many were reviewed by an Immigration Judge and reversed?

b. Of the total individuals detained and placed in ER following dismissal of their cases, how many had applications pending with the immigration court in INA 240 proceedings at the time that the ICE attorney moved for dismissal? How many had applications pending with USCIS (e.g. adjustment of status, SIJ classification, T or U visa)? Of those with applications pending in immigration court, how many were asylum applications and how many were for adjustment of status to lawful permanent resident?

c. Of those individuals who had asylum applications pending in immigration court when the ICE attorney requested the dismissal of proceedings, how many were subsequently given a CFI after dismissal and their placement in ER? Of those, how many passed that interview with the Asylum Officer and were placed back into proceedings to again pursue their asylum claim? Of those with an asylum application pending who were subsequently given a CFI after dismissal and their placement in ER, how many had a negative CFI with an asylum officer which was subsequently reversed by an IJ and were placed back into proceedings?

d. What number of the total individuals detained and placed in ER following the dismissal of their removal proceedings have been placed back into INA 240 proceedings for any reason?

3. Are immigration judges being monitored or tracked on how they respond to ICE motions to dismiss the cases or to withdraw the NTA? If so, how is that information being utilized?

4. There are reports of cases where the immigration judge did not immediately grant ICE's motion to dismiss and did give the noncitizen additional time to respond, but ICE detained the noncitizen anyway.[25]

   a) Since May 20th, in how many cases has an ICE attorney orally requested a dismissal, and the IJ has either denied such a motion or granted additional time for the noncitizen to respond?
   b) In how many of those cases did ICE arrest and detain the noncitizen despite the removal proceedings not being dismissed?
   c) In how many of those cases did ICE request a Change of Venue to a detained docket?
   d) For the subset of cases moved to the detained docket, in how many cases has ICE moved to dismiss again before a different immigration judge in order to place the noncitizen in ER?

---

[25] Supra note 1 (NY Times).

5. Of the total detained and placed in ER after the dismissal of their court cases, how many had a criminal conviction?

6. Of the total detained and placed in ER after dismissal of their court cases, how many were continuously present in the United States for more than two years? Provide an explanation of the legal basis for their placement in ER.

7. Of the total detained and placed in ER after dismissal of their court cases, how many were in removal proceedings after having been initially paroled into the United States at a port of entry? Provide the total number and disaggregate by country of origin, gender and age. Also, provide the total number of individuals who were initially paroled more than two years prior to the issuance of the I-860 ER order.

8. Provide a complete list of all the immigration courts where ICE courthouse arrests and placements into ER have occurred since May 20, 2025. At each of these immigration courts, disaggregated by each individual court, have *in absentia* removal orders increased and if so, by what percentage of the total scheduled court hearings? Provide a daily accounting of the number of *in absentia* removal orders issued in each immigration court since January 1, 2025, disaggregated by court.

Sincerely,


Richard J. Durbin
United States Senator

Mark Kelly
United States Senator


Alex Padilla
United States Senator

Tammy Duckworth
United States Senator


Chris Van Hollen
United States Senator

Ron Wyden
United States Senator

Richard Blumenthal
United States Senator

Adam B. Schiff
United States Senator

Catherine Cortez Masto
United States Senator

Mazie K. Hirono
United States Senator

Michael F. Bennet
United States Senator

Christopher A. Coons
United States Senator

Jacky Rosen
United States Senator

Jeffrey A. Merkley
United States Senator

Ben Ray Luján
United States Senator

Andy Kim
United States Senator

Martin Heinrich
United States Senator

Tina Smith
United States Senator

Edward J. Markey
United States Senator

John Hickenlooper
United States Senator

Angela Alsobrooks
United States Senator

Ruben Gallego
United States Senator

Elizabeth Warren
United States Senator

Patty Murray
United States Senator

𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔆𝔬𝔲𝔯𝔱
𝔖𝔬𝔲𝔱𝔥𝔢𝔯𝔫 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔬𝔣 𝔑𝔢𝔴 𝔜𝔬𝔯𝔨

Exhibit C.K

AFRICAN COMMUNITIES TOGETHER
and THE DOOR,

                    Plaintiffs,

        - against -

TODD LYONS, in his official capacity as
Acting Director, U.S. Immigration and
Customs Enforcement; KRISTI NOEM,
in her official capacity as Secretary of
the United States Department of
Homeland Security; SIRCE E. OWEN, in
her official capacity as Acting Director,
Executive Office of Immigration
Review; and PAMELA BONDI, in her
official capacity as Attorney General,
U.S. Department of Justice,

                    Defendants.

No. 1:25-CV-6366 (PKC)

**BRIEF FOR AMICUS CURIAE CITY OF NEW YORK
IN SUPPORT OF PLAINTIFFS' MOTION FOR A STAY**

MURIEL GOODE-TRUFANT
*Corporation Counsel*
*of the City of New York*
Attorney for Amicus Curiae
100 Church Street
New York, New York 10007
212-356-2490
jdavies@law.nyc.gov

RICHARD DEARING
DEVIN SLACK
GEOFFREY E. CURFMAN
JAMISON DAVIES
    *of Counsel*

August 18, 2025

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .............................................................................ii

PRELIMINARY STATEMENT  AND INTEREST OF AMICUS CURIAE ................1

ARGUMENT ...............................................................................................3

    THE BROADER PUBLIC INTEREST AND THE EQUITIES WEIGH IN
    FAVOR OF STAYING THE CHALLENGED POLICIES ...............................3

       A.  The fear of immigration enforcement at immigration courthouses can
           drive people out of the legal immigration system. ..................................4

       B.  Detentions carried out at immigration courthouses undermine local
           governance. ......................................................................................10

           1. Courthouse detentions dissuade immigrants from participating in all
              manner of judicial proceedings. .......................................................10

           2. Immigration courthouse detentions can also deter residents from
              interacting with government more broadly. .....................................17

CONCLUSION ........................................................................................21

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*City of Chicago v. Sessions*,
   888 F.3d 272 (7th Cir. 2018) ..............................................................19

*Matter of McCabe v. 511 W. 232nd Owners Corp.*,
   2024 N.Y. LEXIS 1991 (N.Y. Ct. App. 2024)....................................20

*Nat. Res. Def. Coun. v. U.S. Dep't of Energy*,
   362 F. Supp. 3d 126 (S.D.N.Y. 2019) ...................................................3

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ...................................................................................3

**Statutes**

5 U.S.C. § 705...........................................................................................1, 3

8 U.S.C. § 1229a(b)(5) ...............................................................................4

**Other Authorities**

*African Communities Together v. Lyons*, No. 25-cv-6366,
   Complaint, ECF No. 1 (S.D.N.Y. Aug. 1, 2025) ..........................15, 16

Alisha Roa et al., *Key Facts on Health Care Use and Costs Among
   Immigrants*, KAISER FAMILY FOUNDATION (Sept. 23, 2024),
   available at https://tinyurl.com/4mdvkjfj (created Aug. 14, 2025)................17

American Civil Liberties Union, *Freezing Out Justice: How
   immigration arrests at courthouses are undermining the justice
   system* (May 3, 2018), available at https://perma.cc/UR85-
   GQNY (created July 23, 2025)..............................................................14

Associated Press, *Migrant family sues over US detention in what
   may be first challenge to courthouse arrests involving kids*, CNN
   (June 27, 2025), available at https://perma.cc/VK6F-P8XT
   (created Aug. 12, 2025) .....................................................................7, 11

Austen C. Jefferson and Steve Kastenbaum, *Can NY stop ICE from
   arresting immigrants at federal courthouses?*, CITY & STATE, NEW
   YORK (May 30, 2025) available at https://perma.cc/9QSA-HTXE
   (created June 12, 2025) ...........................................................................4

Avery Lea Rogers, *Immigrants fear being 'disappeared,' Wisconsin
   attorney says*, WISCONSIN PUBLIC RADIO (June 25, 2025),
   available at https://tinyurl.com/26zahepr (created Aug. 14,
   2025).......................................................................................................9

ii

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Brooke A. Lewis, *HPD Chief Announces Decrease in Hispanics Reporting Rape and Violent Crimes Compared to Last Year,* HOUSTON CHRON. (Apr. 6, 2017), available at https://perma.cc/SF5E-KA4N (created Mar. 16, 2020)...................................19

Cora Engelbrecht, *Fewer Immigrants Are Reporting Domestic Abuse. Police Blame Fear of Deportation*, N.Y. TIMES (June 3, 2018), available at https://tinyurl.com/3ws99c4r (created Aug. 18, 2025) ...............................................................................................15

Dan Clark, *Immigrants are being arrested at NY courthouses, top judge says*, TIMES UNION (Feb. 13, 2025), available at https://tinyurl.com/ypvkzrw2 (created Aug. 14, 2025) ...................................12

Eduardo Cuevas, *'Escalation:' Federal agents now detaining people with active immigration cases*, USA TODAY (July 18, 2025), available at https://perma.cc/8EHX-7MKC (created Aug. 14, 2025)..........................................................................................................8

Emily Baumgaertner Nunn et al., *Migrants Are Skipping Medical Care, Fearing ICE, Doctors Say*, N.Y. TIMES (May 8, 2025), available at https://tinyurl.com/ycy6w2fk (created Aug. 14, 2025)........................................................................................................18

Gloria Rebecca Gomez, *ICE resumes courthouse arrests in Phoenix, but with new tactics amid opposition*, AZ MIRROR (May 28, 2025), available at https://tinyurl.com/mwdwfbka (created Aug. 14, 2025) ................................................................................................7, 11

Gwynne Hogan, *Arrests Nearly Halt a Immigration Court. One Reason: Fewer People Are Showing Up*, THE CITY (Aug. 15, 2025), available at https://perma.cc/R342-2RXU (created Aug. 15, 2025) .........................................................................................................7

Gwynne Hogan, *ICE Agents Arrest at Least Seven Immigrants as Courthouse Blitz Continues*, THE CITY (May 29, 2025), available at https://perma.cc/3RMZ-SWMM (created June 12, 2025) ............................4

Haidee Chu and Gwynne Hogan, *NYC is the Nation's Capital of Immigration Courthouse Arrests, New Data Analysis Shows*, THE CITY (Aug. 11, 2025), available at https://perma.cc/AD29-EWQW (created Aug. 11, 2025) ..........................................................4

Hamed Aleaziz *et al.*, *How ICE Is Seeking to Ramp Up Deportations Through Courthouse Arrests*, N.Y. TIMES (May 30, 2025), available at https://tinyurl.com/4nt2vaas (created Aug. 14, 2025)...................8

**TABLE OF AUTHORITIES (cont'd)**

**Page(s)**

Hamutal Bernstein, et al., *Adults in Immigrant Families Report Avoiding Routine Activities Because of Immigration Concerns*, Urban Institute, July 2019, available at https://perma.cc/57TX-WGNU .................................................................................................17

Heidi Glenn, *Fear Of Deportation Spurs 4 Women To Drop Domestic Abuse Cases In Denver*, NATIONAL PUBLIC RADIO (Mar. 21, 2017), available at https://perma.cc/4C33-KBLR (created July 23, 2025)........................................................................................15

Immigrant Defense Project, *Safeguarding the Integrity of Our Courts: The Impact of ICE Courthouse Operations in New York State* (2019), available at https://perma.cc/F8R8-DP3Z (created July 23, 2025).................................................................... 12, 13, 14

Jeff Abbott, *ICE courthouse arrests are leading migrants to avoid their hearings, observers say*, EL PASO TIMES (Aug. 6, 2025), available at https://perma.cc/HB7Q-GKJC (created Aug. 18, 2025)...........................................................................................8

Jennifer Medina, *Too Scared to Report Sexual Abuse. The Fear: Deportation.*, N.Y. TIMES (Apr. 30, 2017), available at https://perma.cc/EA59-JCDC (created Mar. 16, 2020) ....................................19

Jesus R. Torres et al., *COVID-19 Vaccine Uptake in Undocumented Latinx Patients Presenting to the Emergency Department*, JAMA Netw. Open, 2024;7;(4):e248578 (Apr. 26, 2024), available at https://tinyurl.com/3d6seubu (created Aug. 14, 2025) ...................................18

Kathleen Roche, et al., *Impacts of Immigration Actions and News and the Psychological Distress of U.S. Latino Parents Raising Adolescents*, J. ADOLESCENT HEALTH (2018), available at https://perma.cc/VZ22-RYY8 (created Aug. 18, 2025)....................................17

*Lopez Contreras v. Oddo*, No. 25-cv-00162, Petition for Writ of Habeas Corpus, ECF No. 1 (W.D. Pa. May 29, 2025)...........................................5

Luis Ferré-Sadurní and Ashley Cai, *Trump's Immigrant Crackdown in New York: More Arrests, Longer Detention*, N.Y. TIMES (Aug. 4, 2025), available at https://tinyurl.com/yn5ktnp2.............................................5

Luis Ferré-Sadurni, *Inside a Courthouse, Chaos and Tears as Trump Accelerates Deportations*, N.Y. TIMES (June 12, 2025), available at https://tinyurl.com/2v773rrx (created Aug. 14, 2025) ...................................8

Marisa Gerber, *Low wages, lousy shifts, little room for advancement: Immigrant workers describe on-the-job discrimination*, L.A. TIMES (Oct. 19, 2023), available at https://perma.cc/LDC2-ZTHC (created June 12, 2025)....................................11

iv

## TABLE OF AUTHORITIES (cont'd)

Page(s)

Martha Bellisle, *Volunteers flock to immigration courts to support migrants arrested in the hallways*, ASSOCIATED PRESS (July 20, 2025), available at https://tinyurl.com/rj6fcfts (created Aug. 14, 2025).........................................................................................................7

Matthew Lisiecki and Gerard Apruzzese, *Proposed 2024 Mass Deportation Program Would Socially and Economically Devastate American Families*, Center for Migration Studies (Oct. 9, 2024), available at https://perma.cc/FCU8-6FCT (created Aug. 15, 2025) ...............................................................................................13

Mayor de Blasio, Health Officials Declare End of Measles Outbreak in New York City (Sept. 3, 2019), available at https://tinyurl.com/34wra5mb (created Aug. 14, 2025) ...................................18

Mayor's Office of Immigrant Affairs, *2023 Annual Report on New York City's Immigrant Population and Initiatives of the Office* ("MOIA 2023 Report"), available at https://perma.cc/G94T-ZQLD (created June 12, 2025) ...............................................................3

Mayor's Office of Immigrant Affairs, *2024 Annual Report on New York City's Immigrant Population and Initiatives of the Office*, available at https://perma.cc/2V9U-5EP6 (created June 12, 2025).........................................................................................................3

Mayor's Office of Immigrant Affairs, *State of our Immigrant City: Mayor's Office of Immigrant Affairs Annual Report for Calendar Year 2020*, available at https://perma.cc/3826-M9T7 (created June 12, 2025)...........................................................................................4

Memorandum from John Morton, Director of U.S. Immigration and Customs Enforcement, on Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs (June 17, 2011), available at https://perma.cc/X5GY-3ZZB (created Aug. 12, 2025) .....................................16

Memorandum from Sheila McNulty, Chief Immigration Judge, on Operating Policies and Procedures Memorandum 23-01: Enforcement Actions in or Near OCIJ Space to All Assistant Chief Immigration Judges, Immigration Judges, Court Administrators, and Court Personnel (Dec. 11, 2023), available at https://perma.cc/5J3Z-Q5ZZ (created July 16, 2025).........................................9

Memorandum from Sirce E. Owen, Acting Director of EOIR on the Cancellation of Operating Policies and Procedures to All of EOIR (Jan. 28, 2025), available at https://perma.cc/S9CB-FP96 (created July 16, 2025) .......................................................................9

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Memorandum from Tae Johnson, Acting Director of U.S.
Immigration and Customs Enforcement & Troy Miller, Acting
Comm'r of U.S. Customs and Border Protection, on Civil
Immigration Enforcement Actions in or near Courthouses to ICE
& CBP (Apr. 27, 2021), available at https://perma.cc/KJJ2-
7JNW (created July 16, 2025) .................................................................. 9

Milena Malaver et al., *ICE agents in Miami find new spot to carry
out arrests: Immigration court*, MIAMI HERALD (May 26, 2025),
available at https://tinyurl.com/2wrccmf3 (created Aug. 14,
2025).......................................................................................................... 11

Miriam Jordan, *"We're Petrified": Immigrants Afraid to Seek
Medical Care for Coronavirus*, N.Y. TIMES (Mar. 18, 2020),
available at https://perma.cc/PGQ9-8QB4 (created Mar. 24,
2020).......................................................................................................... 19

N.Y. State Unified Court System, *Family Court Caseload Activity*,
available at https://tinyurl.com/2ufbv9xf (created Aug. 14, 2025)
........................................................................................................................ 11

New York City Commission on Human Rights, *Mediation*, available
at https://perma.cc/P6RQ-6RUZ (created Aug. 13, 2025) .............................. 20

New York City Commission on Human Rights, *Steps in the
Complaint Process*, available at https://perma.cc/8U6H-LWAM
(created Aug. 13, 2025)............................................................................. 20

New York City Criminal Court, *Court Information by County*,
available at https://tinyurl.com/4cwjxyrt (created Aug. 14, 2025)................ 12

New York City Department of Social Services, *Universal Access to
Legal Services: A Report on Year Six of Implementation in New
York City* (Winter 2023), available at https://perma.cc/QK74-
GKEC (created June 12, 2025) ................................................................. 11

New York City Family Court, *Information by County*, available at
https://tinyurl.com/ydsrhtxt (created Aug. 14, 2025) ........................................ 12

New York City Housing Court, *Locations*, available at
https://tinyurl.com/57aw4auw (created Aug. 14, 2025) ..................................... 12

Nik Theodore, *Insecure Communities: Latino Perceptions of Police
Involvement in Immigration Enforcement* (May 2013), available
at https://perma.cc/3UG3-UN9L (created Mar. 16, 2020)............................... 19

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Physicians for Human Rights, *Consequences of Fear: How the Trump Administration's Immigration Policies and Rhetoric Block Access to Health Care* (Apr. 2025), available at https://perma.cc/PBE5-HXR6 (created Aug. 13, 2025) ...................................18

Reuven Blau, *'They've Gone Off the Map': Fear Drives Immigrants Away From Clinics*, THE CITY (Aug. 12, 2025), available at https://tinyurl.com/ybzdktcy (created Aug. 14, 2025).....................................18

Rommel H. Ojeda, *Rumors and Fear Drives Immigrants to Skip Court — A Decision With Heavy Costs*, DOCUMENTED (Mar. 10, 2025), available at https://perma.cc/7HRW-RKCZ (created July 22, 2025) ...........................................................................................9

Roxanne P. Kerani & Helena A. Kwakwa, *Scaring Undocumented Immigrants is Detrimental to Public Health*, 9 AM. J. PUB. HEALTH (Sept. 2018), available at https://tinyurl.com/3xtm6yd7 (created Aug. 14, 2025).....................................................................17

Supreme Court of the State of New York, New York County, *Overview*, available at https://tinyurl.com/ydwnt78m (created Aug. 14, 2025) ...........................................................................13

*Toaquiza v. Joyce*, Amended Petition for Writ of Habeas Corpus, ECF No. 23 (S.D.N.Y. July 7, 2025) ......................................................6

*Toaquiza v. Joyce*, Stipulation and Order, ECF No. 39 (S.D.N.Y. July 22, 2025) ...........................................................................................7

Tom Dart, *Fearing deportation, undocumented immigrants wary of reporting crimes*, THE GUARDIAN, Mar. 23, 2017, available at https://perma.cc/E3PX-XAQH (created Mar. 16, 2020) ...................15

Tori Bedford, *Fear of Deportation Prompts Undocumented Immigrants to Resist COVID-19 Vaccine*, GBH (Jan. 7, 2021), available at https://tinyurl.com/mp3dfnjv (created Aug. 14, 2025).....................................................................................................18

U.S. Citizenship and Immigration Services, *Special Immigrant Juveniles*, available at https://perma.cc/5GDM-JHYQ (created Aug. 14, 2025) .........................................................................6

## PRELIMINARY STATEMENT
## AND INTEREST OF AMICUS CURIAE

The City of New York submits this amicus brief in support of plaintiffs' motion under 5 U.S.C. § 705 seeking a stay of (1) the policy of the U.S. Immigration and Customs Enforcement (ICE) scuttling restrictions on immigration courthouse arrests, and (2) the policy of the Executive Office of Immigration Review (EOIR) pushing immigration judges to dismiss noncitizens' removal proceedings without meaningful process. The City agrees with plaintiffs that these policies violate the Administrative Procedure Act on several different fronts (*see generally* Pls.' Mem. in Supp. of Mot. to Stay Effective Date of Agency Action or Preserve Status or Rights, ECF No. 23). Rather than repeat those points here, the City instead writes to underscore how the public interest and the equities weigh heavily in favor of a stay—to protect not only plaintiffs and their members, but also the broader communities in which the individuals targeted by these unlawful policies reside.

New York City has been the focus of the federal government's courthouse arrest campaign. Already, hundreds of City residents have been caught in a trap laid by immigration authorities at a courthouse in Manhattan, where federal, state, and local courthouses cluster within a few blocks. And this unlawful campaign now presents many other City residents with an impossible choice: risk detention by attending future court proceedings or run the same risk by not attending. To put it mildly, this undermines the public interest.

The courthouse arrest campaign will—by design—have an in terrorem effect, deterring City residents from participating in immigration proceedings and pursuing pathways to status available under federal law. This causes spillover effects that are known and well documented. State and local governments across the nation

experienced them firsthand when the prior Trump administration engaged in similar (if less underhanded) tactics before the courts stepped in to correct course. Creating a culture of fear around court appearances deters people from participating in judicial proceedings—not just immigration proceedings, but all manner of court proceedings that depend on cooperation from members of the public, whatever their status may be. Free access to courts is a pillar of the rule of law, but our judicial system cannot work as it should, as it must, if courthouses are used as traps for those who are simply following what the law requires. And if our residents decide not to appear in immigration court out of fear that they will face detention, many will withdraw from the community to evade immigration authorities, to the detriment of themselves and their communities.

To be clear, the City does not set immigration policy or decide who enters the country; those are matters for the federal government. But the City cannot responsibly govern by turning a blind eye to a basic reality: many immigrants without status, including large numbers of asylum seekers, call New York City home. These individuals must, of necessity, engage with the City's government in important aspects of community life—everything from reporting crimes to police to alerting enforcement agencies to unsafe workplaces. That is for the greater good. The City cannot effectively govern—for the benefit of all New Yorkers—if an entire class of residents are driven into the shadows.

## ARGUMENT

## THE BROADER PUBLIC INTEREST AND THE EQUITIES WEIGH IN FAVOR OF STAYING THE CHALLENGED POLICIES

In determining whether to grant a stay under 5 U.S.C. § 705, this Court employs the familiar test governing preliminary injunctions, *Nat. Res. Def. Coun. v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 149 (S.D.N.Y. 2019), requiring the Court to decide whether relief is in the public interest and to balance the equities, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Both factors point in the same direction here, and they counsel in favor of staying the challenged policies.

Not long ago, America proudly called itself a nation of immigrants. However one feels about that label today, the fact remains that the federal governments' past policies and decisions have resulted in a large number of immigrants without status and asylum seekers living in our communities. They are our neighbors. Nowhere is that more true than in New York City, which is home to more than three million immigrants, nearly 40% of the City's total population.[1] Among them are those who are currently undocumented but who are pursuing legal status.[2] Also included are those fleeing violence and insecurity in their home countries, with more than 100,000 recently entering the City while seeking asylum.[3]

---

[1] Mayor's Office of Immigrant Affairs, *2024 Annual Report on New York City's Immigrant Population and Initiatives of the Office* ("MOIA 2024 Report") at 8, available at https://perma.cc/2V9U-5EP6 (created June 12, 2025).

[2] Mayor's Office of Immigrant Affairs, *2023 Annual Report on New York City's Immigrant Population and Initiatives of the Office* ("MOIA 2023 Report") at 10, available at https://perma.cc/G94T-ZQLD (created June 12, 2025).

[3] *See* MOIA 2023 Report at 24.

3

No matter how these people entered the country, the reality is that they are here, and they form part of our communities, as students, workers, employers, and more.[4] The City cannot pretend that these residents do not exist. To govern, the City must extend public safety, public health, and other public resources to all its residents, allowing them to continue contributing to our communities while here. Federal immigration enforcement actions carried out in and around courthouses severely hamper the City's ability to engage with these residents.

**A.** **The fear of immigration enforcement at immigration courthouses can drive people out of the legal immigration system.**

For many, continued community participation begins with a willingness to follow the pathways to legal status available under federal law. Doing so requires applicants to consistently appear for proceedings at an immigration court, as those who fail to appear are subject to removal orders issued in absentia. *See* 8 U.S.C. § 1229a(b)(5). Yet members of the plaintiff-organizations in this action are among hundreds of people who dutifully appeared for their immigration hearings only to be arrested either in or outside an immigration courthouse.[5] These tactics risk

---

[4] *See* MOIA 2024 Report at 6, 10; Mayor's Office of Immigrant Affairs, *State of our Immigrant City: Mayor's Office of Immigrant Affairs Annual Report for Calendar Year 2020* at 32, available at https://perma.cc/3826-M9T7 (created June 12, 2025).

[5] *See* Haidee Chu and Gwynne Hogan, *NYC Is the Nation's Capital of Immigration Courthouse Arrests, New Data Analysis Shows*, THE CITY (Aug. 11, 2025) ("Capital of Immigration Courthouse Arrests"), available at https://perma.cc/AD29-EWQW (created Aug. 11, 2025); Gwynne Hogan, *ICE Agents Arrest at Least Seven Immigrants as Courthouse Blitz Continues*, THE CITY (May 29, 2025), available at https://perma.cc/3RMZ-SWMM (created June 12, 2025); Austen C. Jefferson and Steve Kastenbaum, *Can NY stop ICE from arresting immigrants at federal courthouses?*, CITY & STATE, NEW YORK (May 30, 2025) available at https://perma.cc/9QSA-HTXE (created June 12, 2025).

driving underground those who are otherwise inclined to follow the country's immigration laws, undermining the very system that those laws are designed to serve.

New York City has become the epicenter of this courthouse arrest campaign.[6] Recent reporting found that arrests at immigration courthouse buildings in New York City accounted for nearly 25% of all immigration courthouse detentions executed across the country between January and June 2025.[7] Federal officials are also far more likely to detain immigrants at immigration courthouses in the City compared with other parts of the country: 7% of all ICE arrests in the City have occurred at immigration courthouses, compared to only 0.5% nationwide.[8] And the sheer number of individuals detained is remarkable: in just a two-week period between late May and early June, federal officers arrested more than 130 people in a lower Manhattan immigration courthouse building.[9]

This campaign has taken a heavy toll on our residents. Consider Dylan Lopez Contreras, a 20-year-old immigrant from Venezuela who was detained at an immigration court in Manhattan after appearing for a routine asylum hearing.[10] Since arriving in New York City in May 2024, Dylan had enrolled in and was actively attending a public school in the Bronx, where he was learning English in a program

---

[6] *See* Luis Ferré-Sadurní and Ashley Cai, *Trump's Immigrant Crackdown in New York: More Arrests, Longer Detention*, N.Y. TIMES (Aug. 4, 2025), available at https://tinyurl.com/yn5ktnp2.

[7] *See* Chu and Hogan, *Capital of Immigration Courthouse Arrests*, *supra* note 5.

[8] *Id.*

[9] *Id.*

[10] *See Lopez Contreras v. Oddo*, No. 25-cv-00162, Petition for Writ of Habeas Corpus, ECF No. 1 at 1-2, 10 (W.D. Pa. May 29, 2025).

designed for older students like him.[11] He was also working part-time to support his family and was in the process of applying for Special Immigrant Juvenile Status (SIJS),[12] a pathway to permanent residency available to children under 21 years old who obtain a state-court order finding that they were abused, neglected, or abandoned.[13] Dylan's detention upended his SIJS proceedings, prevented him from continuing his education, and deprived his family of a critical source of income.

A similar story unfolded for Derlis Snaider Chusin Toaquiza, a 19-year-old immigrant from Ecuador whom agents arrested following a hearing on his asylum application.[14] Before he was detained, Derlis attended a public high school in Queens, where he was learning English and had joined the school's soccer team.[15] His hard work in the classroom earned him the school's "Most Improved" student award, which he was unable to receive in person because he was detained at an ICE facility during the awards ceremony.[16] Outside school, Derlis was the primary caregiver for his younger siblings, preparing their meals and getting them ready for school.[17] Derlis's contributions to his family and community came to a grinding halt

---

[11] *See id.* at 1, 10.

[12] *Id.* at 11-12.

[13] U.S. Citizenship and Immigration Services, *Special Immigrant Juveniles*, available at https://perma.cc/5GDM-JHYQ (created Aug. 14, 2025).

[14] *See Toaquiza v. Joyce*, Amended Petition for Writ of Habeas Corpus, ECF No. 23 at 1, 5, 7 (S.D.N.Y. July 7, 2025).

[15] *Id.* at 5-6.

[16] *Id.* at 6.

[17] *Id.*

following his detention in early June of this year. And though he was released the next month after posting a bond,[18] he and his family suffered during his detention.

Hundreds of other New York City residents were similarly affected. And although our residents have borne the brunt of these tactics, they have swept far more broadly, reaching courthouses across the country. In Los Angeles, a mother and her two young children were detained at an immigration courthouse after a judge granted the government's abrupt motion to dismiss their application for asylum.[19] Another mother and her child were detained just after leaving an immigration courthouse in Phoenix.[20] And a man in Seattle faced a similar fate after a judge dismissed his deportation case.[21] These are but a handful of examples among the hundreds of courthouse arrests that have occurred nationwide this year.

Immigration courthouse arrests like these come with significant costs. Since the federal government began arresting immigrants who show up for proceedings in immigration court, many immigrants have been dissuaded from appearing.[22] According to one report, on a single day in May this year, only one out of every three

---

[18] *Toaquiza v. Joyce*, Stipulation and Order, ECF No. 39 (S.D.N.Y. July 22, 2025).

[19] Associated Press, *Migrant family sues over US detention in what may be first challenge to courthouse arrests involving kids*, CNN (June 27, 2025), available at https://perma.cc/VK6F-P8XT (created Aug. 12, 2025) ("Migrant family sues over US detention").

[20] Gloria Rebecca Gomez, *ICE resumes courthouse arrests in Phoenix, but with new tactics amid opposition*, AZ MIRROR (May 28, 2025), available at https://tinyurl.com/mwdwfbka (created Aug. 14, 2025) ("ICE resumes courthouse arrests in Phoenix").

[21] Martha Bellisle, *Volunteers flock to immigration courts to support migrants arrested in the hallways*, ASSOCIATED PRESS (July 20, 2025), available at https://tinyurl.com/rj6fcfts (created Aug. 14, 2025).

[22] *See* Gwynne Hogan, *Arrests Nearly Halt at Immigration Court. One Reason: Fewer People Are Showing Up*, THE CITY (Aug. 15, 2025), available at https://perma.cc/R342-2RXU (created Aug. 15, 2025).

of the immigrants who had scheduled cases in a Los Angeles courtroom appeared for their hearing.[23] The following month, more than half of the immigrants who were required to appear at a courthouse in Manhattan did not make an appearance.[24] And at an immigration courthouse in Texas, nearly 90% of immigrants did not appear for their scheduled hearings on a day in July.[25]

Immigration attorneys and immigrants themselves have confirmed what these statistics imply. An attorney with the American Immigration Lawyers Association, which represents 17,000 immigration advocates nationwide, recently told reporters: "[s]o many people simply aren't showing up for their court dates" out of fear they will be detained.[26] Other advocates have similarly reported widespread fear among clients and other immigrants considering whether to appear for their

---

[23] Hamed Aleaziz *et al.*, *How ICE Is Seeking to Ramp Up Deportations Through Courthouse Arrests*, N.Y. TIMES (May 30, 2025), available at https://tinyurl.com/4nt2vaas (created Aug. 14, 2025) ("How ICE Is Seeking to Ramp Up Deportations").

[24] Luis Ferré-Sadurni, *Inside a Courthouse, Chaos and Tears as Trump Accelerates Deportations*, N.Y. TIMES (June 12, 2025), available at https://tinyurl.com/2v773rrx (created Aug. 14, 2025).

[25] Jeff Abbott, *ICE courthouse arrests are leading migrants to avoid their hearings, observers say*, EL PASO TIMES (Aug. 6, 2025), available at https://perma.cc/HB7Q-GKJC (created Aug. 18, 2025).

[26] Eduardo Cuevas, *'Escalation:' Federal agents now detaining people with active immigration cases*, USA TODAY (July 18, 2025), available at https://perma.cc/8EHX-7MKC (created Aug. 14, 2025).

hearings.[27] And immigrants have revealed that they decided not to appear or were considering whether to appear given the risk they could face arrest and detention.[28]

This is hardly a surprise; it is largely the point of the federal government's campaign. And until recently, the federal government itself openly recognized these very concerns. In guidance from which the agency now departs without any meaningful explanation, ICE formulated its courthouse detention policy based on the premise that "[e]xecuting civil immigration enforcement actions in or near a courthouse may chill individuals' access to courthouses and, as a result, impair the fair administration of justice."[29] EOIR similarly explained in its own guidance that "permitting enforcement actions in or near" immigration courthouses "would disincentivize noncitizens from appearing for their hearings."[30]

Now, the government brushes aside concerns that courthouse detentions will deter appearances, claiming they are "vague" and "contrary to logic."[31] But the data

---

[27] *See* Avery Lea Rogers, *Immigrants fear being 'disappeared,' Wisconsin attorney says*, WISCONSIN PUBLIC RADIO (June 25, 2025), available at https://tinyurl.com/26zahepr (created Aug. 14, 2025).

[28] Rommel H. Ojeda, *Rumors and Fear Drives Immigrants to Skip Court — A Decision With Heavy Costs*, DOCUMENTED (Mar. 10, 2025), available at https://perma.cc/7HRW-RKCZ (created July 22, 2025).

[29] Memorandum from Tae Johnson, Acting Director of U.S. Immigration and Customs Enforcement & Troy Miller, Acting Comm'r of U.S. Customs and Border Protection, on Civil Immigration Enforcement Actions in or near Courthouses to ICE & CBP (Apr. 27, 2021), available at https://perma.cc/KJJ2-7JNW (created July 16, 2025).

[30] Memorandum from Sheila McNulty, Chief Immigration Judge, on Operating Policies and Procedures Memorandum 23-01: Enforcement Actions in or Near OCIJ Space to All Assistant Chief Immigration Judges, Immigration Judges, Court Administrators, and Court Personnel (Dec. 11, 2023), available at https://perma.cc/5J3Z-Q5ZZ (created July 16, 2025).

[31] Memorandum from Sirce E. Owen, Acting Director of EOIR on the Cancellation of Operating Policies and Procedures to All of EOIR at 1 (Jan. 28, 2025), available at https://perma.cc/S9CB-FP96 (created July 16, 2025).

outlined here shows that these concerns are well founded and already materializing around the country. Many immigrants are indeed forgoing appearances to avoid the risk of arrest inside the courthouse or immediately following their departure.

### B. Detentions carried out at immigration courthouses undermine local governance.

When the federal government arrests individuals appearing for immigration hearings, it affects not only the federal immigration system, but also local governance in the areas where those immigrants live and work. Immigrants who fear detention at an immigration courthouse may abstain from state and local judicial proceedings, leaving them exposed to deprivations those courts serve to protect against. And those who fail to appear for an immigration hearing will likely face an in absentia removal order, causing them to withdraw from the community altogether and fail to engage with public agencies that protect not just them, but also citizens and individuals with legal status.

### 1. Courthouse detentions dissuade immigrants from participating in all manner of judicial proceedings.

When federal authorities stoke a culture of fear around routine immigration appearances, deterrence will not stop at a single courthouse's doors. Targeted populations do not draw such fine lines when their liberty is at stake. So now that immigration authorities are deploying courthouse detention tactics across the

10

country,[32] it threatens to deter cooperation with judicial proceedings of all kinds, in federal, state, and local courthouses alike.

The implications run deep and wide. Many matters critical to the safety and wellbeing of City residents flow through the court system. Protecting rights to fair housing often entails proceedings in housing court.[33] Avoiding abuse or neglect by caregivers and recovering child support frequently requires appearances in family court.[34] Attempts to enforce wage protections and antidiscrimination laws often lead workers into the courts as well. And asylum seekers and immigrants, no less than citizens or permanent residents, face the types of deprivations our court system protects against.[35] If these residents fear that simply appearing in court to protect

---

[32] *See* Chu and Hogan, *Capital of Immigration Courthouse Arrests*, supra note 5 (discussing immigration courthouse detentions in New York City); Associated Press, *Migrant family sues over US detention*, *supra* note 19 (same with respect to Los Angeles); Gomez, *ICE resumes courthouse arrests in Phoenix*, *supra* note 20 (Phoenix); Milena Malaver et al., *ICE agents in Miami find new spot to carry out arrests: Immigration court*, MIAMI HERALD (May 26, 2025), available at https://tinyurl.com/2wrccmf3 (created Aug. 14, 2025) (Miami); Aleaziz et al., *How ICE Is Seeking to Ramp Up Deportations*, *supra* note 23 (discussing operations around the country).

[33] *See, e.g.*, N.Y. City Department of Social Services, *Universal Access to Legal Services: A Report on Year Six of Implementation in New York City* at 11 (Winter 2023), available at https://perma.cc/QK74-GKEC (created June 12, 2025) (reporting that more than 125,000 eviction petitions were filed in New York City housing courts between 2022 and 2023).

[34] *See* N.Y. State Unified Court System, *Family Court Caseload Activity*, available at https://tinyurl.com/2ufbv9xf (created Aug. 14, 2025) (showing that more than 150,000 cases were filed in family court in New York City during 2024 alone).

[35] *See, e.g.*, MOIA 2024 Report at 6; Marisa Gerber, *Low wages, lousy shifts, little room for advancement: Immigrant workers describe on-the-job discrimination*, L.A. TIMES (Oct. 19, 2023), available at https://perma.cc/LDC2-ZTHC (created June 12, 2025) (reporting results of survey finding that 47% of the working immigrants surveyed reported that employers did not pay them for all hours they worked or they faced discrimination and harassment because they were immigrants, among other forms of mistreatment).

their rights or the rights of others could expose them to detention and removal, our judicial system will suffer, and the City with it.

Immigrants have ample justification to fear enforcement at state and local courthouses. Between 2016 and 2018, immigration arrests executed at or around New York State and New York City courthouses climbed more than 1700%, reaching more than 200 incidents in 2018 alone.[36] And by February of this year, immigration authorities had resumed enforcement action in or near state and local courthouses, despite the protections contemplated by the common law privilege prohibiting civil courthouse arrests and measures like New York State's Protect Our Courts Act.[37]

What's more, in New York City, many state and local courthouses—including a housing court, a family court, and both the criminal and civil divisions of the New York County Supreme Court—are clustered just blocks from the federal immigration facilities in downtown Manhattan that are at the center of the latest round of courthouse arrests.[38] Their proximity to the location where hundreds of arrests have occurred itself deters participating in state and local proceedings.

---

[36] *See* Immigrant Defense Project, *Safeguarding the Integrity of Our Courts: The Impact of ICE Courthouse Operations in New York State* at 4-5 (2019), available at https://perma.cc/F8R8-DP3Z (created July 23, 2025) ("Safeguarding the Integrity of Our Courts").

[37] *See* Dan Clark, *Immigrants are being arrested at NY courthouses, top judge says*, TIMES UNION (Feb. 13, 2025), available at https://tinyurl.com/ypvkzrw2 (created Aug. 14, 2025).

[38] *See, e.g.*, New York City Housing Court, *Locations*, available at https://tinyurl.com/57aw4auw (created Aug. 14, 2025) (showing housing court for New York County located at 111 Centre Street in Manhattan, just two blocks from 26 Federal Plaza, the epicenter of courthouse arrests in New York City); New York City Family Court, *Information by County*, available at https://tinyurl.com/ydsrhtxt (created Aug. 14, 2025) (same with respect to New York County family court, located at 60 Lafayette Street in Manhattan); New York City Criminal Court, *Court Information by County*, available at

*(cont'd on next page)*

Past experience shows that immigrants do in fact disengage from local judicial proceedings when they fear courthouse arrests. One poignant example involves actions in housing court. In a 2019 survey covering advocates and legal service providers, 56% reported that their clients feared ICE would detain them if they were to file a housing court complaint.[39] As a result, many immigrants choose to continue living in "deplorable and unsafe conditions," as one attorney described, rather than confront their landlords in judicial proceedings.[40] And even those who do appear in housing court often "feel pressured to resolve [their] … case[s] as quickly as possible," decline to seek advice of counsel, waive defenses and counterclaims, and sign judgment agreements with unjust terms, all in an effort to avoid ICE.[41]

Make no mistake: the victims will not be limited to immigrants without legal status. The vast majority of immigrants without status live in mixed-status households, meaning the household contains at least one U.S. citizen or one person with status.[42] When members of mixed-status households are deterred from enforcing basic housing protections, the whole household suffers. And unsavory landlords

_____

https://tinyurl.com/4cwjxyrt (created Aug. 14, 2025) (same with respect to Supreme Court, New York County, Criminal Term, located at 100 Centre Street in Manhattan); Supreme Court of the State of New York, New York County, *Overview*, available at https://tinyurl.com/ydwnt78m (created Aug. 14, 2025) (same with respect to Supreme Court, New York County, Civil Term, located at 60 Centre Street in Manhattan).

[39] *See* Safeguarding the Integrity of Our Courts at 56-57.

[40] *Id.* at 58.

[41] *Id.* at 57-58.

[42] Matthew Lisiecki and Gerard Apruzzese, *Proposed 2024 Mass Deportation Program Would Socially and Economically Devastate American Families* at 3, Center for Migration Studies (Oct. 9, 2024), available at https://perma.cc/FCU8-6FCT (created Aug. 15, 2025) (finding 4.7 million mixed-status households across the United States but only 1.1 million households containing at least one undocumented resident and no U.S. citizens).

may exploit the situation even more broadly, as removing an entire class of city residents from the equation lowers the overall likelihood that basic housing requirements will be enforced across entire buildings or neighborhoods.

A similar problem arises in the context of abuse, neglect, and other proceedings in family courts. Advocates around New York reported that their clients decided not to pursue or withdrew family court actions—many associated with domestic violence—due to concerns over immigration enforcement.[43] In addition, of New York advocates surveyed in 2017, nearly half reported working with an immigrant who decided not to seek custody or visitation, and more than a third worked with immigrants who opted against seeking an order of protection, again out of fear of immigration authorities.[44]

These challenges are not unique to New York. In a survey of prosecutors from 19 states taken after an uptick in immigration enforcement actions at courthouses during the first Trump administration, more than 80% of the respondents reported that domestic violence had become underreported and more difficult to prosecute.[45] Immigration attorneys and advocates from all 50 states reported in the same survey that they had filed 40% fewer cases on behalf of immigrant survivors in 2017 compared to 2016, noting that their clients were returning to abusers so they could avoid appearing in court.[46] These challenges arose in cities across the country: from

---

[43] Safeguarding the Integrity of Our Courts at 27-29.

[44] *Id.* at 27-28.

[45] American Civil Liberties Union, *Freezing Out Justice: How immigration arrests at courthouses are undermining the justice system* at 2 (May 3, 2018), available at https://perma.cc/UR85-GQNY (created July 23, 2025).

[46] *Id.* at 2.

Houston, which experienced a 16% decline in domestic violence reports within the Hispanic community between 2016 and 2017,[47] to Denver, where the City Attorney noted that several women had elected to drop their domestic violence actions in 2017 out of fear that ICE agents would detain them at the courthouse.[48]

Individuals represented by the plaintiff-organizations illustrate the burdens that arise when immigrants fear participation in state and local proceedings like those designed to protect against domestic abuse. Two of these individuals have pending asylum applications and are pursuing SIJS,[49] which, as explained, requires an order from a family court adjudging them abused, neglected, or abandoned. If these individuals and others like them feel unable to attend court appearances out of fear that they will face detention, as one of them does here,[50] they will close themselves off from an opportunity to obtain legal status and to protect themselves from mistreatment at home, which is available through participation in state-level judicial proceedings.

---

[47] Cora Engelbrecht, *Fewer Immigrants Are Reporting Domestic Abuse. Police Blame Fear of Deportation*, N.Y. TIMES (June 3, 2018), available at https://tinyurl.com/3ws99c4r (created Aug. 18, 2025).

[48] Heidi Glenn, *Fear Of Deportation Spurs 4 Women To Drop Domestic Abuse Cases In Denver* ("Fear of Deportation"), NATIONAL PUBLIC RADIO (Mar. 21, 2017), available at https://perma.cc/4C33-KBLR (created July 23, 2025); Tom Dart, *Fearing deportation, undocumented immigrants wary of reporting crimes*, THE GUARDIAN (Mar. 23, 2017), available at https://perma.cc/E3PX-XAQH (created Mar. 16, 2020).

[49] *African Communities Together v. Lyons*, No. 25-cv-6366, Complaint, ECF No. 1 at 20, 22 (S.D.N.Y. Aug. 1, 2025).

[50] *Id.* at 22.

The former Director of ICE recognized these concerns in guidance issued to immigration officials during a previous administration.[51] The guidance stated that it was against ICE policy to remove individuals who were "in the midst of a legitimate effort to protect their civil rights or civil liberties."[52] And it directed officers to exercise appropriate discretion in pursuing enforcement actions against individuals who were victims of crimes or were pursing actions to protect their wellbeing, including those related to domestic violence, civil rights, and claims against a landlord or an employer.[53] Otherwise, the guidance recognized, officials may deter individuals from accessing critical protections available through the courts.[54]

The purposes underlying this policy dovetail with the mission of a municipal government. So long as immigrants pursuing lawful status reside in our community, the City must extend to them the basic protections that are available to anyone who lives or works within city limits. And municipalities cannot carry out their obligations to govern when faced with largescale barriers to community participation such as those addressed here.

---

[51] *See* Memorandum from John Morton, Director of U.S. Immigration and Customs Enforcement, on Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs (June 17, 2011), available at https://perma.cc/X5GY-3ZZB (created Aug. 12, 2025).

[52] *Id.* at 2.

[53] *See id.*

[54] *Id.*

## 2. Immigration courthouse detentions can also deter residents from interacting with government more broadly.

Detaining individuals who appear for routine immigration hearings undermines local governance in ways that extend beyond deterring immigrants from participating in judicial proceedings. When immigrants pursuing lawful status fail to appear for their immigration hearings out of fear that they will face detention, they are likely to face an in absentia removal order and disengage from the community as a result, which can undermine the essential functions that local governments must perform.

Take healthcare as an example. Studies show that immigrants often avoid visiting a doctor or forgo other forms of healthcare due to fears related to immigration enforcement.[55] That is true not only of immigrants themselves: according to one study, 40% of Latino parents surveyed avoided medical care and other public services for their *children* due to fears related to immigration enforcement.[56] And

---

[55] Alisha Roa et al., *Key Facts on Health Care Use and Costs Among Immigrants*, KAISER FAMILY FOUNDATION (Sept. 23, 2024), available at https://tinyurl.com/4mdvkjfj (created Aug. 14, 2025); Hamutal Bernstein, et al., *Adults in Immigrant Families Report Avoiding Routine Activities Because of Immigration Concerns*, Urban Institute, July 2019, available at https://perma.cc/57TX-WGNU (finding that 6.3% of adults in immigrant families (and 8.4% of Latino adults in immigrant families) reportedly avoided visiting a doctor or clinic while sick because they worried they would be asked about their citizenships status); Roxanne P. Kerani & Helena A. Kwakwa, *Scaring Undocumented Immigrants Is Detrimental to Public Health*, 9 AM. J. PUB. HEALTH 1165-66 (Sept. 2018), available at https://tinyurl.com/3xtm6yd7 (created Aug. 14, 2025).

[56] Kathleen Roche, et al., *Impacts of Immigration Actions and News and the Psychological Distress of U.S. Latino Parents Raising Adolescents*, J. ADOLESCENT HEALTH (2018), available at https://perma.cc/VZ22-RYY8 (created Aug. 18, 2025).

these challenges have already emerged in response to recent immigration enforce-

ment policies, affecting New York City no less than other parts of the country.[57]

When individuals forgo healthcare, it directly affects local governments and

strains local healthcare systems. Fears connected to immigration enforcement have

caused some immigrants—particularly those who are undocumented—to skip vac-

cination for diseases such as measles[58] and Covid-19,[59] which can require costly

governmental responses in the event of an outbreak.[60]  Further, forgoing care often

means that individuals enter the healthcare system with more serious conditions,

placing heightened demands on emergency resources and public hospitals.[61] Local

governments cannot effectively promote public health when portions of their

---

[57] Reuven Blau, *'They've Gone Off the Map': Fear Drives Immigrants Away From Clinics*, THE CITY (Aug. 12, 2025), available at https://tinyurl.com/ybzdktcy (created Aug. 14, 2025); Emily Baumgaertner Nunn et al., *Migrants Are Skipping Medical Care, Fearing ICE, Doctors Say*, N.Y. TIMES (May 8, 2025), available at https://tinyurl.com/ycy6w2fk (created Aug. 14, 2025) ("Migrants are Skipping Medical Care").

[58] Nunn, *Migrants are Skipping Medical Care*, *supra* note 57.

[59] *See, e.g.*, Jesus R. Torres et al., *COVID-19 Vaccine Uptake in Undocumented Latinx Patients Presenting to the Emergency Department*, JAMA Netw. Open, 2024;7;(4):e248578 (Apr. 26, 2024), available at https://tinyurl.com/3d6seubu (created Aug. 14, 2025) (finding 13% of study participants, who consisted of undocumented and legal Latinx California residents, knew someone who was undocumented and decided not to receive the Covid-19 vaccine due to fear of deportation); Tori Bedford, *Fear Of Deportation Prompts Undocumented Immigrants To Resist COVID-19 Vaccine*, GBH (Jan. 7, 2021), available at https://tinyurl.com/mp3dfnjv (created Aug. 14, 2025) (reporting similar issues in Massachusetts).

[60] *E.g.*, Mayor de Blasio, Health Officials Declare End of Measles Outbreak in New York City (Sept. 3, 2019), available at https://tinyurl.com/34wra5mb (created Aug. 14, 2025) (explaining that New York City spent $6 million and dedicated more than 500 staff members in responding to the latest measles outbreak).

[61] Physicians for Human Rights, *Consequences of Fear: How the Trump Administration's Immigration Policies and Rhetoric Block Access to Health Care* at 10 (Apr. 2025), available at https://perma.cc/PBE5-HXR6 (created Aug. 13, 2025).

populations decide not to seek out healthcare due to concerns that they will face deportation.[62]

Concerns related to immigration enforcement can also cripple a city's ability to investigate or prosecute crime. Out of fear that police will ask about their immigration status or the status of people they know, 45% of Latinos have said in surveys that they are less likely to report a crime or offer information about crimes, whether as a witness or a victim.[63] As one concrete example, in Houston, the number of Latinos reporting rapes in 2017 dropped by 40% compared to the year before, even as non-Latino victims reported an increased number of rapes.[64] The result is plain. "[T]he failure to obtain … victim and witness cooperation could both hinder law enforcement efforts and allow criminals to freely target communities with a large undocumented population, knowing that their crimes will be less likely to be reported." *City of Chicago v. Sessions*, 888 F.3d 272, 280 (7th Cir. 2018). That is a harm that cascades across the entire community.

The same fears can undermine other City agencies that exist to protect our residents. As one example, the New York City Human Rights Commission enforces

---

[62] *See* Miriam Jordan, *"We're Petrified": Immigrants Afraid to Seek Medical Care for Coronavirus*, N.Y. TIMES (Mar. 18, 2020), available at https://perma.cc/PGQ9-8QB4 (created Mar. 24, 2020).

[63] Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* (May 2013), available at https://perma.cc/3UG3-UN9L (created Mar. 16, 2020).

[64] Jennifer Medina, *Too Scared to Report Sexual Abuse. The Fear: Deportation.*, N.Y. TIMES (Apr. 30, 2017), available at https://perma.cc/EA59-JCDC (created Mar. 16, 2020); Brooke A. Lewis, *HPD Chief Announces Decrease in Hispanics Reporting Rape and Violent Crimes Compared to Last Year,* HOUSTON CHRON. (Apr. 6, 2017), available at https://perma.cc/SF5E-KA4N (created Mar. 16, 2020).

the New York City Human Rights Law, which prohibits discrimination in employ-ment, housing, and public accommodations, typically at levels more protective than state or federal law. *See, e.g.*, *Matter of McCabe v. 511 W. 232nd Owners Corp.*, 2024 N.Y. LEXIS 1991, at *16 (N.Y. Ct. App. 2024). But enforcement largely de-pends on individuals bringing complaints to the Commission, and the enforcement process often requires in-person interviews or mediation at the Commission's of-fices.[65] Those disinclined to participate in public life due to fears of immigration enforcement may well hesitate to come forward when they face discrimination. And the victims will not remain limited to those deterred from reporting violations: a system built on individual reporting cannot function properly when large segments of our population are unwilling to report the behavior our laws protect against.

\* \* \*

At bottom, enforcement actions carried out at immigration courthouses carry wide reaching implications not only for individual immigrants, but also for the localities where they reside. The public interest and equities weigh decisively in fa-vor of granting plaintiffs a stay of the challenged policies.

---

[65] New York City Commission on Human Rights, *Steps in the Complaint Process*, available at https://perma.cc/8U6H-LWAM (created Aug. 13, 2025); New York City Commission on Human Rights, *Mediation*, available at https://perma.cc/P6RQ-6RUZ (created Aug. 13, 2025).

# CONCLUSION

This Court should grant plaintiffs' request for a stay and other relief.

Dated:    New York, New York
          August 18, 2025

                              Respectfully submitted,

                              MURIEL GOODE-TRUFANT
                              *Corporation Counsel*
                              *of the City of New York*
                              Attorney for Amici Curiae


                    By:    _/s/ Jamison Davies_____
                           JAMISON DAVIES
                           Assistant Corporation Counsel

                           100 Church Street
                           New York, NY 10007
                           212-356-2490
                           jdavies@law.nyc.gov

RICHARD DEARING
DEVIN SLACK
GEOFFREY E. CURFMAN
JAMISON DAVIES
    *of Counsel*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Exhibit C.L

AFRICAN COMMUNITIES TOGETHER; and
THE DOOR,

        *Plaintiffs*,

        v.

Todd LYONS, in his official capacity as Acting
Director, U.S. Immigration and Customs
Enforcement; Kristi NOEM, in her official capacity
as Secretary of the United States Department of
Homeland Security; Sirce E. OWEN, in her official
capacity as Acting Director, Executive Office of
Immigration Review; and Pamela BONDI, in her
official capacity as Attorney General, U.S.
Department of Justice,

        *Defendants*.

Case No. 1:25-cv-6366-PKC

**[PROPOSED] BRIEF FOR STATE OF NEW YORK AS AMICUS CURIAE
IN SUPPORT OF PLAINTIFFS' MOTION TO STAY**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................... ii

INTRODUCTION AND INTERESTS OF AMICUS ................................... 1

ARGUMENT .................................................................................................. 3

    I.    Defendants' Policies Harm the Public Interest by Chilling Participation in
          Immigration Court and State, Local, and Other Court Proceedings ................................. 3

    II.   Defendants' Policies Harm the Public Interest by Arbitrarily Depriving States,
          Communities, and Families of Noncitizens' Important Contributions. .......................... 7

    III.  Defendants' Policies Harm the Public Interest by Pushing Noncitizens into the
          Shadows, Thus Harming Public Safety and Community Welfare. ............................... 11

CONCLUSION ............................................................................................... 16

# TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*New York v. U.S. Immigr. & Customs Enf't*,
    431 F. Supp. 3d 377 (S.D.N.Y. 2019)....................................................................1, 3

**Laws**

Protect Our Courts Act, Ch. 322, 2020 N.Y. Laws 3563 ............................................1

**Miscellaneous Authorities**[*]

Abigail F. Kolker & Holly Straut-Eppsteiner, Cong. Rsch. Serv., *Unauthorized Immigrants:*
    *Frequently Asked Questions* (2022), https://www.congress.gov/
    crs_external_products/R/PDF/R47218/R47218.3.pdf ............................................9

Alejandro Portes et al., *The U.S. Health System and Immigration: An Institutional*
    *Interpretation*, 24 Sociol. Forum 487 (2009), https://www.researchgate.net/publication/
    46443215_The_American_Health_System_and_Immigration_An_Institutional_Interpret
    ation#full-text....................................................................................................14

American Civ. Liberties Union, *Freezing Out Justice: How Immigration Arrests at*
    *Courthouses Are Undermining the Justice System* (2018),
    https://www.aclu.org/report/freezing-out-justice....................................................7

American Immigr. Council, *Immigrants in the United States* (2021),
    https://www.americanimmigrationcouncil.org/fact-sheet/immigrants-in-the-united-
    states/................................................................................................................ 8-10

American Immigr. Council, *U.S. Citizen Children Impacted by Immigration Enforcement*
    (June 24, 2021), https://www.americanimmigrationcouncil.org/wp-content/uploads/
    2025/01/us_citizen_children_impacted_by_immigration_enforcement_0.pdf ................11, 15

Ana Martinez-Donate et al., *Between the Lines: A Mixed-Methods Study on the Impacts of*
    *Parental Deportation on the Health and Well-Being of U.S. Citizen Children*, 9 J.
    Migration & Health art. 100233 (2024),
    https://pmc.ncbi.nlm.nih.gov/articles/PMC11133918/pdf/main.pdf ........................10

Angela Irvine et al., Ceres Pol'y Rsch., *The Chilling Effect of ICE Courthouse Arrests: How*
    *Immigration and Customs Enforcement (ICE) Raids Deter Immigrants from Attending*
    *Child Welfare, Domestic Violence, Adult Criminal, and Youth Court Hearings* (2019),
    https://www.cerespolicyresearch.com/s/icereportfinal21oct2019-aytp.pdf.......................... 4-5

---

[*]All websites were last visited August 25, 2025.

**Miscellaneous Authorities**           **Page(s)**

Angelica S. Reina et al., *"He Said They'd Deport Me": Factors Influencing Domestic Violence Help-Seeking Practices Among Latina Immigrants*, 29 J. Interpersonal Violence 593 (2013) ....................................................................................................13

Assemb. Mem. in Support, in Bill Jacket for ch. 322 (2020), https://digitalcollections.archives.nysed.gov/index.php/Detail/objects/88569#........................3

Ben Markus & Allison Sherry, *ICE Detention, Deportation Can Deny Justice in Local Criminal Cases, Frustrating Prosecutors*, CPR News (Apr. 10, 2025), https://www.cpr.org/2025/04/10/ice-detention-deportation-impacts-victims-rights-judicial-system/ .......................................................................................................................11

Bryan Baker & Robert Warren, Off. of Homeland Sec. Stat., *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2018–January 2022* (2024), https://ohss.dhs.gov/sites/default/files/2024-06/2024_0418_ohss_estimates-of-the-unauthorized-immigrant-population-residing-in-the-united-states-january-2018%25E2%2580%2593january-2022.pdf ........................................................................8

Bureau of Lab. Stat., U.S. Dep't of Lab., *Labor Force Characteristics of Foreign-born Workers Summary* (2025), https://www.bls.gov/news.release/forbrn.nr0.htm.........................8

Carl Davis et al., Inst. on Tax'n & Econ. Pol'y, *Tax Payments by Undocumented Immigrants* (2024), https://sfo2.digitaloceanspaces.com/itep/ITEP-Tax-Payments-by-Undocumented-Immigrants-2024.pdf............................................................................9

Cora Engelbrecht, *Fewer Immigrants Are Reporting Domestic Abuse. Police Blame Fear of Deportation.*, N.Y. Times (June 3, 2018), https://www.nytimes.com/2018/06/03/us/immigrants-houston-domestic-violence.html................................................................4

Daniel Costa et al., *Immigrants and the Economy*, Econ. Pol'y Inst. (Apr. 15, 2025), https://www.epi.org/publication/immigrants-and-the-economy/...............................................8

David Dyssegaard Kallick, *New Yorkers Who Are Undocumented: Occupations, Taxes Paid, and Long-Term Economic Benefits*, Immigr. Rsch. Initiative (July 29, 2024), https://immresearch.org/publications/new-yorkers-who-are-undocumented-occupations-taxes-paid-and-long-term-economic-benefits/..........................................................................8

Elizabeth Fussell, *The Deportation Threat Dynamic & Victimization of Latino Migrants: Wage Theft & Robbery*, 52 Socio. Q. 593 (2011), https://onlinelibrary.wiley.com/doi/epdf/10.1111/j.1533-8525.2011.01221.x .................................................................. 13-14

Elizabeth M. McCormick, *Federal Anti-Sanctuary Law: A Failed Approach to Immigration Enforcement and a Poor Substitute for Real Reform*, 20 Lewis & Clark L. Rev. 165 (2016), https://law.lclark.edu/live/files/22081-lcb201art4mccormickpdf ..............................15

**Miscellaneous Authorities**                                                                  **Page(s)**

ICE Out of Cts. Coal., *Safeguarding the Integrity of Our Courts: The Impact of ICE Courthouse Operations in New York State* (2019), https://www.immigrantdefenseproject.org/wp-content/uploads/Safeguarding-the-Integrity-of-Our-Courts-Final-Report.pdf ........................................................................ 4-5

Irene Gibson, Off. of Homeland Sec. Stat., *Annual Flow Report: Refugees and Asylees: 2022* (Nov. 2023), https://ohss.dhs.gov/sites/default/files/2024-03/2023_0818_plcy_refugees_and_asylees_fy2022_v2_0.pdf ............................................................................ 8

Jacob Bucher et al., *Undocumented Victims: An Examination of Crimes Against Undocumented Male Migrant Workers*, 7 Sw. J. Crim. Just. 159, 164 (2010), https://www.swacj.org/_files/ugd/4d13c6_4055b291cb2c46e2a2c3e6a9491ca767.pdf .........13

James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times (Oct. 9, 2017), http://www.latimes.com/local/lanow/la-me-ln-undocumented-crime-reporting-20171009-story.html .................................................4

Jeffrey S. Passel & Jens Manuel Krogstad, *What We Know About Unauthorized Immigrants Living in the U.S.*, Pew Rsch. Ctr. (2024), https://www.pewresearch.org/short-reads/2024/07/22/what-we-know-about-unauthorized-immigrants-living-in-the-us/ ..............8

Jennifer Van Hook, *Analysis: Who Are the Immigrants Who Come to the U.S.? Here's the Data*, PBS News (Feb. 6, 2025), https://www.pbs.org/newshour/nation/analysis-who-are-the-immigrants-who-come-to-the-u-s-heres-the-data ........................................................8

Jill Cowan & Orlando Mayorquín, *In L.A., Fear of ICE Raids Created a Tense First Day of School*, N.Y. Times (Aug. 14, 2025), https://www.nytimes.com/2025/08/14/us/los-angeles-raids-school-patrols.html ..........................................................................15

Jill Theresa Messing et al., *Latinas' Perceptions of Law Enforcement:Fear of Deportation, Crime Reporting, and Trust in the System*, 30 J. Women & Soc. Work 328 (2015), https://www.researchgate.net/publication/276911374_Latinas%27_Perceptions_of_Law_Enforcement_Fear_of_Deportation_Crime_Reporting_and_Trust_in_the_System#full-text ...13

Leonard Greene & Rocco Parascandola, *NYPD Commissioner Reminds Cops to Ignore President Trump's Immigrant Deportation Orders*, N.Y. Daily News (Feb. 23, 2017), https://www.nydailynews.com/2017/02/23/nypd-commissioner-reminds-cops-to-ignore-president-trumps-immigrant-deportation-orders/ .......................................................12

Letter from Former Judges to Ronald D. Vitiello, Acting Dir. of U.S. Immigr. & Customs Enf't (Dec. 12, 2018), https://www.scribd.com/document/395488473/Letter-From-Former-Judges-Courthouse-Immigration-Arrests ....................................................................7

**Miscellaneous Authorities**                                                       **Page(s)**

Letter from Mary E. Fairhurst, Chief Justice, Wash., to John F. Kelly, Sec'y, Dep't of
    Homeland Sec. (March 22, 2017), https://www.courts.wa.gov/content/publicUpload/
    Supreme%20Court%20News/KellyJohnDHSICE032217.pdf ................................................. 7

Liz Robbins, *Police Fear Trump Immigration Orders May Handcuff Effort to Fight Gangs*,
    N.Y. Times (Feb. 22, 2017), https://www.nytimes.com/2017/02/22/nyregion/police-fear-
    trump-immigration-orders-may-handcuff-effort-to-fight-gangs.html ..................................... 12

Luis Ferré-Sadurní et al., *Inside the Epicenter of ICE Detentions in NYC*, N.Y. Times (Aug.
    4, 2025), https://www.nytimes.com/video/nyregion/100000010299370/inside-the-
    epicenter-of-ice-detentions-in-nyc.html ................................................................................... 5

Mark Greenberg et al., Migration Pol'y Inst., *Immigrant Families and Child Welfare
    Systems: Emerging Needs and Promising Policies* (2019),
    https://www.migrationpolicy.org/sites/default/files/publications/ImmigrantFamiliesChild
    Welfare-Final.pdf ...................................................................................................................... 11

Matthew Lisiecki & Gerard Apruzzese, Ctr. for Migration Stud., *Proposed 2024 Mass
    Deportation Program Would Socially and Economically Devastate American Families*
    (2024), https://cmsny.org/wp-content/uploads/2024/10/CMS-REPORT-Proposed-2024-
    Mass-Deportation-Program-Would-Socially-and-Economically-Devastate-American-
    Families.pdf .............................................................................................................................. 9

Matthew Lisiecki et al., *What Will Deportations Mean for the Child Welfare System?*
    Brookings Inst. (2025), https://www.brookings.edu/articles/what-will-deportations-
    mean-for-the-child-welfare-system/ ......................................................................................... 11

Miguel Pinedo & Christian Escobar, *Childhood Parental Deportations, Immigration
    Enforcement Experiences, and Posttraumatic Stress Disorder Among US-Born Latino
    Adults, 2021*, 114 Am. J. Pub. Health S495 (2024), https://ajph.aphapublications.org/
    doi/pdf/10.2105/AJPH.2024.307660?download=true ....................................................... 10-11

Nawal H. Ammar et al., *Calls to Police and Police Response: A Case Study of Latina
    Immigrant Women in the USA*, 7 Int'l J. Police Sci. & Mgmt. 230 (2005),
    https://niwaplibrary.wcl.american.edu/wp-content/uploads/2015/IMM-Article-
    PoliceResponse-3.5.05.pdf ....................................................................................................... 13

Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in
    Immigration Enforcement* (2013), http://www.policylink.org/sites/default/files/
    INSECURE_COMMUNITIES_REPORT_FINAL.PDF ......................................................... 12

Off. of N.Y. State Att'y Gen. et al., *Setting the Record Straight on Local Involvement in
    Federal Civil Immigration Enforcement: The Facts and the Laws* (2017),
    https://ag.ny.gov/sites/default/files/setting_the_record_straight.pdf ....................................... 13

**Miscellaneous Authorities**                                                                                                  **Page(s)**

Omar Martinez et al., *Evaluating the Impact of Immigration Policies on Health Status Among Undocumented Immigrants: A Systematic Review*, 17 J. Immigr. Minor. Health 947 (2015) ............................................................................................................................... 14

Pamela Constable, *For Immigrant Women, Domestic Violence Creates a Double Shadow*, Wash. Post (Dec. 2, 2013), https://www.washingtonpost.com/local/for-immigrant-women-domestic-violence-creates-a-double-shadow/2013/12/02/5626b85e-55e6-11e3-8304-caf30787c0a9_story.html ................................................................................................ 13

Randy Capps et al., Migration Pol'y Inst., *Immigration Enforcement and the Mental Health of Latino High School Students* (2020), https://www.migrationpolicy.org/sites/default/files/publications/immigration-enforcement-mental-health-latino-students_final.pdf ............ 15

Randy Capps et al., Urban Inst. & Migration Pol'y Inst., *Implications of Immigration Enforcement Activities for the Well-Being of Children in Immigrant Families: A Review of the Literature* (2015), https://www.migrationpolicy.org/sites/default/files/publications/ASPE-ChildrenofDeported-Lit%20Review-FINAL.pdf ................................... 10

Scott D. Rhodes et al., *The Impact of Local Immigration Enforcement Policies on the Health of Immigrant Hispanics/Latinos in the United States*, 105 Am. J. Pub. Health 329 (2015), https://ajph.aphapublications.org/doi/epdf/10.2105/AJPH.2014.302218 .................. 14

Southern Poverty L. Ctr., *Under Siege: Life for Low-Income Latinos in the South* (2009), https://www.splcenter.org/wp-content/uploads/files/d6_legacy_files/downloads/UnderSiege.pdf ............................................................................................................... 14

Steve Lopez, *LAPD Chief Beck Explains Why He Doesn't Want His Officers to Be Immigration Cops*, L.A. Times (Jan. 28, 2017), https://www.latimes.com/local/california/la-me-0129-lopez-beck-immigration-20170127-story.html ................................... 12

Tani G. Cantil-Sakauye, *California Chief Justice: The Courthouse Is Not the Place for Immigration Enforcement*, Wash. Post (Apr. 19, 2017), https://www.washingtonpost.com/opinions/california-chief-justice-the-courthouse-is-not-the-place-for-immigration-enforcement/2017/04/19/b35d5320-2054-11e7-be2a-3a1fb24d4671_story.html ....................................................................................................... 7

Victoria D. Ojeda et al., *Deported Men's and Father's Perspective: The Impacts of Family Separation on Children and Families in the U.S.*, 11 Front. Psychiatry art. 148 (2020), https://pmc.ncbi.nlm.nih.gov/articles/PMC7092634/pdf/fpsyt-11-00148.pdf ........................ 10

## INTRODUCTION AND INTERESTS OF AMICUS

The State of New York submits this amicus curiae brief in support of plaintiffs' motion for a stay of enforcement of new and unprecedented U.S. government policies of broadly authorizing arrests of noncitizens when they appear for their scheduled hearings at immigration courts, and permitting summary dismissal of the proceedings in which those noncitizens are seeking to prove their legal entitlement to remain in the United States. This Court should grant a stay of enforcement while this litigation is pending because, for the reasons explained in plaintiffs' motion papers, the new policies are unlawful and irreparably harmful to plaintiffs, and the equities and the public interest weigh heavily against permitting enforcement of the policies pending judicial review. This brief draws on the State's experience to elaborate on some critical harms to the public interest that result from the policies, which defendants arbitrarily failed to take into account in enacting the policies, and which weigh heavily in favor of a stay.

The State has a strong interest in this case because it and its residents have already suffered serious harms from federal immigration arrests in the State's courthouses that severely damaged trust in the justice system—and the State is now suffering many similar harms from defendants' new policies at issue in this case. The earlier harms from arrests in state and local courthouses prompted the State to bring a successful lawsuit in this Court, against U.S. Immigration and Customs Enforcement (ICE) and related defendants, to enforce the common-law privilege against courthouse arrests, *New York v. U.S. Immigr. & Customs Enf't*, 431 F. Supp. 3d 377 (S.D.N.Y. 2019), and then to enact a state law codifying that common-law privilege as applied to state and local courthouses, the Protect Our Courts Act, Ch. 322, 2020 N.Y. Laws 3563. But now ICE is pursuing large-scale immigration arrests in federal immigration courthouses pursuant to the new

policies challenged in this case. The new policies result in many of the same harms that prompted the State's earlier lawsuit.

*First*, as the State's experience makes clear, arresting individuals attending court proceedings chills participation in those proceedings, and can have spillover chilling effects on participation in other court proceedings. Accordingly, defendants' new policies chill noncitizens from appearing in immigration court to demonstrate their entitlement to remain in the United States, and the policies chill their participation in state and local court proceedings, too, thus harming the State's ability to prosecute crimes and ensure access to justice.

*Second*, indiscriminate courthouse arrests of noncitizens and summary dismissal of the proceedings in which they are seeking to prove their entitlement to remain in the United States arbitrarily deprive the State, communities, and families of these noncitizens' important contributions. Millions of immigrants, including many who are currently undocumented, are critical contributors to the economy, labor force, and tax base in States across the country—and particularly in New York.[1] These immigrants also are critical contributors to their communities in myriad other ways. And they are even more critical to their own families, which very often include U.S. citizens. Defendants' policies will inevitably result in separation of such families, causing grave harms not only to those who are arrested, but also to the children and other family members left behind—and to the State that may bear the costs of supporting them when family cannot.

*Third*, defendants' policies harm public safety and community welfare by forcing noncitizens into the shadows, because they cannot prove their entitlement to remain in the United

---

[1] As used in this brief, "undocumented" immigrants include many who entered the United States through proper ports of entry and are seeking lawful status, for instance, through asylum applications, or whose temporary protected status has ended.

States without risking arrest and deportation. As both the experience of state and local governments and ample social science evidence confirm, fear of immigration enforcement makes noncitizens and their loved ones less likely to report crimes, serve as witnesses, obtain healthcare, and otherwise participate in public life—thus leaving their communities vulnerable to crime, exploitation, and health problems. Such predictable harms to the public interest resulting from defendants' policies counsel strongly in favor of plaintiffs' requested enforcement stay while this litigation is pending.

## ARGUMENT

### I. DEFENDANTS' POLICIES HARM THE PUBLIC INTEREST BY CHILLING PARTICIPATION IN IMMIGRATION COURT AND STATE, LOCAL, AND OTHER COURT PROCEEDINGS.

Immigration arrests in courthouses severely chill participation in court proceedings, which in turn has a detrimental effect on the justice system and public safety. As New York's Legislature found in enacting the Protect Our Courts Act, use of courthouses to locate and arrest undocumented individuals leaves many immigrant community members, "documented and undocumented, afraid to access the justice system or respond to court summonses for fear of potentially life-changing immigration-related repercussions" for themselves or loved ones. Assemb. Mem. in Support, in Bill Jacket for ch. 322 (2020), at 8. The Legislature emphasized that "[t]his trend has a potentially damaging impact on all New Yorkers, not just immigrant communities, as the operation of our judicial system and public safety are undermined." *Id.*. This harmful chilling effect has always animated the privilege against courthouse arrests codified in the Protect Our Courts Act. *See, e.g.*, *New York v. U.S. Immigr. & Customs Enf't*, 431 F. Supp. 3d at 389 (privilege has always been intended "to encourage parties and witnesses 'to come forward voluntarily'" (quoting *Walpole v. Alexander* (1782), 99 Eng. Rep. 530, 531)). And, indeed, ICE itself recognized the harmful chilling

3

effect in substantially restricting courthouse arrests, before its recent unexplained reversal of position.[2]

Extensive evidence confirms that immigration arrests in courthouses lead members of immigrant communities to avoid the justice system altogether. One study of mixed immigration status families nationwide found that fear of ICE would cause 60% of respondents to avoid appearing in court as a witness, despite being a victim of a crime.[3] And the study found that fear of ICE would cause around 40% of respondents to avoid appearing as a defendant or on a bench warrant in criminal court, or in a child welfare hearing.[4] Thus, when ICE was previously making a large number of arrests in state and local courthouses, court systems and law enforcement agencies reported substantial declines in immigrant community members' participation in the justice system. For instance, domestic violence reports and requests for protective orders dropped significantly.[5]

---

[2] *Compare* Belsher Decl. Ex. 1, at 1, ECF Nos. 24-1 (2021 ICE policy severely restricting courthouse arrests because "[e]xecuting civil immigration enforcement actions in or near a courthouse may chill individuals' access to courthouses and, as a result, impair the fair administration of justice"), *with id.* Exs. 3-4, at 1, ECF Nos. 24-3, 24-4 (2025 ICE interim and final policies substantially broadening courthouse arrest authority without acknowledging previously recognized chilling effect).

[3] Angela Irvine et al., Ceres Pol'y Rsch., *The Chilling Effect of ICE Courthouse Arrests: How Immigration and Customs Enforcement (ICE) Raids Deter Immigrants from Attending Child Welfare, Domestic Violence, Adult Criminal, and Youth Court Hearings* 8 (2019). (For sources available on the internet, full URLs appear in the Table of Authorities.)

[4] *Id.* at 8-9.

[5] *See, e.g.*, ICE Out of Cts. Coal., *Safeguarding the Integrity of Our Courts: The Impact of ICE Courthouse Operations in New York State* 22 (2019) ("*Safeguarding Report*") (analyzing data from the New York State Unified Court System showing a decline in the issuance of orders of protection against intimate partners and family members at the same time ICE increased its presence in New York courthouses); James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times (Oct. 9, 2017); Cora Engelbrecht, *Fewer Immigrants Are Reporting Domestic Abuse. Police Blame Fear of Deportation.*, N.Y. Times (June 3, 2018).

New York's court system also reported a significant decline in participation in problem-solving courts and Family Justice Centers.[6]

ICE's recent policies at issue in this case have focused on facilitating arrests in immigration courthouses, and are therefore likely to have a particularly strong chilling effect on participation in immigration proceedings—leading many immigrants to abandon their efforts to prove their legal entitlement to remain in the United States, or to avoid supporting loved ones seeking to prove such legal entitlement.

But the chilling effect will not end there. Immigrant community members are unlikely to draw sharp distinctions between immigration courts and other courts, or to have confidence that ICE's courthouse arrests will be limited to immigration courts. In one study, nearly 50% of court-involved immigrant community members reported a belief that local judges and prosecutors help ICE with arrests.[7] And the immigration court that has been the epicenter of recent courthouse arrests in New York (at 26 Federal Plaza in Manhattan)[8] is within a block or two of numerous other state, local, and federal courts—amplifying the likelihood that noncitizens will fear, and therefore avoid, appearances at any of these courts.

Accordingly, district attorneys across New York report that, due to recent ICE arrests in immigration courthouses, many noncitizen victims and witnesses are expressing fears of

---

[6] *Safeguarding Report*, *supra*, at 23 (10% fewer foreign-born clients sought assistance in the State's Family Justice Centers in 2017 as compared to 2016, before increased ICE courthouse arrests).

[7] Irvine et al., *supra*, at 10 (reporting 48% of court-involved respondents believed that judges were helping ICE arrest people and 49% believed that prosecutors were helping ICE make arrests).

[8] *See* Luis Ferré-Sadurní et al., *Inside the Epicenter of ICE Detentions in NYC*, N.Y. Times (Aug. 4, 2025).

participating in *criminal* court proceedings. For example, the New York County District Attorney (DA) has found that the number of calls to its Immigrant Affairs and Worker Protection hotlines has almost completely dried up in recent months. The Albany County DA has had to send witness advocates to accompany investigators when they pick up victims to testify in court so that the victims are confident that the investigators are not immigration officials. And the Kings County DA has reported that multiple victims of domestic violence ceased cooperating with the prosecution out of fear that they would be arrested by ICE if they came to court to testify.[9] Legal services providers have reported similar recent fears of participation in civil court proceedings that have, for instance, deterred noncitizen clients from pursuing orders of protection in family court or claims against landlords in housing court.[10]

The State's justice system cannot effectively function in the face of this chilling effect. As a group of leading former New York judges recently explained, "[t]o properly function, courts must be places where individuals from all backgrounds and statuses can safely access the justice system."[11] If any such individuals do not see courts as safe spaces, "courts will be unable to provide the protection and services on which individuals depend, and courts' promise of equal justice under the law will remain unfulfilled."[12]

---

[9] *See* Amicus Brief of N.Y. District Attorneys in Support of Defs.' Mot. to Dismiss the Compl. 5, *United States v. New York*, No. 1:25-cv-744 (N.D.N.Y. Aug. 17, 2025), ECF No. 41.

[10] *See* Proposed Brief of Amici Curiae The Legal Aid Society et al. in Support of Defs.' Mot. to Dismiss 5-6, *United States v. New York*, No. 1:25-cv-744 (N.D.N.Y. Aug. 17, 2025), ECF No. 38.

[11] Brief of Amici Cur[i]ae Eight Former N.Y. York Judges & Justices in Support of Defs.' Mot. to Dismiss 8, *United States v. New York*, No. 1:25-cv-744 (N.D.N.Y. Aug. 17, 2025), ECF No. 39 ("Former Judges Brief").

[12] *Id.*

Moreover, when victims, witnesses, or defendants fail to appear because they are afraid, the State bears much of the cost because state employees—judges, prosecutors, public defenders, court reporters, interpreters, and security personnel—must spend their time and resources addressing otherwise unnecessary disruptions. In one study during ICE's earlier push to make state and local courthouse arrests, over half of the judges surveyed nationwide reported interruptions in their cases due to an immigrant crime survivor's fear of coming to court.[13] And judges around the country have raised concerns about the drain on scarce judicial resources caused by ICE arrests in or near courthouses.[14]

## II.  DEFENDANTS' POLICIES HARM THE PUBLIC INTEREST BY ARBITRARILY DEPRIVING STATES, COMMUNITIES, AND FAMILIES OF NONCITIZENS' IMPORTANT CONTRIBUTIONS.

Other serious harms to the public interest result from defendants' new policies through unnecessary arrest, detention, and deportation of noncitizens. By encouraging broad arrests of noncitizens and facilitating dismissal of their legitimate applications for immigration relief, the policies deprive the States of those noncitizens' contributions, and harm the families and communities of which they are—and often long have been—a crucial part.

---

[13] Am. Civ. Liberties Union, *Freezing Out Justice: How Immigration Arrests at Courthouses Are Undermining the Justice System* 2 (2018).

[14] *See, e.g.*, Letter from Former Judges to Ronald D. Vitiello, Acting Dir. of U.S. Immigr. & Customs Enf't 2 (Dec. 12, 2018) ("The environment created by these [ICE courthouse] incidents, in addition to the delays and rescheduling that result when fear prevents parties from appearing in court, only makes it more difficult for judges and court staff to do their jobs."); Tani G. Cantil-Sakauye, *California Chief Justice: The Courthouse Is Not the Place for Immigration Enforcement*, Wash. Post (Apr. 19, 2017) ("We encourage the vulnerable to come to our courthouses for help. But immigration arrests, or the fear of arrests at or near courthouses, disrupt court activities and the lives of those seeking justice."); Letter from Mary E. Fairhurst, Chief Justice, Wash., to John F. Kelly, Sec'y, Dep't of Homeland Sec. (Mar. 22, 2017) ("When people are afraid to appear for court hearings, out of fear of apprehension by immigration officials, their ability to access justice is compromised. Their absence curtails the capacity of our judges, clerks and court personnel to function effectively.").

The United States is home to approximately 45 million immigrants,[15] more than two-thirds of whom have lived in the country for over a decade.[16] Nearly 11 million of these immigrants are currently undocumented.[17] New York State, meanwhile, is home to about 4 million immigrants, about 640,000 of whom are currently undocumented.[18] Many of the undocumented immigrants are seeking to prove their legal entitlement to remain in the United States, for instance, through asylum applications. In recent years—before defendants' new policies—New York has had thousands of residents granted asylum each year, the second most of any State.[19]

The indiscriminate arrests of undocumented immigrants and dismissals of their applications for immigration relief resulting from defendants' policies deprive States of these individuals' substantial contributions, economic and otherwise. Immigrants constitute more than 19% of the American workforce,[20] contribute over $2 trillion to the United States' economic output,[21] and contribute over $650 billion in taxes.[22] In 2019, immigrant-owned businesses generated over $86

---

[15] Am. Immigr. Council, *Immigrants in the United States* (2021).

[16] Jennifer Van Hook, *Analysis: Who Are the Immigrants Who Come to the U.S.? Here's the Data*, PBS News (Feb. 6, 2025).

[17] Bryan Baker & Robert Warren, Off. of Homeland Sec. Stat., *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2018–January 2022* (2024); Jeffrey S. Passel & Jens Manuel Krogstad, *What We Know About Unauthorized Immigrants Living in the U.S.*, Pew Rsch. Ctr. (2024).

[18] David Dyssegaard Kallick, *New Yorkers Who Are Undocumented: Occupations, Taxes Paid, and Long-Term Economic Benefits*, Immigr. Rsch. Initiative (July 29, 2024).

[19] *See* Irene Gibson, Off. of Homeland Sec. Stat., *Annual Flow Report: Refugees and Asylees: 2022*, at 15-16 (Nov. 2023).

[20] Bur. of Lab. Stat., U.S. Dep't of Lab., *Labor Force Characteristics of Foreign-born Workers Summary* (2025).

[21] Daniel Costa et al., *Immigrants and the Economy*, Econ. Pol'y Inst. (Apr. 15, 2025).

[22] Am. Immigr. Council, *Immigrants in the United States*, *supra.*

billion in income and immigrant-led households added over $1.3 trillion to the United States economy as consumers.[23]

Undocumented immigrants alone constitute nearly five percent of the total national workforce and a much larger portion of the workforce in key job sectors such as agriculture and construction.[24] In recent years, nearly half of crop workers were undocumented.[25] In 2023, households headed by undocumented immigrants paid nearly $90 billion in taxes, including approximately $34 billion in state and local taxes, and added almost $300 billion to the economy as consumers.[26] Undocumented immigrants also contribute billions of dollars to Social Security and Medicare.[27] All of these contributions would be lost for any undocumented immigrants who are arrested and detained or deported pursuant to defendants' policies, substantially harming the immigrants' States and communities.

In addition, a large majority of households with an undocumented individual also include at least one United States citizen.[28] Indeed, over four million United States citizen children live

---

[23] *Id.*

[24] Abigail F. Kolker & Holly Straut-Eppsteiner, Cong. Rsch. Serv., *Unauthorized Immigrants: Frequently Asked Questions* 14 (2022).

[25] *Id.*

[26] Am. Immigr. Council, *Immigrants in the United States, supra.*

[27] Carl Davis et al., Inst. on Tax'n & Econ. Pol'y, *Tax Payments by Undocumented Immigrants* 3 (2024).

[28] *See* Matthew Lisiecki & Gerard Apruzzese, Ctr. for Migration Stud., *Proposed 2024 Mass Deportation Program Would Socially and Economically Devastate American Families* 3 (2024) (finding 4.7 million mixed-status households in the United States but only 1.1 million households containing only undocumented individuals).

with an undocumented parent,[29] and over nine million United States citizens live in a home with one or more undocumented family members.[30]

Arrest, detention, and deportation of undocumented family members pursuant to defendants' policies will have numerous detrimental effects. In addition to the severe harms imposed on those who are arrested themselves,[31] these individuals' arrest, detention, and deportation is deeply traumatic and disruptive for family members who are left behind. For children, it is linked to "extreme psychological distress, anxiety, depression, posttraumatic stress disorder (PTSD), and externalizing behaviors (such as aggression)."[32] And beyond emotional and psychological harm, these children often face additional hardships, including financial instability and housing and food insecurity resulting from the loss of a wage-earning parent, and disruptions in their education, such as increased school absences and lower academic engagement.[33] The long-term effects extend into adulthood. Adults who experienced parental deportation during childhood

---

[29] Am. Immigr. Council, *Immigrants in the United States, supra*.

[30] *Id.*

[31] For instance, this Court recently was compelled to issue a temporary restraining order in a lawsuit challenging unsanitary, inhumane, and overcrowded conditions and lack of access to legal counsel at a facility where ICE has been holding individuals arrested in immigration court in New York City. *See* TRO, *Barco Mercado v. Noem*, No. 25-cv-6568 (S.D.N.Y. Aug. 12, 2025), ECF No. 65.

[32] Miguel Pinedo & Christian Escobar*, Childhood Parental Deportations, Immigration Enforcement Experiences, and Posttraumatic Stress Disorder Among US-Born Latino Adults, 2021*, 114 Am. J. Pub. Health S495, S496 (2024); *see also* Randy Capps et al., Urban Inst. & Migration Pol'y Inst., *Implications of Immigration Enforcement Activities for the Well-Being of Children in Immigrant Families: A Review of the Literature* 6 (2015); Victoria D. Ojeda et al., *Deported Men's and Father's Perspective: The Impacts of Family Separation on Children and Families in the U.S.*, 11 Front. Psychiatry art. 148, at 10 (2020).

[33] Ojeda et al., *supra*, at 7, 9-10; Ana Martinez-Donate et al., *Between the Lines: A Mixed-Methods Study on the Impacts of Parental Deportation on the Health and Well-Being of U.S. Citizen Children*, 9 J. Migration & Health art. 100233, at 5 (2024).

are more than twice as likely to suffer from PTSD as those who did not endure such separation.[34]

Moreover, States inevitably bear much of the cost of family separation, whether through increased need for state support in mental and physical healthcare, housing, and other social services for children and other family members of those who are detained or deported, or, in some cases, through the need to take children left behind into state custody.[35]

Finally, sudden immigration arrests disrupt not only family and economic activity, but also all the other involvement the arrested individuals had in their communities and States, often for many years. For instance, the immigration arrests and subsequent detention and deportation can disrupt ongoing criminal or civil legal proceedings, impeding the ability of state and local courts to resolve cases involving the arrested individual.[36]

## III. DEFENDANTS' POLICIES HARM THE PUBLIC INTEREST BY PUSHING NONCITIZENS INTO THE SHADOWS, THUS HARMING PUBLIC SAFETY AND COMMUNITY WELFARE.

Because defendants' policies preclude noncitizens from proving their entitlement to remain in the United States without risking arrest at their required immigration court appearances, defendants' policies also encourage noncitizens to abandon their applications for immigration relief and retreat into the shadows—even if they would otherwise be entitled to legal status. In doing so, defendants' policies deter noncitizens and their loved ones from participating in public

---

[34] Pinedo & Escobar, *supra*, at S501.

[35] *See, e.g.*, Am. Immigr. Council, *U.S. Citizen Children Impacted by Immigration Enforcement* 3-4 (June 24, 2021); Matthew Lisiecki et al., *What Will Deportations Mean for the Child Welfare System?* Brookings Inst. (2025); Mark Greenberg et al., Migration Pol'y Inst., *Immigrant Families and Child Welfare Systems: Emerging Needs and Promising Policies* 17-19 (2019).

[36] *See, e.g.*, Ben Markus & Allison Sherry, *ICE Detention, Deportation Can Deny Justice in Local Criminal Cases, Frustrating Prosecutors*, CPR News (Apr. 10, 2025).

life, for instance, reporting crimes or seeking healthcare or other necessary services, out of fear of immigration authorities. This deterrence harms not only the justice system (see *supra* at 3-7), but public safety and community welfare more generally, and not only for noncitizens, but for everyone in their communities.

For instance, in one study conducted before defendants initiated their recent policies, half of immigrants and more than two-thirds of undocumented immigrants reported that they were reluctant to report or offer information about crimes to law enforcement for fear that officers would inquire about their or others' immigration status.[37] Those numbers will likely increase with defendants' new policies heightening immigrants' fears. That result is highly problematic for public safety because, as one New York county police commissioner explained, "[w]e solve crimes based on people coming to us. It's that simple."[38] For that reason, as a New York City police commissioner elaborated, "[i]t is critical that everyone who comes into contact with the [police], regardless of their immigration status, be able to identify themselves or seek assistance without hesitation, anxiety or fear."[39]

Moreover, if noncitizens do not feel comfortable reporting crimes,  as one major city police chief explained, "you create a shadow population" that "become[s] prey for human predators who extort them or abuse them because they know they won't contact the police."[40] Indeed, state and

---

[37] Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* 5-6 (2013).

[38] Liz Robbins, *Police Fear Trump Immigration Orders May Handcuff Effort to Fight Gangs*, N.Y. Times (Feb. 22, 2017).

[39] Leonard Greene & Rocco Parascandola, *NYPD Commissioner Reminds Cops to Ignore President Trump's Immigrant Deportation Orders*, Daily News (Feb. 23, 2017).

[40] Steve Lopez, *LAPD Chief Beck Explains Why He Doesn't Want His Officers to Be Immigration Cops*, L.A. Times (Jan. 28, 2017).

local law enforcement leaders agree that "[t]he reluctance of folks to come forward . . . is a much greater public safety problem than having people here who may be undocumented but are not committing other crimes," because "[c]riminals thrive in neighborhoods where people don't trust the police."[41]

Ample social science research confirms that fear of arrest and deportation among noncitizens harms public safety. Studies have repeatedly found that such fear makes noncitizens and their loved ones more likely to become victims of crime and other exploitation.[42] For instance, a number of studies have shown that abusive partners may utilize the threat of deportation in order to maintain power and control.[43] In one study of Latina women, 70% of domestic abuse victims said that fear of immigration authorities was a major reason keeping them from seeking the help needed to stop the abuse.[44]

Lack of trust in law enforcement also facilitates labor exploitation, because employers assume employees fearing immigration consequences will not report labor violations such as wage

---

[41] Pamela Constable, *For Immigrant Women, Domestic Violence Creates a Double Shadow*, Wash. Post (Dec. 2, 2013); *see also* Off. of N.Y. State Att'y Gen. et al., *Setting the Record Straight on Local Involvement in Federal Civil Immigration Enforcement: The Facts and the Laws* 14-17 (2017) (collecting similar commentary from additional law enforcement leaders).

[42] See, e.g., Elizabeth Fussell, *The Deportation Threat Dynamic & Victimization of Latino Migrants: Wage Theft & Robbery*, 52 Socio. Q. 593, 604 (2011); Jacob Bucher et al., *Undocumented Victims: An Examination of Crimes Against Undocumented Male Migrant Workers*, 7 Sw. J. Crim. Just. 159, 164, 166 (2010).

[43] *See, e.g.*, Jill Theresa Messing et al., *Latinas' Perceptions of Law Enforcement:Fear of Deportation, Crime Reporting, and Trust in the System*, 30 J. Women & Soc. Work 328, 330 (2015) (citing several studies); Angelica S. Reina et al., *''He Said They'd Deport Me'': Factors Influencing Domestic Violence Help-Seeking Practices Among Latina Immigrants*, 29 J. Interpersonal Violence 593, 601 (2013).

[44] Reina et al., *supra*, at 600. Another study found that the single largest factor independently affecting the rate at which battered immigrant Latina women called the police was immigration status. *See* Nawal H. Ammar et al., *Calls to Police and Police Response: A Case Study of Latina Immigrant Women in the USA*, 7 Int'l J. Police Sci. & Mgmt. 230, 237 (2005).

theft.[45] Indeed, in a number of studies, between 40% and 80% of mostly undocumented immigrants reported being victims of wage theft.[46]

Other research has concluded that immigrant community members often refrain from seeking vital governmental services other than law enforcement assistance—such as healthcare services—when they fear that accessing those services could result in arrest and deportation.[47] And as communicable diseases like COVID-19 illustrate well, refusal of anyone in the community to seek medical help can harm everyone—and impose major costs on the State—by amplifying the disease's spread.[48] At the same time, encouraging noncitizens to seek care promptly limits the extent to which delayed treatment leads to medical emergencies that further increase costs ultimately borne by the State.

Pushing parents into the shadows pushes their children into the shadows too—even when those children may be citizens or otherwise have lawful status. That means that children, too, may avoid necessary healthcare or other vital services. One study found that nearly a third of Latino

---

[45] *See, e.g.*, Fussell, *supra*, at 610.

[46] *See id.* at 604 (finding that two of five respondents reported wage theft since arriving in New Orleans post-Katrina, and citing Nik Theodore et al., *La Esquina (The Corner): Day Laborers on the Margins of New York's Formal Economy*, 9 WorkingUSA: J. Labor & Soc. 407 (Dec. 2006), finding a wage theft rate of approximately 50% in New York); Southern Poverty L. Ctr., *Under Siege: Life for Low-Income Latinos in the South* 6 (2009) (finding that 41% of those surveyed across the South had experienced wage theft, and 80% had in New Orleans).

[47] *See, e.g.*, Omar Martinez et al., *Evaluating the Impact of Immigration Policies on Health Status Among Undocumented Immigrants: A Systematic Review*, 17 J. Immigr. Minor. Health 947, 964 (2015); Scott D. Rhodes et al., *The Impact of Local Immigration Enforcement Policies on the Health of Immigrant Hispanics/Latinos in the United States*, 105 Am. J. Pub. Health 329, 332 (2015).

[48] *See, e.g.*, Alejandro Portes et al., *The U.S. Health System and Immigration: An Institutional Interpretation*, 24 Sociol. Forum 487, 207 (2009) (failure to treat noncitizens in the community "'increase[s] the risk of disease among all members of the community, not just those without papers'").

student participants—including students born in the United States—altered their routines due to deportation fears. Because of these fears, they did not seek medical care, attend religious services, and participate in afterschool activities, among other things.[49] Children whose families fear immigration authorities sometimes even avoid attending school,[50] and substantial local resources may be required to assuage fears enough to keep children in school.[51] Moreover, the consequences of such fears can be dire: in one disturbing incident, a child died when his parents delayed seeking medical care because they feared that hospital officials might report them to immigration authorities.[52] And such fears, and the resulting harms to public safety and community welfare, will only grow as a result of defendants' latest policies—underscoring the urgent need for plaintiffs' requested stay.

---

[49] Randy Capps et al., Migration Pol'y Inst., *Immigration Enforcement and the Mental Health of Latino High School Students* 2-3 (2020).

[50] *See* Am. Immigr. Council, *U.S. Citizen Children*, *supra*, at 2-3.

[51] *See, e.g.*, Jill Cowan & Orlando Mayorquín, *In L.A., Fear of ICE Raids Created a Tense First Day of School*, N.Y. Times (Aug. 14, 2025).

[52] Elizabeth M. McCormick, *Federal Anti-Sanctuary Law: A Failed Approach to Immigration Enforcement and a Poor Substitute for Real Reform*, 20 Lewis & Clark L. Rev. 165, 199 (2016).

## CONCLUSION

For all these reasons and those stated in plaintiffs' motion, this Court should grant

plaintiffs' requested stay.

Dated:    New York, New York
          August 25, 2025

                                        Respectfully submitted,

                                        LETITIA JAMES
                                          *Attorney General*
                                          *State of New York*
                                        BARBARA D. UNDERWOOD
                                          *Solicitor General*
                                        ESTER MURDUKHAYEVA
                                          *Deputy Solicitor General*

                                  By:   */s/ Philip J. Levitz*
                                        PHILIP J. LEVITZ
                                        *Senior Assistant Solicitor General*

                                        28 Liberty Street
                                        New York, New York 10005
                                        (212) 416-6325
                                        philip.levitz@ag.ny.gov

16

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2025, I filed the foregoing document on the Electronic

Case Filing system which caused the document to be served on all counsel of record.

Dated:   New York, New York
         August 25, 2025

                                                      _/s/ Philip J. Levitz_____
                                                      Philip J. Levitz