**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

LATINOJUSTICE PRLDEF, *et al.*,

      Plaintiffs,

      v.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, *et. al.*,

      Defendants.

Civil Action No. 25-8516 (LGS)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON THEIR EXPEDITED PROCESSING CLAIMS**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ........................................................................................................................ 2

    I.  The Trump Administration Turns to Immigration Court Arrests and Dismissals to Hit Immigration Arrest and Deportation Targets ............................................................................. 3

    II. The Public Pushes Back Against Courthouse Arrests and Dismissals ................................ 6

    III.  Widespread Media Coverage of Courthouse Arrests and Dismissals Raises Questions of Government Integrity ................................................................................................................ 8

    IV.  Plaintiffs' FOIA Requests about Defendants' Deportation Tactic and Attempts to Obtain Expedited Processing ............................................................................................................... 9

LEGAL STANDARD .................................................................................................................11

ARGUMENT ........................................................................................................................... 12

    I.  Plaintiffs' Requests Warrant Expedition for Involving "A Matter of Widespread & Exceptional Media Interest in Which There Exist Possible Questions About the Government's Integrity Which Affect Public Confidence" ....................................................... 13

        A.Defendants' Tactic Evokes Widespread & Exceptional Media Interest........................ 13

        B.Questions About Defendants' Deportation Tactic Exist, Affecting Public Confidence 15

    II. Plaintiffs' Requests Also Warrant Expedition for Compelling Need—AIC's Urgency to Inform the Public About Defendants' Deportation Tactic....................................................... 18

        A. AIC Is Primarily Engaged in Information Dissemination.......................................... 18

            1.AIC Is a News Media Requester for FOIA Purposes ............................................ 19

            2.The Records Show that AIC Primarily Engages in Information Dissemination ..... 20

        B. Urgency Exists to Inform the Public About Defendants' Deportation Tactic.............. 21

            1.The Deportation Tactic is Exigent to the Public ....................................................... 22

            2.Delayed Processing is Compromising Two Significant Interests ........................... 23

                i.The Public Has a Significant Interest in Obtaining Records Before the End of Ongoing Debate about Defendants' Deportation Tactic—An Issue of Vital National Importance .......................................................................................................... 23

                ii.The Public Has a Significant Interest in Obtaining Records about Defendants' Deportation Tactic Before Courts (Re)Address Its Legality.................................. 25

CONCLUSION........................................................................................................................ 25

## TABLE OF AUTHORITIES

**Cases**

*Al-Fayed v. CIA*, 254 F.3d 300 (D.C. Cir. 2001)........................................................................ 12, 22

*Am. C.L. Union of No. Cal. v. U.S. Dep't of Def.*, No. C 06-01698, 2006 WL 1469418 (N.D. Cal. May 25, 2006)............................................................................................................................ 22, 23

*Am. C.L. Union v. Dep't of Just.*, 321 F. Supp. 2d 24 (D.D.C. 2004) .................................... passim

*Am. Oversight v. U.S. Dep't of Just.*, 292 F. Supp. 3d 501 (D.D.C. 2018).............................. 13, 15

*Benitez v. Francis*, 25 Civ. 5937, 2025 WL 2371588, at *15 (S.D.N.Y. Aug. 13, 2025)................ 7

*Brennan Ctr. for Just. at N.Y.U. Sch. of L. v. Dep't of Com.*, 498 F. Supp. 3d 87 (D.D.C. 2020) ........................................................................................................................................... passim

*Cause of Action v. FTC*, 799 F.3d 1108 (D.C. Cir. 2015) ............................................................ 19

*Citizens for Ethics & Resp. in Wash. v. U.S. Dep't of Just.*, 436 F. Supp. 3d 354 (D.D.C. 2020) ............................................................................................................................................... 15

*Citizens for Ethics & Resp. in Wash. v. U.S. DOGE Serv.*, 769 F. Supp. 3d 8 (D.D.C. 2025) ........................................................................................................................................... passim

*Ctr. for Pub. Integrity v. U.S. Dep't of Def.*, 411 F. Supp. 3d 5 (D.D.C. 2019)............................ 23

*Democracy Forward Found. v. Dep't of Just.*, No. 25-cv-2597, 2025 WL 3268245 (D.D.C. Nov. 24, 2025). .......................................................................................................................... 12, 14, 15

*Democracy Forward Found. v. Off. of Mgmt & Budget*, 780 F. Supp. 3d 61 (D.D.C. 2025) ............................................................................................................................................. 20, 22

*Edmonds v. FBI*, No. Civ.A 02-1294, 2002 WL 32539613 (D.D.C. Dec. 3, 2002) ................ 15, 17

*Elec. Frontier Found. v. Off. of Dir. of Nat'l Intel.*, No. C 07-5278, 2007 WL 4208311 (N.D. Cal. Nov. 27, 2007)......................................................................................................................... 23

*Elec. Privacy Info. Ctr. v. Dep't of Def.*, 241 F. Supp. 2d 5 (D.D.C. 2003) .................................. 19

*Heritage Found. v. Env't Prot. Agency*, Civil Action No. 23-748, 2023 WL 2954418 (D.D.C. April 14, 2023).......................................................................................................................... 23, 25

*Kisor v. Wilkie*, 588 U.S. 558 (2019) ........................................................................................... 15

*Leadership Conf. on C.R. v. Gonzales*, 404 F. Supp. 2d 246 (D.D.C. 2005) ............................... 20

*Liberman v. U.S. Dep't of Transp.*, 227 F. Supp. 3d 1 (D.D.C. 2016) .......................................... 19

*Nat'l Day Laborer Organizing Network v. U.S. Immigr. & Customs Enf't*, 236 F. Supp. 3d 810 (S.D.N.Y. 2017) .......................................................................................................................... 12

*Protect Democracy Project v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293 (D.D.C. 2017).......... 20, 23

*Protect Democracy Project v. U.S. Dep't of Just.*, 498 F. Supp. 3d 132 (D.D.C. 2020) ............... 20

*Sanchez Mora v. U.S. Customs & Border Prot.*, Civil Action No. 24-3136, 2025 WL 1713252 (D.D.C. 2025) ............................................................................................................................. 11

*Serv. Women's Action Network v. Dep't of Def.*, 888 F. Supp. 2d 282 (D. Conn. 2012) ............... 19

**Statutes**

5 U.S.C. § 552.......................................................................................................................... passim

**Rules**

Fed. R. Civ. P. 56(a) ...................................................................................................... 12

**Regulations**

6 C.F.R. § 5.4 ................................................................................................................11
6 C.F.R. § 5.5 ......................................................................................................... passim
6 C.F.R. § 5.11 ......................................................................................................... 18, 19
8 C.F.R. § 239.2 ............................................................................................................. 5
8 C.F.R. § 1003.23 .......................................................................................................... 5
28 C.F.R. § 16.4 ............................................................................................................11
28 C.F.R. § 16.5 ...................................................................................................... passim
28 C.F.R. § 16.11 ..................................................................................................... 18, 19

**Filings on Other Dockets**

Am. Compl., *Pablo Sequen v. Albarran*, No. 25-cv-6487 (N.D. Cal. Sept. 18, 2025), ECF No. 32
............................................................................................................................. 7

Compl., *A.M. v. U.S. Dep't of Homeland Sec.*, 25-cv-2308 (S.D. Cal. Sept. 4, 2025), ECF No. 1
............................................................................................................................. 7

Compl., *African Cmtys. Together v. Lyons*, 25-cv-6366 (S.D.N.Y. Aug. 1, 2025), ECF No. 1 ...... 7

Compl., *Immigr. Advocs. Response Collaborative v. U.S. Dep't of Just.*, 25-cv-2279 (D.D.C. July 16, 2025), ECF No. 1 ............................................................................................. 7

Letter, *African Cmtys. Together v. Lyons*, 25-cv-6366 (S.D.N.Y. Mar. 24, 2026), ECF No. 77
.......................................................................................................................... 4, 8

Mem. Order, *Immigr. Advocs. Response Collaborative v. U.S. Dep't of Just.*, 25-cv-2279 (D.D.C. Mar. 17, 2026), ECF No. 50............................................................................. 7

Mot. to Dismiss, *A.M. v. U.S. Dep't of Homeland Sec.*, 25-cv-2308 (S.D. Cal. Mar. 30, 2026), ECF No. 30 ......................................................................................................... 8

Op. & Order, *African Cmtys. Together v. Lyons*, 25-cv-6366 (S.D.N.Y. Sept. 12, 2025), ECF No. 51.......................................................................................................................... 7

Order Staying Agency Action, *Pablo Sequen v. Albarran*, 25-cv-6487 (N.D. Cal. Dec. 24, 2025), ECF No. 155, *appeal docketed,* 26-1045 (9th Cir. Feb. 23, 2026) ........................................... 7

**Other Authorities**

Camilo Montoya-Galvez & Jacob Rosen, *Justice Department Tells Judge It Incorrectly Used ICE Memo to Justify Immigration Court Arrests*, CBS News (Mar. 26, 2026, 11:55 AM), https://tinyurl.com/4v8xxkmj ................................................................................ 9, 22

Chloe Atkins, *DOJ Says It Erroneously Relied on ICE Memo to Justify Immigration Courthouse Arrests*, NBC News (Mar. 25, 2026, 11:00 PM), https://tinyurl.com/yb9ppyhy .................. 9, 22

Dean Moses, *ICE Agents Seize Man Inside Manhattan Immigration Court, Wife Left Weeping in Aftermath*, AMNY (Mar. 18, 2026), https://tinyurl.com/yrx7t4uc...................................... 6, 22

Joseph Gunther, Quantifying Immigration Court Arrests (2025), https://tinyurl.com/34nx5jz6.... 6

Laila Khan & Chris Opila, *ICE Attorneys Increasingly Request Case Dismissals at Immigration Court Hearings—and Immigration Judges Grant Them on the Spot*, Am. Immigr. Council (Oct. 7. 2025), https://tinyurl.com/yk8kmwkt .................................................................................. 5

Letter from Hakeem Jeffries & Chuck Schumer, U.S. House of Representatives Democratic Leader & U.S. Senate Democratic Leader, to Mike Johnson & Jone Thune, Speaker of the U.S. House of Representatives & U.S. Senate Majority Leader (Feb. 4, 2026), https://tinyurl.com/ycxu96am ....................................................................................... 7

Mark Dow, *'There is No Law': Scenes from a Houston Immigration Court in Trump's America*, Common Dreams (Sept. 6, 2025), https://tinyurl.com/2f4f4jfd.................................................. 5

Molly Crane-Newman & Emma Seiwell, *ICE's Flawed Justification for Courthouse Arrests Sparks Demand to Free Those Detained*, New York Daily News (Mar. 28, 2026, 11:45 AM), https://tinyurl.com/49d7f96v ..................................................................................... 8, 22

Molly Crane-Newman, *Rep. Goldman Demands ICE Turn Over Full Account of Migrant Arrests Fueled by False Justification*, New York Daily News (Mar. 27, 2026, 10:23 AM), https://tinyurl.com/ahc8zmup ..................................................................................... 8, 22

U.S. Dep't of Just., Exec. Off. for Immigr. Rev., OCIJ Immigration Court Practice Manual (2026)................................................................................................................................ 4, 5

**INTRODUCTION**

In July 2025, Plaintiffs filed several Freedom of Information Act ("FOIA") requests with U.S. Immigration and Customs Enforcement ("ICE") and the Executive Office for Immigration Review ("EOIR") to provide the public with critical information about these agencies' new, controversial mass deportation tactic: ICE officers arresting asylum seekers and other immigrants who appear as required in EOIR immigration courts only to have ICE prosecutors move to dismiss their cases to facilitate expedited removal—deportation with less judicial oversight and fewer due process protections.

Records responsive to Plaintiffs' requests (policies for Defendants' tactic and communications about it between and within EOIR and ICE) will answer several key questions about the tactic and its impact on the integrity of the immigration court system. First, records will reveal the tactic's guidance, which ICE misrepresented for months in litigation and has yet to disclose. Second, records will show whether and how the immigration court system (EOIR) is colluding with immigration enforcement (ICE) to arrest noncitizens in immigration court, deport these individuals faster through expedited removal, and otherwise undermine immigrants' rights to due process. Finally, records will clarify concerning reports that EOIR immigration judges face institutional pressure to acquiesce to this tactic to keep their jobs. Indeed, dozens of U.S. senators and other members of Congress who share these concerns have asked ICE, EOIR, the U.S. Department of Homeland Security ("DHS"), and the U.S. Department of Justice ("DOJ") for the same records that Plaintiffs seek here.

Plaintiffs' requests merit expedited processing for two reasons. First, they involve "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 6 C.F.R. § 5.5(e)(1)(iv); 28

C.F.R. § 16.5(e)(1)(iv). Second, they present a compelling need for requested records, specifically the "urgency" of American Immigration Council ("AIC")—an organization "primarily engaged in disseminating information"—to "inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(i)(I), (v)(II). Each request's record for expedition references at least one hundred and forty-five articles about Defendants' deportation tactic, details extensive public controversy and debate about the tactic and its impact on the integrity of the immigration court system, and shows the requisite urgency to inform the public about these issues. This urgency has only increased since the start of litigation (and closure of the administrative records). Public concern with Defendants' tactic has partially shut down ICE and DHS since February. Last week, it grew even further; ICE withdrew representations about immigration court arrest guidance that it had made for months before another court in this District which had prompted that court to allow these arrests to continue during litigation.

Yet Defendants refuse to expedite any of Plaintiffs' requests. Instead, they insist on processing schedules that will drag record production well into 2028, if not later. Having tried and failed to obtain schedules that reflect the public's unique and urgent interest in responsive records, Plaintiffs now ask the Court to grant them partial summary judgment on their expedited processing claims and set a processing schedule commensurate with this interest.

## BACKGROUND

Last May, the Trump Administration launched a controversial, new initiative to meet its mass deportation targets: arresting asylum seekers and other immigrants in immigration courts after they appear for hearings in their cases and dismissing these cases to funnel noncitizens into expedited removal. This tactic, and its apparent coordination between ICE and EOIR, has

triggered immense and ongoing public pushback, received sustained and widespread media coverage, and spurred so much concern about the integrity of the immigration court system that months later, members of Congress are refusing to fund ICE and DHS unless Defendants stop courthouse arrests. Plaintiffs filed their FOIA requests in July to investigate these concerns and inform the ongoing public debate about the tactic's integrity and legality. Eight months later, they have received only a few hundred pages of records since Defendants insist on processing schedules that will drag production well into 2028 (and potentially beyond) rather than expediting Plaintiffs' requests and completing their processing as soon as practicable.

## I.   The Trump Administration Turns to Immigration Court Arrests and Dismissals to Hit Immigration Arrest and Deportation Targets

Upon taking office, the Trump Administration ordered ICE to arrest at least 1,200 to 1,500 noncitizens daily and threatened to hold agency officials accountable for missing those targets. ECF No. 39-6 § I.B.2. But ICE failed to meet its quotas. And with each passing month, the Administration grew more frustrated. In February 2025, it "remove[d] the agency's acting director and other top officials." *Id.* § I.B.3. A month later, in March, the Administration's Border Czar told the President that ICE "needs to increase the arrests, as their numbers were not high enough." *Id.* § I.B.4 (cleaned up). Then, in May, the White House's Deputy Chief of Staff and leading architect of its mass deportation policy "laid into top immigration officials for not hitting their arrest and deportation targets," which he increased to 3,000 arrests per day. *Id.* § I.B.5-6 (cleaned up). Finally, later that month, the Administration "replaced the acting … director" of ICE's Enforcement and Removal ("ERO") directorate—the unit tasked with immigration arrests and deportations. *Id.* § I.B.6.

Meanwhile, the Administration hatched a new, coordinated tactic for mass deportation: arresting noncitizens in immigration courts, dismissing their immigration cases, and deporting

3

them through expedited removal, rather than court proceedings. Leveraging its authority over the agencies involved in these proceedings, the Administration rescinded ICE and EOIR policies prohibiting arrests at immigration courts and purported to issue guidance permitting such arrests. *Id.* § I.A, C.2-3, C.6. *But see* Letter, *African Cmtys. Together v. Lyons*, 25-cv-6366 (S.D.N.Y. Mar. 24, 2026), ECF No. 77 (representing, after months of court filings to the contrary, that newly issued ICE guidance did not authorize immigration court arrests as previously claimed). Then, exploiting its control over prosecutions and adjudications in these proceedings and immigrants' obligation to appear in person absent permission otherwise, the Administration ordered ICE officers to arrest noncitizens in immigration court after their hearings and directed EOIR immigration judges to dismiss these individuals' cases to facilitate their more rapid deportation. ECF No. 39-6 § I.C.4-5, 7-11.

On May 20, ICE circulated an internal memo to prosecutors in its Office of the Principal Legal Advisor ("OPLA") instructing them to (i) "identify any noncitizen with an upcoming immigration court hearing who would be susceptible to expedited removal if their immigration court case were dismissed"; (ii) "move to dismiss this case" orally at that hearing; (iii) provide ERO officers with at least 48 hour notice of the hearing and "the exact location of the courtroom at which the … hearing is being held and an estimate of the time frame for the hearing" so these officers could plan for an arrest in court; and (iv) give the immigration courts "a 24-hour warning" of the arrest. *Id.* § I.C.5.

On May 30, EOIR leadership emailed Assistant Chief Immigration Judges ("ACIJs")[1] to advise them of ICE "[e]nforcement actions at or near" immigration courts and remind them of the new EOIR policy permitting these actions. *Id.* Ex. D at 98. The email also provided guidance

---

[1] ACIJs "oversee the operations of specific immigration courts." U.S. Dep't of Just., Exec. Off. for Immigr. Rev., OCIJ Immigration Court Practice Manual § 1.3(a)(3) (2026).

for adjudicating ICE oral motions to dismiss, directing ACIJs to advise the immigration judges they supervise to: (i) permit such motions without "additional documentation or briefing," *id.*, despite a regulation generally requiring "pre-decision motions" to "be in writing and … state, with particularity the grounds therefor," 8 C.F.R. § 1003.23(a); (ii) orally "decide[] [these motions] from the bench" on the day filed without "[a] 10-day response period" if ICE has met the regulatory burden, ECF No. 39-6 Ex. D at 98, notwithstanding immigration court procedures generally giving noncitizens ten days to respond, *ee* U.S. Dep't of Just., Exec. Off. for Immigr. Rev., OCIJ Immigration Court Practice Manual § 2.1(b)(1)(A), (2)(A) (2026); and (iii) dismiss cases where ICE shows that "circumstances have changed to such an extent that continuation is no longer in the best interest of the government," ECF No. 39-6 Ex. D at 98, even though the applicable standard is a change in the "circumstances *of the case*," 8 C.F.R. § 239.2(a)(7) (emphasis added).

ICE prosecutors and EOIR immigration judges immediately complied with these new policies. ICE oral motions to dismiss cases "increased by 633%" between May 19 and 20 and doubled the following day. *See* Laila Khan & Chris Opila, *ICE Attorneys Increasingly Request Case Dismissals at Immigration Court Hearings—and Immigration Judges Grant Them on the Spot*, Am. Immigr. Council (Oct. 7. 2025), https://tinyurl.com/yk8kmwkt. Between May 20 and July 28, immigration judges adjudicated eighty-six percent of ICE's 5,000 plus oral motions to dismiss on the spot and granted them at an eighty percent rate, *id.*, lest they be fired for not "rubberstamp[ing]" them, ECF No. 39-6 Ex. E ¶¶ 3-5 at 100; *see also* Mark Dow, *'There is No Law': Scenes from a Houston Immigration Court in Trump's America*, Common Dreams (Sept. 6, 2025), https://tinyurl.com/2f4f4jfd. And, in at least one known instance, OPLA prosecutors shared spreadsheets of cases "amenable" to dismissal with ERO officers so the officers could

5

identify noncitizens to target for arrest and then messaged these officers from courtrooms to alert them to their targets leaving the room. ECF No. 39-6 § II.A.23, 51; *see also* ECF No. 1-23 § II.C.4. Thanks to this coordination, ICE has arrested thousands of people in immigration courts since May (even where immigration judges have refused to dismiss their cases). Joseph Gunther, Quantifying Immigration Court Arrests 1 (2025), https://tinyurl.com/34nx5jz6. And it continues to do so today. *See* Dean Moses, *ICE Agents Seize Man Inside Manhattan Immigration Court, Wife Left Weeping in Aftermath*, AMNY (Mar. 18, 2026), https://tinyurl.com/yrx7t4uc.

## II.    The Public Pushes Back Against Courthouse Arrests and Dismissals

Defendants' coordinated deportation tactic has prompted immense public outrage and demands for greater transparency. Protestors have demonstrated against it outside immigration courts across the country. ECF No. 39-6 § V. Clergy, military veterans, political leaders, and ordinary public citizens are accompanying noncitizens to their court hearings to try to stop, and otherwise document, arrests. *Id.* § VI. Several editorials and editorial boards have criticized this "destructive enforcement policy" and urged the public to accompany noncitizens to immigration court and call their elected officials to express their opposition to this tactic. *Id.* § III. National, state, and local political leaders are decrying the deportation tactic on social media, in press conferences, and in amicus briefs. *Id.* § IV. Dozens of U.S. senators and members of the U.S. House of Representatives have written letters to ICE, EOIR, DHS, and DOJ to "express grave concern" with courthouse arrests and dismissals and ask the agencies for their guidance on this new tactic, their "email communications" about it, and "any materials" that mention "coordinat[ion] and cooperat[ion]" between ICE and EOIR. *Id.* Exs. H-J, M at 112-25, 149-56. And now members of Congress are refusing to fund ICE and DHS—partially shutting these agencies down, *see* ECF No. 45 at 3-4—unless ICE stops arresting noncitizens in immigration

6

court. Letter from Hakeem Jeffries & Chuck Schumer, U.S. House of Representatives

Democratic Leader & U.S. Senate Democratic Leader, to Mike Johnson & Jone Thune, Speaker

of the U.S. House of Representatives & U.S. Senate Majority Leader (Feb. 4, 2026),

https://tinyurl.com/ycxu96am.

Advocates and impacted individuals are also challenging the deportation tactic's legality

in lawsuits across the country. *See* Compl., *Immigr. Advocs. Response Collaborative v. U.S. Dep't

of Just.*, 25-cv-2279 (D.D.C. July 16, 2025), ECF No. 1; Compl., *African Cmtys. Together v.

Lyons*, 25-cv-6366 (S.D.N.Y. Aug. 1, 2025), ECF No. 1; Compl., *A.M. v. U.S. Dep't of Homeland

Sec.*, 25-cv-2308 (S.D. Cal. Sept. 4, 2025), ECF No. 1; Am. Compl., *Pablo Sequen v. Albarran*,

No. 25-cv-6487 (N.D. Cal. Sept. 18, 2025), ECF No. 32. Dozens of judges—including the Hon.

Judge Ho in this District—have ruled that specific immigration court arrests are unlawful and

ordered ICE and DHS to release the arrested noncitizens. *Benitez v. Francis*, 25 Civ. 5937, 2025

WL 2371588, at *15 (S.D.N.Y. Aug. 13, 2025) ("[T]reating attendance in immigration court as a

game of detention roulette is not consistent with the constitutional guarantee of due process.");

*see also* ECF No. 39-6 § VII.A & n.92 (gathering cases). Two courts—including one in this

District—have preliminarily stayed guidance for this tactic in their jurisdictions after concluding

that it is likely unlawful. *See* Op. & Order at 26-28, 46, *African Cmtys. Together v. Lyons*, 25-cv-

6366 (S.D.N.Y. Sept. 12, 2025), ECF No. 51 (staying the EOIR dismissal guidance in Manhattan

and the Bronx); Order Staying Agency Action at 18-34, 38, *Pablo Sequen v. Albarran*, 25-cv-

6487 (N.D. Cal. Dec. 24, 2025), ECF No. 155 (staying the ICE and EOIR courthouse arrest

guidance within ICE's San Francisco area of responsibility), *appeal docketed,* 26-1045 (9th Cir.

Feb. 23, 2026). And other challenges are progressing. *See* Mem. Order, *Immigr. Advocs.

Response Collaborative v. U.S. Dep't of Just.*, 25-cv-2279 (D.D.C. Mar. 17, 2026), ECF No. 50

(granting in part and denying in part defendants' motion to dismiss and ordering the parties to file a proposed schedule for future proceedings); Mot. to Dismiss, *A.M. v. U.S. Dep't of Homeland Sec.*, 25-cv-2308 (S.D. Cal. Mar. 30, 2026), ECF No. 30 (seeking dismissal of plaintiffs' challenge to immigration court arrests in the San Diego Immigration Court).

Defendants' conduct defending their deportation tactic in court is fueling further integrity concerns. Last week, DOJ attorneys told a court in this District that despite extensive coordination with ICE counsel, they had misstated the applicability of ICE guidance to immigration court arrests for months due to "agency attorney error" and obtained a ruling permitting these arrests to continue based on that misstatement that will have to be reconsidered. Letter, *African Cmtys. Together v. Lyons*, 25-cv-6366 (S.D.N.Y. Mar. 24, 2026), ECF No. 77. This "bombshell" "has sparked fury among attorneys and advocates[,] demands that those detained in the crackdown be freed," and at least one member of Congress to write a letter to ICE demanding answers. Molly Crane-Newman & Emma Seiwell, *ICE's Flawed Justification for Courthouse Arrests Sparks Demand to Free Those Detained*, New York Daily News (Mar. 28, 2026, 11:45 AM), https://tinyurl.com/49d7f96v; *see also* Molly Crane-Newman, *Rep. Goldman Demands ICE Turn Over Full Account of Migrant Arrests Fueled by False Justification*, New York Daily News (Mar. 27, 2026, 10:23 AM), https://tinyurl.com/ahc8zmup.

### III.    Widespread Media Coverage of Courthouse Arrests and Dismissals Raises Questions of Government Integrity

Consistent with this immense outrage and pushback, Defendants' deportation tactic has received enduring and pervasive media coverage. The N.Y. Times, PBS, NBC, CBS, CNN, USA Today, Fox News, MSNBC, National Public Radio, the Washington Post, and numerous other media outlets have published over two hundred and thirty articles on this tactic combined since May 20. ECF No. 39-6 § II & n.12. Many articles "feature the public controversy, doubt, and

questions about the integrity, propriety, and legality of immigration court arrests and dismissals." *Id.* § II.A (gathering over fifty examples). Several discuss potential "collusion between ICE and EOIR to facilitate immigration court arrests and dismissals." *Id.* § II.B (reviewing eight examples). And others allude to pressure on immigration judges to acquiesce to this tactic. *Id.* II.C (same). Media coverage of these issues continues in recent reporting on ICE's recent litigation "error." *See, e.g.*, Chloe Atkins, *DOJ Says It Erroneously Relied on ICE Memo to Justify Immigration Courthouse Arrests*, NBC News (Mar. 25, 2026, 11:00 PM), https://tinyurl.com/yb9ppyhy; Camilo Montoya-Galvez & Jacob Rosen, *Justice Department Tells Judge It Incorrectly Used ICE Memo to Justify Immigration Court Arrests*, CBS News (Mar. 26, 2026, 11:55 AM), https://tinyurl.com/4v8xxkmj.

## IV.  Plaintiffs' FOIA Requests about Defendants' Deportation Tactic and Attempts to Obtain Expedited Processing

Amidst this widespread media coverage, public controversy, and calls for greater transparency, Plaintiffs filed the FOIA requests at issue here with EOIR and ICE in July for certain DOJ and DHS records maintained by these agency components. ECF No. 1-1 (EOIR EOIR-ERO Comms); ECF No. 1-10 (EOIR Arrest Guidance); ECF No. 1-18 (ICE ERO-EOIR Comms); ECF No. 1-24 (Intra-ICE Comms); ECF No. 1-29 (ICE OPLA-EOIR Comms); ECF No. 1-34 (OPLA Arrest Guidance); ECF No. 1-39 (OPLA Dismissal Guidance); ECF No. 39-1 (EOIR Dismissal Guidance); ECF No. 39-8 (Intra-EOIR Comms); ECF No. 39-16 (EOIR EOIR-OPLA Comms).

Plaintiffs' requests seek three types of records to inform the public about Defendants' coordinated deportation tactic: (i) guidance for immigration court arrests and dismissals, ECF No. 1-10, ECF No. 1-34; ECF No. 1-39; ECF No. 39-1; (ii) communications between ICE and EOIR about this tactic, ECF No. 1-1; ECF No. 1-18; ECF No. 1-29; ECF No. 39-16; and (iii)

communications within ICE and EOIR about it, ECF No. 1-24; ECF No. 39-8. These records will address critical questions raised in reporting and by the courts and members of Congress about how and why Defendants are dismissing immigration cases and arresting noncitizens in immigration court; whether and how EOIR is colluding with ICE in these arrests and dismissals; and the extent to which immigration judges are acquiescing to this deportation tactic to keep their jobs.

Due to the public's need for prompt answers to these questions and eroding trust in the immigration system from leaving them unanswered, Plaintiffs asked Defendants to expedite their requests based on the widespread and exceptional media interest in the tactic and AIC's compelling need to inform the public about it. ECF No. 1-1 at 3-15; ECF No. 1-10 at 3-13; ECF No. 1-18 at 3-15; ECF No. 1-24 at 3-14; ECF No. 1-29 at 3-15; ECF No. 1-34 at 3-13; ECF No. 1-39 at 3-11; ECF No. 39-1 at 3-11; ECF No. 39-8 at 3-14; ECF No. 39-16 at 3-15. But Defendants have not done so. Instead, DHS and DOJ constructively denied all requests for expedition based on widespread and exceptional media interest by not adjudicating them before Plaintiffs sued (or supplemented their complaint), Opila Decl. ¶¶ 12, 20, 32, 44, 56, 62, 67, 72, 80, 86, ECF No. 54, let alone within the ten-day statutory deadline, 5 U.S.C. § 552(a)(6)(E)(ii)(I). Similarly, ICE and EOIR denied all requests to expedite for compelling need (albeit with variances in form and administrative posture).[2]

---

[2] Denials of expedited processing for compelling need take four forms and postures:

1. Constructive Denial in First Instance: ICE ERO-EOIR Comms Request, Intra-ICE Comms Request, and ICE OPLA-EOIR Comms Requests, *see* Opila Decl. ¶¶ 62, 67, 72;
2. Constructive Denial on Remand: EOIR-ERO Comms Request, *see id.* ¶ 11;
3. Constructive Denial on Appeal of Agency Decision to Close the FOIA Request Administratively: Intra-EOIR Comms Request, EOIR EOIR-OPLA Comms Request, and EOIR Dismissal Guidance Request, *see id.* ¶¶ 32, 44, 56; and
4. Pending Appeal of Denial: EOIR Arrest Guidance Request, OPLA Arrest Guidance Request, and OPLA Dismissal Guidance Request, *see id.* ¶¶ 15-20, 75-79, 83-86.

Defendants' stonewalling has continued in litigation despite the public's growing need for responsive records. *See* ECF No. 40 at 4 (still evaluating whether expedited processing is warranted four months into litigation); ECF No. 45 (opposing expedited processing without making arguments against it). DHS and DOJ have yet to participate in this litigation at all despite being responsible for processing responsive records by law. *See Sanchez Mora v. U.S. Customs & Border Prot.*, Civil Action No. 24-3136, 2025 WL 1713252, at *4-5 (D.D.C. 2025). And ICE and EOIR—components to whom DHS and DOJ have delegated this responsibility as to Plaintiffs' requests, *see* 6 C.F.R. § 5.4(a), (b); 28 C.F.R. § 16.4(a), (b)—are taking months to provide the search descriptions needed for the parties to meet and confer meaningfully (ICE) or insisting that processing records faster than 200 pgs./mo. is not viable since DOGE shrunk its FOIA unit (EOIR). ECF No. 40 at 4-6; *see also* ECF No. 46 ¶¶ 45-48, 55. Such delay threatens to drag the processing of responsive records well into 2028 (if not beyond) and leave urgent questions about the immigration court system's integrity unanswered in the interim. To avert this threat, Plaintiffs seek summary judgment on their expedited processing claims and an order directing all Defendants—not just ICE and EOIR—to process responsive records "as soon as practicable." 5 U.S.C. § 552(a)(6)(E)(iii).[3]

## LEGAL STANDARD

Defendants must expedite a FOIA request's processing where: (I) it "involve[s] … [a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence," 6 C.F.R. § 5.5(e)(1)(iv); 28

---

[3] Plaintiffs sought in good faith to meet and confer with Defendants to resolve this matter without the need for briefing or an order requiring expedited processing. However, the parties were unable to reach agreement, as EOIR insists on its 200 pgs./mo. processing rate, ICE declined to discuss processing rates due to the partial government shutdown, and DOJ and DHS declined to participate in the meet and confer for reasons not known to Plaintiffs.

11

C.F.R. § 16.5(e)(1)(iv); or (II) there is "a compelling need," such as "urgency to inform the public concerning actual or alleged Federal Government activity" if the "request [is] made by a person primarily engaged in disseminating information," 5 U.S.C. § 552(a)(6)(E)(i)(I), (v)(II).

"Agency action to deny … a request for expedited processing" or "failure by an agency to respond … to such a request" within ten days of filing is "subject to judicial review." *Id.* § 552(a)(6)(E)(iii). Review of "agency determinations of 'compelling need'" is *de novo*. *Al-Fayed v. CIA*, 254 F.3d 300, 307 (D.C. Cir. 2001). As is review of "constructive denial" of expedition for widespread and exceptional media interest. *Democracy Forward Found. v. Dep't of Just.*, No. 25-cv-2597, 2025 WL 3268245, at \*4 (D.D.C. Nov. 24, 2025) ("*DFF II*").

Expedited processing claims "are typically and appropriately resolved on summary judgment." *Nat'l Day Laborer Organizing Network v. U.S. Immigr. & Customs Enf't*, 236 F. Supp. 3d 810, 816 (S.D.N.Y. 2017). Evidence is limited to "the record before the agency."[4] 5 U.S.C. § 552(a)(6)(E)(iii). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## ARGUMENT

Plaintiffs' FOIA requests are entitled to expedited processing as a matter of law. There is no genuine dispute that their subject—ICE's and EOIR's coordinated deportation tactic of arresting noncitizens in immigration court and dismissing their immigration cases—is "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 6 C.F.R. § 5.5(e)(1)(iv); 28 C.F.R. §

---

[4] The Declaration of Christopher Opila authenticates and sets forth the administrative records for the requests to expedite the processing of Plaintiffs' FOIA requests. *See generally* Opila Decl..

16.5(e)(1)(iv). Nor is there any real dispute that these requests also involve a compelling need—AIC's urgency to inform the public about this tactic before public debate about it dissipates or courts address its legality. *See* 5 U.S.C. § 552(a)(6)(E)(i)(I), (v)(II).

I.    **Plaintiffs' Requests Warrant Expedition for Involving "A Matter of Widespread & Exceptional Media Interest in Which There Exist Possible Questions About the Government's Integrity Which Affect Public Confidence"**

The coordinated deportation tactic is "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 6 C.F.R. § 5.5(e)(1)(iv); 28 C.F.R. § 16.5(e)(1)(iv). The one hundred and forty-five or more articles on this tactic in each administrative record easily constitute "widespread and exceptional media interest." 6 C.F.R. § 5.5(e)(1)(iv); 28 C.F.R. § 16.5(e)(1)(iv). And the protests, lawsuits, court accompaniment, criticism in editorials and news coverage, and pushback from political leaders all show the existence of "possible questions about the government's integrity which affect public confidence." 6 C.F.R. § 5.5(e)(1)(iv); 28 C.F.R. § 16.5(e)(1)(iv).

A.  **Defendants' Tactic Evokes Widespread & Exceptional Media Interest**

Defendants' coordinated arrest and dismissal tactic has received widespread and exceptional media interest since it began last May. National, state, and local media outlets published almost an article a day for several months. *See, e.g.*, ECF No. 39-6 § II. This voluminous and sustained coverage in a gamut of publications more than exceeds the threshold for the media interest required for expedition under 6 C.F.R. § 5.5(e)(1)(iv) and 28 C.F.R. § 16.5(e)(1)(iv).

Courts find "widespread and exceptional media interest" based on the quantity of media coverage and the range of outlets participating in it. *See Am. C.L. Union v. Dep't of Just.*, 321 F. Supp. 2d 24, 32 (D.D.C. 2004) ("*ACLU I*") (finding "only a handful of articles" in "a variety of

13

publications" enough); *Am. Oversight v. U.S. Dep't of Just.*, 292 F. Supp. 3d 501, 505 (D.D.C. 2018) (noting DOJ's concession that five articles sufficed); *Brennan Ctr. for Just. at N.Y.U. Sch. of L. v. Dep't of Com.*, 498 F. Supp. 3d 87, 97 (D.D.C. 2020) (deeming "more than fifty recent articles from a variety of sources … considerably more than … suffic[ient]"); *Citizens for Ethics & Resp. in Wash. v. U.S. DOGE Serv.*, 769 F. Supp. 3d 8, 27 (D.D.C. 2025) ("*CREW*") (same); *DFF II*, 2025 WL 3268245, at *6 (being "hard pressed to think of stronger evidence" for "widespread and exceptional media interest" than "dozens of articles" in "a range of prominent newspapers … and well-known broadcast outlets").

The quantities of coverage and outlets provided here exceed the sums found sufficient in other cases. Plaintiffs' initial expedite requests from July alone point Defendants to over eighty articles on the deportation tactic by ABC News, the Associated Press, the Boston Globe, CBS News, CNN, Fox News, the Los Angeles Times, National Public Radio, the N.Y. Times, USA Today, the Washington Post and many other publications. ECF No. 1-1 at 4–9 & n.4; ECF No. 1-10 at 3–9 & n.2; ECF No. 1-18 at 4–10 & n.3; ECF No. 1-24 at 4–9 & n.2; ECF No. 1-29 at 4–10 & n.3; ECF No. 1-34 at 3–9 & n.2; ECF No. 1-39 at 2–8 & n.2; ECF No. 39-1 at 2–8 & n.2; ECF No. 39-8 at 4–9 & n.4; ECF No. 39-16 at 4–10 & n.4. With Plaintiffs' supplemental submissions, each expedited processing record now references at least one hundred forty-five articles on this tactic by dozens of prominent media outlets. *See* ECF No. 1-9 § II & n.10; ECF No. 1-15 at 5–6 & n.3; ECF No. 1-23 § II & n.10; ECF No. 1-37 at 6–13 & n.2; ECF No. 1-41 Ex. C § II & n.10; ECF No. 39-6 § II & n.10. Accordingly, there is no genuine dispute that Plaintiffs' FOIA requests concern "[a] matter of widespread and exceptional media interest." 6 C.F.R. § 5.5(e)(1)(iv); 28 C.F.R. § 16.5(e)(1)(iv).

### B. Questions About Defendants' Deportation Tactic Exist, Affecting Public Confidence

Defendants' coordinated deportation tactic is also a matter "in which there exist possible questions about the government's integrity which affect public confidence." 6 C.F.R. § 5.5(e)(1)(iv); 28 C.F.R. § 16.5(e)(1)(iv). This phrase requires a showing of public controversy or doubt about the soundness of government action. *See CREW*, 769 F. Supp. 3d at 27 (agency personnel "operat[ing] in secrecy" with access to payment systems and classified information without appropriate clearances); *Brennan Ctr.*, 498 F. Supp. 3d at 97 (accuracy and legality of agency census calculations); *Citizens for Ethics & Resp. in Wash. v. U.S. Dep't of Just.*, 436 F. Supp. 3d 354, 361 (D.D.C. 2020) (agency "mischaracteriz[ing] some of the core conclusions contained in a report of great public significance"); *ACLU I*, 321 F. Supp. 2d at 32 (potential unconstitutionality of a Patriot Act section); *Edmonds v. FBI*, No. Civ.A 02-1294, 2002 WL 32539613, at *3 (D.D.C. Dec. 3, 2002) (security lapses in an agency's translator program).

A variety of evidence may establish the requisite controversy or doubt: (i) news reports, *CREW*, 769 F. Supp. 3d at 27; *Brennan Ctr.*, 498 F. Supp. 3d at 97; (ii) the response of lawmakers and members of the public, *ACLU I*, 321 F. Supp. 2d at 32 (condemnation by members of Congress and in resolutions passed by state and local governments); *Edmonds*, 2002 WL 32539613, at *3 (concern by U.S. senators); and (iii) editorials, *ACLU I*, 321 F. Supp. 2d at 32.[5] Each type of evidence exists here and leaves no genuine dispute that Defendants' deportation tactic is a matter of public controversy.

---

[5] DOJ has previously attested to reading 28 C.F.R. § 16.5(e)(1)(iv) to mandate the first type of evidence (news reports about the controversy). *See Am. Oversight*, 292 F. Supp. 3d at 506. While the administrative records contain this type of evidence, deference to this reading is improper absent "an 'authoritative pronouncement' setting forth the interpretation—such as an official staff memorandum published in the Federal Register—that reflects the agency's 'fair and considered judgment.'" *DFF II*, 2025 WL 3268245, at *4 (quoting *Kisor v. Wilkie*, 588 U.S. 558, 576-79 (2019)). As for DHS, as far as Plaintiffs are aware, this agency has not interpreted 6 C.F.R. § 5.5(e)(1)(iv) the same way that DOJ once interpreted 28 C.F.R. § 16.5(e)(1)(iv), in part because its reading room contains no such

15

Starting with news reports, "[m]uch of the [news] coverage" in the administrative records "express[es] doubts" about the integrity, propriety, and legality of Defendants' deportation tactic. *E.g.*, ECF No. 1-9 § II.A (summarizing forty-six articles); ECF No. 1-15 at 6-7 & n.4 (citing a dozen articles); ECF No. 1-23 § II.A (summarizing forty-six articles); ECF No. 1-37 at 14 & n.3 (citing dozens of articles); ECF No. 1-41 Ex. C § II (summarizing twenty-five articles); ECF No. 39-6 § II.A (summarizing fifty-one articles). This coverage also decries the tactic for violating due process, forum shopping, and intimidating noncitizens into abandoning their immigration cases. *See, e.g.*, ECF No. 39-6 § II.A. And it raises concerns about collusion between ICE and EOIR and pressure on immigration judges to go along with arrests and dismissals to keep their jobs. *See, e.g.*, ECF No. 1-9 § II.B; ECF No. 1-15 at 6-7; ECF No. 1-23 § II.B-C; ECF No. 39-6 § II.B-C.

Turning to public responses, outrage at Defendants' deportation tactic and its dubious legality has prompted protests at immigration courts throughout the country. *E.g.*, ECF No. 39-6 § V. Similar aversion has motivated clergy, veterans, political leaders, and other members of the public "to accompany noncitizens to their immigration court dates to document dismissals and arrests, attempt to stop the latter, and help arrestees inform their families." *E.g.*, *id.* § VI. Likewise, opposition to this tactic has also prompted advocates to sue Defendants to stop it in four different federal courts (including one in this District). *E.g.*, *id.* § VII.[6] And local governments have filed amicus briefs in several lawsuits in support of stopping the tactic due to concerns that it is chilling noncitizens' participation in other judicial processes. *E.g.*, *id.* § IV.F-

---

interpretation. Accordingly, any such interpretation by DHS may not "be relied on, used, or cited as precedent by [the] agency against [Plaintiffs]." 5 U.S.C. § 552(a)(2).

[6] ICE's months-long misstatement of the guidance for immigration court arrests in one of these challenges adds to the controversy surrounding Defendants' deportation tactic but postdates the administrative process. *See supra* Background §§ II-III.

16

G, J-K; *cf. ACLU I*, 321 F. Supp. 2d at 29 (expediting a request for records about surveillance under the Patriot Act due to "resolutions passed by local and state governments urging Congress to narrow provisions of the Patriot Act").

Meanwhile, dozens of U.S. senators and members of the U.S. House of Representatives have "express[ed] grave concern" with Defendants' deportation tactic. *E.g.*, ECF No. 39-6 § IV.B-C, E, H (listing examples); *cf. Edmonds*, 2002 WL 32539613, at *1, *3 (expediting a request for records about security lapses in a FBI program due to U.S. senators "writ[ing] to the Attorney General … about their concerns regarding the[se] significant security issues"). They have also asked the agencies for the very records that Plaintiffs seek here: (i) "guidance … regarding the dismissal of ongoing court cases, followed by immediate ICE detention and expedited removal"; (ii) "email communications … and written notes of relevant meetings"; (iii) "material that mentions how [DOJ] and [EOIR] will coordinate and cooperate with enforcement operations"; and (iv) information about whether "immigration judges [are] being tracked on how they handle … cases" and the "specific purpose" of such tracking. *E.g.*, ECF No. 39-6 Ex. J at 119; *see also, e.g.*, *id.* Exs. H, M at 113, 152-54. Political leaders have also denounced courthouse arrests and dismissals on social media and in the press. *See, e.g.*, ECF No. 39-6 § IV (gathering examples); *cf. ACLU I*, 321 F. Supp. 2d at 30 n.6, 32 (expediting a request for Patriot Act surveillance records based on U.S. senators criticizing this surveillance in the press).

Concluding with editorials and other public statements, America Magazine, the Hill, and other media outlets have also published op-eds "decry[ing] the arrest[s] as a 'set up,'" "a farce," and "seriously disturbing." *E.g.*, ECF No. 39-6 § III; *cf. ACLU I*, 321 F. Supp. 2d at 30, 32 (expediting a request for surveillance records based on an editorial criticizing the practice). And at least one bar association has denounced the "deeply concerning pattern" of arrests and

17

dismissals in immigration courts for "violati[ng] … the fundamental due process rights owed to all." *E.g.*, ECF No. 39-6 § III.B.

Considering all this evidence, there is no real dispute that Defendants' deportation tactic is "[a] matter … in which there exist possible questions about the government's integrity which affect public confidence" as well as "[a] matter of widespread and exceptional media interest." 6 C.F.R. § 5.5(e)(1)(iv); 28 C.F.R. § 16.5(e)(1)(iv). Therefore, Plaintiffs' FOIA requests merit expedited processing under these regulations.

## II.    Plaintiffs' Requests Also Warrant Expedition for Compelling Need—AIC's Urgency to Inform the Public About Defendants' Deportation Tactic

Additionally, and alternatively, expedited processing of Plaintiffs' requests is also warranted for urgency to inform. "A requestor meets the statutory requirements for expedition on this basis if it is a person or entity 'primarily engaged in disseminating information,' and there is 'urgency to inform the public concerning actual or alleged Federal Government activity.'" *Brennan Ctr.*, 498 F. Supp. 3d at 98 (quoting 5 U.S.C. § 552(a)(6)(E)(v)). Each element exists here: AIC is primarily engaged in information dissemination and urgency exists to inform the public about immigration court arrests and dismissals before public debate about this new, high-profile enforcement tactic dissipates or courts (re)address its legality. Indeed, DOJ conceded as much in administrative processing by reversing EOIR decisions to deny expedition on this ground and "remand[ing]" Plaintiffs' expedited processing requests "to EOIR for further processing." ECF No. 1-6 at 2.

### A.  AIC Is Primarily Engaged in Information Dissemination

AIC is primarily engaged in information dissemination. A requester that is a "member of the news media" need not "establish that [it] primarily engages in information dissemination." 6 C.F.R. §§ 5.5(e)(3), 5.11(b)(6); 28 C.F.R. §§ 16.5(e)(3), 16.11(b)(6). Other requesters must make

18

this showing, though "information dissemination … need not be [their] sole occupation." 6 C.F.R. § 5.5(e)(3); 28 C.F.R. § 16.5(e)(3). AIC meets FOIA's standard for news media membership. Alternatively, it has shown that it primarily engages in information dissemination.

### 1.  AIC Is a News Media Requester for FOIA Purposes

As EOIR has already concluded in this case, AIC is a "news media requester." *E.g.*, ECF No. 39-6 Ex. P at 213. "[A]ny … entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience" is "a representative of the news media" for FOIA purposes. 5 U.S.C. § 552(a)(4)(A)(ii); *see also* 6 C.F.R. § 5.11(b)(6); 28 C.F.R. § 16.11(b)(6); *ACLU I*, 321 F. Supp. at 29 n.5. Such entities include blogs, *Liberman v. U.S. Dep't of Transp.*, 227 F. Supp. 3d 1, 10-13 (D.D.C. 2016), and cause-specific "nonpartisan, nonprofit organizations" like AIC, *Serv. Women's Action Network v. Dep't of Def.*, 888 F. Supp. 2d 282, 285, 287-88 (D. Conn. 2012) (gathering examples).

AIC gathers data, records, and other information about immigration topics of interest to the public from FOIA and other sources, which it then analyzes and discusses in blog posts, factsheets, reports, and interactive online tools. *E.g.*, ECF No. 39-6 § VIII. AIC's blog "publishes analysis, research, and opinions on immigration issues, with a focus on recent immigration events and hot topics"—including Defendants' deportation tactic. *E.g.*, *id.* § VIII.A, C.1. AIC's factsheets and reports simplify complicated issues of "immigration law and policy" for public digestion and explain the effects of changes in immigration policy on immigrants and the U.S. economy. *E.g.*, *id.* § VIII.B. And AIC's interactive online tools analyze immigration, census, and other data to model immigrants' economic benefits to communities. *E.g.*, *id.* § VIII.D.

AIC distributes these publications to the public for free through its website, newsletters, social media accounts, and conversations with journalists. *E.g.*, *id.* § VIII. "[P]osting content to a

public website" is "a means of distributing it." *Cause of Action v. FTC*, 799 F.3d 1108, 1123 (D.C. Cir. 2015). As is "disseminat[ing] [a] biweekly electronic newsletter," *Elec. Privacy Info. Ctr. v. Dep't of Def.*, 241 F. Supp. 2d 5, 15 (D.D.C. 2003), or "reach[ing] the public indirectly" by "issuing press releases to media outlets" and "partner[ing] with others," *Cause of Action*, 799 F.3d at 1125-26. "Between January 1, 2025, and September 25, 2025, 4.6 million different Internet users visited the Council's website, an average of 17,228 users per day." *E.g.*, ECF No. 39-6 § VIII. Many Council publications receive tens—if not hundreds—of thousands of views. *E.g.*, *id.* § VIII.A.1-5. And several publications reach the public at large by shaping immigration coverage in newspapers, television shows, and other traditional media outlets or being referenced in such coverage. *E.g.*, *id.* § VIII.B.1, 4-6, 8, D.

Consequently, there is no genuine dispute that AIC is a member of the news media for FOIA's purposes and need not establish that it "primarily engages in information dissemination" for its requests to warrant expedition based on urgency to inform. 6 C.F.R. § 5.5(e)(3); 28 C.F.R. § 16.5(e)(3).

### 2. The Records Show that AIC Primarily Engages in Information Dissemination

Alternatively, the administrative records establish that AIC primarily engages in information dissemination. "This standard requires that information dissemination be the main and not merely an incidental activity of the requestor." *Protect Democracy Project v. U.S. Dep't of Just.*, 498 F. Supp. 3d 132, 139 (D.D.C. 2020) (cleaned up). Nonpartisan, nonprofit law and public policy organizations whose core mission "is to inform public understanding on operations and activities of government" are "primarily engaged in disseminating information." *Protect Democracy Project v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293, 298 (D.D.C. 2017); *see also Democracy Forward Found. v. Off. of Mgmt & Budget*, 780 F. Supp. 3d 61, 73 (D.D.C. 2025)

20

("*DFF I*") (conceding that Democracy Forward Foundation is primarily engaged in disseminating information); *CREW*, 769 F. Supp. at 26-27 (same for CREW); *Brennan Ctr.*, 498 F. Supp. 3d at 98 (same for Brennan Center for Justice). As is a nonprofit whose website "serve[s] as the site of record for relevant and up-to-minute … news and information" on a topic. *Leadership Conf. on C.R. v. Gonzales*, 404 F. Supp. 2d 246, 260 (D.D.C. 2005).

AIC is a nonpartisan, "national leader" on immigration law and policy akin to the organizations mentioned above. *E.g.*, ECF No. 39-6 § VIII. The sheer volume of publications on immigration issues published by AIC since the start of 2025—over one hundred and counting, *see, e.g.*, *id.* § VIII— shows that information dissemination is AIC's primary activity, not merely incidental to its work. *Cf. Brennan Ctr.*, 498 F. Supp. 3d at 98 (referencing the number of articles a nonprofit wrote and published on its website when finding it "primarily engaged in information dissemination"). This output reflects "[c]ommunications, research, and other information dissemination [being] a primary tool for AIC to advance its mission"— "a nation where immigrants are embraced, communities are enriched, and justice prevails for all." *E.g.*, ECF No. 39-6 § VIII. It also demonstrates how AIC uses "its analysis, publications, and research" to "build 'positive public attitudes,'" "create a more welcom[ing] America," and "challeng[e] the myths and misinformation that too often dominate the political and public debate around immigration." *E.g.*, *id.* § VIII (quoting AIC's website). As such, the records establish that AIC is primarily engaged in information dissemination like the Brennan Center for Justice, CREW, Democracy Forward Foundation, and other peer organizations.

**B. Urgency Exists to Inform the Public About Defendants' Deportation Tactic**

Urgency exists to inform the public further about Defendants' deportation tactic before debate about this high-profile government action dies or courts address its legality. "[T]his element requires that (1) 'the request concerns a matter of current exigency to the American

21

public'; (2) 'the consequences of delaying a response would compromise a significant recognized interest'; and (3) 'the request concerns federal government activity.'" *Brennan Ctr.*, 498 F. Supp. 3d at 98 (quoting *ACLU I*, 321 F. Supp. 2d at 30). Defendants' tactic is undeniably a federal government activity and easily meets the other two requirements.

### 1. The Deportation Tactic is Exigent to the Public

Defendants' tactic is exigent to the public. Exigency exists where "the events at issue [in a FOIA request are] the subject of a currently unfolding story." *Al-Fayed*, 254 F.3d at 310. "Courts often look to objective markers like the volume of news articles and media reports to discern whether there is a current exigency." *DFF I*, 780 F. Supp. 3d at 73 (gathering cases); *see also* 6 C.F.R. § 5.5(e)(3) ("The existence of numerous articles published on a given subject can be helpful to establishing the requirement that there be an 'urgency to inform' the public on the topic."); 28 C.F.R. § 16.5(e)(3) (same). Courts repeatedly find fifty or so articles on a topic sufficient for exigency. *CREW*, 769 F. Supp. 3d at 27; *see also Am. C.L. Union of No. Cal. v. U.S. Dep't of Def.*, No. C 06-01698, 2006 WL 1469418, at *6 (N.D. Cal. May 25, 2006) (*"ACLU II"*) (finding exigency from "at least fifty-three separate articles on the [agency] program in the fifty-two days immediately prior to the FOIA requests"). As such, exigency existed when Plaintiffs filed their FOIA requests. *See supra* Argument § I.A (noting "over eighty articles on the deportation tactic" in Plaintiffs' initial expedite requests). And exigency continued through the administrative process. *See id.* (referencing additional submissions filed before litigation that bring each administrative record to between one hundred and forty-five and two hundred and thirty-two articles); ECF No. 39-6 § II & n.12 (citing one hundred and eleven articles from July 2025 to November 2025).[7]

---

[7] Defendants' deportation tactic continues to receive media coverage today (though such coverage is not part of the administrative records since it postdates the administrative process). *See, e.g.*, Moses, *supra* Background § I; Crane-

### 2.    Delayed Processing is Compromising Two Significant Interests

Delayed processing of Plaintiffs' requests is compromising two significant recognized interests: (i) "'obtaining in a timely fashion information vital to the current and ongoing debate surrounding the legality of' a high-profile government action," *E.g.*, *CREW*, 769 F. Supp. 3d at 27 (quoting *Protect Democracy Project*, 263 F. Supp. 3d at 299); and (ii) informing the public debate about the legality of government action before courts resolve it in pending litigation, *Heritage Found. v. Env't Prot. Agency*, Civil Action No. 23-748, 2023 WL 2954418, *4 (D.D.C. April 14, 2023).

### i.    The Public Has a Significant Interest in Obtaining Records Before the End of Ongoing Debate about Defendants' Deportation Tactic—An Issue of Vital National Importance

Responsive records are vital to the current debate about the legality of Defendants' tactic, a high-profile government action. "[O]ngoing public … debates about issues of vital national importance cannot be restarted or wound back." *Protect Democracy Project*, 263 F. Supp. 3d at 300 (quoting *Elec. Frontier Found. v. Off. of Dir. of Nat'l Intel.*, No. C 07-5278, 2007 WL 4208311, at *7 (N.D. Cal. Nov. 27, 2007)). Indicia for the requisite profile and importance include (i) the quantity of media coverage, *CREW*, 769 F. Supp. 3d at 27; (ii) the implication of individual liberties, *ACLU I*, 321 F. Supp. 2d at 29 (privacy rights); *ACLU II*, 2006 WL 1469418, at *7 (freedoms of association and expression); (iii) push back from lawmakers and state and local governments, *ACLU I*, 321 F. Supp. 2d at 29 (state and city resolutions condemning the federal activity); *Ctr. for Pub. Integrity v. U.S. Dep't of Def.*, 411 F. Supp. 3d 5, 12 (D.D.C. 2019) (congressional hearings); and (iv) public protest and other manifestations of opposition, *ACLU II*, 2006 WL 1469418, at *7.

---

Newman & Seiwell, *supra* Background § II; Crane-Newman, *supra* Background § II; Atkins, *supra* Background § III; Montoya-Galvez & Rosen, *supra* Background § III.

Under these criteria, Defendants' deportation tactic is so salient to the American public that obtaining information vital to the ongoing debate about its legality is a significant, recognized interest. Media coverage of this tactic far surpasses the coverage discussed by courts recognizing other high-profile government actions. *Compare, e.g.*, *CREW*, 769 F. Supp. 3d at 27 (at least fifty articles), *with supra* Argument § I.A (approximately thrice that many articles). This tactic implicates constitutional rights, particularly immigrants' right to due process. *E.g.*, ECF No. 39-6 § VII.A (gathering cases finding that this tactic has violated this right). Arrests and dismissals have also prompted rebuke from lawmakers and state and local governments as well as extensive opposition from the public. *See supra* Argument § I.B (discussing criticism on social media and in the press, congressional letters, and amicus briefs and recounting lawsuits, demonstrations outside immigration courts, and accompaniment to immigration court).[8]

Responsive records are critical to the debate about this tactic's legality and propriety. They will allow the public to assess (i) the guidance that exists for it; (ii) whether and how EOIR (the immigration judiciary) is colluding, coordinating, or cooperating with ICE (immigration enforcement) to arrest noncitizens in immigration courts and deport them through expedited removal; and (iii) the extent to which immigration judges face pressure to acquiesce to this tactic to keep their jobs. ECF No. 1-1 at 13; ECF No. 1-10 at 11; ECF No. 1-18 at 13; ECF No. 1-24 at 13; ECF No. 1-29 at 13; ECF No. 1-34 at 11; ECF No. 1-39 at 9; ECF No. 39-1 at 9; ECF No. 39-8 at 13; ECF No. 39-16 at 13. Media coverage has expressed alarm about each issue, *see supra* Argument § I.B, but not explained whether or how it exists, *see, e.g.*, ECF No. 39-6 § II.B (discussing coverage "alluding to collusion between ICE and the EOIR"); *id.* § II.C (recounting

---

[8] Debate about Defendants' deportation tactic has also reached such an apex that many U.S. senators and other members of Congress are refusing to fund ICE and DHS unless Defendants cease this tactic. *See supra* Background § II. The administrative records for expedited processing do not discuss this tactic's role in the partial government shutdown since the shutdown postdates the start of litigation and the closure of these records.

articles "alluding to pressure on immigration judges to grant dismissals"). "Congressional leaders have repeatedly expressed interest in similar questions, sending letters to [Defendants] seeking" the same records and information Plaintiffs seek in their FOIA requests. *CREW*, 769 F. Supp. 3d at 28 (cleaned up); *see also* Argument § I.B.

### ii.   The Public Has a Significant Interest in Obtaining Records about Defendants' Deportation Tactic Before Courts (Re)Address Its Legality

Alternatively, delayed processing of Plaintiffs' requests threatens the public's interest in having an informed debate about Defendants' deportation tactic during the pendency of litigation challenging it. The public has a significant interest in an informed debate about a governmental process—such as a "court case" challenging the lawfulness of agency action—before that process concludes. *Heritage Found.*, 2023 WL 2954418, at *4; *cf. Brennan Ctr.*, 498 F. Supp. 3d at 98-99 (census and reapportionment processes). Four challenges to Defendants' tactic are already pending, *see supra* Background § II, and receiving media coverage, *see, e.g.*, ECF No. 39-6 § VII.B. Two have obtained preliminary relief, while others are progressing rapidly. *Supra* Background § II. Records responsive to Plaintiffs' requests are vital to informing the public debate about this tactic's legality while courts (re)address it. *See supra* Argument § II.B.i.

Considering all this evidence, there is no real dispute that urgency exists to inform the public about Defendants' coordinated deportation tactic. And as AIC is primarily engaged in disseminating information, Plaintiffs' FOIA requests merit expedited processing under 5 U.S.C. § 552(a)(6)(E)(i)(I), (v)(II).

### CONCLUSION

For the reasons above, there is no genuine dispute as to any material fact that Plaintiffs' requests warrant expedited processing for both widespread and exceptional media interest and

urgency to inform. Defendants' coordinated deportation tactic involves "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 6 C.F.R. § 5.5(e)(1)(iv); 28 C.F.R. § 16.5(e)(1)(iv). Likewise, AIC is "primarily engaged in disseminating information," and there is "urgency to inform the public concerning" this tactic. 5 U.S.C. § 552(a)(6)(E)(v)(II). Therefore, Plaintiffs are entitled to summary judgment on their expedited processing claims arising from their FOIA requests as a matter of law. Plaintiffs respectfully request the Court to grant their motion for partial summary judgment and order Defendants to process their FOIA requests as soon as practicable.

Date: April 3, 2026

Daniel A. McGrath
Anisha Hindocha*
Robin Thurston*
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
dmcgrath@democracyforward.org
ahindocha@democracyforward.org
rthurston@democracyforward.org

*Appearing Pro Hac Vice

Respectfully submitted,

/s/    Chris Opila

Christopher ("Chris") Opila
Raul A. Pinto
AMERICAN IMMIGRATION COUNCIL
PMB2026
2001 L Street N.W., Suite 500
Washington, DC 20036
(202) 507-7699
copila@immcouncil.org
rpinto@immcouncil.org

Rex Chen
LATINOJUSTICE PRLDEF
475 Riverside Dr., Suite 1901
New York, NY 10115
(212) 219-3360
rchen@latinojustice.org

26

**CERTIFICATE OF COMPLIANCE**

I certify that foregoing complies with Local Rule 7.1, in that it contains 8,244 words exclusive of the caption, table of contents, table of authorities, signature blocks, and required certificates; is double-spaced except for headings, footnotes and block quotations; and is in twelve-point type except for text in footnotes.

/s/   Chris Opila
Christopher ("Chris") Opila
AMERICAN IMMIGRATION COUNCIL
PMB2026
2001 L Street N.W., Suite 500
Washington, DC 20036
(202) 507-7699 | copila@immcouncil.org

27